IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELIPE VICINI LLUBERES and
JUAN VICINI LLUBERES
c/o Patton Boggs, LLP
2550 M. Street, N.W.
Washington, DC 20037,

               Plaintiffs/Movants,

    v.

UNITED STATES DEPARTMENT OF
STATE
c/o Executive Office, Office of the Legal
Advisor, Room 5519
2201 C Street, N.W.
Washington, DC 20520-6310,

               Respondent.

CASE NO.

ORAL HEARING REQUESTED

## PLAINTIFFS' MOTION TO COMPEL DEPOSITION
## TESTIMONY PURSUANT TO SUBPOENAS

Movants Juan Vicini Lluberes and Felipe Vicini Lluberes ("Plaintiffs" or the "Vicinis"),

plaintiffs in the underlying action *Felipe Vicini Lluberes and Juan Vicini Lluberes vs. Uncommon Productions,*

*et al.,* Civil Action No. 07-CA-11623 (DPW) pending before the United States District Court of the

District of Massachusetts (the "Underlying Action"), hereby move this Honorable Court, pursuant

to Rules 26, 30, 45 and 37 of the Federal Rules of Civil Procedure, for an Order compelling the

United States Department of State ("State") to comply with five subpoenas seeking deposition

testimony from four current and/or former State employees (Bryan, Searby, Garuckis and Hertell)

as narrowed by Plaintiffs in discussions with State.

Pursuant to Local Rule 7(m), Plaintiffs' counsel contacted State's counsel prior to filing this

Motion, to which State refused to consent. Plaintiffs also hereby request an oral hearing of this

Motion pursuant to Local Rule 7(f). A Memorandum of Points and Authorities and a proposed

Order are attached for the Court's consideration.

Respectfully submitted,

Read K. McCaffrey
Stephen Díaz Gavin
Benjamin G. Chew (D.C. Bar # 418577)
Nigel L. Wilkinson (D.C. Bar # 466221)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
E-mail:    bchew@pattonboggs.com

*Counsel for Plaintiffs/Mounts Felipe Vicini Lluberes and
Juan Vicini Lluberes*

Dated: June 17, 2008

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of June 2008, I caused to be filed with the Court

and served via first class mail, postage prepaid, the foregoing Motion to Compel, Statement of

Points and Authorities in support thereof, a complete set of exhibits, and proposed Order, upon the

following:

Brian P. Hudak, Esq.
Assistant United States Attorney
U.S. Department of Justice
Judiciary Center
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone:      (202) 514-7143
E-mail:          brian.hudak@usdoj.gov

and

Royce Min, Esq.
Office of the Legal Adviser
United States Department of State
2201 C Street, N.W.
Washington, D.C. 20520
Telephone:      (202) 647-6823
E-mail:          minrb@state.gov

*Counsel for Respondent the United States Department of State*

Elizabeth C. Koch, Esq.
LEVINE SULLIVAN KOCH & SHULTZ, LLP
1050 17th Street, NW
Suite 800
Washington, DC 20036
Telephone: (202) 508-1100
Facsimile:  (202) 861-9888
E-mail:     ekoch@lskslaw.com

*Counsel for Defendants in the Underlying Action,*
*William Haney and Uncommon Productions LLC*

# Exhibit A

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a)   PLAINTIFFS**

Felipe Vicini Lluberes and Juan Vicini Lluberes

**DEFENDANTS**

Uncommon Productions LLC and William M. Haney III

**(b)**  County of Residence of First Listed Plaintiff    Dominican Republic
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    foreign (Los Angeles, CA)
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Jessica Block, Block & Roos, LLP, 60 State Street, Suite 3800, Boston,
MA 02109 (617) 223-1900

Attorneys (If Known)

CA 11623 DPW

07

**II. BASIS OF JURISDICTION**   (Place an "X" in One Box Only)

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government
Defendant

☒ 4   Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☒ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

**V.  ORIGIN**   (Place an "X" in One Box Only)

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
another district
(specify)

☐ 6   Multidistrict
Litigation

☐ 7   Appeal to District
Judge from
Magistrate
Judgment

**VI.  CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332

Brief description of cause:
libel and slander

**VII.  REQUESTED IN
COMPLAINT:**

☐   CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $ $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes   ☒ No

**VIII. RELATED CASE(S)
IF ANY**

(See instructions):

JUDGE

DOCKET NUMBER

DATE
08/31/2007

SIGNATURE OF ATTORNEY OF RECORD
Jessica Block

**FOR OFFICE USE ONLY**

RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only)____Felipe Vicini Lluberes v. Uncommon Productions LLC et al____

IN CLERKS OFFICE

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local
    rule 40.1(a)(1)).

2007 AUG 15 A 5

| | | | |
|---|---|---|---|
| ☐ | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT. | U.S. DISTRICT COURT DISTRICT OF MASS |
| ☐ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. | *Also complete AO 120 or AO 121 for patent, trademark or copyright cases |
| ☑ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891. | |
| ☐ | IV. | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. | |
| ☐ | V. | 150, 152, 153. | |

07-CA-11623 DPW

3.  Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this
    district please indicate the title and number of the first filed case in this court.

    _____

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                                    YES ☐        NO ☑

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC
    §2403)

                                                                    YES ☐        NO ☑

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                                    YES ☐        NO ☐

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                                    YES ☐        NO ☑

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of
    Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                                    YES ☐        NO ☑

    A.    If yes, in which division do all of the non-governmental parties reside?

          Eastern Division ☐          Central Division ☐          Western Division ☐

    B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,
          residing in Massachusetts reside?

          Eastern Division ☑          Central Division ☐          Western Division ☐

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes,
    submit a separate sheet identifying the motions)

                                                                    YES ☐        NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME   Jessica Block
ADDRESS   Block & Roos, LLP, 60 State Street, Suite 3800, Boston, MA 02109
TELEPHONE NO.   (617) 223-1900

(CategoryForm.wpd  - 5/2/05)

**IN THE UNITED STATES DISTRICT COURT** ~~FILED~~
**FOR THE DISTRICT OF MASSACHUSETTS** CLERKS OFFICE

2007 AUG 31  A 9: 5ᵗ

U.S. DISTRICT COURT
DISTRICT OF MASS.

FELIPE VICINI LLUBERES )
and )
JUAN VICINI LLUBERES )
)
Plaintiffs, )
)
v. )
)
UNCOMMON PRODUCTIONS, LLC )
and )
WILLIAM M. HANEY, III, )
)
Defendants. )
)

**0 7 CA 1 1 6 2 3 DPW**
Civil Action No.

MAGISTRATE JUDGE MBB

## COMPLAINT

Plaintiffs Felipe Vicini Lluberes ("Felipe Vicini") and Juan Vicini Lluberes ("Juan

Vicini") (collectively, "Plaintiffs" or the "Vicinis"), by and through their undersigned counsel,

hereby bring their Complaint for preliminary and permanent injunctive relief and compensation

for damages to their personal reputations against Defendants Uncommon Productions, LLC

("Uncommon Productions") and William M. Haney, III ("Haney"), for defamation (libel and

slander) and declaratory judgment, alleging as follows:

### The Parties

1.     Plaintiff Felipe Vicini is a citizen and resident of the Dominican Republic.

2.     Plaintiff Juan Vicini is a citizen and resident  of the Dominican Republic.

3.     Felipe Vicini and Juan Vicini are members of the Vicini family of the Dominican

Republic.  The Vicini family, including the Plaintiffs, owns and operates its sugar-related

business in the San Pedro de Macorís area through a company named Cristóbal Colón, C. por A

("CC"). CC owns and operates sugar cane fields, processing centers and a sugar mill and related equipment in the San Pedro de Macorís area. The sugar produced is, in turn, sold to customers around the world. The United States is one of its largest markets

4.      Neither CC nor any of the businesses managed and operated by the Vicini Family are public companies. CC and the individual members of the Vicini family treasure their privacy, do not seek publicity and rarely appear in the media in the Dominican Republic or elsewhere. Although the members of the Vicini family have contributed numerous resources to charitable and other eleemosynary activities over the past 100 years in the Dominican Republic, they do so discreetly, in the background and without seeking publicity for those efforts.

5.      The Vicinis are neither public figures generally nor limited purpose public figures. Indeed, beginning at 10:45 into *The Price of Sugar*, while a picture of Felipe Vicini is shown on the screen, the film's narrator states that:

> "Despite their prominence, they [Juan and Felipe Vicini] keep out of the public eye. There are few published photographs of the family, and they are rarely mentioned in the [Dominican] press."

6.      Thus, Defendants' creation, marketing, release and distribution of *The Price of Sugar*, as described herein, come as an unwarranted and undeserved intrusion into that privacy. Though *The Price of Sugar* is rife with egregious misstatements, inaccuracies, fabricated scenes, false, misleading and defamatory statements about the Vicinis, other members of the Vicini family, CC, and the Dominican Republic itself, examples of which are provided *infra* at ¶36, the Vicinis seek relief and recovery only as to those statements that constitute defamation *per se* and only to the extent that they have damaged, and threaten to irreparably harm, their personal reputations.

2

7.    Defendant Uncommon Productions, LLC, is a California company with its principal place of business at 6305 Yucca St., 7th floor, Los Angeles, California. Uncommon Productions is registered in Massachusetts as a limited liability company and maintains its only other office at 282 Moody St., Suite 309, Waltham, Massachusetts. Uncommon Productions is an independent film production company in the business of producing both documentaries and feature films.

8.    Defendant William M. Haney, III, is an individual residing at 61 Lincoln Road, Wayland, Massachusetts, and the co-owner, partner, director, and producer of Defendant Uncommon Productions. Haney also owns property in Centerville, Massachusetts and Cotuit, MA.

## Jurisdiction and Venue

9.    The Court has jurisdiction pursuant to 28 U.S.C. § 1332 in that the action is between citizens of Massachusetts and citizens of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs, and pursuant to 28 U.S.C. § 2201, in that a genuine controversy exists between Plaintiffs and Defendants..

10.    Venue in this District is proper pursuant to 28 U.S.C. § 1391 in that the Defendants reside in this District and a substantial part of the events, acts, and omissions giving rise to the Plaintiff's claims occurred in this District.

11.    The Vicinis are aggrieved by Defendants' defamatory statements of fact that have resulted in injuries sustained by the Plaintiffs in Massachusetts and elsewhere.

## Facts Common to All Counts

12.    Defendants have created and marketed a film titled *The Price of Sugar*, which was released and distributed in 2007. Although Defendants claim the film is a documentary

3

regarding job conditions faced by workers in the sugar industry of the Dominican Republic and the role of the Plaintiffs and the government of the Dominican Republic in creating those alleged conditions, *The Price of Sugar* is riddled with multiple malicious falsehoods and fabrications about the Vicinis. Indeed, the film is a carefully constructed and intentional effort to damage the Plaintiffs' personal reputations.

13.     Defendants showed *The Price of* Sugar to members of the United States House of Representatives and staff in or about November and December 2006, falsely representing the film to be an accurate documentary and account. The *Price of Sugar* has also been shown to the general public in Massachusetts and other venues on at least the following occasions: March 11 and 13, 2007 at the South by Southwest Festival in Austin, Texas; May 18, 2007 at the "Esclaves Au Paradis" (Slaves in Paradise) symposium in Paris, France; May 26 and 29, 2007 at the Seattle International Film Festival; June 13 and 15, 2007 at the SILVERDOCS Film Festival in Silver Spring, Maryland; June 15 and 17, 2007 at the Nantucket Film Festival in Nantucket, Massachusetts; June 16 and 17, 2007 at the Provincetown Film Festival in Provincetown, Massachusetts; June 21, 2007 at the Avignon Film Festival in Avignon, France; August 9, 2007 at the Four Corners Arts Center in Tiverton, Rhode Island; August 9, 2007 at the Screening Room in Dennis, Massachusetts; and from August 17 through August 23, 2007 at ArcLight Hollywood in Los Angeles, California.

14.     Defendants have scheduled additional showings on September 13, 2007 as part of the International Black Docufest at the High Museum of Art in Atlanta, Georgia; September 19 through September 23, 2007 as part of the "Slaves in Paradise" exhibit at the Third International Film Festival in Montreal, Canada; September 26, 2007 at Village East in New York City;

October 19, 2007 at the Music Hall in Beverly Hills California; and November 2, 2007 at Lumiere in San Francisco, California.

15.    Defendants also maintain a website for *The Price of Sugar*, www.thepriceofsugar.com. The website, which includes a trailer for the film, states that Father Christopher Hartley "discovers shocking examples of modern-day slavery intrinsic to the global sugar trade" and lists Defendant Haney as the film's director, producer, and writer. The implication of this statement, combined with the images of a building bearing the Vicini name, is that the Vicinis are responsible for such examples of modern-day slavery, a malicious and false accusation.

16.    The website's "Director's Statement" represents that "Haitian children can be bought even today and for decades part of the annual harvest has been luring Haitian men into the fields where, as illegal aliens, they are systematically denied basic human rights by both the government and wealthy plantation owners." Again, in the context of the trailer containing the Vicini name, the clear implication is that the Vicinis traffic in Haitian children, a false and malicious accusation.

17.    The website advises consumers to "[w]rite your congressman and ask him or her to make sure the full civil and labor rights of the cane workers are respected and guaranteed in exchange for the opportunity to export Dominican sugar to the U.S. market." The website further urges consumers to: "Buy Fair Trade Certified sugar and sweets made with Fair Trade sugar. Fair Trade sugar ensures that cooperatives of small-scale sugarcane growers receive a fair price for their crops and that critical protections are provided to any laborers they employ." It then provides graphical links to four organizations that purport to "certify" products as being

5

produced in agreement with these "Fair Trade" principles. These organizations do not "certify" the CC sugar.

18.    The Vicinis have filed suit against the Defendants to obtain relief from a number of false and defamatory statements of alleged fact made by the Defendants about them in their film *The Price of Sugar*. Defendants' defamatory statements of purported fact about the Vicinis are undisputedly false and were made either with negligent disregard to the truth of the statements about the Vicinis, or with actual malice, because the Defendants made their false statements of fact with knowledge or reckless disregard that the "facts" in their statements were false.

## Defendants Repeatedly Defame the Vicinis in *The Price of Sugar*

19.    In *The Price of Sugar*, Defendants repeatedly describe alleged negative conditions for workers in the Dominican Republic sugar industry generally by falsely implying such negative conditions exist among workers specifically employed by the Vicinis. For example, the film depicts and describes bateyes (sugar workers' villages) as places where Dominicans allegedly rarely go, places of squalor, and refers to them as the "Vicini bateyes."

20.    The film repeatedly refers to the Vicini family as the owners of most of the plantations in a particular church parish in which sugar plantation workers allegedly suffer from adverse conditions, and the film includes images of a building associated with the Vicini family, the J.B. Vicini building, also known as "Casa Vicini." There are dozens of references in the narrative words and images in the film to the Vicini family in connection with the sugar industry in the Dominican Republic. Those words include implications that Vicini family members advocate their interests in the sugar industry by improperly influencing public officials and law enforcement officers in the Dominican Republic.

6

21.    The film includes a number of photographic images of various members of the Vicini family, including Felipe and Juan Vicini, images of buildings known to be owned by the Vicini family and images of various private residences in which members of the Vicini family reside, alongside narrative words and images regarding the sugar industry in the Dominican Republic.  Defendants purposefully included these images to make viewers believe that the Vicinis were responsible for the negative conditions described by the narrator.

## Defendants' False and Defamatory Statements that the Vicinis Engaged In Criminal Conduct

22.    Throughout *The Price of Sugar*, Defendants repeatedly and falsely state or imply that the Vicinis have been and are involved in myriad criminal acts and behavior.

23.    By stating in the film that judges in the Dominican Republic would be reluctant to take a case involving death allegedly attributable to the Vicinis, Defendants falsely implied that Plaintiffs committed murder and would exercise illegal methods to obstruct justice.

24.    Defendants also falsely juxtaposed references to the Plaintiffs with images of a worker who had been beaten, to create the false factual implication that the Vicinis assault and batter their employees.  This implication is false on its face, and the images depict a worker who never worked for the Vicinis.

25.    *The Price of Sugar* also repeatedly creates the false implication that the Vicinis took actions to conceal their acts by refusing to attend international meetings (which the Vicinis were not asked to attend), and by threatening dissenters and investigators.

26.    The film even contains allegations that the Vicinis intended to murder a priest: Fr. Hartley.

7

27.    Throughout the film, Defendants also falsely allege that the Vicinis bribed or paid off various individuals in connection with the sugar industry, both to obtain favorable treatment and to create public disturbances.

## Defendants' False Statements and Representations Regarding Adverse Worker Conditions in CC's Sugar Business

28.    Defendants repeatedly and falsely state or imply in the film that conditions for workers employed by the Vicinis are inhospitable, deficient, and unsafe. Defendants knew that these statements were false when they created and distributed the film. In one scene, which shows workers being paid on the Vicinis' property, Defendants, in a false and obvious attempt to make the Vicinis appear odious, refer to the site as a "concentration camp."

29.    Defendants falsely state or imply in the film that the Vicinis have made efforts to conceal or cover up adverse living conditions for workers employed by them to convey false factual implications that the Vicinis did, indeed, allow and endorse adverse conditions for workers that they employed.

30.    Defendants repeatedly use misleading images to convey the implication that the Vicinis maintain and support substandard working conditions for employees, in particular by using images that show adverse employee conditions and employees who have lost limbs in accidents, but do so filming on land not owned by the Vicinis and people not employed by them.

31.    Defendants also falsely state or imply in *The Price of Sugar* that the Vicinis provide little or no access to healthcare to workers who are employed by the Vicinis and live on property owned by them. For example, one set of images depicts American doctors visiting sugar industry workers, but fails to disclose that the images were taken at places and properties not owned by the Vicinis. Indeed, throughout the film, Defendants portray lands, housing,

8

people, scenery which blatantly, falsely and maliciously is intended to lead the viewer to believe that what is being conveyed is part of the Vicini sugar business.

32.    Defendants' statements about the availability of health care for workers employed by the Vicinis were and are absolutely and recklessly false. Workers on the Plaintiffs' land have access to clinics opened by the Vicinis which are staffed daily by physicians and nurses.

33.    Defendants also falsely state or imply in the film that the Vicinis' workers are not paid in cash for work they performed and allege that instead they are forced to accept in lieu of cash script for redemption in company-affiliated stores where only overpriced and substandard goods are available. These statements and implications are false because all of the workers are paid in cash, and neither the Vicinis nor CC own or operate any such stores. This false theme is developed through images that depict workers who do not work for the Vicinis and do not reside on lands owned by the companies controlled by the Vicinis.

34.    The following false and misleading statements and manipulated images are examples that illustrate the recklessness and malice with which *The Price of Sugar* was made:

a)    scene at 2:15 minutes into the film showing the town of Los Llanos as the center of Fr. Hartley's parish (when, in fact, in late 2006 the Bishop of the Diocese San Pedro de Macorís removed him as pastor for serious wrongdoing, as the Bishop himself explained in a December 21, 2006 pastoral letter to the diocese);

b)    scene at 4:25 minutes showing an amputee in a rundown batey (when, in fact, the land shown is the Paloma batey, which is not owned or operated by CC or the Vicinis, and the person shown, an amputee, had been run over by a train (losing his leg) alongside cane fields owned by an entity in no way affiliated with CC or the Vicinis);

9

c)    scene at 4:37 showing a burned woman (when, in fact, she was an employee of another sugar operation in no way affiliated with CC or the Vicinis);

d)    scene at 5:25 with statement "Breaking centuries' old taboo, the Father [Hartley] brings in outsiders – American doctors" (when, in fact, foreign missionaries, including medical missionaries, have worked in the D.R. for many years. CC workers have access to a fully-staffed clinic which has helped control such problems as parasitic-borne diseases, and several churches of different denominations, which are supported by missionary work, have been built in the CC bateyes).

e)    scene at 6:05 "The Haitian workers are under armed guard ..." (when in fact, the footage was shot on property not owned by CC or any entity affiliated with the Vicinis, the armed men shown are members of the National Police, and workers on CC land are not under armed guard, but rather are free to move in and out of the bateyes);

f)    scene at 6:55 – 7:15 in which the worker is quoted as saying "No tengo nada – I have nothing [here in the D.R.]" (when, in fact, the worker actually is referring to having nothing for him in Haiti);

g)    statement at 9:15 that the Vicini family owns most of the sugar land in Fr. Hartley's former parish (when, in fact, most is owned by an entity in no way affiliated with CC or the Vicinis);

h)    allegation at 11:45 that 30,000 Haitian men are recruited every harvest season from Haiti (when, in fact, there are no more than 10,000 migrant sugar cane workers now in the entire D.R. sugar industry and CC currently employs fewer than 1,200 cane cutters per crop);

10

i)        night scene at 11:50 allegedly showing Haitian workers, including a little girl, lined up to work in the bateyes (when, in fact, this scene shows a group of Haitians moving freely into the Dominican Republic seeking all types of jobs);

j)        statement at 19:20 that "As many as one million Haitians live in the Dominican Republic. Nobody is certain how many live in the bateyes" (when, in fact, most Haitians work in construction, tourism and other sectors in both the urban and rural areas of the Dominican Republic and only a tiny fraction work and live in the bateyes);

k)        scene at 21:26 showing malnourished child in a car seat (when, in fact, this picture was taken in a batey in no way affiliated with CC or the Vicinis);

l)        scene at 39:30 in which Fr. Hartley states that feeding centers had to be established to help people in a shabby batey (when, in fact, this was shot in Batey Paloma, a batey owned by a sugar mill in no way affiliated with CC or the Vicinis);

m)        scene at 43:17 showing worker, Johnny Belizaire, who is greeted by Fr. Hartley and told that there will be a meeting of the workers regarding a strike against "the Company" (when, in fact, Mr. Belizaire was a paid employee of Fr. Hartley, not CC or the Vicinis, and this scene was fabricated by Haney);

n)        scene at 49:00 showing Vincente Jules Garcia living in bad conditions (when, in fact, Mr. Garcia was not an employee of the Vicinis and this was shot at La Redonda, a batey owned by an entity in no way affiliated with CC or the Vicinis);

o)        scene at 49:20 showing new housing in Batey Gautier (when, in fact, this is a batey owned by an entity in no way affiliated with CC or the Vicinis);

p)        scene at 57:00 alleging that the Vicinis pressured the Catholic Church to remove Fr. Hartley and stating that the Bishop supports him (when, in fact, the Bishop eventually

11

removed Fr. Hartley for cause, as reported in a pastoral letter to the diocese dated December 21, 2006);

q)      scene at 1:01 showing an elderly man with skin disease Fr. Hartley states was caused by poor nourishment (when, in fact, this was not shot on CC's or the Vicinis' property);

r)      scene at 1:14 in which Johnny Belizaire states: "If they get Father Christopher out of the country I am not going to wait for the Vicinis to send someone to kill me. I would kill myself." (when, in fact, per Church directive, Fr. Hartley has long since left the D.R. and Johnny Belizaire not only has not killed himself but rather lives free of charge in a CC-owned house by virtue of his father having worked for the company);

s)      scene at 1:13:29 in which Yela Machasa claims: "If the Father [Hartley] leaves, because I work with him, I will be abused [by the Vicinis]" (when, in fact, Machasa lives in Batey Canepa, owned by CC, and no harm has come to her); and

t)      scene at 1:13:45, Fr. Hartley states: "If the Father [Hartley] leaves, this a phrase the Company [CC] continually repeats to the workers, things are this way because he is here, but just you wait until he is gone, and we will remind you who is in charge of this" (when, in fact, CC has continued to devote substantial resources into improving the conditions and quality of life of those people it employs).

## Defendants' Wrongful Refusal to Cease and Desist

35.     Prior to publication of *The Price of Sugar*, the Vicinis pointed out to Haney myriad defamatory falsehoods and inaccuracies in the trailer for the film. Haney thereafter removed a few of such falsehoods and inaccuracies but wrongfully refused to remove the rest.

12

36.     On May 7, 2007, the Vicinis through counsel sent a letter to Haney and

Uncommon Productions attaching a list of forty-five (45) of the more egregious of *The Price of*

*Sugar's* misstatements, misrepresentations and misleading information about the Vicinis and

requesting that they cease and desist any further publication of the film.  An updated list (now

citing fifty-three (53) such instances) is attached hereto as **Exhibit A.**

37.     Via successive letters dated May 17 and June 12, 2007, Haney and Uncommon

Productions, through counsel, refused to cease and desist from showing *The Price of Sugar* and

in fact have continued to show the film, requiring the Vicinis to file this action.

38.     Unless the Court enjoins Defendants from the tortious conduct described above,

Plaintiffs will suffer irreparable harm.

## COUNT I
## (Defamation (Libel and Slander) *Per Se*)

39.     The Vicinis repeat and incorporate by reference the allegations set forth in

paragraphs 1-38.

40.     Defendant Uncommon Productions produced, marketed, published, distributed,

and/or arranged for the publication and distribution of a film entitled *The Price of Sugar*.

41.     Defendant Haney wrote, directed, co-produced, marketed, published, distributed,

and/or arranged for the publication and distribution of a film entitled *The Price of Sugar*.

42.     Defendants, through their creation, marketing, publication and distribution of *The*

*Price of Sugar*, falsely claimed that the Vicinis committed or threatened to commit a number of

criminal acts.  For example, Defendants falsely claim in *The Price of Sugar* that Plaintiffs (a)

murdered migrant workers, (b) made death threats to conceal their alleged crimes, (c) planned to

murder a priest, and (d) bribed public officials.

13

43.    Defendants' false statements that the Vicinis committed various crimes have harmed Plaintiffs' reputations and are defamatory *per se*.

44.    Defendants, through their creation, marketing, publication and distribution of *The Price of Sugar*, falsely claimed that the Vicinis tortured or mistreated migrant workers.  For example, Defendants claim that Plaintiffs (a) used armed guards to threaten workers, (b) failed to provide workers with basic needs like clothing, shelter, and medical care, (c) failed to pay wages to workers, and (d) were responsible for the malnourished conditions of workers' children.

45.    Defendants' false statements that the Vicinis tortured or mistreated migrant workers have harmed Plaintiffs' reputations and are defamatory *per se*.

46.    All of Defendants' statements in *The Price of Sugar* about the Vicinis committing criminal acts or torturing or mistreating workers are false, and in many cases conveyed in staged scenes of a purported "documentary" that is more fiction than fact.

47.    None of Defendants' statements in *The Price of Sugar* about the Vicinis was made under any privilege.

48.    Defendants have marketed, distributed, and displayed *The Price of Sugar* to third-parties in the United States and Europe, and Defendants continue to attempt to market and distribute the film to third-parties worldwide via their own efforts and a website, www.thepriceofsugar.com.

49.    Defendants were negligent in making false statements in *The Price of Sugar* about the Vicinis because Defendants knew or should have known that such statements were false.

50.    Alternatively, Defendants acted with actual malice in making false statements in *The Price of Sugar* about the Vicinis because Defendants knew that their statements about the

14

Plaintiffs were false at the time the film was created, marketed, and distributed or made their statements about the Vicinis with reckless disregard concerning the falsity of such statements.

51. As the direct and proximate result of these Defendants' false and defamatory statements in *The Price of Sugar* about the Vicinis, *per se*, the Plaintiffs have suffered damage to their personal reputations.

52. The Vicinis are likely to succeed on the merits of their defamation claims against the Defendants.

53. The Vicinis have suffered and continue to suffer irreparable harm to their reputations as a result of Defendants' defamatory statements.

54. The harm to the Vicinis' reputations outweighs any marginal harm Defendants would suffer from restraining distribution of Defendants' false and defamatory film.

55. Freedom of speech is not a license to defame, and the public interest favors restraining distribution of false and defamatory materials.

WHEREFORE, Plaintiffs Felipe and Juan Vicini respectfully request that the Court issue an Order enjoining Defendants from showing *The Price of Sugar* in its current form and from alleging, directly or indirectly, that the Vicinis have engaged in criminal conduct, and enter judgment in their favor and against Defendants Uncommon Productions and Haney, jointly and severally, in an amount difficult to ascertain but to be proven at trial, and grant such other and further relief that the Court may deem proper.

## COUNT II
## (Declaratory Judgment)

56. The Vicinis repeat and incorporate by reference the allegations set forth in paragraphs 1 through 55.

57. This is a claim for declaratory judgment under 28 U.S.C. § 2201.

58.    A genuine controversy exists between the Vicinis, on one hand, and Haney and

Uncommon Productions, on the other hand as to the falsity of Defendants' statements that charge

the Vicinis *inter alia,* with crimes, including murder, attempted murder, assault and battery,

human trafficking, enslavement, bribery and obstruction of justice.

WHEREFORE, Plaintiffs Felipe and Juan Vicini respectfully request that the Court enter

judgment in their favor and against Defendants Uncommon Productions and Haney and declare

that:

A.    Any and all statements made in *The Price of Sugar* which allege, directly or

indirectly, that the Vicinis have engaged in criminal conduct are false and constitute defamation

*per se*.

B.    Defendants shall immediately cease and desist from showing, marketing or selling

*The Price of Sugar*, either directly or indirectly.

C.    Defendants shall immediately take down *The Price of Sugar* website.

D.    Defendants shall cease and desist from re-publishing or repeating any statement or

allegation that either or both of the Vicinis have engaged in any kind of criminal conduct.

Of Counsel:

Read K. McCaffrey
Stephen Díaz Gavin
Benjamin G. Chew
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
E-mail: rmccaffrey@pattonboggs.com

Respectfully submitted,

Jessica Block
BLOCK & ROOS, LLP
60 State Street, Suite 3800
Boston, MA 02109
Telephone: (617) 223-1900
Facsimile: (617) 227-1948
E-mail: block@blockroos.com

Counsel for Plaintiffs Felipe Vicini
Lluberes and Juan Vicini Lluberes

Dated: August 31, 2007

16

# EXHIBIT A

## FACTUAL ANALYSIS OF *THE PRICE OF SUGAR*

| Item | Min/ Sec # | Description of Scene | Comments on Scene |
|---|---|---|---|
| 1. | 2:15 | Los Llanos is the center of Fr. Hardey's parish | Fr. Hardey is no longer the pastor of the parish. In late 2006, the Bishop of the Diocese San Pedro de Macorís removed Fr. Hardey as pastor for cause as a result of serious wrongdoing, as the Bishop himself explained in a December 21, 2006 pastoral letter to the diocese. No other bishop in the Dominican Republic asked that Fr. Hardey come to his diocese. |
| 2. | 2:40 | Scene with Fr. Hardey's former church in the background, where he alleges that he needed permission and 3 months before he could muster the courage to get into a Vicini company' batey. | There are no restrictions on entering the bateyes; certainly not those where people who work for the CC lands are located. No fences or other means of preventing access are ever seen in the film. Fr. Hardey and the Catholic Church, as well as other religious denominations, have built churches and performed work in the bateyes |
| 3. | 3:31 | Still photographs following the scene with tractor pulling cut cane | Setups. Not shot on CC land. Pictures are not necessarily in CC property or are related in any manner to CC operations. |
| 5. | 4:25 | Scene with amputee in rundown batey | This is the Paloma batey.² It belongs to CEA, the Government-owned sugar company. It is not CC land. |
| 6. | 4:30 | Amputee in scene. | Never a CC employee. The scene was shot on CEA land. The person pictured was run over by a CEA train alongside the CEA cane fields where he worked and lost his leg. |

---

[1] Sugar mill, land and related operations are the property of Cristóbal Colón, C por A ("CC"), sometimes references seen in the film to "Ingenio Cristóbal Colón," or "ICC", the sugar mill operation itself.

[2] Identifying face for CC land: houses are generally painted white with blue trim.

Case 1:08-mc-00384-RJL    Document 1-2    Filed 06/17/2008    Page 22 of 27

| # | Time | | |
|---|---|---|---|
| 7. | 4:37 | Burned woman in the following scene. | Neither CC land nor a CC employee. It is CEA property. |
| 8. | 4:50 | Water supply allegedly contaminated with parasites. | Does not occur on CC property, but rather one of the bateyes in land of CEA, the Government-owned sugarcane company. |
| 9. | 5:10-5:22 | Scenes alleging poor quality and unavailability of food. | Again, these scenes occur on the property of CEA, the Government-owned sugar cane land. |
| 10. | 5:25 | "Breaking centuries' old taboo, the Father brings in outsiders -- American doctors ..." | As an initial matter, the statement is false. Foreign missionaries, including medical missionaries, have worked in the bateyes in the Dominican Republic for many years. Moreover, with respect to the particular scene, the doctors were brought in by director Haney. These scenes all occur in Paloma, not a CC batey. In fact, workers on CC land have access to clinic opened by CC and daily and staffed by physicians and nurses. Have worked substantially to control such problem as parasitic-borne disease. |
| 11. | 6:05 | "The Haitian workers are under armed guard ..." with shot of men with pistol in back side. | False. Workers are free to move in and out of the bateyes and may travel around the country. The scene depicting the armed men is actually members of the National Police. Further, scene filmed is in Los Llanos and not on CC land. CC workers are not controlled under armed guard. |
| 12. | 6:36 | Company store scene, where workers allegedly paid only in script for use at store. | CC pays workers in cash. CC has no "company stores." |
| 13. | 6:55-7:15 | "No tengo nada" scene with worker in red cap. | Worker never says that in the film to Fr. Hartley. Man says "no tengo nada" referring to what is left for him in Haiti. |
| 14. | 9:15 | Vicini family allegedly owns most of the sugar lands in Fr. Christopher's parish. | Most of the land in Fr. Hartley's former parish in Los Llanos is CEA land, i.e., Government owned. |
| 15. | 11:28 | Ana Mdia Lora interview scene, showing armed police, suggesting that | The armed men are members of the Dominican Republic National Police. They are not guarding any CC property, but |

Case 1:08-mc-00384-RJL    Document 1-2    Filed 06/17/2008    Page 23 of 27

| | | they are controlled by CC. | rather guarding a square in the colonial sector of Santo Domingo. |
|---|---|---|---|
| 16. | 11:45 | Scene driving with Belgian priest to the Haitian border. Allegation is that 30,000 men every harvest season are recruited. | There are no more than 10,000 migrant sugar cane workers now in the DR sugar industry. CC employs presently less than 1,200 cane cutters per crop. |
| 17. | 13:25 | "Buscones" scene, allegedly complaining about not having been paid. Shot in Fr. Hartley's church. | The person identified as "Dario", who makes the allegation is not a CC employee. |
| 18. | 14:50 | Night scene allegedly showing Haitian workers, including little girl, lined up waiting to enter DR. | Fabricated scene. General pool of potential workers move freely from Haiti into the Dominican Republic looking for all type of work. |
| 19. | 16:00 | Haitian worker "Espinal" scene, where Fr. Hartley interrogating him about work. | Fr. Hartley's putting words in the speaker's mouth. Without ever demonstrating that "Espinal" is, in fact, seeking a job in the cane field, Fr. Hartley asks if he knows how to cut cane, etc. Moreover, Espinal clearly states in Spanish that he is looking for a job in Santo Domingo, not a job as a cane cutter. |
| 20. | 16:58 | Drive by of what Fr. Hartley calls a "concentration camp'; allegation of gazing into trouble. | In fact shows CC workers being paid their wages (which are paid in cash). In fact, too, no one interfered with filming. |
| 21. | 17:45 | Scene showing barbed wire in roof of building which will house workers | Workers themselves put in the wire to keep robbers at bay. |
| 22. | 18:14 | Man on horseback with shotgun; workers in background | Not CC property, not CC employee. |
| 23. | 19:20 | "As many as 1 MM Haitians live in the DR. No one knows for sure how many live in the bateyes." | In fact, there are only approximately 10,000 cane cutters nationwide. Most Haitians work in construction, tourism and other sectors in both the urban and rural areas of the Dominican Republic, including the largest construction project in the country, the building of the Metro in Santo Domingo. |

| # | Time | | |
|---|---|---|---|
| 24. | 19:32 | Johnny Belizaire, who introduces himself as son of Haitian workers, born in batey, pictured cutting cane. Implication is that he works for the Vicinis. | Belizaire, who appears repeatedly in the film, has never been an employee in any capacity of CC. His stepfather has been an employee of CC. Although he might have cut cane at some point, Belizaire has never been a CC employee. Belizaire was a paid employee of Fr. Hartley at the time of the filming. |
| 25. | 19:59 | Scenes of children allegedly working in the cane fields. | Scene is staged. CC does not employ children. |
| 26. | 20:20 | Yela Machasa of Batey Cinepa, pictured carrying child on unpaved street in batey. | Although Batey Cinepa is a CC batey, Yela Machasa was also a paid employee of Fr. Hartley. She is shown in several shots in the film. However, this scene is not shot in Batey Cinepa or any other CC batey. |
| 27. | 21:00 | Scene showing worker chewing sugar cane, after Yela Machasa says wages not enough to cover cost of food. | Does not occur on CC land. |
| 28. | 21:26 | Malnourished child in car seat. | This still photograph was taken in Batey 3 Barahona, Government-owned land and located several hundred kilometers from the CC plantations. |
| 29. | 22:48 | "Calle liberal" scene following Fr. Hartley's observation that Americans would be bothered by what it takes to "get sugar in their coffee in the morning." | Picture taken in Barahona sugar mill. As previously noted, this is located hundreds of kilometers from CC land. |
| 30. | 23:30 | Fr. Hartley. "The Vicini family has a lot of blood on its hands." | This is a reckless and completely false accusation, lacking any basis in fact. Its publication in TPS is intended to defame the Vicini family. |
| 31. | 23:30-27:00 | Begins the "cemetery" scene, suggesting Vicini/CC involvement in killing of workers. | The graveyard is not located on CC land. Contrary to the allegation by Fr. Hartley in the film that its existence was secret, the graveyard is well known to people in the area. Moreover, Fr. Hartley several years ago ordered that people |

The Price of Sugar – Film vs. Reality
Page 5 of 7

| | | | |
|---|---|---|---|
| | | | not be buried there. |
| 32. | 24:10 | Narrator: "In an unmarked corner of the Vicini plantations there is a cemetery." | This is a reckless and false statement. The cemetery is not located on Vicini land. The statement is made to imply that the land is a dumping ground for alleged Vicini crimes. |
| 33. | 26:35-27:10 | Fr. Hartley tells story of smuggled Haitian worker allegedly being beaten by supposed Vicini employee and worker arrives dead at unnamed batey. | CC does not import any Haitian workers and on this basis alone, the allegation is false. Moreover, as Fr. Hartley himself acknowledges, there is no proof either of the cause of the death or relationship to any action by CC or Vicini. False suggestion of responsibility is coupled with additional falsehood suggesting Vicini corruption of the judiciary. |
| 34. | 27:15 | Stills of bad conditions following scenes with cemetery and allegedly beaten victim. | None of the photos is on CC land. |
| 35. | 27:40 | Scene involving supposed questions from Spanish and U.S. Embassy about being forbidden from going into CC bateys | Untrue. CC has never prevented Fr. Hartley's going to the bateys in CC lands. Indeed, CC has never prevented any other visitors, as demonstrated by the shooting of footage in TPS that does occur on CC land, and which was not prevented by CC. The charge is also belied by the work of Fr. Hartley on bateys in CC land. |
| 36. | 38:3[3] | Al Rojo Vivo sequence regarding supposed fear and hate of Haitians. | Al Rojo Vivo is a Miami-based TV show. Footage is not on CC property. Involves a riot following an incident in Valverde province near Haitian border where Haitians had attacked a Dominican couple and raped the woman. |
| 37. | 39:35 | Scene following at Rojo Vivo where Fr. Hartley says that feeding centers established to help people in shabby | Scene supposedly shows shabby treatment. Scene not shot on CC property. They are taken in Batey Paloma (Government sugar mill) |

[3] Interval is the part of the movie regarding Fr. Hartley's upbringing in Spain.

Case 1:08-mc-00384-RJL    Document 1-2    Filed 06/17/2008    Page 26 of 27

| | | batey | |
|---|---|---|---|
| 38. | 40:00-41:30 | Housing project built on Church land which Dominican families opposed. | Housing project is in Batey Paloma, a CEA batey, not CC. |
| 39. | 43:17 | Scene involving worker who is greeted by Fr. Hartley to be told that there is a meeting of all the workers on Sunday regarding a strike against "the Company," i.e., CC. | This "worker" is Johnny Belizaire, who as noted has never been an employee of CC, but rather of Fr. Hartley. This is an encounter completely staged by Fr. Hartley and Bill Haney. |
| 40. | 45:40 | Scenes of cane fields burning, images of newspapers suggesting sabotage at the "ingenios" – the mills. Fr. Hartley alleging that he is blamed. | Fr. Hartley acknowledges that there had been a drought, which would have contributed to the fires. In fact many of the fires were started by the workers themselves. |
| 41. | 47:00 | Johnny Belizaire speaking following Fr. Hartley's recounting death threats. In this scene, he suggests that the conditions for working for CC are worse than death. | Belizaire is not an employee of CC and is, in fact, a paid employee of Fr. Hartley at the time film was made. |
| 42. | 47:53 | Scene with boys bathing at an open well in a rainstorm. | Totally staged scene. |
| 43. | 49:00 | Vicente Jules García, filmed living in bad conditions in Batey La Redonda before he could move into new home. | La Redonda is a CEA batey, not a CC property. García was never an employee of CC. He occupied several positions until he became a "weigher" for CEA, which is a Government owned property. |
| 44. | 49:20 | New housing in Batey Gautier. | Batey Gautier is a CEA – Government-owned – batey, not a CC property. |
| 45. | 52:43 | Scene with Dominican reporter accompanying Fr. Hartley to visit pregnant woman | Does not occur on CC land. |

The Price of Sugar – Film vs. Reality
Page 7 of 7

| 46. | 53:45 | Fr. Ruquoy, the Belgian priest under attack for helping the Haitian workers and who was the object of a support campaign by Amnesty International | In fact, charged with having issued false birth certificates to Haitian workers. His order had him removed from the Dominican-Haitian border. |
| 47. | 55:00 | Lawyer Noemi Méndez, who worked with Fr. Hardey, alleges that Fr. Hardey's life was at risk. | The implication of the statements is that the Victim had threatened Fr. Hardey's life, a completely false accusation. There is no factual basis for any of the alleged threats by CC or any Victim interest. |
| 48. | 57:00 | Scene alleges that the CC have pressured the Church to remove Fr. Hardey. Stated that Bishop supports Fr. Hardey. | In fact, Bishop eventually removes Fr. Hardey for cause, not because of pressure from CC. The Bishop of San Pedro de Macorís himself reported the removal of Fr. Hardey for cause in a pastoral letter to the diocese, dated December 21, 2006. |
| 49. | 59:16 | Scene with American doctors in El Manguito. | The doctor is Dr. Kim Wilson, a protégée of director Bill Haney. Moreover, the scene is filmed outside CC land. Fr. Hardey acknowledges that this is not a batey. |
| 50. | 1:01:00 | Scene with man with skin disease | This scene is not shot on CC property. |
| 51. | 1:02:00 | Follow-up with Belizaire | As previously noted, is an employee of Fr. Hardey. |
| 52. | 1:08:00 | House of Ricardo Hernández, former administrator of CC sugar cane fields. | Fr. Hardey alleges that he controls 25,000 to 30,000 workers. In fact, the number of workers for whom he was responsible as the administrator was only approximately 2,500. |
| 53. | 1:26 | Narrator: Johnny [Belizaire] has been fired from his job and threatened with eviction from his home. | False. Belizaire has never been a CC employee. Nevertheless, as of August 1, 2007, he was still in his home. |

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FELIPE VICINI LLUBERES and
JUAN VICINI LLUBERES

           Plaintiffs,

    vs.                                              CASE NO. 07 CA 11623 DPW

UNCOMMON PRODUCTIONS, LLC
and  WILLIAM HANEY III,

           Defendants.

## PLAINTIFFS' FIRST SUPPLEMENTAL RESPONSES TO DEFENDANTS' FIRST INTERROGATORIES

Plaintiffs Felipe Vicini Lluberes and Juan Vicini Lluberes ("Plaintiffs"), by and through their undersigned counsel, pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Court's local rules, hereby supplements their responses to Defendants' Uncommon Productions, LLC and William Haney III, ("Defendants") First Set of Interrogatories (the "Interrogatories") as follows:

### GENERAL OBJECTIONS

The following General Objections apply to each of Defendants' Interrogatories:

1.      Plaintiffs object to each Interrogatory which seeks or purports to seek information or documents that are: (a) subject to the attorney-client privilege; (b) constitute material protected under the attorney work product doctrine; and/or (c) are otherwise protected from disclosure by any other applicable privilege under federal or state law.

2.      Plaintiffs object to the Definitions and Instructions section of the Interrogatories, and to the Interrogatories themselves, to the extent that Defendants attempt to impose obligations

4932933

greater than those required by the Federal Rules of Civil Procedure, the Local Rules of this Court, or any other applicable rules, statutes, or case law.

3.    Plaintiffs object to each Interrogatory to the extent that it is overly broad and unduly burdensome.

4.    Plaintiffs object to each Interrogatory to the extent that it seeks information that is neither relevant to the subject matter of the litigation nor reasonably calculated to lead to the discovery of admissible evidence.

5.    Plaintiffs object to each Interrogatory to the extent that it seeks information or materials obtainable from some other source that is more convenient, less burdensome, or less expensive.

6.    Plaintiffs object to each Interrogatory to the extent that the terms or phrases contained therein are undefined, vague and/or ambiguous.

7.    Plaintiffs object to each Interrogatory to the extent it contains legal conclusions and/or factual inaccuracies.

8.    Plaintiffs object to each Interrogatory to the extent it seeks the disclosure of proprietary or confidential business or personal information, personnel information, information that invades the privacy of individuals, and/or information that is protected by banking and/or consumer privacy laws. Such information, to the extent it is relevant and not privileged, will be produced only once an appropriate protective order is entered by the Court.

9.    Plaintiffs object to each Interrogatory to the extent it contains separate and discrete subparts.

10.    Plaintiffs object to the definitions of "you" and "your" as set forth in the Interrogatories to the extent such definitions include entities or individuals outside the bounds of permissible discovery.

11.    Plaintiffs object to the definition of "Your Sugar Business" as vague and ambiguous, and to the extent it incorporates businesses or companies that are neither relevant to the subject matter of the litigation nor reasonably calculated to lead to the discovery of admissible evidence.

12.    Plaintiffs object to the definition of "Relevant Time Period" to the extent it includes a time period beyond which could conceivably lead to the discovery of admissible evidence.

13.    When responding to the Interrogatories, Plaintiffs expressly reserve their right to (a) object to the admissibility at trial of any documents or information produced in connection with its responses, and (b) modify any of said responses at a later date if further factual development or analysis warrants such a modification including, but not limited to, producing any additional nonprivileged, responsive documents that may come within his possession, custody or control as discovery proceeds.

14.    Plaintiffs reserve the right to amend and/or supplement these Interrogatories.

## RESPONSES/SPECIFIC OBJECTIONS

**Interrogatory No. 14 [sic]:** Identify each and every statement or implication in the Film that you allege is false and defamatory and on which your claims are based, and for each: (a) if it is an implication, identify the statements in the Film that you allege give rise to the implication; (b) explain specifically what is false about the statement or implication; (c) explain what you contend the truth is; (d) identify all facts that support your contention that the statement or implication is false; (e) identify all documents that support your contention that the statement or implication is false; and (f) identify all persons with knowledge regarding the truth or falsity of the statement or implication.

**RESPONSE:** See General Objections 2, 9 and 10, which are specifically incorporated herein by reference. See also Plaintiffs' Initial Disclosures.

4932933                                    3

**SUPPLEMENTAL RESPONSE:** Subject to and without waiving any of their initial objections, Plaintiffs supplement their response to this interrogatory and state that the following statements by themselves or in conjunction with images appearing on screen are defamatory per se and constitute the statements upon which their claims are based.

1.      The recorded statement, which begins approximately at 23:38 *The Price of Sugar*:

> FATHER HARTLEY:  The Vicini family have a lot of blood on their hands.  This is well known.  Nobody dares speak out and say it because many people fear for their lives or the lives of their loved ones.  And this is a fact.  People disappear.  People are never found.

The implication of this statement is that the Vicinis kidnap people and/or commit murder. This implication is false. Persons with knowledge include Bill Haney, Fr. Christopher Hartley, Jhonny Belizaire, Felipe Vicini and Campos DeMoya.

2.      The recorded statement, which begins approximately at 1:13:59 in *The Price of Sugar*:

> JHONNY BELIZAIRE: (subtitled): If they get Father Christopher out of the country I am not going to wait for the Vicini to send someone to kill me.  I would kill myself. Anyone following Father Christopher's path is in great danger.

The implication of this statement is that unidentified facts exist that support Belizaire's opinion that the Vicinis will kill him after Fr. Hartley leaves the Dominican Republic. This implication is false. Fr. Hartley left the Dominican Republic in December 2006 and Belizaire is alive and well and remains housed in a Vicini-owned batey. Persons with knowledge include Fr. Christopher Hartley, Jhonny Belizaire, Felipe Vicini and Campos DeMoya.

3.      The recorded statement, which begins approximately at 1:25:45 in *The Price of Sugar*:

> NARRATOR:  The batey is still a dangerous place.  Jhonny has been fired.  He and his family have been threatened with eviction from their home; but without legal status, they are unable to go elsewhere to make a living.  And the attacks on Father Christopher continue.

The implication of this statement is that the Vicinis have threatened Belizaire and his family and are in imprisoning him because he and his family have no legal status in the DR, and the Vicinis are continuing to attack Fr. Hartley. The implications of this statement are false. Belizaire was never a Vicini employee but remains housed on a Vicini-owned batey on account of his father's employment status. In documents produced by Defendants, Belizaire admits that he has a Dominican birth certificate and Dominican identification, giving him legal status in the Dominican Republic. Persons with knowledge include Bill Haney, Fr. Christopher Hartley, Jhonny Belizaire, Felipe Vicini and Campos DeMoya.

4.     The recorded statement, beginning at approximately 2:33 in *The Price of Sugar*, in conjunction with the following images appearing on screen:

> FATHER HARTLEY:  One of the first things I was told -- some of the people in the Dominican Republic came to me saying, by the way, remember you're not allowed into the Vicini bateyes. It took me three months to muster the courage to go into the sugarcane fields. NARRATOR: The growing and harvesting of Dominican sugar is done almost entirely by laborers from Haiti. What Father Christopher saw in the plantations he began to document.







The implications of this statement in conjunction with the above photographs are that the photographs depict conditions occurring on Vicini-owned plantations. These implications are false.

Defendants admit that none of these photographs was taken on Vicini-owned plantations. Persons with knowledge include Bill Haney, Fr. Christopher Hartley, Pedro Portal, and Celine Gautier.

5.    The recorded statement, beginning at approximately 4:26 in *The Price of Sugar*, in conjunction with the following images appearing on screen:

> FATHER HARTLEY: Gradually, I began to learn more about their [people living on Vicini bateyes] situation. What I discovered was truly appalling.



The implication of this statement in conjunction with the images appearing on screen at the time of the statement is that the images depict conditions occurring on Vicini-owned plantations. This implication is false. The on-screen images are of batey Paloma, which is not a Vicini batey, and the one-legged man depicted in the above scene man was never a Vicini employee. Persons with knowledge include Bill Haney, Fr. Christopher Hartley and Campos DeMoya.

6.    The recorded statement, which begins at approximately 17:43 in *The Price of Sugar*, in conjunction with the following images appearing on screen:

> FATHER HARTLEY: This is where they're going to put the workers when they arrive. Anywhere from 60 to 100 people are going will be crammed into this one barrack. You can see all this wiring up on the top which is to prevent them from escaping at night

and they will have armed men at the door of the barracks in the night
so they don't attempt to flee the barrack in the night.









The implications of this statement in conjunction with the photographs appearing on screen during the statement are that the Vicinis treat Haitian workers like prisoners, confine the workers to the Vicini plantations against the workers' will, and will shoot and/or injure any workers attempting to escape the Vicini plantations. Each of these implications is false. Defendants admit that the first two photographs above were not taken on Vicini Property. The second two photographs do not show workers under armed guard. Statements made by Hartley and Belizaire, which do not appear in the film but have been produced in discovery, confirm that Vicini employees do not carry guns. Persons with knowledge include Bill Haney, Fr. Christopher Hartley, Jhonny Belizaire, Felipe Vicini and Campos DeMoya.

7.      The recorded statement, which begins at approximately 20:22 in *The Price of Sugar*, in conjunction with the following photograph appearing on screen:

> NARRATOR: The batey dwellers get much of their calories from chewing sugarcane. Their diet often leads to malnutrition.



This statement in conjunction with the above photograph imply the photograph depicts conditions occurring on Vicini property. This implication is false. Defendants admit that the above photograph was taken in 2005 in batey Cuchillo, which is not a Vicini-owned batey. Persons with knowledge include Bill Haney and Celine Gautier.

Respectfully submitted,

Read K. McCaffrey (admitted *pro hac vice*)
Stephen Diaz Gavin (admitted *pro hac vice*)
Benjamin G. Chew (admitted *pro hac vice*)
PATTON BOGGS LLP
2550 M St, N.W.
Washington, DC 20037
Telephone: (202) 457-6015
Facsimile: (202) 457-6315
e-mail: rmccaffrey@pattonboggs.com

Jessica Block
BLOCK & ROOS LLP
60 State Street
Suite 3800
Boston, MA 02109
617-223-1900
Fax: 617-227-1948
Email: block@blockroos.com

Counsel for Plaintiffs
Felipe Vicini Lluberes
and Juan Vicini Lluberes

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiffs' First

Supplemental Answers and Objections to Defendants' First Interrogatories was served, this 21st day

of February 2008 via electronic mail and first class mail, postage prepaid, upon:

Elizabeth C. Koch (admitted *pro hac vice*)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1050 Seventeenth Street, N.W.
Washington, D.C. 20036
Telephone: (202) 508-1100
Facsimile: (202) 861-9888
E-mail: bkoch@lskslaw.com

Counsel for Defendants
Uncommon Productions, LLC
and William M. Haney, III

Benjamin G. Chew

4932933                                    11

# Exhibit C

The Price of Sugar                    PIX LOCK                    10/12/06

**The Price of Sugar – English Script [Note: TC's are based on DVD RT]**

KIDS ON BIKES, SMALL TOWN

01:00:21, TITLE – Photoshop: Uncommon Productions presents

FC AT SCHOOL- FC SINGING WITH KIDS

FC DRIVING JEEP
FC: I arrived in the Dominican Republic September of '97. I had no idea of the magnitude of all that I was going to confront.

FC LOOKS INTO MIRROR

01:01:15 TITLE – National Ministry, AfterEffects: The Price of Sugar

DISSOLVES TO IMAGE OF SUGAR

DISSOLVES TO RIOTS
*CROWD: Out with the Father!*
(Fuera el Padre)
*MAN: If he's a real Priest he must understand that the community doesn't want him.*
(Si el es padre de verdad, el tiene que comprender que la comunidad no lo quiere.)

*MAN: They either take the Priest out of the country or we'll take him out. That Priest is an enemy of the Republic.*
(El cura, o lo sacan del país o lo vamos a sacar nosotros. Eso es un cura enemigo de la república.)

*CROWD: Out of Los Llanos, the Priest and the Haitians!*
(El cura y los haitanos fuera de Los Llanos!)

DISSOLVES TO IMAGE OF SUGAR- TO LOS LLANOS

01:02:10, TITLE – Title Tool: Narrated by Paul Newman

AERIALS
**The town of Los Llanos in the Dominican Republic is the center of Father Christopher Hartley's parish. [7:08]**

DRIVING, AERIALS
**Every day he goes out to the sugar plantations, to the tiny villages known as bateyes – where Dominicans rarely go. [7:27]**

01:02:40, TITLE – Title Tool, Lower Third: Father Christopher Hartley

PAGE                                    **UP00001**                    1

The Price of Sugar                PIX LOCK                10/12/06

JHONNY EATING CANE

*JHONNY: I am 25 years old and I was born in the batey and I have never seen the owner, José Vicini, personally come here. He never comes around to ask people how things are going. He only flies over in his helicopter.*
(Yo tengo 25 años y yo naci en este batey y nunca le he visto la cara al dueño, a José Vicini, personalmente venir acá y sentarse por lo menos acá y preguntarle a la gente que cómo se siente, eso nunca lo he visto. Solamente pasa en su helicóptero.)

HELICOPTER IN THE AIR
RT: 22:07
MEN CUTTING CANE

FC: Most of this product ends up in the United States. The United States purchases the raw material, it's processed in the refineries in the United States and it ends up on the American table. I'm sure most American families would be very embarrassed to know at what price they put sugar in their coffee every morning.

STILL CALLE LIBERTAD

01:22:57, TITLE/IMAGE OF SUGAR – National Ministry, AfterEffects:
- THE DOMINICAN SUGAR INDUSTRY HAS A PREFERENTIAL TRADE DEAL WITH THE U.S. GOVERNMENT.

- THE DEAL OBLIGATES AMERICANS TO BUY DOMINICAN SUGAR AT UP TO DOUBLE THE WORLD PRICE.

- THE U.S. IMPORTS MORE SUGAR FROM THE DOMINICAN REPUBLIC THAN FROM ANY OTHER COUNTRY.

CEMETERY
STILLS

FC: The Vicini family have a lot of blood on their hands. This is well known. Nobody dares speak out and say it because many people fear for their lives or the lives of their loved ones. And this is a fact. People disappear, people are never found…

**In an unmarked corner of the Vicini plantation is a cemetery. [4:27]**

FC AT CEMETERY
FC: Dominicans don't know of this cemetery.
I only found this place about 7 – 8 months ago and I've been here for 7 years and nobody had ever mentioned it. It's like a taboo place.
You're standing on peoples' bodies. All of this – it's not just where you see crosses. Some are very obvious – you can just see those, those lumps. Why all of a sudden there is no grass over there? I mean this is tropical weather. Everything grows in five minutes.

UP00011

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FELIPE VICINI LLUBERES and
JUAN VICINI LLUBERES,

Plaintiffs,

vs.

CASE NO.  07 CA 11623 DPW

UNCOMMON PRODUCTIONS, LLC
and WILLIAM HANEY III,

Defendants.

## DEFENDANT UNCOMMON PRODUCTIONS, LLC RESPONSES TO PLAINTIFF FELIPE VICINI LLUBERE'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant

Uncommon Productions, LLC ("defendant") hereby responds to Plaintiff Felipe Vicini

Llubere's First Set of Interrogatories (the "Interrogatories").

### GENERAL OBJECTIONS

Defendant responds to the Interrogatories subject to the objections set forth

herein, each of which is incorporated into each response, without waiving and expressly

preserving (a) any objections as to competency, relevancy, materiality, privilege, and

admissibility of any of the responses; and (b) the right to object to other discovery

procedures involving and relating to the subject matter of interrogatories responded to

herein.

1.      Defendant objects to the Interrogatories to the extent that they seek

discovery of work product or information or communications protected from discovery

Ildefonso Olmedo. January 5, 2003.
"There are so many questions to ask, but no one dares to answer and interrupt the law of silence. Nobody has seen, nobody has heard anything. "Yes, Father, it was the Guarda-Campestre (guard) of Batey Contador. He chased them when they were trying to escape. He beat them up with the machete, in that barrack... It was probably five in the morning, it wasn't dawn yet. He says he cannot let them escape, that the bosses pay too much per head" finally someone gets over the fear and tells him what happened.
*["Después ya sólo caben las preguntas, pero nadie se atreve a romper la ley del silencio. Nadie ha visto, nadie ha oído. «Sí, padre, fue el guarda campestre del batey de Contador. Los cazó cuando intentaban huir. Les golpeó con el machete ahí, en ese barracón... Serían las cinco de la madrugada, aún no había amanecido. Dice que no les puede dejar escapar, que los jefes pagan demasiado por cada cabeza», confiesa finalmente un paisano que vence el miedo.]*

The Spanish Priest has been in his mission in the sugar cane fields of the Dominican Republic for five years and personally suffers the abuse over the Haitians, the slavery of the sugar cane. – Never serve someone who has served- says the Priest after learning that in that same morning the guarda campestre (the police in the villages where the workers are confined) had imprisoned and beat a group of cane cutters who, like himself, are Haitian. Hours later, the Priest repeated agrily to the administrator of the factory that owns all these fields: "Merite, the Campestre of Contador". He was asking for justice and the end of the bad treatments. In a corner of 'Don' Ricardo's office, the almighty boss that the Vicini Consortium has put in front of the sugar factory Cristóbal Colón..."
*[El sacerdote español lleva cinco años de misión entre los campos de caña de la República Dominicana y padece en carne propia los abusos sobre los haitianos, la esclavitud de la caña. «Nunca sirvas a quien sirvió», masculla el clérigo al saber que el guarda campestre (policía de las aldeas donde son recluidos los braceros) que esa mañana había apresado y apaleado a un grupo de cortadores era, como ellos, haitiano. «Meritè, el Campestre de Contador», repetía enrabietado horas después el padre ante el administrador del ingenio al que pertenecen todos aquellos campos. Exigía justicia y el fin del maltrato. A sus espaldas, en una esquina del despacho de don Ricardo, el todopoderoso jefe que el Consorcio Vicini ha puesto al frente de la factoría azucarera Cristóbal Colón y que ahora oía las quejas del padre..."]*

## E) Reports from the U.S. Department of State and from NGOs

> U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 8, 2006.
[http://www.state.gov/g/drl/rls/hrrpt/2006/78889.htm]
"Although the law provides for these rights, and the government generally respected these provisions in practice, there were some exceptions. For example human rights groups alleged that many Haitians were not allowed to leave the sugarcane plantations where they worked. Local and international human rights groups charged that there was discrimination against Haitian migrants and that they were subject to arbitrary and unjustified action by the authorities."

of security for the sugar mill; as well as the caretaker and the guard of the batey. They took with them 3 of the 5 men."

*["Que a partir del 20 de noviembre aproximadamente comenzaron a llegar los trabajadores al Ingenio Cristóbal Colón, propiedad de la familia Vicini en San Pedro de Macorís, en fecha 21 de noviembre entre las 4 y 5 de la mardrugada, en el Batey Contador del referido ingenio. De acurdo a declaraciones de los lugareños se presentó un vehículo de colo verde (jeep- jeepeta) inteerceptando a 5 hombres que aparentemente pretendían marcharse del Batey, en el vehículo referido habían 2 personas, uno de ellos identificado como el Encargado de Seguridad del ingenio Cap. Amarante, además del mayordomo y el guarda campestre del lugar, llevándose 3 de los 5 hombres."]*

"The witnesses of this incident also say, and we do not mention them in order to avoid retaliations from the Company, that these people were severly beaten.

These people were later taken to Batey Copellito and given to the Administrator Mr. Ricardo Hernández and from there, they were allegedly taken to the Ingenio Cristóbal Colón..."

*["Que de igual manera cuentan los testigos del hecho, los cuales no mencionamos para evitar represalias en su contra de parte del ingenio estas personas fueron duramente golpeadas. Que posteriormente estas personas fueron llevadas al Batey Copellito y entregadas al administrador Sr. Ricardo Hernández y de ahí supuestamente trasladadas al Ingenio Cristóbal Colón..."]*

"That thanks to the testimonies of their friends we know that the names of the missing men are Tusaint, Editon and Gebon, and their whereabouts are unknown."

*["Que por referencia de sus compañeros nos enteramos que los nombres de los desaparecidos son Tusaint, Editon y Gebon, y su destino o paradero es desconocido."]*

**Interrogatory No. 3:**       Please state all of the facts supporting the following statement, which begins approximately at 12:10 (Exhibit 1, pp. 10:10-14) in *The Price of Sugar:*

> 10    FATHER HARTLEY:  Haitians are
> 11    recruited by what are called buscones, who
> 12    work for the companies, go across the border
> 13    into Haiti, and recruit approximately 30,000
> 14    men every harvest season.

**RESPONSE:**

**A) U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 6, 2007:**

[Full text: http://www.state.gov/g/drl/rls/hrrpt/2006/78889.htm]

"At year's end there were allegations that some employers, specifically the Vicini Corporation, had resumed the practice of importing undocumented workers for the sugar fields." (Section 5, Page 13)

## B) Interviews

> Group of young men, residents of San Jose de los Llanos, interviewed during a protest against Father Christopher (Tape U210):

Cameraman: Who brings the Haitians here?
*[Quién trae los Haitianos aquí?]*

Man #2: The Vicini.

Cameraman: But why do they do that?
*[Pero por qué hacen eso?]*

Man #2: They bring them to cut cane.
*[Para picar caña es que los traen.]*

Cameraman: Why, why do they bring the Haitians?
*[Por qué, por qué traen a los Haitianos?]*

Man #2: Oh, listen, if they don't have Haitians here, then who is going to cut the cane?
*[Oh, oiga, si no tienen a los Haitianos aquí entonces quién va a picar la caña?]*

Bridget Wooding (bio above) describes how "buscones" recruit Haitians across the border for the sugar companies. (Tape U207-208):

Interviewer: "How does the Vicini company gets its workers in years past?  How do they get workers from Haiti, which is a ways away?  How do they get them to their plantation?  Can you tell me about how their operation seems to work?"

Bridget: "Up until the time of the fall of Baby Doc, say two decades ago in Haiti, there had been agreements between the two countries.  With the fall of Baby Doc, the dictator in Haiti, that fell into abeyance.  And so what's been happening now is that plantations like the Vicini or construction companies or agro-industrial employers have been often working out together with people on both sides of the border, together with scouts effectively, how to get the labor force for the harvesters as necessary.  And the problem is that this may often involve extortion, it may involve corruption, it may involve traveling by illegal means, all of which is detrimental to the people who are going to come and work.  They may never arrive at their destination, they may never be returned properly to Haiti, there may be shortfall in their wages because of the informality, the lack of regulation that has been particularly acute over the last two decades."

17

**RESPONSE:** *See* Responses to Interrogatory Nos. 3 and 5.

## A) Reports about the Dominican government's complicity in human trafficking

> U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 6, 2007 http://www.state.gov/g/drl/rls/hrrpt/2006/78889.htm
"Nongovernmental organizations (NGOs) alleged corruption among the military and migration officials stationed at border posts and noted that these officials sometimes facilitated the illegal transit of Haitian workers into the country. In January authorities indicted seven military officials accused of accepting bribes to permit the entry of Haitians, 25 of whom died from asphyxiation while being smuggled in the back of a truck."

> "Historic Perspectives of the Dominican-Haitian relations. Experiences that can be applied to the present realities". Conference given by Bernardo Vega in New York. November 18th, 2005:
[Note: Bernardo Vega is a Dominican historian, economist and writer. He served as director of the newspaper El Caribe, Ambassador in Washington and Governor of the Central Bank of the Dominican Republic.]

"The American Marines left the Dominican Republic in 1924 and Haiti in 1934 and from that point on the hiring of Haitian labour was done by the new armies of the two countries with the same formula as the one the American Marines established: in direct colaboration with the owners of the sugar cane factories. This didn't change, not even after the killing of thousands of Haitians by the Dominican soldiers ordered by Trujillo in 1937.The dictator excluded the Haitians that lived in the bateyes from the genocide and only two months after it took place, the sugar mills started bringing Haitian workers through the frontier."
*["Los infantes de marina abandonaron a Santo Domingo en 1924 y a Haití en 1934 y desde esas fechas las contrataciones de mano de obra haitiana las efectuaban los representantes de los nuevos ejércitos de ambos países, junto con los dueños extranjeros de los ingenios y eso siguió aun después de la matanza de varios miles de haitianos por parte de soldados dominicanos ordenada por Trujillo a finales de 1937 y en la cual los civiles no participaron, ni la apoyaron. El dictador excluyó de ese genocidio a los haitianos ubicados en los bateyes de los ingenios y el reclutamiento desde Haití de braceros se reinició apenas dos meses después de la tragedia."]*

"In 1986, the first time in 80 years, both countries had democratic regimes. Shortly after that, the Haitian army disappeared eliminating one of the negotiators in the hiring of Haitian workers."
*["A partir de 1986, por primera vez en ochenta años, coexistieron regímenes democráticos en ambos lados de la isla. Poco después desapareció el ejército haitiano, lo que eliminó a uno de los interlocutores en la trata de la mano de obra."]*

"The dealing of Haitian workers 'braceros' became a private and informal business without any military control, which previously assured the return to Haiti of the inhabitants of the bateyes. The "buscones" on both sides are the ones who now promote the traffic and the Dominican army pretends like they don't see anything. It has become harder for the sugar industry to get the Haitians to cut cane when they can choose to go work in another place now that the pseudo-military 'guardacampestres' have lost their power to keep the workers in the bateyes."

**A) The poor housing conditions of the bateyes is reported in various government reports and the media:**

> U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 8, 2006.
[http://www.state.gov/g/drl/rls/hrrpt/2006/78889.htm]
"Housing in the *bateyes* was poor; many individuals slept in barracks on iron beds without mattresses or on dirt floors. Many families of 5 or more shared living quarters that measured as little as 10 by 9 feet. Bathroom facilities, where available, were generally unhygienic, and cooking facilities were usually improvised."

> "Needed But Unwanted: Haitian Immigrants and Their Descendants in the Dominican Republic". By: Bridget Wooding and Richard Moseley-Williams. 2004.
[http://www.ciir.org/shared_asp_files/uploadedfiles/%7B3106D504-A9F9-457C-AF18-A6FCD9A9AE62%7D_Needed_but_unwanted.pdf]
"The ingenios were required to provide health services and accommodations. In reality health care was rudimentary where it existed, and the barracks in the bateyes, often a long walk to the cane fields, were overcrowded and filthy, lacking water, sanitation, electric light, and cooking facilities. "

> Report written by Father Christopher and other local representatives of the Catholic Church for the visit of the Dominican President Hipólito Mejía to Spain in 2003.
"The conditions of life and work of the cane workers and specifically of the bateyes are extremely difficult. Many of the workers and their children sleep on the ground or on box springs. The housing in the bateyes is reduced to small barracks of 3x3 meters where 6 people sleep on bunkbeds, with no toilets, no ventilation, or a place to cook."
*["Las condiciones de vida y de trabajo de los trabajadores de la caña y de manera específica en los bateyes son extremadamente difíciles. La vivienda en los bateyes se reduce a pequeños barrancones formados por cubículos de 3x3 m, en los que se hacinan hasta 6 personas en "camarotes" (literas), sin letrinas, sin ventilación apropiada, ni un lugar para cocinar."]*

> Report "Migration In The Caribbean: Haiti, The Dominican Republic And Beyond" 2003. By James Ferguson, Minority Rights Group International (MRG)
[http://www.minorityrights.org/recent_pub_Detail.asp?ID=33]
"Few of the foreign tourists enjoying the US $250-a-day luxury of the Casa de Campo resort on the Dominican Republic's south coast will be aware of a different minority in the vicinity of their hotel complex. A few miles from the hotel stand some of the Dominican Republic's hundreds of bateyes, clusters of concrete barracks or wooden shacks, home to the country's poorest people: those who cut cane on its sugar plantations."

> Spanish Newspaper El Mundo, "Un Cura en el Infierno" ("A Priest In Hell"), by Ildefonso Olmedo. January 5, 2003.
"Just a few kilometers from the resorts of La Romana and Punta Cana, from the golf course "Diente de Perro" and from the mansions of Julio Iglesias and Óscar de la Renta, thousands of people live every harvest in disgusting barracks and tin houses without electricity, drinking water or toilet facilities; and many times, without a voice."

41

*["A pocos kilómetros de los centros hoteleros de La Romana y Punta Cana, del campo de golf Diente de Perro y de las mansiones de Julio Iglesias y Oscar de la Renta, miles de personas viven cada zafra en infectos barracones y cajas de hojalata sin luz, sin agua potable, sin letrinas las más de las veces, sin voz."]*

**B) U.S. Univision "Azucar Amarga" ("Bitter Sugar") on February 21-23, 2005. U.S. nationwide Latino TV network, reported by Ricardo Arambari.**

Ricardo: "This is where they sleep. Trapped in a barrack with barbed wires above their head."
*["Aquí es donde duermen. Atrapados en un barracón con alambre de púas sobre la cabeza."]*

**C) Power Point presentation entitled "Investigacion Vicini" located on the internet:**
[Note: This document is attributed to the Newlink PR company which was retained by the Vicinis.]

"ICC (Ingenio Cristobal Colon), 23 bateyes, CAEI 8 bateyes, Angelina 13 bateyes.
In each batey there are 6 kinds of housing: individual, duplex or collective. In some cases they are overcrowded."
*["ICC 23 bateyes, el CAEI 8 bateyes, Angelina 13 bateyes. En cada batey existen 6 tipos de vivienda que van individuales, dúplex, colectivas. En algunos casos hay hacinamiento."]*

**D) Reports, media and interview (from the year 1970 on) describe the conditions in the bateyes as being very much as they continue to be today.**

> U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 8, 2006.
[http://www.state.gov/g/drl/rls/hrrpt/2006/78889.htm]
"Although the law provides for these rights, and the government generally respected these provisions in practice, there were some exceptions. For example human rights groups alleged that many Haitians were not allowed to leave the sugarcane plantations where they worked. Local and international human rights groups charged that there was discrimination against Haitian migrants and that they were subject to arbitrary and unjustified action by the authorities.

Human rights NGOs, the Catholic Church, and activists described Haitian living conditions in *bateyes* as modern-day slavery. In most *bateyes*, medical assistance either was rudimentary or not readily available. Housing in the *bateyes* was poor; many individuals slept in barracks on iron beds without mattresses or on dirt floors. Many families of 5 or more shared living quarters that measured as little as 10 by 9 feet. Bathroom facilities, where available, were generally unhygienic, and cooking facilities were usually improvised. The availability of fresh food, including fruits and vegetables, was severely limited. Clean water was often unavailable."

> "The Cane of Uncle Tom" Magazine: Match Du Monde, France. March 10, 2006.

INTRODUCTION: "Near the Dominican Republic beaches that tourists of the whole world visit, Haitian workers survive living in horrifying ghettos, reduced to slavery by the big Dominican sugar companies. The hope for a better life has put them in the route to exile. The cruelty of their guards and the misery that reigns there makes these cane cutters prisoners for eternity."
*["A proximite des plages immacullees de la Republique dominicaine, si prisees par les tourists du monde entire, des travailleurs haitiens survivent dans des ghettos effroyablles, reduits en esclavage par les grandes companies sucrieres domincaines. L'espoir d'une vie meilleure les a mis sur les routes de l'exil. La cruaute des gardiens et la misere qui regne chez eux, en Haiti, font des ces coupeurs de canne des prisonniers a perpetuite."]*

> U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. February 28, 2005.
[http://www.state.gov/g/drl/rls/hrrpt/2005/61725.htm]
"In various sugarcane industry shantytowns, field guards reportedly kept workers' clothes and documents to prevent them from leaving until the end of the harvest. Employers also withheld wages to keep workers in the fields. Sugarcane workers were paid less, worked longer hours, and had fewer benefits than workers in other industries. One monitor in a batey reported that laborers worked 14-16 hours per day – a violation of the Labor Code. Many older sugarcane workers, who had lived in sugarcane shantytowns for 50 years and longer, had not received pensions for which deductions had been taken from their pay. Several NGOs asserted that the privatization of the sugarcane industry was the reason the government did not enforce protection laws for cane cutters' rights. The IOM estimated that approximately 650,000 Haitian immigrants--or 7.5 percent of the country's population--lived in shantytowns or sugarcane work camps known as "bateyes," which were harsh environments with limited or no electricity, usually no running water, and no adequate schooling."

> Testimony Videotaped by Univision for the TV Program "Azucar Amarga" ("Bitter Sugar") on February 21-23, 2005. Reported by Ricardo Arambari.
[Note: Interview with Franklin Almeyda, Secretary of Interior and Police of the Dominican Republic.]

Ricardo: "But when you talk about historical processes, there used to be contracts between the two countries, contracts..."
*["Pero cuando me habla de un proceso histórico, antes había acuerdos bilaterales, ha habido tratados..."]*

Franklin Almeyda: "What those contracts did was to legalize a behavior that is not human because that was a way to legalize a kind of slavery for the modern times. That is slavery."
*["Esos acuerdos bilaterales lo que hicieron fue este, legalizar un comportamiento inhumano porque era legalizar una forma de esclavitud en tiempos modernos, eso es esclavitud."]*

Interviewer: "That is slavery."
*[Eso es esclavitud.]*

Franklin Almeyda: "That is slavery, that's true."

43

Sonia: "In working in a batey? I would say that it is a kind of modern-day slavery... Later he (Haitian) arrives in the community and he is prevented from leaving and exercising his right – the intrinsic right to free transit, to circulate and walk around. The owner of the plantation feels he is his owner. He can't negotiate a salary because it is already pre-established and anyway he doesn't have a way to complain or anyone to complain to. Eh – the houses they live in are really not adequate to be inhabited by human beings. Just as the health conditions aren't – because there are no health conditions. So it is a life that – it is very close to what you could call slavery – very, very close."

> Gustavo Olivo Peña (Tape U187):
[Gustavo Olivo Peña is a Dominican political analyst and respected journalist. Editor and co-founder of the Dominican online leading newspaper "Clave Digital". He previously wrote for the magazines "Ahora" and "Rumbo" among others. He also co-hosts "Uno mas Uno" a morning TV show on TeleAntillas.]

Gustavo: "[The Vicini employees in their bateyes are] living in conditions that remind you of the barracks of the Medieval times, of slavery-like conditions. It's something unbelievable."
["Eh...viviendo en condiciones realmente que recuerdan las barracas de la edad media, de esclavistas, es una cosa increible."]

Fausto Rosario (Tape U187):
[Fausto Rosario is a recognized journalist, manager of the Dominican company Media Team and co-founder and director of the online Dominican newspaper "Clave Digital."]

Fausto: "A batey is a subgroup within the Dominican society. Its poor living conditions are marked by the neglect of the government. In the bateyes there aren't any health services, education services, nutrition services. There is no drinking water or electricity in these bateyes. These people do not have the backing, nor the interest or help from the society."
["El batey es una demarcación, un sub-grupo dentro de la sociedad Dominicana muy marginado aceptado por la desatención pública. No tienen servicios de salud, de educación, de alimentación, agua, electricidad. Igualmente tampoco tienen la inversión publica en ayuda o en interés."]

> Ana Mitila Lora (Tape U090):

Ana Mitila: "To tell you the truth – it is nothing new in the Dominican Republic. It's something that has a century, maybe a century since the sugar industry started. That's the way that it has worked. It's in slave conditions that people live there and they are like a big hand one century ago. It's incredible."


**Interrogatory No. 8:**        Please state all of the facts supporting the following statement, which begins approximately at 23:38 (Exhibit 1, pp. 18:21 – 19:5) in *The Price of Sugar*:

47

21    FATHER HARTLEY: The Vicini family
22    have a lot of blood on their hands. This is
0019
1    well known. Nobody dares speak out and say it
2    because many people fear for their lives or
3    the lives of their loved ones. And this is a
4    fact. People disappear. People are never
5    found.

**RESPONSE:**    *See* Responses to Interrogatory Nos. 2, 3, 4, 5, 6, 7 and 10.

#### A) Newspaper Reports

> El Nuevo Herald, "Esclavos en el Paraíso" ("Slaves in Paradise"), January 9, 2005. By Gerardo Reyes.

"During four days a journalist and a photographer of El Nuevo Herald went around the bitter corners of this area and interviewed dozens of workers of 10 bateyes of the Vicini Company and two of Central Romana of the Fanjul family. The most common complaints are hunger, the bad treatment they receive from the company employees in the Vicini fields -- such as insults, beatings and clandestine imprisonments, the deficient and in most cases non-existent medical services, and the daily work exploitation in exchange for a sum of money that is rarely enough to eat once a day."

*["Durante cuatro días, un reportero y un fotógrafo de El Nuevo Herald recorrieron los rincones amargos de esta zona y entrevistaron a decenas de trabajadores en unos 10 bateyes del Consorcio Vicini y en dos del Central Romana, de la familia Fanjul. La denuncia común es el hambre, los malos tratos que reciben por parte de los capataces en los terrenos de los Vicini, desde insultos hasta golpizas y encarcelaciones clandestinas, los deficientes y en muchos casos inexistentes servicios médicos y la explotación inhumana de su trabajo a cambio de un estipendio que escasamente alcanza para comer una vez al día."]*

> Miami Herald, English-language follow-up to "Esclavos en el Paraíso" ("Slaves in Paradise"), March 6, 2005. By Gerardo Reyes:

"Three workers disappeared after they were caught and beaten by Vicini complex employees when they were trying to escape in November of 2003, according to a complaint by the nonprofit "Dominican Center for Advisory and Legal investigations."

> Spanish newspaper, El Mundo, "Un Cura en el Infierno" ("A Priest In Hell"), by Ildefonso Olmedo, January 5, 2003:

"There are so many questions to ask, but no one dares to answer and interrupt the law of silence. Nobody has seen, nobody has heard anything. "Yes, Father, it was the Guarda Campestre (guard) of Batey Contador. He chased them when they were trying to escape. He beat them up with the machete, in that barrack... It was probably five in the morning, it wasn't dawn yet." He says he

48

cannot let them escape, that the bosses pay too much per head" finally someone gets over the fear and tells him what happened." The Spanish Priest has been in his mission in the sugar cane fields of the Dominican Republic for five years and personally suffers the abuse over the Haitians, the slavery of the sugar cane. – Never serve someone who has served- says the Priest after learning that in that same morning the guarda campestre (the police in the villages where the workers are confined) had imprisoned and beat a group of cane cutters who, like himself, are Haitian. Hours later, the Priest repeated agrily to the administrator of the factory that owns all these fields: "Merité, the Campestre of Contador". He was asking for justice and the end of the bad treatments. In a corner of 'Don' Ricardo's office, the almighty boss that the Vicini Consortium has put in front of the sugar factory Cristóbal Colón…"

*["Después ya sólo caben las preguntas, pero nadie se atreve a romper la ley del silencio. Nadie ha visto, nadie ha oído. «Sí, padre, fue el guarda campestre del batey de Contador. Los cazó cuando intentaban huir. Les golpeó con el machete ahí, en ese barracón… Serían las cinco de la madrugada, aún no había amanecido. Dice que no les puede dejar escapar, que los jefes pagan demasiado por cada cabeza», confiesa finalmente un paisano que vence el miedo." El sacerdote español lleva cinco años de misión entre los campos de caña de la República Dominicana y padece en carne propia los abusos sobre los haitianos, la esclavitud de la caña. «Nunca sirvas a quien sirvió», masculla el clérigo al saber que el guarda campestre (policía de las aldeas donde son recluidos los braceros) que esa mañana había apresado y apaleado a un grupo de cortadores era, como ellos, haitiano. «Merité, el Campestre de Contador», repetía enrabietado horas después el padre ante el administrador del ingenio al que pertenecen todos aquellos campos. Exigía justicia y el fin del maltrato. A sus espaldas, en una esquina del despacho de don Ricardo, el todopoderoso jefe que el Consorcio Vicini ha puesto al frente de la factoría azucarera Cristóbal Colón y que ahora oía las quejas del padre…]*

> Italy: Il Manifesto "L'Inferno dei -braceros- haitiani" ("The Hell of the Haitian Workers"), by: Marina Forti, December 13, 2006.

"Mr. Vicini said to the camera that the 2,000 Haitians in his company earn the minimum salary for agricultural workers in the country and they receive housing, medicines and school for the children. The images of the bateyes show something different: miserable metal or wooden barracks without any windows, the children, naked, playing in the dusty bateyes. The workers explain that it's not true, they don't receive any medical attention, and if they do get to see a doctor, they have to buy the medicines themselves. They don't have enough to feed their children properly either. Mr. Vicini says to the camera that the cutters make 100 pesos, 3 dollars per ton of cut cane; but the camera is there on payment day to confirm that it's only 85 pesos per ton, minus the social security contribution. The workers won't even have access to this social security in the future."

*["Fa venire un certo prurito sentire un signor Vicini dire, alla telecamera, che i duemila haitiani impiegati dalla sua compagnia guadagnano piu del salario minimo dei lavoratori agricoli dominicani, e in piu ricevono alloggio, cure mediche, scuola per I figli. Le immagini girate nel batey dicono proprio il contrario: mostrano tuguri soffocanti e lerci, brande di metallo, o addirittura barache di lamiera senza neppure un buco come finestra e bambini mezzi nudi che scorozzano della polvere. Visi nerissimi, ragrinziti dale sole e dalla fatica, spiegano che no, non ricevono cure mediche- o se vedono un medico poi devono comprarsi le medicine, e non hanno neppure abbastanza soldi per nutrire I figli. Il signor Vicini dice alla telecamera che il bracero prende 100 pesos (tre dollari) per tonnellata di canna tagliata, quando la telecamera riprende il*

*momento della paga pero risultano 85 pesos per tonnellata, meno le trattenute per una sicurezza sociale a cui il lavatore non avra mai diritto."]*

**B) Television Reports**

> Dominican television show "Nuria, Investigación Periodística" (Ch. 9, Color Visión). TV journalist Nuria Piera stated on July 16, 2005:
NURIA: The life and the work conditions of the sugar cane workers are really pathetic in the sugar mills of the Vicini family where they are subdued to a regime of terror, surrounded by armed men in the sugar fields.
*["Las condiciones de vida y trabajo de estos braceros es realmente patética en los ingenios de la Casa Vicini donde son sometidos a un régimen de terror rodeados en los campos de caña de hombres armados.]*

> U.S. CNN, Anderson Cooper 360° Blog associated with special report: "Invisible Chains: Sex, Works and Slavery". Posted by Steve Turnham, CNN Producer, December 18, 2006:
[www.cnn.com/CNN/Programs/anderson.cooper.360/blog/2006/12/is-sugar-production-modern-day-slavery.html]
"The Vicinis showed us one of the *bateyes*. It appeared to have plumbing and electricity; the people seemed happy, and there was a shop, and a school. But just down the road, we came across another *batey*, where other Vicini workers lived, that was not on the official tour. No running water, no electricity, too little food. The old or infirm looked like they were starving. One old man told us he hadn't eaten in four days. Children told us they planted cane in Vicini fields for three pesos a row. It takes half a day to plant a row."

> Univision, "Azucar Amarga" ("Bitter Sugar") aired on February 21-23, 2005. Reported by Ricardo Arambari:
Ricardo Arambari: "After being witnesses of these inhumane conditions, in which the cutters survive, we ask ourselves if slavery was abolished…. The people that employ them in these very bad conditions, in this case are the Consortium Vicini."

"When we questioned the Vicini about the miserable conditions in which their workers live, like we were able to verify; they defend themselves saying that they are not violating any law, that they are trying to improve the situation at the bateyes and that, anyway, it is not their responsibility."

Ricardo speaking to a cane cutter:

Ricardo: So you feel the pressure, that you have to stay here to work?
*[O sea que sientes la presión de que te tienes que quedar aquí a trabajar?]*

Man: Yes.
*[Sí]*

Ricardo You cannot escape?
*[No te puedes escapar?]*

Man: No.

Ricardo: If you want to go, for example, this night, go out to the road, you can't?
*[Si te quieres ir, por ejemplo, esta noche, salir por la carretera, no puedes?]*

Man: No.

Ricardo No?

Man: No.

Ricardo: What do they do to you?
*[Qué te hacen?]*

Man: If they find you, they put you there, in a room there.
*[Es que lo meten a uno allí, en un cuarto allí.]*

Ricardo They arrest you?
*[Te tienen preso?]*

Man: Yes.
*[Sí]*

Ricardo: "The people that employ them in these very bad conditions, in this case the Consortium Vicini, have a very simple answer."
*["Quienes los emplean en estas pesimas condiciones, en este caso el Consorcio Vicini, tienen una sencilla respuesta."]*

REP. OF THE VICINI CONSORTIUM: "If they are absent from that area, we are responsible for the cost of repatriating that worker according to the Direction of Immigration."
*["Si ellos se ausentan de esa zona, nosotros somos responsables ante la Direccion de Inmigracion por el costo de repatriar ese trabajador."]*

Ricardo: "After being witnesses of these inhumane conditions, in which the cutters survive, we ask ourselves if slavery was abolished."
*["Despues de ser testigos de estas condiciones infrahumanas en las que subsisten los picadores, nos preguntamos si realmente se abolio la esclavitud."]*

"When we questioned the Vicini about the miserable conditions in which their workers live, like we were able to verify; they defend themselves saying that they are not violating any law, that they are trying to improve the situation at the bateyes and that, anyway, it is not their responsibility."

51

*[“Al cuestionar a los Vicini por que las condiciones de sus trabajadores son tan miserables, como pudimos comprobar, se defienden diciendo que no estan violando ninguna ley, que estan tratando de mejorar la situacion de los bateyes y que en todo caso no es su responsabilidad.”]*

## C) Interviews by Uncomon Productions:

> Father Christopher (Tape U204):

"That's why you have the Merité, who is the head of the "buscones", who would lock them up in the barn where they keep the fertilizer, lock them up and beat the hell out of them with a machete, with a flat machete. Slap them, or they would actually put them in prison because the sugar mill had its own prison. I mean, the prison is a room. Have a room, lock somebody up for two or three days, exercising the same authority of the national police or of a prosecutor or if a judge."

> Father Christopher (Tape U122):

"Merité has done exactly the same thing this year. He's becoming a very, very wealthy man. The Vicini family—Because he's the one responsible, for example, for the Haitians not leaving the bateyes. He beats the hell out of them. He locks them up in a shed and hits them with a flat machete. Or he conceals their little backpack, so their meager possessions are taken away from them. This was a very common practice. Basically, it's industrial kidnapping."

> Father Christopher (Tape U026):
"We have a Feeding Center right where we are now, here… But malnutrition -- I mean, you're the experts -- is really the cause of many, many of the tragedies of these children who -- I mean, they don't learn because they're hungry, and because this doesn't function if it doesn't develop properly, you know? Which is very sad, especially because -- even you pick it up immediately -- there's some very, very bright children who are just going to be wasted.

And so it's not just they're poor, or it's not just… Now these people work very, very hard, they work for 10 hours. But after 10 hours of work, you've made 90 cents. So it's a whole system of injustice. So how do I envision the work that I'm trying to do? And people such as yourselves that maybe today come to help? It's like two tracks: one would be, say, call it charity. I would even there include the work that you're doing today within that context. And then the work of justice. If you didn't come today, maybe there are babies which are going to die, that are going to die, and you saved a baby's life today. But you shouldn't be the people coming all the way from Massachusetts for these people. Because these people have the right to a health care system, even if it's very basic, no?

These children, because of their very harsh living conditions, are exposed to many, many illnesses. And most of them have parasites, they suffer from malnutrition. Many of them have many different kinds of skin diseases due to the poor water condition. And they

have very poor access to anything to do with nutrition, for example, a feeding center or things of that nature. And these children, the ones that we are taking care of today, also very easily exposed to HIV, mainly through sexual transmission. And I'd say approximately 15% of the dwellers of the bateyes are HIV positive, although most of them don't even realize it."

> Father Christopher (Tape U038):

"And most of these children, the majority of these children come to our feeding center. This is probably the only decent meal they are going to have in the day, when they come here to the Feeding center. That, obviously, many of the illnesses that they suffer, the disease, et cetera, is a consequence of their very poor nutrition."

> Father Christopher (Tape U040):

"These people, all of them, work for one the wealthiest families in the Dominican Republic, the Vicini family. The other being that Fanjul family. They employ about 30 thousand cutters, sugar cane cutters, who come to harvest the sugar cane during the harvest season, which lasts from November through June. Most of these children, even the grown ups, suffer from many different illnesses and sicknesses because the living conditions are so deplorable. And also because their immune system is very weak, so they are very prone, they are very exposed to sicknesses and diseases that most of us have the adequate immune system for."

> Father Christopher (Tape U045):
"The outlook of the company is that these people have no rights. Their only right is to obey the company rules. If you follow the company rules, everything is going to be fine. Nobody is going to mess around with you. We will be very happy with you. But that implies giving up your fundamental freedoms, freedom of movement, freedom of speech, freedom of worship, right to healthcare services, education for you children. And the basic needs of life."

> Doctor Kim Wilson from Boston's Children's Hospital (Tapes U172 and U173):

"Really these are some of the worst conditions that I've ever seen. This is really extreme poverty. Families are living without access to water, without access to food, without access to, you know, really any healthcare or any infrastructure at all. They're living in hovels, and they don't really even have the dignity of owning them. They have really no access to any kind of human rights— any public rights, because in many cases they don't have the papers that they need to be actually citizens. So it's really tragic.

We know that over half of the adults living in the bateyes have evidence of being infected with tuberculosis. And we know that over a quarter of the children here have had tuberculosis. We know that maternal mortality, which is a problem throughout the Dominican Republic, is huge here. Many women die prior to giving birth or in childbirth. Many of the deaths aren't even documented or recorded. And we know that infant

mortality and specifically neonatal mortality, or children who die the first month after birth or at birth, is just incredibly high. And what's really tragic about those numbers is that we know how to treat all those conditions. We know how to prevent them, and we know how to treat them. And the treatments are simple and they're cheap. The developing world can afford this. And we know how to do it, and we know they're effective. And what's truly tragic is how very few of those simple, basic life saving interventions are getting out here to the people who need them the most."


> Jhonny Belizaire, resident of Vicini batey Santa Lucia (Tape U137):

"Well, one Sunday at noon, I was sitting in the batey after I had returned from work and immediately a truck appeared and Alex told me that the Father had asked him to tell me to wait for him at Batey Contador. So I got ready and left for Contador. So, when I arrived I found a "trip" of Haitians; that means that they had been brought through the frontier and in that trip there were two students that left Haiti, but that their parents lived here, resided here and they sent them the money so that they could come legally. So the "buscones" told them that they had the possibility of bringing them without spending that much money to get a visa in their passport and that with only paying a "buscon" five thousand pesos he would bring them over here without any kind of problem for them, so that later, they would take them to Casa de Campo, where their parents work. And well, they decided to come with him, but they explained to me... when I got there, in the dialogue that I was having with them, they told me that when they were in the frontier, where they had them, they, since apparently you could tell by their appearance that they were not cane cutters, they came from Puerto Principe. So the "buscon" told them to dirty their clothes so that when the people came to bring them to the Dominican Republic they would think that they were cane cutters, because physically the cane cutters, you can see it in their outfits, physically you can tell that they work in the cane fields and that they are not people that are used to another kind of work."

*["Pues, un domingo al medio día estaba yo sentado en el batey que había yo regresado del trabajo entonces apareció inmediatamente una camioneta y me dijo Ale que el Padre, me mandó a decir que lo esperara en el batey Contador. Entonces me, me alisté y arranqué para Contador. Entonces cuando yo llegué encontré a un viaje de Haitianos, es decir que los habían traído por la frontera y en ese viaje andaban dos estudiantes que salieron de Haiti, pero que sus papas vivían aquíi, residían aquí y les mandaron el dinero para que ellos vinieran legalmente. Entonces los buscones les dijeron a ellos que ellos tenían la facilidad de traerlos sin que ellos gastaran tanto dinero para visar un pasaporte y que ellos con tan sólo pagarle a un buscón, eh, cinco mil pesos el los traía para acá sin ningún tipo de problema para ellos, para luego, luego llevarlos a Casa de Campo donde trabajan sus padres. Y ellos bien, decidieron venir con el, pero ellos me expli... cuando yo llegué, en el diálogo que tenía con ellos, ellos me dijeron que cuando estaban, eh, en la frontera, donde los tenían, ellos, como aparentemente eran personas que se les veía en el físico que no eran gente que picaban cana, porque eran gente fina que sabía, que venían de Puerto Príncipe. Entonces el buscón les dijo que, que se ensuciaran la ropa para cuando la gente vinieran a... a reclutarlos para traerlos a República Dominicana vieran que son gente que pican caña, que son cortadores de caña porque físicamente a los cortadores de caña se les ve la facha; es decir se les ve en lo físico que son gente que, que trabaja en la caña y que no son gente que tenga acost... acostumbrados a otro tipo de trabajo."]*

"So they were not in agreement to stay, but they couldn't leave because at night, the guard went to the house where they were sleeping and he was putting pressure on them with a shotgun, that they could not leave because some had already escaped during the night. So, the next day when I arrived they had given them a mattress and a "machete" to go cut cane. And since they were, they didn't know how to do that kind of work they said: "No". So they said to them: "Okay, if you don't want to work, you are going to have to work forced because you are not leaving from here."

*["Entonces ellos no estaban de acuerdo en quedarse, pero que ellos no podían irse porque en la noche, el Campestre fue a la casa a donde estaban durmiendo y los estaba presionando con una escopeta, que ellos no se podían ir porque habían unos cuantos que se habían escapado en la noche. Entonces al otro día cuando yo, eh, cuando yo llegué les dieron un colchón y un machete para que fueran a picar caña. Y ellos como no estaban, no sabían, eh hacer ese tipo de trabajo dijeron que no. Entonces ellos dijeron "bueno, si ustedes no quieren trabajar, van a tener que trabajar obligados porque de aquí no se van."]*


> Jhonny Belizaire, resident of Vicini batey Santa Lucia (Tape U115):

Jhonny: "In the last few months some Haitians arrived... and they were asking me why life was so bad here and I was explaining the conditions here. So, they told me that they wanted to leave. And since I know that when they bring you from the border, they stop you from leaving, I told them that they couldn't go and I told them that it was better for them to try to escape at night so they wouldn't get in trouble. I spoke to them and they agreed. So that night, he came looking for me, at around 8' o'clock and he told me: "Jhonny, I am leaving" and I said: "Take care". And so when I went outside to say goodbye, I saw two men with a pair of very well sharpened machetes. They were the same men that had recruited them at the border. And I told them: "why are you going around with the machetes? And they told me that the man that was leaving, that they were looking for him, that they were looking for him so he wouldn't leave and that I was also part of the fact that the man was going to leave and that they were going to kill me... to assassinate me. And I asked him: "Well, if you kill me, you know that you are going to get caught?" They said: No, that they were not afraid, they were not afraid because they are employees of the company and that the company was going to protect them and that if they were put in jail, the company was going to take them out. And I got scared because they had the intentions of killing me."

*["Entonces en los meses pasados, hay unos cuantos Haitianos que vinieron para acá y que... y ellos me preguntaban a mí por qué aquí se vive tan mal y yo les estaba explicando las condiciones de vida que hay aquí. Entonces ellos me dijeron: "Bueno, no, no me voy a quedar". Y cómo yo se que aquí el que, cuando los traen de la frontera para acá les impiden salir, le dije que no podían irse, que el no podia irse y le dije que era preferible el irse de noche, para que en el día se evitara un problema. Entonces yo hablé con el y el me dijo que sí. Entonces a la noche, el se iba y me vino a llamar, como a las ocho de la noche y me dijo: "Jhonny, me voy a ir" y le dije yo, "bueno, cuídate". Y entonces cuando salí para afuera a despedirme, vi a dos hombres con unos machetes bien afilados. Eran los mismos capataces que lo habían reclutado de la frontera para acá. Y les dije, y les dije:"por qué andan con los machetes?" y ellos me dijeron a mí que al hombre que se iba, que ellos lo estaban acechando, acechándolo, que estaban acechándolo para que el no se fuera y que también yo formaba parte de que el hombre se iba a*

*ir y que ellos me iban a matar... a asesinar. Y yo le pregunté: "Bueno, si ustedes me matan, ustedes saben que ustedes van a caer presos?" Ellos me dijeron que no, que ellos no tenían miedo, no tenían miedo porque ellos son trabajadores de la compañía y que la compañía los iba a proteger y que si los metían presos, la compañía los iba a sacar. Y yo me, cogí miedo porque tenía miedo porque ellos tenían las intenciones de matarme."]*

> Yancro Belizaire, Jhonny's father, resident of Vicini batey Santa Lucia (Tape U115):

"Around here, we didn't know anything. The guard would hit us, but not anymore, now they can't, now they can only look at you like this, they are afraid of us. But before, uh! You would wake up and you couldn't cut cane. They would say: "Go!" But not now, thanks to Christopher, not now."

*["Nosotros estaba aquí, ahí... no sabía nada. Aquí Campestre golpeaba a uno, pero ahora no, ahora no se puede, ahora no más me tienen que mirar así, ellos tienen miedo a nosotros. Pero a de antes, uh! Cuando tu levantas, tu no podías picar caña, que váyase! Ahora no, gracias a Christopher, ahora no."]*

> Yela Machasa, resident of Vicini batey Canepa (Tape U179):

"Well, in the past, there used to be a lot of violence in the bateyes. The workers were treated badly. When the workers came from Haiti, they would take their clothes, they would beat them, they would treat them badly and so, you would feel very bad about that, you didn't know who to go to. And one day, there were three sick men that couldn't work. They were going to leave. Well, there is one from the company, a guard of the company called Merité. He found the two of them and asks them: "Where are you going?" And they said: "Well, we are sick and we don't have family here. We feel bad, we cannot work, we leave". And he takes them as prisoners in a truck and when he arrives to the office in the batey, to the office, he took out the machete, he beat him to the ground, he hit him twice the... the two of them."

*["Bueno, antes había mucha violencia en los bateyes. Los maltrata a los trabajadores mucho, se quita, cuando los trabajadores vino de Haiti, les quita la ropa, les dá golpes, los maltrata y bueno, uno se sentía mala con eso, no sabían de quién que uno va ahí y bueno. Y un día había tres que estaban enfermos y que no podían trabajar. Se iban. Bueno, hay uno de la Compañía, un, un Campestre de la Compañía que se llama Merite. Le encuentra con los dos y les pregunta: "Pa' donde van" y ellos dijo: "Bueno, nosotros está enfermo y no tenía familia aquí. Nosotros se sentía mala, nosotros no puede trabajar, me voy" y lo agarra preso en una camioneta y cuando el llega allá en el batey, el mismo oficina, el jalo machete, el lo cae a planazos, le dan dos planazos a... los dos."]*

> Guillermo, cane cutter (Tape U128):

Interviewer: Guillermo tell me, the people that work with you, the other cutters that come to cut cane for this company, they also have a bit of fear towards the bosses, the administrator, the field chief?

*[Guillermo dime, los compañeros tuyos, los otros picadores que vienen a picar caña a esta compañía, ellos también le tienen un chin de miedo a los jefes, al administrador, al jefe de campo?]*

56

Guillermo: There are many there that are scared because when they came here... What happens is that the immigrants, They take their bags away from them.
*[Si es que es muchos allá que tienen miedo, porque tienen miedo, porque, porque ellos antes cuando vinieron... Es que los migrantes. Es que se la cogen, es que el bulto, es que, es que se lo han guardado a ellos.]*

Interviewer: They would take their bag and they would keep it.
*[Les quitaban el bulto y se los guardaban.]*

Guillermo: They would keep it.
[Se los guardaban ellos.]

Interviewer: Yes, and why did they do that? What for?
*[Sí, y por qué hacían eso, para qué?]*

Guillermo: So they don't leave.
*[Es que, es que para que no se vayan.]*

Interviewer: They would take their things?
*[Les quitaban sus cosas?]*

Guillermo: Yes.
*[Sí.]*

Interviewer: Do you know if they've ever hit a person?
*[Está bien. Tú sabes si alguna vez le han dado golpes a alguna persona?]*

Guillermo: Yes. They would hit them.
*[Sí. Es que le dan tres planazos por reparo.]*

Interviewer: And why is that, is that because they wanted to leave?
*[Eso por qué, por qué se querían marchar?]*

Guillermo: Yes, because they wanted to leave, yes.
*[Sí, porque se querían ir, sí.]*

Interviewer: Did you see that?
*[Eso lo viste tu?]*

Guillermo: I saw it myself. In front there.
*[Lo he visto yo mismo. En frente ahí.]*

Interviewer: When people come here, with the company to work in the cane, they are scared to leave, to leave the sugar mill?
*[Cuando la gente viene aquí, con la compañía a trabajar en la caña, tiene miedo de irse, de dejar el ingenio?]*

Guillermo: Yes they are scared because sometimes what happens is that the Vicinis go look for them, what happens is that the bosses... attack them, what happens is that to leave, sometimes they put guards at night so that you can't leave. They have to go there, even against their will. They are forced to go cut cane.

*[Sí, de antes tiene miedo porque a veces que, es que los Vicini mismos que los van mandar, es que los jefes, es que... es que de atacar, de ellos, es que pa' irse, a veces ellos ponen sirenos de noche que pa' que no se iba ir. Tiene que irse ahi, es que ellos obligatoriamente tienen que picar cana obligados.]*

> Group of young men, residents of San Jose de los Llanos, interviewed during a protest against Father Christopher (Tape U210):

Man #2: We had never seen something like this around here, a strike! Just now are we seeing this, a strike, throwing rocks, like this, we had never seen. This is a good town. Those thiefs are with the Vicini.

*[Oye, porque esto en este sitio que nunca se habia visto esto, dizque va a haber huelga ahora se esta viendo esto aqui, dizque huelga, tirando piedras, esto, nunca se habia visto. Esto es un pueblito sano, aqui ahora. Estos ladrones que estan con los Vicini.]*

Man #2: Look, all those bateyes there, if the Father weren't there, many people would be hungry, exploited, those Hatians there, the way the Vicini treat them.

*[Mire, de todos esos bateyes ahi, si el Padre no estaba ahi, muchisima gente pasando hambre, explotados, esos Haitianos ahi, como los trataban los Vicini a ellos.]*

Man #3: Starving to death.
*[Muriéndose del hambre.]*

Man #2: Older men, eighty something years old cutting cane. And they don't care about them.
*[Estos viejos desde ochenta y pico de años cortando caña, de cincuenta asi. Sin importarles cómo están.]*

Man #3: Can you imagine, they would fire them without giving them a pension or anything.
*[Imaginate, te tenian que correr porque no los pensionaban ni nada.]*

**D) Interview of Dario**

> Dario:

"I brought people here. The first immigration was on the fourth of December. On the ninth. It was on the ninth, we went... (Inaudible) a group of people. It was seven, at night. And Merité hits those people, he takes their money from their own hands, employees of the company because here that is... "

*["Se los trae gente pa' aca. La primera inmigración el día 4 de Diciembre. El día 9. Fue el día 9, se pasa... (Inaudible) un poco de gente. A las siete de la tarde. Y Merite les da golpes a esa gente, se los ha quitado el cuartos, de las manos de ellos, empleados de la Compañia porque por eso aqui... "]*

DARIO: "Merité counts the people and when there is a bad situation, like there is not water or anything. Merité himself stands outside and guards with a, club in his hands. If you don't walk fast enough he beats you."
*["Es Merite que cuenta a todas las personas y cuando ellas salen en una situación malo, malo.... pero no hay agua, no hay nada. Es la misma Merite se para afuera como un guardia. Ella como un, con un palo en la mano. Si una no anda rápido, el les da palo."]*

## E) Government Reports

> <u>U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 6, 2007.</u>
[www.state.gov/g/drl/rls/hrrpt/2006/78889.htm]

1) "At year's end there were allegations that some employers, specifically the Vicini Corporation, had resumed the practice of importing undocumented workers for the sugar fields." (Section 5, Page 13)

2) "Conditions for the agricultural workers were poor, particularly in the sugar industry. Most bateyes lacked schools, medical facilities, running water, and sewage systems and had high rates of disease. Company-provided housing was sub-standard. Most sugarcane workers were Haitian or of Haitian descent. In some *bateyes*, employers withheld a portion of wages to ensure that workers returned to the fields for the next season's harvest. Sugarcane workers often did not receive medical services or pensions due them even though deductions were taken from their pay." (Section 6E, Page 18)

Power Point presentation entitled "Investigacion Vicini" located on the internet:
[Note: This document is attributed to the Newlink PR company which was retained by the Vicinis. The document is dated March 30, 2007.]

"Data of the Group
Health: When the workers are refered to [medical] specialists, they have no way to get there because they lack transportation and economical resources."
*["Datos del Grupo. Salud: Cuando los trabajadores son remitidos a los especialistas no tienen manera de llegar a ellos porque carecen de transporte y de medios económicos."]*

"Less than a third of the batey households have direct access to water in their patio (24.9%). In the interior of the houses (8.0%). The lack of drinking water forces people to use and drink contaminated water, which produces diseases."
*["Menos de la tercera parte de los hogares de los bateyes tienen acceso directo a agua en el patio (24.9%). En el interior de su vivienda (8.0%). La carencia de agua potable obliga a la gente a utilizar y beber agua contaminada lo que les produce enfermedades."]*

"The social situation of the bateyes is perceived as critical and this suggests a great political threat since DR-CAFTA opened the competition."

*["La situación social de los bateyes es percibida como crítica lo que sugiere una gran
amenaza política a partir de la apertura de competencia con el DR-CAFTA."]*

**Interrogatory No. 9:**     Please state all the facts supporting the following statement,
which begins approximately at 24:05 (Exhibit 1, pp. 19:6 – 20:1) in *The Price of Sugar*:

```
6        NARRATOR:  In an unmarked corner of
7        the Vicini plantation is a cemetery
8              FATHER HARTLEY: Dominicans don't know
9        of this cemetery.  I only found this place
10       about seven or eight months ago, and I've been
11       here for seven years, and nobody had ever
12       mentioned it.  It's like a taboo place.
13       You're standing on people's bodies.  All of
14       this.  It's not just where you see crosses.
15       Some are very obvious.  You can just see those
16       lumps.  Why all of a sudden is there no grass
17       over there?  I mean, this is tropical weather,
18       everything grows in five minutes.
19              This is the man who was murdered the
20       night of December 7th.  He was beaten as he
21       was climbing into the bus to come across the
22       border, and he was found dead on arrival at
                                    20
1        the Vicini bateye call Copaito.
```

**RESPONSE:**

**A) Father Christopher describes the story as follows, and states that the cemetery is on the
corner of a Vicini batey called Dos Hermanas:**

> Father Christopher (Tape U051):

"These are people they've done away with, people who were troublemakers, people who
complained.  Many times they've tried to organize among themselves and they've expelled
everybody from the bateyes, and actually murdered people. One was killed on December 7th.
I'm following that case because I'm trying to file a court case against the Vicini for murder. I've
taken it to court. They're most famous "buscon", his name is Merité. On the night, there was a
trip from the border with workers on the night of December 7th, 2003, for this harvest that ended
just this past June.

One of the hundreds and hundreds who were, after two weeks, waiting at the border, with not a
roof over their heads and just a bowl of rice, for two weeks waiting for the trip to be organized at
Dubeje, they all got very excited when the buses finally arrived.

> Interview of Father Christopher (Tape U143):

Father Christopher: "One of the major accusations is that they accuse me of inciting people to burn the sugar cane fields, but to the tune of, of fifty thousand hectares. And they went to him to the Secretary of State for the Enforces to accuse me and he basically told them to get out of his office. He didn't believe them and he said, I know the Priest personally because he's been here in my office and I know that what you are saying is not true, but that gives you an idea of how far they are ready to go."


> U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 8, 2006
[http://www.state.gov/g/drl/rls/hrrpt/2006/78889.htm]
"Officials of the association of sugar industries regularly criticized the priest heading this effort, and newspapers carried unfounded allegations that he had encouraged workers to destroy property."


> Dominican Newspaper Diario Libre
[http://www.diariolibre.com/app/article.aspx?id=44705]
HEADLINE: "The burning of cane causes RD$350M in losses.
Faustino Jimenez, The Director of Inazucar, says that the traditional defenders of the Haitians in the country could be behind these actions. He revealed that as a result of the fires in the sugar cane plantations of the country, the sugar industry has lost over RD$350M. He didn't rule out the possibility that sectors of the country who defend the Haitians and dedicate themselves to discredit the country could be behind these fires. The Priests Ruquoy and Hartley are among those defenders."

*["Quema de caña causa pérdidas RD$350 MM. Faustino Jiménez dice que detrás de esas acciones podrían estar los tradicionales defensores de los haitianos en el país. El director del Instituto Azucarero Dominicano (Inazucar), Faustino Jiménez, reveló que como consecuencia de las quemas de plantaciones cañeras perpetradas por manos criminales en los ingenios del país, la industria azucarera ha tenido pérdidas por encima de los RD$350 millones en lo que va de año. El funcionario no descartó que detrás de esos incendios estén sectores que se dedican a desacreditar al país para justificar su defensa a los haitianos. Dijo que entre esos defensores de los haitianos están los sacerdotes Pedro Riquoy y Christopher Hartley."]*


> INAZUCAR, Instituto Azucarero Dominicano (Dominican Sugar Institute) Report, April 15, 2005 Writen by: Faustino Jimenez, executive director.
[http://www.inazucar.gov.do/]
"The Sugar Industry has been the victim, once more, of significant and criminal fires that have devastated an important part of the cane plantations, especially in the East Region of the country.... The most affected companies were Central Azucarera Consuelo ... and in second place, the Ingenio Cristobal Colon of the Vicini Company.... The less affected ones were Central Romana and Barahona."
*["La industria azucarera ha sido víctima una vez más de grandes y criminales incendios que han devastado una parte importante de las plantaciones de caña con énfasis en la Región Este*

I HEREBY AFFIRM, UNDER THE PENALTY OF PERJURY, THAT THE
CONTENTS OF THE FOREGOING ARE TRUE AND CORRECT TO THE
BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Dated:  November 26, 2007

William M. Haney, III
For Uncommon Productions, LLC

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

By: _____
Elizabeth C. Koch (pro hac vice)
Thomas Curley (pro hac vice)
1050 Seventeenth Street, N.W., Suite 800
Washington, DC  20036
Telephone:  (202) 508-1100
Facsimile:  (202) 861-9888

Jonathan M. Albano BBO #013850
Lisa E. Kirby BBO #667802
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA  02110
Telephone:  (617) 951-8000
Facsimile:  (617) 951-8736

# Exhibit E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**FELIPE VICINI LLUBERES and
JUAN VICINI LLUBERES,**

           **Plaintiffs,**

    **vs.**

**UNCOMMON PRODUCTIONS, LLC,
and WILLIAM M. HANEY, III,**

           **Defendants.**

**Civil Action No. 07-11623 (DPW)**

### DEFENDANTS' INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Defendants Uncommon

Productions, LLC and William M. Haney, III ("Defendants") provide to Plaintiffs Felipe

Vicini Lluberes and Juan Vicini Lluberes ("Plaintiffs") their initial disclosures.

Defendants make these disclosures without waiving and expressly preserving (a)

any objections as to competency, relevancy, materiality, privilege and admissibility of any

of the information or documents provided; and (b) the right to object to discovery

requests involving or relating to the subject matter of the disclosures made herein and the

documents provided herein.

As used herein, the "Film" refers to the documentary produced by Uncommon

Productions entitled *The Price of Sugar*.

I.    **Individuals Likely to Have Discoverable Information that Defendants
      May Use to Support Their Defenses**

Defendants' identification of individuals who are likely to have discoverable

information is continuing, and Defendants reserve the right to supplement this disclosure.

Notwithstanding the foregoing, the following individuals may have discoverable

information regarding (a) the researching, filming, and production of the Film; (b) the

public figure status of Plaintiffs; and/or (c) the substantial truth of the allegedly

defamatory statements in the Film concerning Plaintiffs:

1.    William M. Haney, III, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050

Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to all topics).

2.    Eric Grunebaum,  c/o Levine Sullivan Koch & Schulz, L.L.P., 1050

Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to all topics).

3.    Eric Cochran, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050

Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to (a) and (c)).

4.    Jerry Risius, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050

Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to (a) and (c)).

5.    Debra Longo, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050

Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to all topics).

6.    Diana Trudell, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050

Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to all topics).

7.    Adam Moyer, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050

Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to (a) and (c)).

8.     Peter Rhodes, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050

Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to (a)).

9.     Father Christopher Hartley, Ethiopia (as to all topics).

10.     Yela Machasa, Dominican Republic (as to (a) and (c)).

11.     Jhonny Belizaire, Dominican Republic (as to (a) and (c)).

12.     Noemi Mendez, Dominican Republic (as to all topics).

13.     Flor Angel Polanco, Dominican Republic (as to all topics).

14.     Father Pedro Ruquoy, Zambia (as to all topics).

15.     Sergio Roitberg, Newlink, Miami, Florida (as to (b) and (c)).

16.     Campos de Moya, Grupo Vicini, Dominican Republic (as to (b) and (c)).

17.     Fernandez Mario Rivadulla, Grupo Vicini, Dominican Republic (as to (b)

and (c)).

18.      Ricardo Hernandez, Grupo Vicini, Dominican Republic (as to (b) and

(c)).

19.     Carmen Ogando, Grupo Vicini, Dominican Republic (as to (b) and (c)).

20.     "Merité," Grupo Vicini, Dominican Republic (as to (c)).

21.     Amelia Vicini, c/o Town & Country Magazine, 300 West 57th Street, New

York, New York 10019-3794 (as to (b) and (c)).

22.     Felipe Vicini Lluberes (as to all topics).

23.     Juan Vicini Lluberes (as to all topics).

## II.     **Documents**

Defendants' review of their files is continuing and they reserve the right to

supplement the categories of documents identified herein.  Notwithstanding the

foregoing, Defendants may use various documents, information and tangible things that fall within the following categories, that are in their possession, custody or control, to support their defenses: film footage and still photographs shot by Defendants and their agents, including the Film and excerpts of outtake footage; excerpts of film footage obtained by Defendants in connection with the production of the Film; original documents from the Dominican Republic related to the conditions of the Haitian cane cutters and related matters obtained by Defendants in connection with the production of the Film; news articles and transcripts, websites, academic papers, books, U.S. government, international, and non-governmental organization reports, correspondence, notes, and similar materials obtained and reviewed by Defendants in connection with the production of the Film; still photos obtained by Defendants in connection with the production of the Film; Newlink materials accessed on the internet; and similar materials obtained by Defendants since the production of the Film relating to Plaintiffs and to the substantial truth of the statements in the Film being challenged by Plaintiffs.

Defendants' documents, information and tangible things are located in their Massachusetts offices and the post-production facility in New York City.

## III.    Damages

Inapplicable.

## IV.    Insurance Information

A copy of Defendants' insurance policy is provided herewith.

Respectfully submitted,

*Of Counsel*

BINGHAM MCCUTCHEN LLP

Elizabeth C. Koch (*pro hac vice*)
Thomas Curley (*pro hac vice*)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1050 Seventeenth Street, N.W., Suite 800
Washington, DC 20036
Telephone:    (202) 508-1100
Facsimile:     (202) 861-9888

By: _____/s/_____
        Jonathan M. Albano BBO #013850
        Lisa E. Kirby BBO #667802
150 Federal Street
Boston, MA 02110
Telephone:    (617) 951-8000
Facsimile:     (617) 951-8736

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Defendants'

Initial Disclosures were served via email to Jessica Block, block@blockroos.com and

Benjamin Chew, bchew@PattonBoggs.com, this 8th day of November, 2007.


_____/s/_____
Elizabeth C. Koch

# Exhibit F



**Congressional Human Rights Caucus (CHRC)**

**Briefing and Screening:**

# Screening of Documentary Film on Deplorable Conditions in the Dominican Republic's Sugar Plantations

## Documentary:
### *The Price of Sugar* (2007)

**Wednesday, November 14, 2007**

**2:30pm – 4:00pm**

**2200 Rayburn**

# Rev. Christopher F. Hartley

**CH001750**

CH001750

**Introduction.**

Congressman Lantos
Congressman McGovern

My heartfelt thanks to both of you and to all the members of the **Congressional Human Rights Caucus (CHRC)** who have worked so hard to put together this event.

It is a real honor for me to be with you this afternoon.

1.- I come before you, not in my own name, but in the name of the thousands and thousands of workers, men women and children, who every day struggle to survive in the sugar cane plantations of the Dominican Republic.

I am here to lend my voice to the cry of this voiceless humanity whose tragic fate I have had the privilege to witness and accompany over the past ten years of my priestly ministry. I will never be able to thank the Good Lord for the grace of this experience.

2. - Let me make it perfectly clear from the very start that I am not a member of any organization, I am not a human rights champion; I do not work for any international organization to defend or denounce anyone; I have no links or ties to any civil or political institution; I have no hidden agendas. I am only a member of the Catholic Church.

Furthermore, I am not a financial expert; I have no qualifications in the area of Human Rights; I have no degrees in International Relations; I know very little about politics. I am no expert on the Dominican-Haitian relations.

All I am is a Catholic Priest

But by virtue of the mission entrusted to me by Jesus Christ and the Church I can assure you that my only real credentials to be with you today, is the unconditional love I have for the people I served for almost ten years in the sugar cane fields of the Eastern part of the Dominican Republic.

**CH001751**

CH001751

3. - For this love, I have paid and continue to pay a very heavy price. A love that has at times been the cause of much fear in my heart; a love for which I have been slandered and humiliated, persecuted and badmouthed; a love for which on several occasions my life has been threatened; a love that at times has been for me, for my family and my parishioners a real crucifixion. However, at the same time, a love, which has always reminded me in my darkest hour, that as the Lord say in the Gospel: *"No one has greater love than the one whom lays down his life for his friends"*.

4. - What you are about to see in the documentary "The Price of Sugar", is only but a glimpse of the tragedy; the human degradation in which so many thousands of human beings waste their lives in this very evil industry of which they have become its prisoners.

I know of about twelve documentaries produced on this same topic in recent years. I assure you that none of them could ever capture – even remotely - the human suffering my eyes witnessed and my hands touched. It will always be beyond my understanding how the Dominican government, and three of the wealthiest families of the Dominican Republic: The Fanjul family; the Vicini family and the Campollo family; could permit their workers and their dependants to wallow in such injustice, in such filth, in such misery, in such an absurd fate; in such human degradation.

5. - After so much hard work there have been some positive changes in the bateyes of the sugar cane fields. For those changes, we rejoice.

Nevertheless, much remains to be done: But because the rule of law is so fragile in the Dominican Republic and the institutions that should guarantee everyone's human and labor rights so ineffective. Because the sugar barons are so immensely powerful. And most of all, because practically all of the sugar harvested in the Dominican Republic is imported and refined by the United States of America for your domestic and industrial consumption, I very strongly believe that the United States is just as responsible as the Dominican Republic for the present situation of the sugar industry in that Caribbean island.

6. - Isn't it almost humorous to think that we gather this afternoon, on behalf of the workers of the sugar cane plantations. Which have been described in the Human Rights Report of 2006, published in March of this year by the State Department of

**CH001752**

CH001752

the United Sates as "modern day slavery", in the very same building were your own legislators pass law after law, that shields the sugar industry of any real accountability and therefore, any real possibility of lasting change?

7. - I recently wrote to a very prominent US official in the United States Embassy to the Dominican Republic some reflections on the present situation in the Dominican sugar cane plantations. I pointed out how in most cases, the changes were a fiction. Not because these changes were not real, but because they happened for the wrong reasons. The sugar industry does not respond to the rule of law, but to the pressure of the media, and the sugar barons well know that the media will not keep it´s inquisitive aye eternally on their plantations.

If the rule of law is not applied to the sugar industry in the Dominican Republic, but most of all in the United States, eventually things will return to the way they always were.

I quote from what I wrote to this US diplomat in the Dominican Republic:

"[...] It is true that many changes have taken place, I am the first to have witnessed them and the first to rejoice for them. The problem with these changes is that they took place for the wrong reasons.

The changes are a fiction. They are a fiction because they are not an expression of the rule of law entering the sugar industry. The changes are a circumstantial response to the unbearable pressure of a certain period. I don´t rejoice in the fact that changes took place because of the pressure we had subjected these families to. [...] That was a tragedy because it was a fiction of the rule of law. The Dominican government; the DR Labor Department, the Ministry Interior and Police were responding to the internal and international pressure we were able to generate. These governmental institutions were not applying the rule of law (they could care less), they were responding to the pressure of the moment. This explains why the sugar industry and the Dominican government is so eager to shake of this pressure.

9.- Two of the main changes frequently trumpeted: trafficking in persons and child labor, are not as real as the government and the industry proclaim.

  a. Child labor. Simply put: the kids continue to sow the fields. It is just more hidden. Elegant signs are posted to indicate the Vicini do not permit the practice, but the practice continues. There is practically no supervision from the Labor Department and when it is discovered, the kids are scolded!! But no sanctions are imposed on the company.
  b. Trafficking in persons continues unchecked across the border. Everybody knows. Maybe not in the scale of the past but this is just a temporary phenomenon. Once the international outcry fades and the splash of the latest documentary fades away, it will return. Why? Again, it didn´t change because of the rule of law but because of the international pressure of the media. This pressure cannot continue indefinitely. It will pass, it won´t be news worthy, other issues will come up. [...]"

**CH001753**

CH001753

End of quote.

8.- It has been my privilege to work side by side with wonderful human beings who have done their very best to bring about the some changes to this very evil industry. It would be impossible for me to name them all.

However, I truly believe the real heroes of this story are the workers themselves. They had the courage to stand up to this injustice.

Maybe a simple anecdote can illustrate this: right before my departure, an ealderly worker of the Vicini plantations – whose name and the name of the batey I withhold for his own security - said to me: "Father, our lives are still filled with misery, but you know? Now everything is different, because before we were so afraid that every time the bosses yelled at us, we would always put our heads down, but now, when they come to us, we always look up."

To me, these are the real heroes.

9.- There are, on the other hand, new challenges ahead and I quote from the aforementioned text:

"[...] On another front: We must be specially attentive to the new developments regarding the harvesting of sugar cane (note I do not say the "sugar industry"), it has to do with the much talked about ETHANOL. Remember it is a new venture. A joint venture, which involves the Vicini, Fanjul, some Brazilian corporations and the Dominican government. Among my colleges we are calling it "asociación de malhechores".

This will require thousands of workers, thousands of Haitian migrant workers, plus women and children. Kid yourself not, they are not going to invest on hundreds of harvesting machines and other machinery in the first years. They must first be sure the project is going to be a success. The proposed site as you know, is the ingenio, bateyes and cane fields of the Ingenio Boca Chica and the Ingenio Quisqueya. I know every square inch of those plantations like the palm of my hand, they are both within the boundaries of the Parish of San José de Los Llanos, It is going to take many years until it can be mechanized for very complicated technical reasons. The infrastructure is simply not there. Thousands of men are going to be required. Mark my words...

[...]

In the end, I am left with a question myself. That is: How hard and how far is the US government ready to push on the issue of Human and Labor Rights in the sugar cane plantations (Embassies, diplomats can only implement in the end the policies and the directives of the governments they represent, is it not so?)? What mechanisms of "check and balance" are you ready to implement in order to keep the Dominican government and sugar industry honest? [...].

CH001754

CH001754

End of quote.

10. · I wish to offer my heartfelt gratitude To Bill Haney and Eric Grunebaum for their extraordinary effort at producing this documentary, which I pray to God will touch the minds and hearts of all of you and many others. Without their courage and professionalism we would not be meeting today on behalf of the many thousands of sugar cane workers who have placed so much trust in us. With them, I wish to thank and honor all the professionals of the media who had the determination of bringing this evil to light. Without you all, I would still be shouting in the wilderness of a sugar cane field but no one would hear my voice.

To conclude, my final remarks are for Congressman Lantos and Congressman McGovern. Many of us, the little people on the street, are doing our very best to bring about the necessary changes, even though on the world scene it might not amount to very much.

You can do much more. Maybe your efforts will demand that you pay a heavy price too. I say to you what I said repeatedly to the poor Haitian workers: don´t be afraid! I assure you that though many of your efforts might not be rewarded at the ballot poll; there are efforts on behalf of God´s poorest children that will only be rewarded in heaven.

Gentlemen, it is in your hands now to make sure all this hard work not be put to waste. It is now in your hands to bring the dawn of a new day to the terrible darkness that still hovers over the sugar cane fields of the Dominica Republic.

Thank you very much and may God bless you all.

**CH001755**

CH001755

# Exhibit G

# Office of the Bishop of San Pedro de Macorís

OFFICES: Avenida General Duvergé # 151 - POST OFFICE BOX 175 - San Pedro de Macorís, Dominican Republic
Telephones: 246-3800 and 246-3704. Fax: 246-3506

CIRCULAR # 012-06                                         December 21, 2006

## FOR THE ENTIRE DIOCESE OF SAN PEDRO DE MACORÍS

My Dear Brothers and Sisters,

Fraternal greetings in the Lord Jesus. I would not want to end this year without sending you a few words and Christmas greetings and wishing you a prosperous year in 2007.

Once again Christmas has come. It seems like every year Christmas is just a routine. Yet Christmas is always current and always new. The mystery of Christmas, the Incarnation of God is an event that never goes out of fashion and therefore will always be new for all of us believers.

We are hoping for many new things for this upcoming year. It is the year of our Tenth Anniversary. We are celebrating these ten years with jubilation and with thanks to our Lord for everything that He has done for us and with us.

Blessed greetings to all, for Christmas and the New Year.

On another subject, I also wish to convey to you some information that I believe will be of interest to everyone in the Diocese, namely, that Fathers Christopher and Antonio have left the Diocese.

As you know Father Antonio was already here when the Diocese was created and spent 11 years working with a great deal of love and missionary enthusiasiasm. We must acknowledge the spiritual, human, and material transformation that has taken place in the Parish of San Antonio de Padua de El Puerto. We recognize with gratitude all the contributions made by Father Antonio to the Diocese and to the Parish.

Ever since we started the process of drawing up the Pastoral Plan, Father Antonio was not in tune with the Plan. On several occasions he voiced his disagreement. He discussed this with Father Christopher at a spiritual retreat on the Plan and later in a letter sent to me, in which he raised questions about the Plan in relation to Church Doctrine.

1

As I did not respond to his letter, so as not to polemicize the matter, in a second letter he "summoned" me, requesting a response. Please allow me to cite one paragraph from his letter:

> *"Regardless of the reasons you have for not responding to my letter, I must assume that you do not have full confidence in me. If indeed this is the case, this situation would be for me personally, sacerdotally, and ecclesiastically a very uncomfortable one and I would feel honestly obliged to place your disposal the diocesan duties in which I am endeavoring to collaborate with you. (Parish of El Puerto, Parish Vicar of Los Llanos and Diocesan Advisor to the Movement of Short Courses in Christianity (Movimiento de Cursillos de Cristiandad). Without your express confidence in me, I do not believe that I should continue working in this Diocese any longer. I would like to thank you for having allowed me to work with you over these years and once again place myself at the complete disposal of my bishop."*

To that I responded that I accepted. I had thought about waiting until his contract expired (July 2007) and then not renew it. But I accepted that he would dispose of his pastoral duties and leave the diocese. I gave my reply in writing in a letter.

Father Antonio, however, has made it known throughout El Puerto and elsewhere that I had fired him from the Diocese, which is not true. I merely accepted that he place his pastoral duties at my disposal.

Now, at this stage of the situation, Father Christopher enters the scene, wanting to defend his good friend Father Antonio. Father Christopher came to the Dioceses at the suggestion and recommendation of Father Antonio.

Incardinated in and coming from the Archdiocese of New York, Father Christopher came for missionary assistance for one year. After he completed that one year, we renewed his contract for a second year, and later, as everything was going well, we renewed his contract for four years. After completing those four years, Father Christopher, without consulting me, requested excardination from the Archbishop of New York. I found out about this through the Cardinal Archbishop of New York who asked me if I was willing to incardinate Father Christopher in San Pedro de Macorís. That is when Father Christopher made a formal request for incardination. I responded to Cardinal Egan that, as we had never before faced this issue, I would consider the possibility of beginning on this date the process of Incardination, a process that takes three years. In January 2006 (one year and seven months later) I responded to Father Christopher, with a copy to the Cardinal, that I could not incardinate him in San Pedro de Macorís. The process ended with that letter. As Father Christopher's time here was already over, I hoped that the Cardinal or Father Christopher would make the decision. But things did not turn out that way.

While I was waiting, there occurred in El Puerto the events in which Father Christopher intervened in a very disloyal and anti-ecclesiastical manner, committing very serious offenses. I have proof of all of this. Father Christopher says that he lost an electronic device (a very modern tape recorder). Providentially, that tape recorder came into my possession and therein lies the proof of the offense.

2

Father Christopher was not dismissed from the Diocese for the good he did. Rather, we asked Father Christopher to leave the Diocese because of his serious offenses which we are keeping to ourselves. His arrogance and zeal for self-promotion led him to believe that he could do everything and that nothing would work without him. I never wanted it to end like this. In all fairness, I must thank him for the spiritual and material good that he did for the diocese. I thank him for the economic resources that he secured and used for us in our diocesan and parish projects. But, regrettably, we must end our relationship in a way that we did not wish.

Let us thank God that we have been able to resolve some of problems arising out of this situation and hope that time will help us resolve the other problems as well.

We are confident in and committed to continuing the mission of the Church, in the manner of the Church and as a Diocesan Church. We shall continue the work and projects that Fathers Christopher and Antonio were carrying out, insofar as is possible. It is good to report that the financial contributions for these projects will not keep coming, because these were personal contributions, not institutional contributions.

We thank God for sending us the St. Vincent de Paul Fathers who already have been received in the Diocese and who, with great missionary and collaborative spirit, are now busy providing pastoral care in these two parishes. To them, we extend our warmest welcome.

Once again, I wish you happiness for Christmas and remind you that "God Will Provide".

I bless you in the name of Jesus, the Good Shepherd.


_____
Francisco Ozoria Acosta
Bishop of the Diocese of San Pedro de Macorís



# Obispado de San Pedro de Macorís

OFICINAS: Avenida General Duvergé # 151 – APARTADO POSTAL 175 – San Pedro de Macorís, Rep. Dom.
Teléfonos: 246-3800 y 246-3704. FAX: 246-3506

## NOTA DEL OBISPADO DE SAN PEDRO DE MACORIS

Por las presentes letras, NOTIFICAMOS que, el Reverendo Padre Christopher Hartley, quien por nueve años ha colaborado en esta Diócesis de San Pedro de Macorís, ha terminado su misión.

El Padre Hartley, pertenece al clero de la Arquidiócesis de New York, fue enviado por su Arzobispo el Cardenal Oconnor fallecido, y al terminar ahora su misión en República Dominicana, se pondrá al servicio de su nuevo Arzobispo el Cardenal Edward Egan.

Estamos sinceramente agradecidos de el apoyo misionero del Padre Christopher, que con abnegación, entrega y sacrificio ha trabajado incansablemente como párroco de la parroquia San José de Los Llanos y como encargado de algunos proyectos y programas diocesanos. Ej. El Hospital Católico Sagrado Corazón de Jesús, la Capilla y centro de formación en la cárcel, La Casa de Galilea, las capillas en las comunidades de la parroquia, las casas de Gautier.

En la Iglesia Católica es normal la sucesión de obispos y presbíteros, y es también normal la continuidad de la misión. La Iglesia continúa la obra de Jesús su fundador y nosotros siempre en nombre de Cristo y de la Iglesia.

Así como el Padre Chrstopher ha terminado su misión, ahora nos llegan otros misioneros. Damos muchas gracias a Dios que nos ha enviado a los Padres Paúles (la Congregación de la Misión) cuyo carisma es servir especialmente a los pobres y a los enfermos. Ellos nos colaborarán al estilo de su fundador San Vicente de Paúl, en las parroquias de Los Llanos y de El Puerto.

En la sede del Obispado de San Pedro de Macorís, a los dos (2) días del mes de Octubre del dos mil seis (2006)

_____
+ Mons. Francisco Ozoria Acosta
Obispo de la Diócesis de San Pedro de Macorís

VICINI-000355



# Obispado de San Pedro de Macorís

OFICINAS: Avenida General Duvergé # 151 – APARTADO POSTAL 175 – San Pedro de Macorís, Rep. Dominicana
Teléfonos: 246-3800 y 246-3704. FAX: 246-3506

C-012-06

21 de diciembre de 2006

## TODA LA DIOCESIS DE SAN PEDRO DE MACORIS

Muy queridos hermanos y hermanas

Un fraternal saludo en el Señor Jesús. Quiero no terminar este año sin antes dirigirles unas palabras y un saludo de Navidad; y desearles un venturoso año 2007.

Llegó Navidad otra vez. Parece como si fuera la rutina de cada año. La Navidad es siempre actual y siempre nueva. El misterio de la Navidad, la Encarnación de Dios, es un acontecimiento que nunca pasa de moda y por tanto deberá ser siempre nueva para todos nosotros los creyentes.

Esperamos muchas cosas nuevas para el próximo año; es el año de nuestro décimo aniversario. Celebraremos estos diez años con mucho júbilo, agradeciendo al Señor todo lo que ha hecho por nosotros y con nosotros.

Muchas felicidades para todos, en navidad y Año Nuevo.

En otro orden, quiero comunicarles algunas informaciones que creo son útiles para toda la Diócesis: los padres Christopher y Antonio dejaron la Diócesis.

El Padre Antonio ya estaba aquí cuando se creó la Diócesis, permaneció 11 años trabajando con mucho amor y entusiasmo misionero. Tenemos que agradecer la transformación espiritual, humana y material que se ha llevado a cabo en la parroquia San Antonio de Padua de El Puerto. Reconocemos con sentido de gratitud todos los aportes del P. Antonio a la Diócesis y a la Parroquia.

Desde que comenzamos el proceso de elaboración del Plan Pastoral el P. Antonio no estuvo en sintonía con dicho plan. En varias ocasiones se expresó en desacuerdo. Se expresó con el P. Christopher en un retiro espiritual sobre el Plan y luego en una carta dirigida a mí donde cuestionaba sobre el Plan en relación a la Doctrina de la Iglesia.

VICINI-000356

Como yo no le contesté su carta para no polemizar, en una segunda carta me "emplazó" solicitando respuesta. Me permito citar un párrafo de su carta:

"Sea cual sea la razón que Ud. tenga para no haber dado respuesta a mi carta esto me hace suponer que no cuento con su confianza plena. Si esto es así, sería para mí una situación personal, sacerdotal y eclesiásticamente, muy incomoda y me sentiría obligado en conciencia a poner a su disposición los cargos diocesanos en los que intento servir y colaborar con Ud. (Párroco de El Puerto, Vicario Parroquial de Los Llanos y Asesor Diocesano del Movimiento de Cursillos de Cristiandad). Sin su expresa confianza, no creo que deba seguir en esta Diócesis por más tiempo, Me iría agradeciéndoles haberme permitido colaborar estos años y volvería a estar a la plena disposición de mi obispo"

A lo que yo respondí que aceptaba. Había pensado esperar a cuando se venciera el contrato (julio 2007) para no renovarlo. Pero yo acepto que dispongas los cargos pastorales y deje la Diócesis, Mi respuesta la puse por escrito en una carta.

El P. Antonio ha difundido en el Puerto y en todas partes, que lo saqué de la Diócesis, lo cual no es cierto. Sencillamente le acepté que pusiera a mi disposición sus cargos pastorales.

En esta situación entra en escena el P, Christopher queriendo defender a su gran amigo Antonio. El P. Christopher vino a la Diócesis motivado y recomendado por el Padre Antonio.

Incardinado y procedente de la Arquidiócesis de New York, vino para una ayuda misionera por un año. Pasado ese año, renovamos por un segundo año y luego como todo marchaba bien, renovamos por cuatro años. Al cumplirse los cuatro años, él sin previa consulta conmigo, solicitó excardinación al Arzobispo de New York. Yo me entero por vía del Cardenal Arzobispo de New York, quien me preguntaba si estaba dispuesto a Incardinar al Padre Christopher en San Pedro de Macorís. Es cuando el Padre Christopher hace una solicitud formal de Incardinación. Yo respondo al Cardenal Egan que, como nunca antes habíamos tratado el tema, yo abría la posibilidad de comenzar en esa fecha el proceso de Incardinación es decir, tres años. En enero del 2006 (un año y siete meses después), yo respondí al Padre enviando una copia al Cardenal, que no podía Incardinarlo en San Pedro de Macorís. Con esta comunicación terminaba el proceso. Ya el Padre estaba sobre el tiempo, yo esperaba que tomaran la decisión, el Cardenal o el Padre, pero no sucedió así,

Estando yo en esa espera, acontece lo de El Puerto donde interviene el P. Christopher de una forma muy desleal y antieclesial, con hechos muy graves. De todo esto tengo prueba. Al P. Christopher dizque se le extravió un dispositivo electrónico (una

VICINI-000357

grabadora muy moderna). Providencialmente esa grabadora llegó a mi poder y ahí está la prueba del delito.

El Padre Christopher no se fue de la Diócesis por el bien que hizo. Al P, Christopher le pedimos que dejara la Diócesis por delitos graves que nos reservamos. Su evaron a creer que lo podía todo y que nada servía sin él. Nunca desce que termináramos así. Siendo justo, tengo que agradecer todo el bien espiritual y material que proporcionó a la Diócesis. Le agradezco los recursos económicos que consiguió y empleó en los proyectos diocesanos y parroquiales. Pero lamentablemente terminamos como no deseamos.

Gracias a Dios que hemos podido resolver algunos problemas fruto de esa situación, esperamos que el tiempo nos ayude a resolver los demás.

Estamos confiados y comprometidos a continuar la misión de la Iglesia al estilo de la Iglesia e integrados como Iglesia Diocesana. Continuaremos el trabajo y los proyectos que los Padres Christopher y Antonio realizaban, según las posibilidades. Es bueno informar que las ayudas para esos proyectos no seguirán llegando porque eran ayudas personales, no ayudas institucionales.

Agradecemos a Dios que nos ha enviado a los Padres Paules quienes ya, han sido recibidos en la Diócesis y que con gran espíritu misionero y de colaboración se ocuparán del cuidado pastoral de las dos parroquias. Les damos la bienvenida.

Nuevamente quiero felicitarles por la Navidad y recordarles que "Dios Provee".

En Jesús Buen Pastor, les bendice.


+Francisco Ozoria Acosta
Obispo de la Diócesis de san Pedro de Macorís

VICINI-000358

# Exhibit H
# Filed Under Seal

# Exhibit I

**Uncommon Productions LLC**
282 Moody Street, Suite 309
Waltham, MA  02453

As of April ⊇1, 2005

**Father Christopher Hartley**

Los Llanos

Dear Father Christopher:

This letter confirms our understanding with respect to a documentary motion picture currently entitled "Act of Hope" (the "Documentary") concerning your work with the sugar cane cutting communities in the Dominican Republic, as follows:

1.      In appreciation for your cooperation and the rights you are granting to us, we agree to pay a charity designated by you 50% of any profit we make on the Documentary after recovering our costs.

2.      You will consult with us, provide us with information, allow yourself to be interviewed and otherwise reasonably cooperate with us in production of the Documentary.  We agree that we will use only biographical information concerning you provided by you or otherwise approved by you.

3.      You agree that we may use your name and likeness, biographical information concerning you and any interviews or other recordings of you in the Documentary and in the distribution, advertising, publicity and promotion of the Documentary in any media, now or hereafter known, throughout the universe in perpetuity.  We will own the Documentary and any other works prepared in connection with it, and you agree not to assert any copyright or other rights of ownership therein. We will, however, that we will not license the Documentary for exhibition on any cable television service that primarily exhibits programming that is rated TV-MA ("Mature Audience") under the Federal Communications Commission's V-chip ratings system (such as the Playboy Channel).

4.      As the producer, you understand that we will have editorial control of the Documentary and you agree that we may edit any depictions of you, any material provided by you and any of your statements or comments and may juxtapose any of the foregoing, or any simulation and/or impersonation of them, with any other material selected by us.  You waive and agree not to assert any claims based upon such and editing and use of such material, including, but not limited to, claims or liabilities for libel, slander, invasion of the right of privacy, or other infringement or violation of your personal or property rights of any sort whatsoever.  We agree, however, that this consent is given with the understanding that Bill Haney will be associated with the Documentary throughout photography and editing (other than any editing after the completion of the Documentary for local censorship, broadcast time, etc.).

#271331.1

UP00060

5.    You confirm to us that you have the right to grant every right granted herein without the consent of any other person and will indemnify us against any contrary claim.

6.    We may assign or license any of the rights granted by you to any third party after the Documentary has been finished (examples of third parties are distributors, broadcasters, etc.).  We will not authorize any such third party, however, to edit the Documentary in any material way, except for timing and to comply with local censorship requirements and broadcast standards.  We will not license any recording of you for any production other than the Documentary and the advertising, publicity and promotion of the Documentary without your consent.

Please confirm your agreement to the above by signing in the space below.

**Uncommon Productions LLC**

By _____
    Bill Haney, Manager

ACCEPTED AND AGREED:

_____
**Father Christopher Hartley**

# Exhibit J

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FELIPE VICINI LLUBERES, ET AL.,

        Plaintiffs,

        v.

UNCOMMON PRODUCTIONS, LLC, ET AL.,

        Defendants.

Civil Action No. 07-11623 (D. Mass.)

## DECLARATION OF FATHER CHRISTOPHER HARTLEY

I declare under penalty of perjury as follows:

1.    My name is Christopher Hartley.  By vocation, I am a Catholic priest ordained on November 8, 1982.

2.    I am not a citizen of the United States of America.  By virtue of the birth countries of my parents, I am a dual citizen of the countries of Spain and the United Kingdom.

3.    In August 2007, I was assigned by my Archdiocese to undertake mission work in Ethiopia.  I have resided since that time in Ethiopia and will continue to reside there until re-assigned by my Archdiocese.

4.    I do not regularly travel to the District of Columbia.

5.    In November – December 2007, I traveled from Ethiopia to the United States for approximately three weeks.  During that trip, I visited the District of Columbia from November 13, 2007 through November 15, 2007.

6.    On November 14, 2007, I attended a screening of the documentary "The Price of Sugar" at a location near the United States Capitol Building in the District of Columbia.

7.    On November 14, 2007, I was not served with the subpoena issued by Benjamin G. Chew and attached as exhibit A to this declaration.

8.    On November 14, 2007, no one approached me and attempted to hand me the subpoena issued by Benjamin G. Chew and attached as exhibit A to this declaration.

9.    During the afternoon of November 14, 2007, while accompanied by a reporter from CNN, Joe Johns, I did hear an individual call out my name as I crossed an intersection near the United States Capitol Building in the District of Columbia. However, I did not see the individual. The individual did not hand me any documents and did not attempt to hand me any documents.

10.    On December 5, 2007, I returned to Ethiopia from the United States. I have been continuously present in Ethiopia since December 5, 2007.

11.    I have reviewed the subpoena issued by Benjamin G. Chew and attached as exhibit A to this declaration. I first saw this document in January 2008. No documents responsive to that subpoena are located in either the District of Columbia or elsewhere in the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 4, 2008.

Father Christopher Hartley

2

# Exhibit K

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| FELIPE VICINI LLUBERES, *et al.,* ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Civil Action No. 1:08-mc-00010-RJL |
| ) | |
| UNCOMMON PRODUCTIONS, LLC, *et al.,* ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## AFFIDAVIT OF SCOTT KUCIK

I, Scott Kucik, do hereby swear and affirm under the penalties of perjury that the following information is based on my personal knowledge, that I am competent to so testify, and that it is both true and correct.

1.     I grew up here in Washington, D.C. and graduated from Gonzaga College High School in 1984.

2.     In 1989, I graduated from The Catholic University of America, earning my degree in English literature.

3.     I am married, and my wife and I have a four-month old daughter.  We are of the Catholic faith.

4.     I have been employed as a process server and as a Manager at Capitol Process Services ("Capitol") for approximately ten years.

5.     I have personally served process for approximately ten years, many here in the District of Columbia.  I also supervise approximately ten to fifteen process servers at Capitol, ensuring that the applicable rules and procedures are followed.  I also have served process on behalf

of many state and federal courts, including this Honorable Court on many occasions. On no occasion has any Court or arbitral body determined that any Affidavit of Service I signed was in any way inaccurate or incorrect.

6.      As set forth below, on Wednesday, November 14, 2007 at 5:02 p.m. I personally served Father Christopher Hartley with a Subpoena *duces tecum* (the "Subpoena"), a true and correct copy of which is attached hereto as **Exhibit 1**.

7.      Benjamin G. Chew of Patton Boggs LLP, one of the counsel for Plaintiffs in the above-captioned matter, first contacted me about serving Fr. Hartley on or about Tuesday, November 13.

8.      Mr. Chew explained to me that, given that the person to be served was a Catholic priest, he wanted the service to be effected in the most sensitive, unobtrusive and respectful way possible. Indeed, given the sensitivity of the assignment, Mr. Chew asked that either David Felter, Capitol's owner, or I, personally effect the service on Fr. Hartley.

9.      After I told Mr. Chew that I would handle the service of Father Hartley, he explained that Fr. Hartley would be appearing at a Congressional hearing the next day, and that I should meet him there for lunch to discuss the particulars.

10.     The next day I met Mr. Chew and his colleague Nigel L. Wilkinson for lunch at a restaurant on Capitol Hill.

11.     At lunch, Mr. Chew apprised me that the three of us were to attend the hearing but, to avoid embarrassment to Fr. Hartley, I was not to serve him with the Subpoena until he was out of the building and away from any crowd. Mr. Chew also provided me $40 in cash, which he directed me to serve on Fr. Hartley as the requisite witness fee along with the Subpoena.

12.     After the lunch I attended the hearing, sitting next to Mr. Chew. Mr. Wilkinson sat in another part of the room. Fr. Hartley spoke at great length, mentioning the Vicini family many times. Mr. Chew and I both brought cell phones to the hearing.

13.     At my direction, Ambiko Guice of Capitol was parked in a vehicle outside.

14.     I planned that, after the hearing, Mr. Guice and I would follow Fr. Hartley and serve him in a quiet and respectful manner.

15.     At the end of the hearing I separated from Mr. Chew and waited for Fr. Hartley to emerge from the hearing room.

16.     After a few minutes Fr. Hartley came into the hall and entered the elevator with an African American male who was approximately 6'3", 240 pounds, and appeared to be in his forties/fifties with close-cropped hair (the "Third Party").

17.     I entered the elevator with Fr. Hartley and the Third Party. Fr. Hartley and the Third Party spoke to each other in what appeared to be a familiar manner.

18.     Fr. Hartley and the Third Party exited the elevators and proceeded down a flight of stairs arriving at the entrance of Independence Avenue, as did I.

19.     All three of us exited the building.

20.     Per my instructions, Mr. Guice was parked in front of the building.

21.     Fr. Hartley and the Third Party began walking toward 1st and Independence Avenue.

22.     I followed Fr. Hartley and the Third Party, staying at a distance of about 20-30 yards behind them.

23.     Mr. Guice was unable to move his vehicle because it was stuck in traffic.

24.     I became concerned that Fr. Hartley and the Third Party would hail a taxi, which would make my continued following of them difficult or impossible. Accordingly, I called Mr.

4931256                                                   3

Chew on my cell phone for instructions. Mr. Chew asked me to please proceed to serve the Subpoena on Fr. Hartley.

25.    At that time, Fr. Hartley and the Third Party were walking at a leisurely pace. Having concluded my brief telephone conversation with Mr. Chew, I quickened my pace, and, at the intersection of 1st and Independence Avenue, I closed the distance, arriving behind the two waiting for the stoplight to change.

26.    As I approached within a few feet of Fr. Hartley and the Third Party, I addressed Fr. Hartley by speaking his name.

27.    Fr. Hartley turned toward me, and I took an additional few steps so that I was with Fr. Hartley and the Third Party (that is, within approximately two feet).

28.    I told Fr. Hartley that I was serving him with a witness subpoena, while holding the Subpoena out toward him so that he could read it while I was serving him.

29.    Fr. Hartley turned his back to me without taking the Subpoena in his hand.

30.    I then requested that Fr. Hartley please take the Subpoena in his hand so that I would not have to leave it at his feet. As he ignored me, I continued to plead with him in a deferential and apologetic manner for him to take the Subpoena.

31.    When Fr. Hartley failed to respond, I laid the Subpoena at his feet. I kept the witness fee in my hand because I did not want to put the cash on the ground.

32.    The light changed, after which Fr. Hartley and the Third Party crossed the street. After crossing the street, Fr. Hartley and the Third Party continued to walk not immediately hailing any taxi.

33.    I did not pursue Fr. Hartley across the street because I had already effected service.

34.    I called Mr. Chew from the scene on my cell phone, informing him that I had effected service on Fr. Hartley, but that Fr. Hartley had refused to take the Subpoena, requiring me to leave the Subpoena at Fr. Hartley's feet.

35.    After completing my telephone conversation with Mr. Chew, I waited at the place I served Fr. Hartley for approximately ten minutes. At that point, when it was clear that Fr. Hartley would not be returning to retrieve the Subpoena, I picked it up, so as to avoid someone else picking it up, which might have embarrassed Fr. Hartley. I later returned the Subpoena to Mr. Chew.

36.    On November 15, 2007, I executed an Affidavit of Service, a true and correct copy of which is attached as **Exhibit 2.**

37.    Mr. Chew recently provided me a copy of Fr. Hartley's Motion to Quash Non-Party Subpoena, including the Declaration of Father Christopher Hartley (January 4, 2008) ("Hartley Declaration").

38.    Paragraph 9 of the Hartley Declaration reads as follows:

> "During the afternoon of November 14, 2007, while accompanied by a reporter from CNN, Joe Johns, I did hear an individual call out my name as I crossed an intersection near the United States Capitol building in the District of Columbia. However, I did not see the individual. The individual did not hand me any documents or attempt to hand me any documents."

The Hartley Declaration is inaccurate in several respects:

a)    First, I did not call out his name as he crossed the intersection. Rather, I approached and addressed him respectfully as he and the Third Party waited at the light.

b)    Second, Fr. Hartley turned toward me and very definitely saw me as I was speaking to him, during which time I was within only about two feet of him.

c)    Third, he saw me hold out the Subpoena to him.

d)    Fourth, not only did I attempt to hand him the Subpoena, but also, when Fr. Hartley turned his back to me to avoid the Subpoena, I asked him explicitly to take the Subpoena in his hand so that I would not have to leave it at his feet.

Scott Kucik

District of Columbia: SS

Subscribed and sworn to before me this 16th day of January, 2008.

_Nicole G. Davis_    Notary Public

Nicole G. Davis
Notary Public, District of Columbia
My Commission Expires 01-14-2009

My Commission Expires: _____

# Exhibit L

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| FATHER CHRISTOPHER HARTLEY, | ) |
| Movant, | ) |
| v. | ) Civil Action No. 1:08-mc-00010-RJL |
| FELIPE VICINI LLUBERES, *et al.*, | ) |
| Respondents. | ) |

## DECLARATION OF JOSEPH E. JOHNS

I, Joseph E. Johns, do hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.    I am over 18 years of age and competent to give this Declaration based on my personal knowledge of the facts set forth herein.

2.    I am a CNN correspondent, Washington, D.C. Bureau.

3.    On the afternoon of November 14, 2007, I was on the street in Washington, D.C. with Father Christopher Hartley.

4.    While we were waiting at an intersection a gentleman called out Father Hartley's name.

5.    I saw the gentleman attempt to hand some papers to Father Hartley.

6.    Father Hartley took a quick look at the papers and walked away.

7.    At that point that same gentleman said something like "Father Hartley, I am laying the document at your feet" or "I am laying the subpoena at your feet."

8.    Father Hartley did not look back and kept walking.

Signed on January 23 , 2008.

Joseph E. Johns

2

# Exhibit M

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FATHER CHRISTOPHER HARTLEY

        Movant,

    v.

FELIPE VICINI LLUBERES, *et al.*,

        Respondents.

Civil Action No. 1:08-mc-00010-RJL

## OPPOSITION TO PLAINTIFFS'/RESPONDENTS' MOTION FOR CLARIFICATION

### INTRODUCTION

Father Christopher Hartley, through counsel, hereby offers the following points in opposition to Plaintiffs'/Respondents' Motion for Clarification. This is a miscellaneous action before this Court on Father Hartley's Motion to Quash a third-party deposition subpoena *duces tecum* issued to him by Respondents. On May 2, 2008, this Court quashed that Subpoena in part. Now, in a Motion for Clarification, Respondents improperly seek to have the Court decide discovery-related issues that should be presented – if at all – through a separate Motion to Compel. As such, the issues presented in Respondents' Motion are improperly before the Court and, in any event, are without merit. Accordingly, Father Hartley respectfully requests the Court deny Respondents' Motion for Clarification.

## ARGUMENT

### A.    The Court's May 2, 2008 Order Is In Need Of No Clarification.

This miscellaneous action relates solely to a Motion to Quash by Father Hartley.

Specifically, on January 4, 2008, Father Hartley filed a motion to quash the third-party

deposition subpoena *duces tecum* (the "Subpoena") issued to him by Plaintiffs/Respondents in

connection with an underlying litigation pending in the United States District Court for the

District of Massachusetts. In that Motion, Father Hartley sought to quash the Subpoena in two

respects: (1) the Subpoena's command that Father Hartley produce documents and (2) its

requirement that Father Hartley appear for his deposition in the District of Columbia. In an

Order dated May 2, 2008, the Court granted Father Hartley's Motion as it related to the taking of

his deposition. With respect to the subpoenaed documents, Father Hartley agreed to produce

non-privileged responsive documents, and has done so. Accordingly, the Court's May 2, 2008

Order denied this portion of Father Hartley's original Motion to quash and ordered Father

Hartley to produce the requested documents. *See* Ex. A (Order dated May 2, 2008).

Respondents' May 6, 2008 Motion for Clarification does not in fact seek clarification of

the Court's Order. It is instead a shadow Motion to Compel, seeking from the Court an order

requiring Father Hartley to produce privileged documents as well as those to which he has

interposed an objection, and setting, by Court order, a deadline for the completion of Father

Hartley's document production. (As explained below, none of these requests has any legal

merit.) When similar issues were raised during the April 3, 2008 hearing on Father Hartley's

Motion to Quash, the Court noted that such issues required a Motion to Compel – a Motion that

was not before the Court. This remains true now. If Respondents wish to challenge the

completeness of Father Hartley's response to the Subpoena, they should comply with the rules

concerning discovery disputes and, if warranted, file an appropriate Motion. The Court should

-2-

reject Respondents' attempt to bypass the rules and bootstrap their alleged discovery disputes
onto Father Hartley's Motion to Quash.

**B.    Any Delay In Father Hartley's Objections Should Be Excused Based On
Respondents' Failure To Comply With The Rules.**

In any event, even were the issues raised in Respondents' Motion for Clarification

properly before the Court, the relief Respondents request is without any legal basis.  First,

Respondents seek an order that Father Hartley's objections (including those on the basis of

applicable privileges) to the Subpoena were untimely and therefore were waived.  As the normal

rule, a person served with a subpoena *duces tecum* must serve any objections to that subpoena

within fourteen days after the subpoena is served.  *See* Fed. R. Civ. P. 45(c)(2)(B).  However,

this is not a strict rule, so that "[i]n unusual circumstances and for good cause ... the failure to

act timely will not bar consideration of objections." *Alexander v. FBI*, 186 F.R.D. 21, 34

(D.D.C. 1998).  This case presents exactly the type of "unusual circumstances."  Specifically,

Father Hartley's failure to serve objections within fourteen days of alleged service of the

Subpoena is attributable primarily to the actions of Respondents, as explained below.

Federal Rule of Civil Procedure 45(b)(1) requires a party issuing a subpoena to provide

"prior notice [to] . . . each party in the manner prescribed by Rule 5(b)." *Judson Atkinson*

*Candies, Inc. v. Latini-Hohberger Dhimantec*, 476 F. Supp. 2d 913, 928 (N.D. Ill. 2007).

Indeed, "[w]ithout question, Rule 45(b)(1) requires a party issuing a subpoena for the production

of documents to a non-party to 'provide prior notice to all [other] parties to the litigation.'"

*Murphy v. Board of Educ.*, 196 F.R.D. 220, 222 (W.D.N.Y. 2000) (sanctioning counsel for

serving third-party subpoenas without prior notice to other parties to litigation) (citation

omitted).  Here then, the Rules required Respondents to provide counsel for Uncommon

Productions and William Haney, defendants in the underlying defamation action, prior notice

that they intended to serve a subpoena for the production of documents on Father Hartley, a

third-party to the case. Respondents never provided such notice. This failure becomes important

because of the manner in which Father Hartley was allegedly served with the Subpoena.

The affidavit of service to Respondents' Subpoena states that the Subpoena was served

on Father Hartley in the early evening of November 14, 2007. *See* Ex. B (Affidavit of service).

As the Court is aware, Respondents and Father Hartley have differing positions as to the details

of that alleged service. However, both Respondents and Father Hartley agree that Father Hartley

did not take physical possession of any documents or the Subpoena on November 14, 2007 and

therefore was unaware of its contents.

Defendants were also unaware of the contents of the Subpoena because Respondents did

not provide the required advance notice that they intended to attempt to serve a third-party

subpoena on Father Hartley. Nor did Respondents attempt to timely remedy this failure by

promptly serving the Subpoena and process server's affidavit on defense counsel. Instead, on

December 17, 2007, some thirty-three (33) days after the Subpoena was allegedly served,

Respondents mailed a copy of the Subpoena to counsel for the defendants. *See* Ex. C (Subpoena

with Certificate of Service) at pg. 8. On December 20, 2007, defense counsel received the copy

of the Subpoena, together with the affidavit of service, by mail. Father Hartley promptly was

alerted about the Subpoena and retained the undersigned counsel. The next day, December 21,

2007, when undersigned counsel was provided a copy of the Subpoena, was the first time Father

Hartley (through counsel) had actual physical possession of the Subpoena. Father Hartley's

objections to the Subpoena were subsequently served fourteen days later, on January 4, 2008.

*See* Ex. D (Father Hartley's Objections) at pg. 5.

Thus, under the unusual circumstances present here, Father Hartley's failure to provide

# Exhibit N

AO88  (Rev. 12/06) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

### DISTRICT OF COLUMBIA

Felipe Vicini Lluberes, et al.

V.

Uncommon Productions, LLC, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  07-11623 (DPW) D. Mass.

TO:    David Searby, c/o Office of the Legal Advisor, Room 5519
United States Department of State, 2201 C Street, N.W.,
Washington, DC  20520-6310

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION    Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC  20037 | DATE AND TIME 5/19/2008 10:00 am |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A

| PLACE    Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC  20037 | DATE AND TIME 5/16/2008 10:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE 4/28/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Nigel L. Wilkinson, Esq., Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC  20037, (202) 457-6000
Attorney for Plaintiffs

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev.  12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____          _____
                          DATE                                              SIGNATURE OF SERVER

                                                                  _____
                                                                          ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
    (1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
    (2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
    (B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
    (3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
        (i) fails to allow reasonable time for compliance;
        (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
        (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
        (iv) subjects a person to undue burden.
    (B) If a subpoena
        (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
        (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
        (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
    (1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
    (B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
    (C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
    (D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost.  On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost.  If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
    (2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
    (B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it.  After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved.  A receiving party may promptly present the information to the court under seal for a determination of the claim.  If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it.  The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

ATTACHMENT A

### INSTRUCTIONS AND DEFINITIONS

1.      This subpoena seeking documents is directed to David Searby ("Searby"), acting in his personal or professional capacity as a United States Government employee.

2.      In producing documents, Searby shall furnish all documents in his possession, custody, or control, regardless of whether such documents and things are possessed by Searby.  A document is deemed to be in Searby's control if he has the right to secure the documents or a copy thereof from another person or public or private entity having actual possession thereof.  If any document requested herein is not in Searby's possession, custody or control, then Searby is required to state, to the best of his knowledge, the name and address of the person in possession and/or control of the original thereof.  The fact that a document is in possession of another person does not relieve Searby of the obligation to produce his copy of the document, even if the two documents are identical.

3.      If any document within the scope of this request is not produced either because it has been destroyed or because it is no longer in Searby's possession, custody or control, identify (a) the number of the request for production to which it would have been responsive, (b) its author, (c) its date, (d) its subject matter, (e) its current location, (f) the person or entity that has possession, custody, or control, (g) the reason that it was not produced, (h) the date and circumstances of its loss, destruction, or release from custody, and (i) the person authorizing the loss, destruction, or release from custody.

4.      If Searby claims that any responsive electronically stored information (such as, any e-mail, electronic document (such as a Word or WordPerfect document, or electronic spreadsheet) or digital or analog video) "is not reasonably accessible" to Searby because of "undue burden or cost" within the meaning of the Federal Rules of Civil Procedure, describe with specificity that undue

4954395

burden or cost and the current location and custodian of such electronically stored information.

5.     Unless a different time period is set forth in a specific document request, the time period covered by these document requests is January 1, 2003 through the present.

6.     Unless context clearly indicates otherwise, the following words shall be deemed to have the following meanings:

A.     "Document" is intended to have the broadest possible meaning within the scope of the Federal Rules of Civil Procedure, and includes, without limitation, all originals, non-identical copies, and copies with marginal notations or interlineations, of any writings (including e-mails), drawings, graphs, charts, photographs, sound recordings, video recordings, images and other data or data compilations— stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably useable form.

B.     "Pertaining to," "relating to," "related to," "reflecting," "with respect to," "regarding," "referring to," "in reference to," and "concerning" shall be interpreted broadly, including both explicit and implicit references, and shall mean, without limitation, relating to, regarding, constituting, defining, discussing, containing, embodying, reflecting, stating, dealing with, prepared in contemplation of, prepared in connection with, prepared as a result of, or in any way pertaining to.

C.     "Hartley" means Father Christopher Hartley, who appears in the movie entitled "The Price of Sugar."

D.     "Uncommon Productions" means the Defendant Uncommon Productions, LLC and its officers, directors, employees, consultants, attorneys and representatives.

4954395

<u>Please Produce</u>:

1.      All documents related to communications between Searby and Hartley concerning the working and living conditions on the bateyes in the Dominican Republic.

2.      All documents Searby received from Hartley related to the working and living conditions on the bateyes in the Dominican Republic.

3.      All documents Searby provided to Hartley related to the working and living conditions on the bateyes in the Dominican Republic.

4.      All documents related to communications between Searby and Uncommon Productions concerning the working and living conditions on the bateyes in the Dominican Republic.

5.      All documents related to communications between Searby and any third party related to the lawsuit currently pending in the United States District Court for the District of Massachusetts, captioned <u>Lluberes v. Uncommon Productions, LLC</u>, Civil Case No. 07-11623 (DPW).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

FELIPE VICINI LLUBERES and
JUAN VICINI LLUBERES

        Plaintiffs,

    vs.

UNCOMMON PRODUCTIONS, LLC
and WILLIAM M. HANEY, III,

        Defendants.

CASE NO. 07 CA 11623 DPW

## NOTICE OF DEPOSITION

To:    David Searby
       c/o Office of the Legal Advisor
       Room 5519
       United States Department of State
       2201 C Street, N.W.
       Washington, D.C. 20520-6310

    PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 45, beginning

on Monday, May 19, 2008 at 10:00 a.m. at the law offices of PATTON BOGGS, LLP, 2550 M

Street, N.W., Washington, DC 20037, Plaintiff Felipe Vicini Lluberes will take the deposition of

David Searby before a notary public or other person authorized to administer oaths or take

depositions in the District of Columbia and shall be taken for discovery purposes, or any other

lawful purpose. The deposition may be recorded by stenographic and videographic means. If the

deposition is not completed on the day on which it is scheduled, it will continue from day to day

until completion.

Date: April 28, 2008

4955556

_[signature]_

Read K. McCaffrey (admitted _pro hac vice_)
Stephen Diaz Gavin (admitted _pro hac vice_)
Benjamin G. Chew (admitted _pro hac vice_)
Nigel L. Wilkinson (admitted _pro hac vice_)
PATTON BOGGS LLP
2550 M St, N.W.
Washington, DC 20037
Telephone: (202) 457-6015
Facsimile: (202) 457-6315
e-mail: bchew@pattonboggs.com

Jessica Block
BBO # 046110
BLOCK & ROOS LLP
60 State Street, Suite 3800
Boston, MA 02109
Telephone: (617) 223-1900
Facsimile: (617) 227-1948
Email: block@blockroos.com

Counsel for Plaintiffs
Felipe Vicini Lluberes
and Juan Vicini Lluberes

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of April, 2008, the foregoing Notice of Deposition was served by electronic and first class mail, postage prepaid, upon:

Elizabeth C. Koch, Esq.
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
1050 Seventeenth St., N.W.
Suite 800
Washington, D.C. 20036

_[signature]_

# Exhibit O



United States Department of State

*Washington, D.C.   20520*

May 2, 2008

**VIA FACSIMILE AND
U.S. MAIL**

Nigel L. Wilkinson, Esq.
Patton Boggs, LLP
2550 M Street, N.W.
Washington, D.C. 20037

Re: *Felipe Vicini Lluberes, et al. v. Uncommon Productions, LLC, et al.*
Case Number 07-11623 (DPW) D. Mass.

Dear Mr. Wilkinson:

This is in response to your subpoena dated April 28, 2008 addressed to David Searby, a Department employee currently serving with the U.S. Embassy in Santo Domingo. The subpoena seeks the production of documents on May 16 and deposition testimony on May 19 in connection with the above-captioned litigation.

As you know, the Department of State is not party to this litigation. Requests for information from the Department in connection with such litigation must be made in accordance with the Department's *Touhy* regulations set forth at 22 C.F.R. Part 172. As provided in 22 C.F.R. § 172.5(a), a request must "set forth in writing, and with as much specificity as possible, the nature and relevance of the official information sought." We note in particular that the request in this instance provides no indication of the nature of the information sought in the deposition, nor does it indicate the relevance of any of the information sought, either in the deposition or in the document production. In addition, the Department requires "a plan of all reasonably foreseeable demands, including but not limited to the names of all employees and former employees from whom discovery will be sought, areas of inquiry, expected duration of proceedings requiring oral testimony, and identification of potentially relevant documents." 22 C.F.R. § 172.5(b).

In order for us to determine whether your requests should be granted, it is necessary that the information specified in these regulations be provided. The Department's regulations also make clear that it considers the factors identified in 22 C.F.R. § 172.8 before it complies with any requests and that appropriate approvals must be obtained before any witnesses or documents can be produced.

Accordingly, by this letter, and pursuant to the Federal Rules of Civil Procedure, including but not limited to Rule 45, the Department objects to your subpoena. The Department reserves the right to address the factors in 22 C.F.R. § 172.8, as well as to raise any additional objections, after the necessary information has been received.

If you have any questions, please call me at 202-647-7423.

Sincerely,

Timothy E. Ramish
Assistant Legal Adviser
  for Western Hemisphere Affairs
United States Department of State

**United States Department of State**

## FACSIMILE TRANSMISSION COVER SHEET

Date: 5/2    Time: 4:00    Pages Transmitted: 3    *plus cover*

**TRANSMITTED TO:**    Fax Number: 202-457-6315

Name: Nigel Wilkinson

Organization: Patton Boggs

Telephone: 202-457-6000

Description: _____

**TRANSMITTED FROM:**    Fax Number: _____

Name: Tim Ramish

Telephone: 202 647-6328 or 7423

**COMMENTS:**

Note: _____

# Exhibit P



**PATTON BOGGS** LLP
ATTORNEYS AT LAW

2550 M Street, NW
Washington, DC 20037
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

May 9, 2008

Benjamin G. Chew
202-457-6015
bchew@pattonboggs.com

**Via Hand Delivery**

Timothy E. Ramish, Esq.
Assistant Legal Advisor for Western Hemisphere Affairs
United States Department of State
2201 C Street, N.W., Room 4325
Washington, DC 20520

Re :  *Lluberes, et al. v. Uncommon Productions, et al.*, D. Mass. Case No. 07-CA 11632 (DPW):
      **Subpoena Directed to David Searby**

Dear Mr. Ramish:

        This letter responds to your May 2, 2008 request for additional written information concerning the nature and relevance of the information sought in the subpoena issued to David Searby on April 28, 2008, in the above referenced litigation ("Current Litigation"). Specifically, you requested information as identified in the *Touhy* regulations set forth in 22 C.F.R. Part 172.

        As you know, the *Touhy* regulations do not excuse federal Government agencies, including the United States Department of State ("Department"), from having to produce documents and/or witnesses for deposition pursuant to a subpoena issued under Rule 45 of the Federal Rules of Civil Procedure. *See Yousuf v. Samantar*, 451 F.3d 248 (D.C. Cir. 2006) (the Department is subject to and must comply with a Rule 45 subpoena).[1] While the *Touhy* regulations "may provide the method by which an agency head will comply with or oppose a subpoena, the legal basis for any opposition to the subpoena must derive from an independent source of law such as a governmental privilege or the rules of evidence or procedure." *Watts v. Securities and Exchange Commission*, 482 F.3d 501, 509 (D.C. Cir. 2007). Similarly, the *Touhy* regulations do not excuse the Department from having to provide a privilege log for any documents or information withheld from production on grounds of privilege.[2] The *Touhy*

---

[1] *Securities and Exchange Commission v. Seldon*, 484 F.Supp.2d 105, 108-09 (D.D.C. 2007) (private litigants may subpoena documents from a federal agency and that agency must comply with the Federal Rules of Civil Procedure when responding to such a subpoena).

[2] *See In re Apollo Group, Inc. Securities Litigation*, Civil Action No. 04-2147-PHX-JAT, 2007 WL 778653 (D.D.C. March

4957079



May 9, 2008
Page 2

regulations, therefore, are not, in and of themselves, a valid basis on which to refuse to respond to a subpoena.

However, in the interest of facilitating the Department's responses to the Subpoena, we have complied with the procedures you identified in 22 C.F.R. Part 172 and provided, below, the information the Department has requested pursuant to the guidelines set forth in 22 C.F.R. Part 172.8. We trust that the following information fully satisfies any procedural obligation we may have to obtain the Department's substantive responses to the Subpoena.

Also, please be on notice that we are contemporaneously issuing similar subpoenas seeking information from other current and former Department employees: Michael J. Garuckis; Alexander T. Bryan; Michael D. Puccetti; and Ambassador Hans H. Hertell. A courtesy copy of these subpoenas is enclosed with this letter. The information we are providing in this letter applies equally to the subpoenas directed to these individuals (as they concern the same subject matter and underlying lawsuit), and therefore satisfies our obligations to comply with the *Touhy* regulations.

Because discovery in the Current Litigation closes on June 27, 2008, we are on a tight timeframe to obtain the Department's responses. **Please let me know no later than 5:00 p.m. on Friday, May 16, 2008, whether the Department will provide the subpoenaed documents and information and produce witnesses for deposition.** Otherwise, we will have no choice but to seek an order from the United States District Court for the District of Columbia compelling production pursuant to Rule 45.

### Background of the Current Litigation

Brothers Felipe and Juan Vicini ("the Vicinis"), members of a family in the Dominican Republic who own and operate sugar cane fields, processing centers and a sugar mill and related equipment in the San Pedro de Macroís area, are the Plaintiffs in the Current Litigation. A copy of the Complaint filed in August 2007 is attached as Exhibit 1.

In the Current Litigation, the Vicinis seek preliminary and permanent injunctive relief and declaratory judgment against a Massachusetts filmmaker (William Haney) and his production company (Uncommon Productions, LLC) (collectively, "Defendants") who produced and have distributed throughout the United States a purported "documentary" film entitled *The Price of Sugar* ("*POS*"), which purports to depict current working and living conditions in the sugar cane fields and villages, known as *bateyes*, in the Dominican Republic. In the course of this

---

12, 2007) (Government must produce adequate privilege log if withholding material responsive to a Rule 45 subpoena based on privilege).



May 9, 2008
Page 3

"documentary," the filmmaker, largely through Fr. Christopher Hartley ("Fr. Hartley"), who appears throughout the film, and whose statements about the Vicinis are the central focus of the "documentary," falsely accuses the Vicinis of heinous crimes, including *inter alia*, murder, attempted murder of a priest (Fr. Hartley), human trafficking and obstruction of justice.

For example, Fr. Hartley states in the film that:

> **The Vicini family have a lot of blood on their hands.** This is
> well known. Nobody dares speak out and say it because many
> people fear for their lives or the lives of their loved ones. **And
> this is a fact.** People disappear. People are never found.

*POS*, 23:38 (emphasis added). This statement of alleged "fact" by Fr. Hartley constitutes one of several false statements that form the predicate of the Vicinis' claim for defamation *per se*. In response to the Vicinis' interrogatories, Defendants have cited Fr. Hartley as the primary source for their scandalous allegations against the Vicinis, making Fr. Hartley one of the key witnesses in the case.

### Fr. Christopher Hartley's Involvement in the Current Litigation

Fr. Hartley has also thrust himself into Defendants' promotion of *POS* in the United States, appearing at a screening here in Washington, D.C., on November 14, 2007, before the Congressional Human Rights Caucus, after which Fr. Hartley spoke, without the administration of any oath, repeating many of the same false allegations against the Vicinis contained in *POS*. *See* Exhibit 2 (Fr. Hartley's prepared remarks dated November 14, 2007). In response to one of the questions in the session following the showing of *POS*, Fr. Hartley reluctantly revealed a material fact omitted from the film: *i.e.*, that the Catholic Church declined to renew his contract, requiring him to leave the Dominican Republic (having been sent to the D.R. by the Archdiocese of New York). In point of fact, the Bishop of the Catholic diocese of San Pedro de Macorís, to which he had been assigned, specifically relieved him of his duties as a pastor and priest there for cause.[3]

It was shortly after this screening on Capitol Hill that the Vicinis arranged to have Fr. Hartley – their principal accuser and Defendants' key witness – served with a document and

---

[3] The Church has expressed a different view: in Circular # 012-06, for the Entire Diocese of San Pedro de Macorís, dated December 21, 2006, Bishop Francisco Ozoria Acosta, announced that, despite some "material and good work" Fr. Hartley had done in the Dominican Republic, the Church asked Fr. Hartley to leave because of "serious offenses... [Fr. Hartley's] arrogance and zeal for self-promotion led him to believe that nothing would work without him."



deposition subpoena. Hartley moved to quash that subpoena, arguing, in part, that he was never actually served. *See Hartley v Lluberes*, Case No. 08-mc-00010 (RJL) (D.D.C., filed Jan. 4, 2008). Indeed, in a sworn declaration attached to his motion to quash, Fr. Hartley testified:

> 5.    In November – December 2007, I traveled from Ethiopia to the United States for approximately three weeks. During that trip, I visited the District of Columbia from November 13, 2007 through November 15, 2007.

> 6.    On November 14, 2007, I attended a screening of the documentary "The Price of Sugar" at a location near the United states Capitol building in the District of Columbia.

> 7.    On November 14, 2007, **I was not served** with the subpoena issued by Benjamin G. Chew and attached as Exhibit A to this declaration.

> 8.    On November 14, 2007, **no one approached me and attempted to hand me** the subpoena issued by Benjamin G. Chew and attached as Exhibit A to this declaration.

> 9.    During the afternoon of November 14, 2007, while accompanied by a reporter from CNN, Joe Johns, I did hear an individual call out my name as I crossed an intersection near the United States Capitol Building in the District of Columbia. However, **I did not see the individual. The individual did not hand me any documents and did not attempt to hand me any documents.**

> I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 4, 2008.

*See* Exhibit 3, Hartley Declaration (emphasis added).

Fr. Hartley's sworn denials were promptly rebutted by Scott Kucik of Capitol Process Services, Inc. ("Capitol"), a ten-year veteran server and supervisor of other servers at Capitol (who actually served Fr. Hartley with the subpoena), and the very person Hartley cited as the witness to the purported lack of service— CNN reporter Joe Johns. *See* Exhibit 4 (Kucik Affidavit) and Exhibit 5 (Johns Declaration).

As Mr. Kucik testified:

4957079



**PATTON BOGGS** LLP
ATTORNEYS AT LAW

May 9, 2008
Page 5

The Hartley Declaration is inaccurate in several respects:

a)    First, I did not call out his name as he crossed the intersection. Rather, I approached and addressed him respectfully as he and the Third Party waited at the light.

b)    Second, Fr. Hartley turned toward me and very definitely saw me as I was speaking to him, during which time I was within only about two feet of him.

c)    Third, he saw me hold out the Subpoena to him.

d)    Fourth, not only did I attempt to hand him the Subpoena, but also, when Fr. Hartley turned his back to me to avoid the Subpoena, I asked him explicitly to take the Subpoena in his hand so that I would not have to leave it at his feet.

Exhibit 4, ¶ 38.

Joe Johns, who had reported sympathetic stories about Fr. Hartley in the past, confirmed that Fr. Hartley's sworn testimony was false:

3.    On the afternoon of November 14, 2007, I was on the street in Washington, D.C. with Father Christopher Hartley.

4.    While we were waiting at an intersection a gentleman called out Father Hartley's name.

5.    I saw the gentleman attempt to hand some papers to Father Hartley. Father Hartley took a quick look at the papers and walked away.

6.    At that point that same gentleman said something like "Father Hartley, I am laying the document at your feet" or "I am laying the subpoena at your feet."

Exhibit 5.

Despite his false assertions that he was never served, Fr. Hartley did produce some documents subject to a variety of objections. But Fr. Hartley has steadfastly refused to testify in the Current Litigation, even after the Vicinis offered to pay his travel and lodging expenses to return to Washington (we believe he is currently assigned to a post in Ethiopia) or have their counsel travel to a location of his choosing. Last week, Judge Leon of the United States District Court for the District of Columbia ruled that Fr. Hartley could not be compelled in the Current



**PATTON BOGGS** LLP
ATTORNEYS AT LAW

May 9, 2008
Page 6

Litigation to testify at deposition.[4]

### Plaintiffs' Only Recourse to Test Fr. Hartley's Accusations is to Obtain Documents and Testimony from the Department Employees With Whom Fr. Hartley Frequently Communicated

Among the documents Fr. Hartley did produce are several e-mail communications he had with Department employees, between October 2006 and November 2007, regarding the Vicinis, working and living conditions on Dominican bateyes, and the Current Litigation. The Department employees with whom Hartley communicated are, as follows:

1.  David Searby
    Position (2007): Desk Officer for the Dominican Republic
    U.S. Department of State,
    Washington, DC
    SearbyDP@state.gov

    Current Position:
    Press Attaché,
    Embassy of the United States
    Dominican Republic

2.  Michael J. Garuckis
    Position (2006): Judicial/Legal Affairs Officer
    Economic and Political Section
    Embassy of the United States
    Dominican Republic
    GaruckisMJ@state.gov

3.  Alexander T. Bryan
    Position (2006): Labor and Human Rights Officer
    Embassy of the United States
    Dominican Republic
    BryanAT@state.gov

4.  Michael D. Puccetti

---

[4] It is incredible that given Fr. Hartley's zeal for his purported cause and the Defendants' reliance upon Hartley as the main factual resource for their film, neither Hartley nor Defendants would want to set the record straight as to Hartley's accusations.



**PATTON BOGGS** LLP
ATTORNEYS AT LAW

May 9, 2008
Page 7

> Position (2008): Global Affairs Officer
> Office of Policy Planning and Coordination
> Bureau of Western Hemisphere Affairs
> U.S. Department of State
> Washington, DC
> PuccettiMD@state.gov

5.   Hans H. Hertell
     Position (2007): United States Ambassador
     to the Dominican Republic
     Embassy of the United States
     Dominican Republic
     HertellHH@state.gov

It appears from the evidence collected in the Current Litigation that Fr. Hartley discussed with the above individuals issues regarding (1) a CODEL to the Dominican Republic in December 2006 to visit Vicini sugar plantations; (2) attempts to ensure that the Vicinis would be specifically referenced by name in the House Human Rights Report on the Dominican Republic; (3) exchanges of documents concerning the Vicinis; (4) *POS* promotion (Fr. Hartley evidently forwarded copies of *POS* to both Messrs. Searby and Bryan); and (5) the Current Litigation and Fr. Hartley's concern that he may be served with a subpoena when attending the POS screening on Capitol Hill in November 2007.[5]  Further, Fr. Hartley met with various Department employees during visits to Washington DC in June and November 2007.

As the Vicinis' main accuser and primary source for Defendants' defamatory conduct, Fr. Hartley's credibility and the accuracy of the information he provided to Defendants is one of the main issues in the Current Litigation.  The evidence developed to date indicates that Fr. Hartley made many of the accusations he makes in POS to the above-named individuals.  *See, e.g.* Exhibit 2, Fr. Hartley's prepared remarks at pp. 4-5, in which Hartley quotes from a communication to "a very prominent US official in the United States Embassy to the Dominican Republic," complaining about the Vicinis.  That prominent U.S. official to whom Fr. Hartley referred in his prepared remarks was Michael Garuckis, the then Judicial/Legal Affairs Officer at the U.S. Embassy in the Dominican Republic.

---

[5] Fr. Hartley has designated the vast majority of his production as "Confidential" pursuant to a protective order entered in the Current Litigation.  While it is inconceivable how the vast majority of Fr. Hartley's production could be considered "Confidential" under the Federal Rules of Civil Procedure, the protective order prohibits any party from distributing such designated documents outside the Current Litigation.  Thus, we are prohibited from attaching the e-mails received from Fr. Hartley that show the specific communications with State Department employees.



**PATTON BOGGS** LLP
ATTORNEYS AT LAW

May 9, 2008
Page 8

Given Fr. Hartley's refusal to provide any support for his accusations and his apparent lack of veracity, the Vicinis' only alternative to determine the actual facts at issue in the Current Litigation is to seek relevant information from those individuals with whom Fr. Hartley communicated— specifically, the Vicinis are entitled to discover what information Fr. Hartley provided to Messrs. Searby, Garuckis, Bryan, Puccetti and Hertell, that could either prove or disprove the defamatory statements made in *POS*.

### The Considerations Outlined in 22 C.F.R. § 172.8 Favor Allowing the Vicinis to Obtain the Requested Discovery from Current and Former Department Employees

Pursuant to 22 C.F.R. § 172.5, the Vicinis are hereby providing notice that they intend to seek relevant discovery from Messrs. Garuckis, Bryan, Puccetti and Hertell, in addition to Mr. Searby. Thus, the information provided below, using the guidelines set forth in 22 C.F.R. § 172.8, apply equally to the current subpoena directed to Mr. Searby and subpoenas directed to Messrs. Garuckis, Bryan, Puccetti and Hertell, which seek the same information pertaining only as to each specific subpoenaed individual.

**A.    Compliance Would not be Unduly Burdensome or otherwise be inappropriate under the applicable rules governing the Current Litigation (22 C.F.R. Part 172.8(a)(1))**

Discovery from third parties in the Current Litigation is governed by Fed. R. Civ. P. 26 and Fed. R. Civ. P. 45, which allow the Vicinis without a court order to seek all non-privileged information that is relevant to their claims or the Defendants' defenses, including information that is reasonably calculated to lead to the discovery of admissible evidence. *See also Yousuf v. Samantar*, 451 F.3d 248 (D.C. Cir. 2006) (the Federal Rules of Civil Procedure were designed to provide a liberal opportunity for discovery, including discovery from a United States agency as a non-party). As described above, Fr. Hartley's communications to Department employees concerning the Vicinis, the Current Litigation, the working and living conditions on Dominican bateyes, Hartley's involvement in and promotion of *POS*, and Hartley's propensity for veracity,[6] are all issues highly relevant to the Current Litigation.

The Department's burden of collecting responsive documents is minimal. Presumably, documents related to Fr. Hartley's communications with Messrs. Searby, Garuckis, Bryan, Puccetti and Hertell would be limited to e-mails sent and received from the official e-mail addresses identified above. These e-mails could be easily retrieved by using simple keyword searches (for example "Hartley" and "Searby"). We believe Fr. Hartley's e-mail address used in

---

[6] Indeed, the Federal Rules of Evidence 607 and 608 allow the use of extrinsic evidence to impeach a declarant's credibility.



**PATTON BOGGS** LLP
ATTORNEYS AT LAW

May 9, 2008
Page 9

his communications with Department employees was hartley.christopher@gmail.com and parr.sanjose@verizon.net.do. Moreover, the timeframe in the subpoena is limited to between January 1, 2003 to the present. However, in the interest of minimizing any burden, we are willing to narrow the time frame to between September 1, 2006 through the earlier of (1) the present day or (2) the date upon which the individual left the Department's employ. This limited time frame does not apply to the subpoena directed to former Ambassador Hans H. Hertell, from whom we seek relevant information exchanged during his tenure as the United States Ambassador to the Dominican Republic.

We are willing to minimize any burden associated with giving oral testimony. We anticipate that each deposition will last no more than a few hours, and are willing to schedule the depositions at a time and place most convenient to each deponent (be that here in the United States or in the Dominican Republic). However, please be advised that such depositions will need to be scheduled before discovery closes in the Current Litigation on June 27, 2008.

**B.    The Requested Disclosures are Appropriate Under Relevant Substantive Law Concerning Privilege or Disclosure of Information (22 C.F.R. Parts 172.8(a)(2) and 172.8(b))**

Communications between Fr. Hartley and the identified Department employees are neither subject to any recognized substantive privilege nor contain any of the types of information precluded from disclosure by 22 C.F.R. Part 172.8(b). Fr. Hartley was a Catholic priest assigned to the Dominican Republic who went to great lengths to bring international attention to the Dominican sugar plantations in general, and specifically the Vicinis. Fr. Hartley's crusade involved his seeking interviews with the international press, such as Spanish, Italian and American television (including Univision and CNN), and with reporters from across the United States. In those interviews, Fr. Hartley frequently blamed the Vicinis for perpetuating social and economic problems among Haitian immigrants. Indeed, even if Fr. Hartley were to claim his communications with Department employees was subject to some privilege, he has waived any such privilege because he consistently forwarded his Department communications to third parties, including the press. Moreover, Fr. Hartley himself published part of his e-mail to Mr. Garuckis, in which he continued his campaign against the Vicinis. *See* Exhibit 2.

**C.    The Public Interest is Best Served by Permitting the Requested Discovery (22 C.F.R. Part 172.8(c)**

As with any defamation case, the public interest is best served by having the truth publicized rather than falsehoods. *See, eg., Gertz v Robert Welch, Inc.*, 418 U.S. 323, 341 (1974) ("The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to

4957079



**PATTON BOGGS** LLP
ATTORNEYS AT LAW

May 9, 2008
Page 10

abandon this purpose, for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being-a concept at the root of any decent system of ordered liberty.'")

> **D.    Permitting the Requested Discovery Will Not Unreasonably Distract Department Employees from Performing their Official Business (22 C.F.R. Part 172.8(a)(4) or Unreasonably cause the United States to Spend Time and Money for Private Purposes (22 C.F.R. Part 172.8(a)(5))**

As noted above, we believe that compiling responsive documents can be accomplished with minimal time and effort, as we have limited the time frame and seek only electronic documents. Further, we are also willing to pay for all reasonable costs associated with compiling and producing responsive documents.

To the extent oral testimony is requested from current or former Department employees, we will schedule such depositions at a time and place most convenient for the subpoenaed individuals.

> **E.    Compliance Will Have No Effect on the Government's Impartiality Between private Litigants (22 C.F.R. Part 172.8(a)(6)), Will Have No Adverse Effect on Performance by the Department of its Mission and Duties (22 C.F.R. Part 172.8(a)(7)), and Will Not Involve the Department in Controversial Issues Not Related to its Mission (22 C.F.R. Part 172.8(a)(8))**

Finally, the documents and testimony the Vicinis seek are limited to communications between Fr. Hartley and the Defendants, and five former and/or current Department Employees, concerning discrete issues, during a discrete time period. None of the requested information relates to current Department missions or duties (indeed, all of the requested information relates to events that have already occurred), and the Vicinis are not seeking to implicate any current or former Department employee. Nor are they seeking the Department's endorsement of any issue raised in the Current Litigation. Rather, the Vicinis simply seek to discover the actual facts underlying Fr. Hartley's and the Defendants' defamatory conduct.

4957079



May 9, 2008
Page 11

If you desire any additional information or if we can be of any further assistance, please do not hesitate to contact me at (202) 457-6015, or by email at bchew@pattonboggs.com. We appreciate your consideration and look forward to the Department's prompt response.

Very truly yours,

Benjamin G. Chew

Enclosures

4957079

# Exhibit Q



U. S. Department of Justice

Jeffrey A. Taylor
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

May 16, 2008 *J.L*

**BY FEDERAL EXPRESS**
Benjamin G. Chew
Patton Boggs LLP
2550 M Street, NW
Washington, DC 20037
bchew@pattonboggs.com

**RE:**    *Lluberes, et al. v. Uncommon Productions, Inc. et al.,*
Civil Action No. 07-11632 (DPW) (D. Mass)

Objections to Subpoenas Directed to Current and Former Department of State Officers

Dear Benjamin,

I hope this day continues to find you well. As I noted in our phone conversation from earlier today, please let this letter serve as the Department of State's ("Department's") formal and continuing objection to the subpoenas directed to Messrs. Searby, Garuckis, Bryan, Puccetti, and Hertell pursuant to Federal Rule of Civil Procedure 45 and the Department's *Touhy* regulations, 22 C.F.R. § 172.1.

Specifically, the Department objects to the subpoenas on the grounds, among others, that the subpoenas (i) have not been properly served pursuant to the Rules or applicable statutes and regulations, (ii) are vague, ambiguous, unduly burdensome, and overbroad, (iii) seek information that is so tangentially, if at all, relevant to the underlying action, (iv) seek to impose obligations upon third-parties beyond those provided for in the Rules or applicable statues and regulations, (v) fail to comply with the requirements of 28 U.S.C. § 1783 and other applicable statutes, rules and regulations for subpoenas of persons located in foreign countries, (vi) call for the production of information protected by the deliberative process privilege, the state secret privilege, the attorney-client privilege, the attorney work-product privilege and other privileges, (vii) call for a response before the Department has reasonable time to consider the subpoenas and requests for information under its *Touhy* regulations; and (viii) fail to otherwise comply with applicable rules, statutes and regulations. The Department and the individuals subpoenaed reserve the right to supplement these objections should the need arise.

If you have any questions or concerns please let me know. I look forward to speaking with you next Friday, May 23, 2008, in furtherance of our efforts to meet and confer regarding the subpoenas.

Sincerely,

BRIAN P. HUDAK
Assistant United States Attorney

Phone:  (202) 514-7143
Email:  brian.hudak@usdoj.gov

# Exhibit R

**From:**      Hudak, Brian (USADC) [Brian.Hudak@usdoj.gov]
**Sent:**      Wednesday, May 28, 2008 2:17 PM
**To:**        Chew, Benjamin
**Cc:**        MinRB@state.gov
**Subject:**   RE: In re State Department Subpoenas -- Update


Dear Ben,

I hope this day finds you well.  I did not receive a response to my last
email from Thursday, May 22, 2008.  Nonetheless, I thought it best to
email you an update on the status of the subpoenas you issued to certain
State Department employees in their official capacities.

We have discussed the subpoenas, your Touhy letter, and your emails with
relevant persons at the Agency.  We are in the process of formulating a
formal response to your inquiry, but wanted to let you know our
preliminary thoughts on the matter in the hope of resolving it without
further litigation.

Notwithstanding the Agency's belief that the information you seek is
irrelevant (see below), as of now, in the spirit of compromise, the
Agency is willing to consider authorizing the release of documents as
limited by your May 15, 2008, email.  That is, non-privileged email
communications, in the custody and possession of the subpoenaed
individuals, with Father Hartley and/or Ms. Noemi Mendez dated from
September 1, 2006, to the present.  As we understand your limitation to
exclude all other communications (including privileged communications),
the Agency would not be providing a privilege log unless it was
asserting a privilege to a communication with Father Hartley or Ms.
Mendez (indeed, the Agency's generation a log beyond this would foist an
undue burden of incredible proportions on the Agency, a third party to
the present action).  Further, neither the subpoenaed individuals nor
the Agency would search any disaster recovery or "back-up" server
systems, as such a search would clearly present an undue burden.

With regards to deposition testimony, the Agency is disinclined to
authorize the release of such testimony.  Under the Agency's Touhy
regulations and Federal Rule of Civil Procedure ("Rule") 45, the Agency
believes that depositions of the subpoenaed persons presents, among
other things, an undue burden to the Agency.  See Agency's Objection
Letter of 05/16/08 for other reasons.  That is, the burden and expense
of providing Agency employees for deposition in this action far
outweighs any relevant or responsive information that you might expect
to discover.  Indeed, from our understanding, oral statements made by
Father Hartley, a third-party to your action, to State Department
officials do not form the basis of any of your present claims against
Defendants.  Further, as Father Hartley will not be providing deposition
testimony in your action, evidence that would tend to challenge his
credibility is largely, if not entirely, irrelevant.  Moreover, the
information you seek in the subpoenas does not make it any more or less
likely that Defendants (of which Father Hartley is not) made any
knowing, reckless or negligent inaccurate-statements about your clients.
Lastly, deposition subpoenas of those persons located in the Dominican
Republic or 100 miles from the District are ripe to be quashed pursuant
to Rule 45(c)(3)(A)(ii) and/or 28 U.S.C. Sect. 1783.

To repeat, this email does not constitute a final agency decision, and
is simply part of ongoing meet and confer process regarding the
subpoenas.  The Agency expects to release a final decision on the
information requests contained in your subpoenas by no later than June

6, 2008.  If you have any questions or concerns, or wish to discuss this
matter with us further, please let me know a time that works well for
you.

Best regards,
Brian

Brian Hudak
Assistant United States Attorney
555 4th Street NW
Washington, DC 20530
(202) 514-7143

# Exhibit S



**United States Department of State**

*Washington, D.C.   20520*

June 6, 2008

**VIA MAIL AND EMAIL (bchew@pattonboggs.com)**
Benjamin G. Chew
Patton & Boggs LLP
2550 M Street, NW
Washington, DC 2037

   Re: *Felipe Vicini Lluberes, et al. v. Uncommon Productions, LLC, et al.*
     Case Number 07-11623 (DPW) D. Mass.

Dear Mr. Chew:

   On behalf of the Deputy Legal Adviser,[1] this letter responds to your letter of May 9, 2008, and your subpoenas for deposition testimony and documents addressed to former and current employees of the Department (Alexander Bryan, Michael Garuckis, Hans Hertell, Michael Puccetti, and David Searby). This letter also takes into consideration written and oral communications between members of your law firm, including you, and the Department and the U.S. Attorney's Office in relation to these subpoenas.

   We have considered your requests under the Department's *Touhy* regulations at 22 C.F.R. part 172, and in light of Federal Rule of Civil Procedure ("Rule") 45 and other applicable Rules, regulations and statutes. After due consideration and deliberation, the Department hereby declines to authorize the deposition testimony of any of the individuals identified above in response to your requests and subpoenas, and reasserts its objections to the subpoenas. As more fully explained below, after evaluating the relevancy of the information you seek and the Department's burden in responding to your requests, under the factors identified in Department's *Touhy* regulations, it is clear that the subpoenas are overbroad and unduly burdensome to the Department as a third-party to your litigation.[2] However, in order to provide you a response that might nevertheless address your concerns, the Department will authorize the release of certain documents responsive to your requests, subject to the understandings and parameters set forth below.

---

[1] Under Department of State Delegation of Authority 206, the Legal Adviser has delegated to the Deputy Legal Advisers the authority conferred upon the Legal Adviser and the Office of the Legal Adviser pursuant to the Department's *Touhy* regulations at 22 C.F.R. part 172.

[2] The Department also expressly reserves its right to move to quash or oppose any motion to compel on other legal bases as articulated in its letter of May 16, 2008, and other communications between the Department and Plaintiffs, including, but not limited to, the failure to comply with statutes, Department regulations, and the Rules.

### *Evaluation of Your Requests For Deposition Testimony*[3]

In your May 9 letter, and in communications concerning the subpoenas referred to above, you have stated that you are seeking to depose former and current Department employees to help prove or disprove allegedly defamatory statements made by Defendants concerning your clients in the film *The Price of Sugar*. Ltr. from B. Chew to T. Ramish, May 9, 2008 ("May 9 letter"), at 8. In particular, you have expressed a desire to depose Department employees in order to assess the veracity of statements made in *The Price of Sugar* by Father Christopher Hartley, who you describe as your clients' "main accuser and primary source for Defendants' defamatory conduct." May 9 Ltr., at 7, 8. Based upon the Department's evaluation of your requests under its *Touhy* factors, the Department believes that the requests are unduly burdensome and, thus, objectionable under Rule 45.

### 1.    *General Irrelevance of Request Information.*

From our understanding, your clients are pursuing legal claims against William Haney and Uncommon Productions LLC, the makers and producers of the film *The Price of Sugar*, and not Father Hartley. Accordingly, statements made by Father Hartley, a third-party to your action, to Department officials do not form the basis of any of your present claims against Defendants. Moreover, the information you seek in the subpoenas does not make it any more or less likely that Defendants (of which Father Hartley is not) made any knowing, reckless or negligent false and defamatory statements regarding your clients. Indeed, we fail to see how statements made by Father Hartley to Department officials are relevant to your action, or could lead to the discovery of other relevant information. Further, as Father Hartley will not be providing deposition testimony in your action, evidence that would tend to challenge his credibility is largely, if not entirely, irrelevant. Accordingly, the Department believes that the requests seek information that is of little, if any, relevance to the action.

### 2.    *Undue Burden of Producing Witnesses for Depositions.*

Authorizing Department officials to provide testimony in your action constitutes a significant burden to the Department.

*First*, although you have limited the scope of your subpoenas to communications between Father Hartley and/or Ms. Noemi Mendez, and Department officials, based upon the purpose of the subpoenas as described by Plaintiff's counsel on phone calls with the Department's attorneys, the Department remains concerned that the subpoenas seek to

---

[3]    While the Department understands that certain jurisdictions require evaluation of an agency's response to a Federal Subpoena under Rule 45 standards, even if such standards are applied to the subject subpoenas, the Department believes consideration of its *Touhy* factors provides a framework in which to evaluate whether Plaintiff's requests are objectionable under Rule 45 as unduly burdensome.

discover what information was considered by the Department and how much weight was given to such information in the deliberative process concerning various Department reports.

*Second*, while the Department agrees that a public interest exists in the publication of true, versus false, statements, the Department fails to see how the requested information is at all relevant to this purpose as described above. Accordingly, the need to maintain impartiality between private litigants in this action is implicated.

*Third*, the need to conserve the time of Department officials and to avoid spending time and money of the United States for private purposes is implicated in this case. Notably, some of the witnesses subpoenaed are located in foreign countries. Further, as the information sought by the subpoenas has minimal, if any, relevance, there exists scant justification to compel Department officials to divert their attention from the Department's mission and expend government resources to testify as third-parties in the current litigation between two private parties.

*Lastly*, the need to avoid involving the Department in controversial issues not related to its mission and the adverse effects compliance may have on the Department's mission further compound the Department's burden in responding to the requests. Quite simply, whether or not a private production company defamed Plaintiff is simply not related to the Department's mission.

*    *    *

Accordingly, based on the miniscule relevance, if any, of the requested deposition testimony, and the significant burdens such testimony presents to the Department, the Department pursuant to its *Touhy* regulations and Rule 45, does not authorize the release of deposition testimony in response to the subpoenas.

### *Evaluation of Your Requests For Documents*

In your various subpoenas for documents, you request the production of (1) documents related to communications and information exchanged between specific Department employees and Father Hartley concerning the working and living conditions on the bateyes in the Dominican Republic; and (2) documents relating to your plaintiffs or to above-referenced case. In certain of your subpoenas, you also request the production of documents related to communications between these employees and Uncommon Productions.

In your letter of May 9, you narrowed the time frame of your documents requests to between September 1, 2006 through the earlier of (1) the present day or (2) the date upon which the individual left the Department's employ. Finally, we note that in your email of May 15 to Royce Min (Department of State) and Brian Hudak (U.S. Attorney's Office), you proposed further limiting your requests solely to each employee's written communications with Father Hartley and Ms. Noemi Mendez.

For the reasons discussed above, we have determined that compliance with your original requests for documents would be unduly burdensome. In addition, we also object to your original requests for documents on other grounds, including but not limited to the following: (1) such requests may call for the production of information protected by various privileges, including the deliberative process privilege; (2) such requests do not satisfy other factors set forth under 22 C.F.R. § 172.8; (3) such requests may inappropriately call for opinion testimony, which is specifically prohibited under 22 C.F.R. § 172.9; and (4) certain subpoenas were not properly served as required under applicable Rules, regulations, and statutes.

Notwithstanding this determination, and our belief that any documents reflecting communications between Father Hartley and Department officials are not relevant to your clients' claims against Defendants, in order to provide you a response that might nevertheless address your concerns, we are prepared to authorize the release of the following category of documents:

> non-privileged email communications with Father Hartley
> and/or Ms. Noemi Mendez in the custody and possession of
> the subpoenaed individuals sent from September 1, 2006 to
> the present.

As we believe this limitation to exclude all other communications (including privileged communications), the Department would not be providing a privilege log unless it was asserting a privilege to a communication with Father Hartley or Ms. Mendez encompassed within the above description.[4] Further, neither the subpoenaed individuals nor the Department would search any disaster recovery or "back-up" server systems, as such a search would clearly present an undue burden. We intend to begin production of these documents to you shortly on a rolling basis.

\*   \*   \*

Absent your provision of additional pertinent information, we believe that the foregoing response is a final response to your subpoenas. We hereby request that you withdraw the portions of the subpoenas that seek information beyond that the Department as agreed to produce as described above. Please let us know whether you will withdraw such portions or not. All further communications regarding your requests and subpoenas should be directed to Assistant United States Attorney Brian Hudak at (202) 514-7143, or me at (202) 647-6823.

---

[4]     As noted in prior Department communications to you, the Department's generation of a log beyond this would foist an undue burden of incredible proportions on the Department, a third party to the present action.

Sincerely,

Royce Min
Attorney Adviser
Office of the Legal Adviser

cc:    Susan Biniaz, Deputy Legal Adviser, State Department
       Brian Hudak, U.S. Attorney's Office

# Exhibit T

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

Felipe Vicini Lluberes, et al.,

v.

Uncommon Productions, LLC, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  07-11623 (DPW) D. Mass.

TO:  Alexander T. Bryan, c/o Office of the Legal Advisor, Room
5519, United States Department of State, 2201 C Street,
N.W., Washington, DC  20520-6310

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
| | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC  20037 | DATE AND TIME 5/28/2008 9:00 am |
| --- | --- |

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See Attachment A

| PLACE     Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC  20037 | DATE AND TIME 5/23/2008 9:00 am |
| --- | --- |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| *[signature]* | 5/9/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Benjamin G. Chew, Esq., Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC 20037, (202) 457-6000
Attorneys for Plaintiffs

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Felipe Vicini Lluberes, et al. | ) |
| | ) |
| | ) |
| **Plaintiff(s)** | ) |
| | ) Case No.: 07-11623 (DPW) |
| v. | ) |
| Uncommon Productions, LLC, et al. | ) |
| | ) |
| | ) |
| **Defendant(s)** | ) |

## AFFIDAVIT OF SERVICE

to wit: Washington, DC

I, Wesley Jennings, having been duly authorized to make service of the Deposition Subpoena Duces Tecum with Attachment A on Alexander T. Bryan c/o Office of the Legal Advisor in the above entitled case, hereby depose and say:

That I am over the age of eighteen and that I am not a party to or otherwise interested in this suit.

That my place of business is 1827 18th Street, NW, Washington, DC 20009-5526 (202) 667-0050.

That on May 09, 2008 at 12:22 PM, I served the within Deposition Subpoena Duces Tecum with Attachment A on Alexander T. Bryan c/o Office of the Legal Advisor at United States Department of State, 2201 C Street, NW, Room 5519, Washington, DC 20520-6310 by serving McKinley Nell, Secretary to Legal Advisor's Office, authorized to accept. Described herein:

Gender: Male    Race/Skin: Black    Hair: Black    Approx. Age: 38    Height: 5'7"    Weight: 160

I declare under penalty of perjury that I have read the foregoing information contained in the Affidavit of Service and that the facts stated in it are true and correct.

**5-9-08**

Executed on:

Wesley Jennings
CAPITOL PROCESS & INVESTIGATOR
SERVICES, INC.
1827 18th Street, NW
Washington, DC 20009-5526
(202) 667-0050

ID: 08-001923

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

### DISTRICT OF COLUMBIA

Felipe Vicini Lluberes, et al.,

V.

Uncommon Productions, LLC, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 07-11623 (DPW) D. Mass.

TO:   Michael J. Garuckis, c/o Office of the Legal Advisor, Room 5519, United States Department of State, 2201 C Street, N.W., Washington, DC 20520-6310

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
| | |
| | DATE AND TIME |
| | |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC 20037 | DATE AND TIME 5/30/2008 9:00 am |
| --- | --- |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See Attachment A

| PLACE   Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC 20037 | DATE AND TIME 5/23/2008 9:00 am |
| --- | --- |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| *[signature]* | 5/9/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Benjamin G. Chew, Esq., Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC 20037, (202) 457-6000
Attorneys for Plaintiffs

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Felipe Vicini Lluberes, et al. | ) |
| | ) |
| | ) |
| **Plaintiff(s)** | ) |
| | ) Case No.: 07-11623 (DPW) |
| v. | ) |
| Uncommon Productions, LLC, et al. | ) |
| | ) |
| | ) |
| **Defendant(s)** | ) |

### AFFIDAVIT OF SERVICE

to wit: Washington, DC

I, Wesley Jennings, having been duly authorized to make service of the Deposition Subpoena Duces Tecum with Attachment A on Michael J. Garuckis c/o Office of the Legal Advisor in the above entitled case, hereby depose and say:

That I am over the age of eighteen and that I am not a party to or otherwise interested in this suit.

That my place of business is 1827 18th Street, NW, Washington, DC 20009-5526 (202) 667-0050.

That on May 09, 2008 at 12:22 PM, I served the within Deposition Subpoena Duces Tecum with Attachment A on Michael J. Garuckis c/o Office of the Legal Advisor at United States Department of State, 2201 C Street, NW, Room 5519, Washington, DC 20520-6310 by serving McKinley Nell, Secretary to Legal Advisor's Office, authorized to accept. Described herein:

Gender: Male    Race/Skin: Black    Hair: Black    Approx. Age: 38    Height: 5'7"    Weight: 160

I declare under penalty of perjury that I have read the foregoing information contained in the Affidavit of Service and that the facts stated in it are true and correct.

**5-9-08**
Executed on:

_Wesley Jennings_
Wesley Jennings
CAPITOL PROCESS & INVESTIGATOR
SERVICES, INC.
1827 18th Street, NW
Washington, DC 20009-5526
(202) 667-0050

ID: 08-001922

CAPITOL PROCESS & INVESTIGATOR SERVICES, INC. • 1827 18th Street, NW, Washington, DC 20009-5526 • (202) 667-0050

Client Reference: N/A

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

Felipe Vicini Lluberes, et al.,

V.

Uncommon Productions, LLC, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 07-11623 (DPW) D. Mass.

TO:  Michael D. Puccetti, c/o Office of the Legal Advisor, Room 5519, United States Department of State, 2201 C Street, N.W., Washington, DC 20520-6310

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC 20037 | DATE AND TIME 5/29/2008 9:00 am |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See Attachment A

| PLACE   Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC  20037 | DATE AND TIME 5/29/2008 9:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE 5/9/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Benjamin G. Chew, Esq., Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC 20037, (202) 457-6000
Attorneys for Plaintiffs

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Felipe Vicini Lluberes, et al. | ) |
| | ) |
| | ) |
| Plaintiff(s) | ) |
| | ) Case No.: 07-11623 (DPW) |
| | ) |
| v. | ) |
| Uncommon Productions, LLC, et al. | ) |
| | ) |
| | ) |
| Defendant(s) | ) |

### AFFIDAVIT OF SERVICE

to wit: Washington, DC

I, Wesley Jennings, having been duly authorized to make service of the Deposition Subpoena Duces Tecum with Attachment A on Michael D. Puccetti c/o Office of the Legal Advisor in the above entitled case, hereby depose and say:

That I am over the age of eighteen and that I am not a party to or otherwise interested in this suit.

That my place of business is 1827 18th Street, NW, Washington, DC 20009-5526 (202) 667-0050.

That on May 09, 2008 at 12:22 PM, I served the within Deposition Subpoena Duces Tecum with Attachment A on Michael D. Puccetti c/o Office of the Legal Advisor at United States Department of State, 2201 C Street, NW, Room 5519, Washington, DC 20520-6310 by serving McKinley Nell, Secretary to Legal Advisor's Office, authorized to accept. Described herein:

Gender: Male   Race/Skin: Black   Hair: Black   Approx. Age: 38   Height: 5'7"   Weight: 160

I declare under penalty of perjury that I have read the foregoing information contained in the Affidavit of Service and that the facts stated in it are true and correct.

Executed on: **5-9-08**

Wesley Jennings
CAPITOL PROCESS & INVESTIGATOR
SERVICES, INC.
1827 18th Street, NW
Washington, DC 20009-5526
(202) 667-0050

AO88 (Rev. 12/06) Subpoena in a Civil Case

Issued by the
# UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

Felipe Vicini Lluberes, et al.,

V.

Uncommon Productions, LLC, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  07-11623 (DPW) D. Mass.

TO:   Hans H. Hertell, c/o Office of the Legal Advisor, Room 5519,
United States Department of State, 2201 C Street, N.W.,
Washington, DC 20520-6310

☐ **YOU ARE COMMANDED** to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC 20037 | DATE AND TIME 5/27/2008 9:00 am |
|---|---|

☑ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See Attachment A

| PLACE   Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC 20037 | DATE AND TIME 5/23/2008 9:00 am |
|---|---|

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _By: [signature]_ | 5/9/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Benjamin G. Chew, Esq., Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC 20037, (202) 457-6000
Attorneys for Plaintiffs

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Felipe Vicini Lluberes, et al. | ) |
| | ) |
| | ) |
| **Plaintiff(s)** | ) |
| | ) **Case No.: 07-11623 (DPW)** |
| **v.** | ) |
| Uncommon Productions, LLC, et al. | ) |
| | ) |
| | ) |
| **Defendant(s)** | ) |

### AFFIDAVIT OF SERVICE

to wit: Washington, DC

I, Wesley Jennings, having been duly authorized to make service of the Deposition Subpoena Duces Tecum with Attachment A on Hans H. Hertell c/o Office of the Legal Advisor in the above entitled case, hereby depose and say:

That I am over the age of eighteen and that I am not a party to or otherwise interested in this suit.

That my place of business is 1827 18th Street, NW, Washington, DC 20009-5526 (202) 667-0050.

That on May 09, 2008 at 12:22 PM, I served the within Deposition Subpoena Duces Tecum with Attachment A on Hans H. Hertell c/o Office of the Legal Advisor at United States Department of State, 2201 C Street, NW, Room 5519, Washington, DC 20520-6310 by serving McKinley Nell, Secretary to Legal Advisor's Office, authorized to accept. Described herein:

Gender: Male    Race/Skin: Black    Hair: Black    Approx. Age: 38    Height: 5'7"    Weight: 160

I declare under penalty of perjury that I have read the foregoing information contained in the Affidavit of Service and that the facts stated in it are true and correct.

**5-9-08**
Executed on:

Wesley Jennings
CAPITOL PROCESS & INVESTIGATOR
SERVICES, INC.
1827 18th Street, NW
Washington, DC 20009-5526
(202) 667-0050

ID: 08-001925                                                                                     Client Reference: N/A

CAPITOL PROCESS & INVESTIGATOR SERVICES, INC. • 1827 18th Street, NW, Washington, DC 20009-5526 • (202) 667-0050

AO88 (Rev. 12/06) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

### DISTRICT OF COLUMBIA

Felipe Vicini Lluberes, et al.

V.

Uncommon Productions, LLC, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number: [1] 07-11623 (DPW) D. Mass.

TO: David Searby, c/o Office of the Legal Advisor, Room 5519
United States Department of State, 2201 C Street, N.W.,
Washington, DC 20520-6310

☐ **YOU ARE COMMANDED** to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC 20037 | DATE AND TIME 5/19/2008 10:00 am |
|---|---|

☑ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A

| PLACE   Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC 20037 | DATE AND TIME 5/19/2008 10:00 am |
|---|---|

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]* | 4/28/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Nigel L. Wilkinson, Esq., Patton Boggs, LLP, 2550 M Street, N.W., Washington, DC 20037, (202) 457-6000
Attorney for Plaintiffs

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Felipe Vicini Lluberes, et al. | ) |
| | ) |
| | ) |
| | ) |
| **Plaintiff(s)** | ) **Case No.: 07-11623, (DPW) D.Mass** |
| | ) |
| v. | ) |
| Uncommon Productions LLC, et al. | ) |
| | ) |
| | ) |
| **Defendant(s)** | ) |

### AFFIDAVIT OF SERVICE

to wit: Washington, DC

I, Frederick Parsons, Jr., having been duly authorized to make service of the Deposition Subpoena Duces Tecum with Attachment A and Witness Fee Check in the Amount of $45.00 on David Searby c/o Office of the Legal Advisor in the above entitled case, hereby depose and say:

That I am over the age of eighteen and that I am not a party to or otherwise interested in this suit.

That my place of business is 1827 18th Street, NW, Washington, DC 20009-5526 (202) 667-0050.

That on April 28, 2008 at 2:30 PM, I served the within Deposition Subpoena Duces Tecum with Attachment A and Witness Fee Check in the Amount of $45.00 on David Searby c/o Office of the Legal Advisor at United States Department of State, 2201 C Street, NW, Room 5519, Washington, DC 20520 by serving Roger A. Mencl, Bureau Security Officer, authorized to accept. Described herein:

Gender: Male    Race/Skin: White    Hair: Shaved    Age: 44    Height: 5'9"    Weight: 175

I declare under penalty of perjury that I have read the foregoing information contained in the Affidavit of Service and that the facts stated in it are true and correct.

Executed on: 6.2.08

Frederick Parsons, Jr.
CAPITOL PROCESS & INVESTIGATOR
SERVICES, INC.
1827 18th Street, NW
Washington, DC 20009-5526
(202) 667-0050

ID: 08-001218                                                                          Client Reference: N/A

CAPITOL PROCESS & INVESTIGATOR SERVICES, INC. • 1827 18th Street, NW, Washington, DC 20009-5526 • (202) 667-0050

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELIPE VICINI LLUBERES and
JUAN VICINI LLUBERES

               Plaintiffs / Movants,

     v.

UNITED STATES DEPARTMENT OF
STATE,

             Respondent.

CASE NO.

ORAL HEARING REQUESTED

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL
DEPOSITION TESTIMONY PURSUANT TO SUBPOENAS**

Movants Juan Vicini Lluberes and Felipe Vicini Lluberes ("Plaintiffs" or the "Vicinis"),

plaintiffs in the underlying action *Felipe Vicini Lluberes and Juan Vicini Lluberes vs. Uncommon Productions*

*LLC, et al.,* Civil Action No. 07-CA-11623 (DPW) pending before the United States District Court

of the District of Massachusetts (the "Underlying Action"), have moved this Honorable Court,

pursuant to Rules 26, 30, 45 and 37 of the Federal Rules of Civil Procedure, for an Order

compelling the United States Department of State ("State") to comply with five subpoenas seeking

documents and deposition testimony from five current and/or former State employees as narrowed

by Plaintiffs in discussions with State. In further support thereof, the Vicinis state as follows:

## I.    INTRODUCTION

Plaintiffs in the Underlying Action, brothers Felipe Vicini Lluberes and Juan Vicini Lluberes,

members of a family that owns and operates sugar cane fields (which contain villages known as

*bateyes),* processing centers and a sugar mill located in the San Pedro de Macoris area of the

Dominican Republic, sued the filmmakers of a purported "documentary" film about the Vicinis'

*bateyes* called *The Price of Sugar* ("*POS*") for defamation. The defendant filmmakers relied extensively upon, and featured prominently in their film, Father Christopher Hartley, a Roman Catholic priest formerly based in the Dominican Republic who falsely accuses the Vicinis of committing heinous crimes including murder, child abuse and human trafficking. Despite having personally served Fr. Hartley with a subpoena while he was promoting *POS* at a screening on Capitol Hill here in the District of Columbia in November 2007, Fr. Hartley, who currently is based in Ethiopia, successfully moved to quash the subpoena with respect to his deposition testimony. The Court denied, however, his motion to quash as to the production of documents. But to date, Fr. Hartley has resisted producing all of the communications he has had with various third parties (including State employees) about *POS* and the Vicinis.

Therefore, in aid of their defamation suit against the defendant filmmakers, the Vicinis served five subpoenas upon State seeking deposition testimony and documents from five State employees known to have communicated directly with Fr. Hartley and his representative, Noemi Mendez (a/k/a Manuela Castro), about *POS* and the Vicinis. State, however, has refused to make any of its subpoenaed employees available for deposition, offering mere "boilerplate" objections on grounds of relevance and undue burden, and invoking its internal *Touhy* regulations which as a matter of law are inapplicable in determining State's compliance with the federal court subpoenas at issue. In correspondence and telephone conferences with State's counsel, Plaintiffs have sought State's compliance with the subpoenas by making every reasonable effort to reduce any burden upon State by limiting the total number of witnesses subpoenaed for deposition from five to four, and by offering to take the depositions of the four State employees wherever they are currently posted, including in the Dominican Republic, and paying the associated costs of those depositions. Plaintiffs also agreed to narrow the scope of their document requests to communications and materials exchanged between Fr. Hartley, his representative, Ms. Mendez, and the subpoenaed State

2

employees. Plaintiffs also set forth in detailed exchanges with State that the information they seek is not only reasonably calculated to lead to the discovery of admissible evidence in the Underlying Action, but also is directly relevant to their defamation claims against the defendant filmmakers. In short, Fr. Hartley's communications about the Vicinis bears directly upon Fr. Hartley's credibility as the primary source of the filmmakers' information about the Vicinis (which also is a critical element of Plaintiffs' defamation claim— the falsity of the filmmakers' statements about the Vicinis in *POS*), and also exposes Fr. Hartley as a source of information in State's Human Rights Report on the Dominican Republic, which the defendant filmmakers have cited as a source for the statements in their film allegedly "independent" from Fr. Hartley. Plaintiffs also recognize the sensitivity of State's internal communications, and therefore have affirmatively stated that they do not seek any information subject to the deliberative process, attorney-client, and other potentially applicable privileges— only Fr. Hartley's (and Ms. Mendez's) communications and exchanges with the five subpoenaed State employees concerning the Vicinis and *POS*.

For the foregoing reasons, and because State has failed to provide a legally sufficient basis for refusing to comply with the subpoenas, Plaintiffs respectfully request that the Court enter an order compelling State to produce its employees for deposition.

## II.    RELEVANT FACTS

### A.    The Underlying Action

Plaintiffs initiated the Underlying Action in August 2007. As set forth in their Complaint, attached hereto as **Exhibit A,** Plaintiffs seek preliminary and permanent injunctive relief and declaratory judgment against Massachusetts filmmaker William Haney and his production company Uncommon Productions, LLC ("UP") (the "Defendants"), for defaming them in *POS*. Discovery in the Underlying Action currently is scheduled to close on August 11, 2008.

The Complaint sets forth in detail that *POS* falsely depicts the working and living conditions

3

of Haitian workers in *bateyes* owned by the Vicinis.[1] Defendants Haney and UP, *inter alia*, fabricated and staged scenes falsely portraying deplorable living and working conditions on Vicini *bateyes*. They also "borrowed" from raw film footage and photographs taken by third parties of squalid living conditions, malnourished children and disfigured adults even though Defendants knew that the scenes and photographs were <u>not</u> taken on *bateyes* owned by the Vicinis.

*POS* also prominently features interviews with, and narration by, Fr. Hartley, whose parish overlapped with Vicini-owned *bateyes*. Throughout the film, Fr. Hartley falsely accuses the Vicinis of committing various illegal and outrageous acts, including murder, human trafficking, child abuse and obstruction of justice. For example, Fr. Hartley states in the film that

> **the Vicini family have a lot of blood on their hands.** This is well
> known. Nobody dares speak out and say it because many people fear
> for their lives or the lives of their loved ones. **And this is a fact.**
> People disappear. People are never found.

*POS* at 23:38; *POS Script* at UP00011 (emphasis added) (**Exhibit C**). This statement of alleged "fact" by Fr. Hartley constitutes one of the seven statements forming the basis for the Vicinis' claim of defamation *per se* against Defendants. Indeed, Defendants have expressly identified Fr. Hartley as the primary source of their false allegations in *POS* against the Vicinis, making Fr. Hartley one of the most important witnesses for both Plaintiffs and Defendants in the Underlying Action.[2]

Fr. Hartley also has thrust himself into Defendants' promotion of *POS* in the United States, appearing at a screening here in Washington, D.C., on November 14, 2007, before the

---

[1] While the Complaint identifies the majority of the false statements appearing in *POS*, Plaintiffs' lawsuit is challenging only seven (7) statements that constitute defamation *per se* under Massachusetts law. The seven statements at issue are identified in Plaintiffs' Supplemental Interrogatory response number 14. **Exhibit B.**

[2] When answering an interrogatory concerning the statement quoted above, Defendants cited to multiple "sources" that can each be traced directly to Fr. Hartley. The sources Defendants cited include six interviews directly with Fr. Hartley; four interviews with *batey* residents that are all known "witnesses" handpicked by Fr. Hartley to appear regularly with Fr. Hartley in films, television segments and press articles; and four international newspaper articles and three television programs that prominently feature Fr. Hartley's statements and storytelling. UP Interrogatory Answers at 48-60 (**Exhibit D**). Plaintiffs and Defendants also identified Fr. Hartley as a critical witness in their initial disclosures. Defendants, in particular, identified Fr. Hartley as the first non-party witness with knowledge of all topics referenced in their initial disclosures. Defendants' Initial Disclosures at 3 (**Exhibit E**).

Congressional Human Rights Caucus, after which Fr. Hartley spoke, repeating many of the same false allegations against the Vicinis contained in *POS*. *See* **Exhibit F** (Fr. Hartley's prepared remarks dated November 14, 2007). In response to one of the questions in the session following the showing of *POS*, Fr. Hartley reluctantly revealed a material fact omitted from the film— that the Church declined to renew his contract, requiring him to leave the Dominican Republic (having been sent there by the Archdiocese of New York). In point of fact, however, the Bishop of the Catholic diocese of San Pedro de Macorís, to which he had been assigned, specifically relieved him of his duties as a pastor and priest for "serious offenses" and an "arrogance and zeal for self-promotion [that] led him to believe that nothing would work without him."[3] Fr. Hartley thereafter was transferred to Ethiopia to perform mission work.

## B.    Fr. Hartley's Involvement with State Employees About *POS* and the Vicinis

Fr. Hartley has actively corresponded with, and met, several State employees between October 2006 and November 2007, about *POS* and the Vicinis. State employees with whom Fr. Hartley has communicated include: (1) David Searby (formerly the Desk Officer for the Dominican Republic and now Press Attaché at the U.S. Embassy in the Dominican Republic); (2) Michael J. Garuckis (formerly the Legal Affairs Officer at the U.S. Embassy in the Dominican Republic); (3) Alexander T. Bryan (formerly the Labor and Human Rights Officer at the U.S. Embassy in the Dominican Republic); (4) Michael D. Puccetti (currently a Global Affairs Officer in the Bureau of Western Hemisphere Affairs); and (5) Hans H. Hertell (formerly U.S. Ambassador to the Dominican Republic).

Discovery produced in the Underlying Action clearly shows that Fr. Hartley discussed with these State employees: (1) arranging for a Congressional Delegation to travel to the Dominican

---

[3] Circular # 012-06, for the Entire Diocese of San Pedro de Macorís, dated December 21, 2006, by Bishop Francisco Ozoria Acosta. **Exhibit G** (includes an English translation).

5

Republic in December 2006 to visit Vicini sugar plantations;[4] (2) including the Vicinis by name in State's House Human Rights Report on the Dominican Republic;[5] (3) exchanging documents concerning the Vicinis with State employees;[6] (4) promoting[7] *POS* (Fr. Hartley evidently forwarded copies of *POS* to both Messrs. Searby and Bryan[8]); and (5) the Underlying Action.[9]

For example, in the prepared remarks that Fr. Hartley gave and distributed in conjunction with his appearance at the November 14, 2007, screening of *POS* on Capitol Hill, he quoted extensively from a communication to "a very prominent US official in the United States Embassy to the Dominican Republic," complaining about the Vicinis. **Exhibit F** (Fr. Hartley's November 14, 2007 Remarks at 4-5). That prominent U.S. official to whom Fr. Hartley referred in his prepared remarks was Michael Garuckis, the then Judicial/Legal Affairs Officer at the U.S. Embassy in the Dominican Republic.[10] Various other communications produced in discovery show that Fr. Hartley regularly communicated with, and met, State employees to discuss the Vicinis and *POS*. For example, in July 2007, Fr. Hartley traveled to Washington, D.C., and met with David Searby, the then Dominican Desk Officer at State to discuss *POS* and the Vicinis.[11] And in November 2007, Fr. Hartley met with Michael Puccetti, the Global Affairs Officer in the Bureau of Western Hemisphere

---

[4] **Exhibit H** at CH000570-574, CH000577, CH000587-588.

[5] **Exhibit H** at CH000577, CH000673-674.

[6] **Exhibit H.**

[7] In consideration for his involvement in *POS*, Fr. Hartley in fact entered into a written contract with the Defendant filmmakers to share fifty-percent (50%) of the film's profits, with his share ultimately going to charities of his choice. **Exhibit I.**

[8] **Exhibit H** at CH000850-853, CH000891, CH000898.

[9] **Exhibit H** at CH000971.

[10] **Exhibit H** at CH003850-54.

[11] **Exhibit H** at CH000837, CH000927, CH000971-972.

Affairs at State, also to discuss *POS* and the Vicinis.[12]

### C.     Attempts to Obtain Discovery from Fr. Hartley

Recognizing that Fr. Hartley, the Vicinis' principal accuser and central figure in *POS*, is an important witness in the Underlying Action, Plaintiffs personally served Fr. Hartley with a subpoena on November 14, 2007, in Washington, D.C., just after Fr. Hartley attended and spoke at the screening of *POS* for the Congressional Human Rights Caucus. That subpoena required Fr. Hartley to produce documents and provide deposition testimony relevant to Plaintiffs' defamation claims.

However, nearly two months after service was effected, Fr. Hartley moved to quash the subpoena on the grounds, *inter alia*, that he was not personally served. *See Hartley v. Lluberes*, Case No. 08-mc-00010 (RJL) (D.D.C., filed Jan. 4, 2008). In a sworn declaration attached to his motion to quash, Fr. Hartley testified, in relevant part:

> 5.     In November – December 2007, I traveled from Ethiopia to the United States for approximately three weeks. During that trip, I visited the District of Columbia from November 13, 2007 through November 15, 2007.
>
> 6.     On November 14, 2007, I attended a screening of the documentary "The Price of Sugar" at a location near the United states Capitol building in the District of Columbia.
>
> 7.     On November 14, 2007, **I was not served** with the subpoena issued by Benjamin G. Chew and attached as Exhibit A to this declaration.
>
> 8.     On November 14, 2007, **no one approached me and attempted to hand me** the subpoena issued by Benjamin G. Chew and attached as Exhibit A to this declaration.
>
> 9.     During the afternoon of November 14, 2007, while accompanied by a reporter from CNN, Joe Johns, I did hear an individual call out my name as I crossed an intersection near the United States Capitol Building in the District of Columbia. However, **I did not see the individual. The individual did not hand me**

---

[12] **Exhibit H** at CH001700.

> **any documents and did not attempt to hand me any
> documents.**
>
> I declare under penalty of perjury under the laws of the United States
> of America that the foregoing is true and correct. Executed on
> January 4, 2008.

**Exhibit J**, Hartley Declaration (emphasis added). Virtually all of Fr. Hartley's sworn account of not

being served on November 14, 2007, turned out to be false, as it was directly contradicted by the

affidavits of the process server, Scott Kucik of Capitol Process Services, Inc. ("Capitol"), a ten-year

veteran server and supervisor of other servers at Capitol, and CNN reporter Joe Johns, who was

walking with Fr. Hartley on the afternoon of November 14, 2007 when Fr. Hartley was served. See

**Exhibit K** (Kucik Affidavit) and **Exhibit L** (Johns Declaration).

Mr. Kucik expressly impeached Fr. Hartley's Declaration, testifying, in relevant part:

> The Hartley Declaration is inaccurate in several respects:
>
> a)    First, I did not call out his name as he crossed the
> intersection. Rather, I approached and addressed him respectfully as
> he and the Third Party waited at the light.
>
> b)    Second, Fr. Hartley turned toward me and very definitely saw
> me as I was speaking to him, during which time I was within only
> about two feet of him.
>
> c)    Third, he saw me hold out the Subpoena to him.
>
> d)    Fourth, not only did I attempt to hand him the Subpoena,
> but also, when Fr. Hartley turned his back to me to avoid the
> Subpoena, I asked him explicitly to take the Subpoena in his hand so
> that I would not have to leave it at his feet.

**Exhibit K. ¶ 38.**

CNN reporter Joe Johns, who had reported sympathetic stories about Fr. Hartley in the

past, also contradicted Fr. Hartley's false testimony:

> 3.    On the afternoon of November 14, 2007, I was on the street
> in Washington, D.C. with Father Christopher Hartley.

> 4.      While we were waiting at an intersection a gentleman called out Father Hartley's name.
>
> 5.      I saw the gentleman attempt to hand some papers to Father Hartley.
> Father Hartley took a quick look at the papers and walked away.
>
> 6.      At that point that same gentleman said something like "Father Hartley, I am laying the document at your feet" or "I am laying the subpoena at your feet."

**Exhibit L.**

After Mr. Kucik's and Mr. Johns' affidavits were filed with the Court, Fr. Hartley changed course and decided to volunteer the production of a limited number of documents, though he continued to perpetuate the falsehood in his papers filed with the Court that he was not personally served.[13]  To date, Fr. Hartley has produced approximately 3,800 pages of documents (of mostly selective emails, including a small number of emails between Fr. Hartley and State employees) and 80 hours of videotape. But Fr. Hartley has steadfastly refused to testify in the Underlying Action, even after Plaintiffs offered to pay for his reasonable travel and lodging expenses to Washington, D.C., or have their counsel travel to a location of his choosing.  On May 2, 2008, the Honorable Richard J. Leon of the United States District Court for the District of Columbia granted, in part, and denied, in part, Fr. Hartley's motion to quash Plaintiffs' subpoena, ruling that although Fr. Hartley could not technically be compelled to appear for deposition, he was still required to respond to the document requests with which he was in fact served.[14]

As set forth above, among the selectively group of documents that Fr. Hartley did produce are several e-mail communications he had with State employees, dating from October 2006 to

---

[13] Amazingly, even in his latest submission to this Court filed on May 19, 2008, Fr. Hartley continues to dispute that he was personally served. See **Exhibit M** at 4. ("As the Court is aware, Respondents and Father Hartley have differing positions as to the detail of that alleged service.") (Opposition to Plaintiffs'/Respondents' Motion for Clarification).

[14] Given Fr. Hartley's zeal for his purported cause and Defendants' reliance upon Fr. Hartley as the primary source of the facts asserted in their film, it is curious that Fr. Hartley and Defendants lack the moral courage or integrity to produce him for deposition.

November 2007. **Exhibit H.** Each one of the five State employees subpoenaed for information in this matter (Searby, Garuckis, Bryan, Puccetti, and Hertell) communicated with Fr. Hartley about the Vicinis, working and living conditions on their *bateyes*, and the Underlying Action.

E.  <u>Attempts to Obtain Discovery from State</u>

Plaintiffs issued their initial subpoena to State on April 28, 2008, requesting deposition testimony and a production of documents from David Searby principally concerning his communications with Fr. Hartley. **Exhibit N** (Searby Subpoena). The Searby subpoena was served upon State in accordance with its regulation governing service of process upon agency personnel. *See* 22 C.F.R. § 172.3. State initially responded to the Searby subpoena on May 2, 2008, with a letter from Timothy E. Ramish, Assistant Legal Adviser for Western Hemisphere Affairs, in which State asserted several objections and requested that Plaintiffs provide further information in accordance with the agency's *Touhy* regulations, 22 C.F.R. Part 172. **Exhibit O** (May 2, 2008, Ramish Letter).

Plaintiffs responded in an eleven-page letter dated May 9, 2008, pointing out that the Federal Rules of Civil Procedure, not the agency's *Touhy* regulations, governed State's compliance with the subpoena. **Exhibit P.** Nonetheless, to facilitate State's affirmative response, and without waiving its right to proceed under the Federal Rules to enforce the subpoena, Plaintiffs provided State with ample information about the Underlying Action conforming to the *Touhy* regulations, addressing each factor listed in 22 C.F.R. 172.8. *Id.*[15] Plaintiffs also further accommodated State by narrowing the scope of their document requests to the subpoenaed State employees' communications with Fr. Hartley and a Dominican lawyer with whom he worked, Ms. Noemi Mendez (a/k/a Manuela Castro), and to communications dating from September 1, 2006, to the present (or the date upon which the State employee left State's employ). *Id.*

---

[15] Plaintiffs also served the additional four subpoenas seeking documents and deposition testimony upon State employees Garuckis, Bryan, Puccetti, and former Amb. Hertell, in conjunction with the May 9 letter. Each of these agency personnel were served pursuant to 22 C.F.R § 172.3.

Over the course of the next four weeks, Plaintiffs counsel conferred by telephone with attorneys for State on no less than four occasions and communicated numerous times by e-mail. In particular, in teleconferences taking place on May 15th and 16th, and in emails exchanged during these two days, Plaintiffs' counsel made further efforts to accommodate State's burdensomeness concerns. Plaintiffs offered to reduce the total number of depositions requested from five to four, dropping their request to take the deposition of State employee Michael Puccetti, and further offered to conduct the remaining depositions— at Plaintiffs' expense— in the Dominican Republic, or wherever each of the four deponents currently live.

State responded on May 16, 2008, with a letter setting forth several "formal and continuing objection to the subpoenas" pursuant to "Federal Rule of Civil Procedure 45 and the Department's *Touhy* regulations, 22 C.F.R. 172.1." **Exhibit Q** (May 16, 2008 Hudak Letter). Nearly two weeks later, via email, Assistant U.S. Attorney Brian Hudak, on behalf of State, provided a preliminary response to Plaintiffs. **Exhibit R** (May 28, 2008, Hudak E-mail). In short, Mr. Hudak indicated that State would be amenable to a limited production of non-privileged communications between the individual State employees and Fr. Hartley or Noemi Mendez on or after September 1, 2006. *Id* However, as to the depositions, Mr. Hudak advised that, pending the agency's final decision, State was not inclined to authorize any deposition testimony principally on grounds of undue burden and because it did not believe that any of the information sought by Plaintiffs was directly relevant to the Underlying Action. *Id*

Finally, on June 6, 2008, four weeks after Plaintiffs submitted their comprehensive May 9 letter, State issued its final decision, declining to produce any witnesses for deposition on general relevance and undue burden grounds. **Exhibit S** (June 6, 2008, State Letter). While State did agree to produce non-privileged documents responsive to the subpoenas as narrowed by Plaintiffs, it refused to extend its production to responsive documents residing on State's "disaster recovery or

11

'back-up' server systems, as such a search would clearly present an undue burden." *Id.*

Plaintiffs had one final conference call with State's counsel on Tuesday, June 10, 2008, in an attempt to avoid court intervention, during which State reiterated its objection to producing any witnesses for deposition. State did agree to commence producing non-privileged documents responsive to the subpoenas (as narrowed by Plaintiffs) on a rolling basis starting Friday, June 13, 2008. Plaintiffs received the first 19 responsive documents (222 pages) on Monday, June 16, 2008.[16]

### III.    ARGUMENT

### A.    State's Duty to Comply Is Governed by the Federal Rules of Civil Procedure, Not the Department's Internal *Touhy* Regulations

The Federal Rules of Civil Procedure, and not State's internal *Touhy* regulations, govern its (and its employees') obligation to comply with Plaintiffs' subpoenas both with respect to the production of documents and depositions. As the United States Court of Appeals for the District of Columbia held,

> Rule 45 gives the district courts authority to issue subpoenas and instructs the courts how to address disputes over subpoenas. We have held, moreover, that government agencies are "persons" subject to Rule 45 subpoenas. *See* [*Yousuf v. Samantar*, 451 F.3d 248, 257 (D.C. Cir. 2006)]. **Therefore, a challenge to an agency's refusal to comply with a Rule 45 subpoena should proceed and be treated not as an APA action but as a Rule 45 motion to compel** (or an agency's Rule 45 motion to quash). See 5 U.S.C. § 703 ("The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute...").
>
> **Rule 45 also supplies the standards under which district courts assess agency objections to a subpoena.** The rule requires that district courts quash subpoenas that call for privileged matter or would cause an undue burden. Courts have applied these Rule 45 standards to document subpoenas issued to third-party agencies or agency employees in federal civil suits. *See Houston Bus. Journal, Inc. v. Office of the Comptroller of the Currency*, 86 F.3d 1208, 1212 (D.C. Cir.

---

[16] Plaintiffs had a brief telephone conference with Mr. Hudak on Monday, June 16, 2008, during which Plaintiffs discussed filing the current motion and agreed with Mr. Hudak to jointly set up an appropriate briefing schedule.

1996); see also [*Linder v. Calero-Portocarrero*, 251 F.3d 178, 181 (D.C. Cir. 2001). **Rule 45 does not set forth a different standard for testimonial subpoenas issued under Rule 45 to an agency or agency employee (nor would it be logical to apply a different standard); Rule 45's privilege and undue burden standard thus applies to both document and testimonial subpoenas.** *See* [*Exxon Shipping Co. v. Dept. of Interior*, 34 F.3d 774, 779 (9th Cir. 1994)] (applying Rule 45 standard to third-party testimonial subpoenas directed to federal agency employees). **Moreover, an agency's *Touhy* regulations do not relieve district courts of the responsibility to analyze privilege or undue burden assertions under Rule 45.** An agency's *Touhy* regulations are relevant for internal housekeeping and determining who within the agency must decide how to respond to a federal court subpoena. *See* 5 U.S.C. § 301 (authorizing *Touhy* regulations but providing: "This section does not authorize withholding information from the public or limiting the availability of records to the public."); *Yousuf*, 451 F.3d at 257 (describing *Touhy* regulations as establishing "method[ ] by which ... an agency would respond to a subpoena."); *Comm. for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 788, 793 (D.C. Cir. 1971) (5 U.S.C. § 301 "does not confer a privilege"); *see also* 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 45.05[1][b] (3d ed. 2006) ("[T]hough an agency regulation may provide the method by which an agency head will comply with or oppose a subpoena, the legal basis for any opposition to the subpoena must derive from an independent source of law such as a governmental privilege or the rules of evidence or procedure.").

*Watts v. Securities and Exchange Comm'n*, 482 F.3d 501, 508-09 (D.C. Cir. 2007) (emphasis added).

State's formal response dated June 6, 2008, clearly indicates that its analysis was guided almost exclusively by the factors contained in their *Touhy* regulations, and not by the broad command of Rules 26 and 45. Indeed, State expressly stated that "consideration of its *Touhy* factors provides a framework in which to evaluate whether Plaintiff's requests are objectionable under Rule 45 as unduly burdensome." **Exhibit S.** This is contrary to controlling precedent in this Circuit and a fundamental misstatement of the scope and reach of *Touhy* regulations. To the extent that State's refusal to produce its employees for deposition or produce documents is based upon its internal *Touhy* regulations, State's refusal is improper, and the Court should enter an order requiring State to

fully comply with the subpoenas.[17]

### B.    Plaintiffs Are Entitled to an Order Compelling State to Make the Subpoenaed State Employees Available for Deposition

State has improperly withheld discoverable deposition testimony from Plaintiffs, asserting little more than facially insufficient blanket objections of irrelevance and undue burden. Its unsubstantiated objections range from claims that the information sought in the subpoenas— State's communications with Fr. Hartley about *POS* and Plaintiffs— are "irrelevant" to the Underlying Action and that Plaintiffs failed to comply with the requirements for service of persons located in foreign countries. None of these objections is valid or justifies the refusal to produce any of the subpoenaed State employees for deposition. *See* Fed.R.Civ.P. 45(d), 37(a), and 26(b); *see also* Fed. R. Civ. P. 45(d) Adv. Comm. Notes, 1970 Am. ("[T]he scope of discovery through a subpoena is the same as that applicable to Rule 34 and other discovery rules."). Rule 26, which provides access to information "reasonably calculated to lead to the discovery of admissible evidence," is broadly construed, and the "party opposing discovery bears the burden of showing why discovery should be denied." *Ellsworth Assocs. v. United States*, 917 F.Supp. 841, 845 (D.D.C. 1996). State has failed to meet its burden as to each of its blanket objections.

### 1.    The Subpoenas Were Properly Served

State claimed in its May 16, 2008 letter objecting to the production of any of its employees for deposition that Plaintiffs subpoenas "have not been properly served pursuant to the Rules or applicable statutes and regulations." **Exhibit Q.** To the contrary, all five subpoenas were properly served personally upon each of State's employees as required by State's own regulation, 22 C.F.R. § 172.3, which provides that the Executive Office of the Office of the Legal Advisor ("L/EX") is the

---

[17] Even so, in the interest of facilitating State's compliance with the subpoenas, Plaintiffs provided ample information to State about their need for the information sought and its relevance to the Underlying Action— just as State initially had requested— pursuant to 22 C.F.R. § 172.8. **Exhibit P.**

"only" entity authorized to receive and accept subpoenas directed to State or its current or former employees, wherever they may be employed for State. 22 C.F.R. § 172.3(a).[18] This regulation applies both to subpoenas seeking documents and deposition testimony.

As set forth in **Exhibit T**, Plaintiffs properly served all five State employee subpoenas upon L/EX (on April 28, 2008 as to Mr. Searby, and on May 9 as to Messrs. Bryan, Garuckis, Pucetti and Amb. Hertell). To the extent that State has refused to produce witnesses for deposition or documents on the basis of improper service, its refusal was improper, and the Court should enter an order compelling State to fully comply with the subpoenas.

### 2.    The Subpoenaed State Employees' Deposition Testimony Is Directly Relevant to Plaintiffs' Defamation Claims

State's blanket objection on relevance grounds to producing any of the subpoenaed employees for deposition lacks any merit, as does the perplexing statement that Fr. Hartley's communications about the Vicinis and *POS* with the subpoenaed State employees "is of little, if any, relevance to the action." **Exhibit S** (June 6, 2008, Response at 2) As set forth in great detail by Plaintiffs in their May 9 letter to State, Fr. Hartley plays a central role in *POS* both as a figure appearing in the film and as the primary source of the Defendant filmmakers' defamatory statements about the Vicinis.

Given the close relationship that Fr. Hartley seems to have had with State's employees in providing information about *POS* and the Vicinis, it is simply hard to fathom how State could reach the conclusion that "statements made by Father Hartley, a third-party to your action, to Department officials do not form the basis of any of [Plaintiffs'] present claims against Defendants." **Exhibit S**, at 2. To the contrary, the Defendant filmmakers' defamation in large part is based upon false

---

[18] In fact, according to 22 C.F.R. §172.3(b), service on any entity other than L/EX is deemed invalid under State's regulations: "In the event that any subpoena, demand, or request is sought to be delivered to a Department employee (including former employees) other than in the manner prescribed in paragraph (a) of this section, such attempted service shall be ineffective."

statements by Fr. Hartley in *POS*, which is plainly evident both from the Complaint and Plaintiffs' detailed May 9 letter. Moreover, evidence obtained to date in the Underlying Action shows that there were extensive communications between Fr. Hartley and the subpoenaed State employees concerning *POS* and the Vicinis. It therefore is hard to understand how Plaintiffs' narrow requests for documents and deposition testimony sought from State's employees are not, at a bare minimum, "reasonably calculated to lead to the discovery of admissible evidence" in the Underlying Action. Fed.R.Civ.P. 26(b)(1).

Equally absurd is State's assertion that because "Father Hartley will not be providing deposition testimony in your action, evidence that would tend to challenge his credibility is largely, if not entirely, irrelevant." *Id.* Merely because Fr. Hartley has actively sought to evade (and refuse) service of process to testify in the Underlying Action does not mean that his communications with State's employees about *POS* and the Vicinis are somehow rendered irrelevant (or, for that matter, inadmissible). Both the limited discovery taken to date and the litigation over Fr. Hartley's motion to quash before this Court have uncovered serious questions about Fr. Hartley's credibility. If anything, the fact that Fr. Hartley has resisted providing deposition testimony makes more urgent the need for a thorough inquiry into his statements about the Vicinis.

Fr. Hartley's communications with third parties also are relevant to establishing the falsity of Fr. Hartley's (and the Defendant filmmakers') statements in *POS*— an essential element of Plaintiffs' defamation claim. Statements made by Fr. Hartley to the subpoenaed State employees therefore has a direct bearing on the truthfulness or falsity of Fr. Hartley's statements on the same subject matter in *POS*. Fr. Hartley also may have been the source of information about the Vicinis appearing in State's Human Rights Report on the Dominican Republic.[19] Defendants, in fact, have cited State's Human Rights Reports for 2005, 2006 and 2007 as a purported "independent" source for their

---

[19] *See, e.g.,* **Exhibit H**, at CH000577.

statements about the Vicinis in *POS*.[20]  Exposing Fr. Hartley as the source of that information

therefore is directly relevant to the success of Plaintiffs' defamation case against Defendants.[21]

Finally, given Fr. Hartley's steadfast refusal to appear to testify in the Underlying Action either at

deposition or at trial, the subpoenaed State employees are the only available source to provide and

authenticate Fr. Hartley's communications with State.

### 3.    State Fails to Assert a Valid Objection to Producing Any Witnesses for Deposition on Grounds of Undue Burden

As set forth above, Plaintiffs agreed to narrow the scope of the five subpoenas both with

respect to documents and depositions, including dropping their request to depose one of the five

State employees who was served, Michael Pucetti.  Plaintiffs also have offered to take the

depositions of the remaining four State employees (Messrs. Bryan, Searby, Garuckis and former

Amb. Hertell) in the Dominican Republic (where they work), if necessary, and to incur the expense

of taking those depositions.  At a minimum, Plaintiffs have taken "reasonable steps to avoid

imposing undue burden or expense" on State or its employees in seeking these four depositions.

Fed.R.Civ.P. 45(c)(1).

State, however, has failed to offer any specific factual basis for its refusal to produce any of

these witnesses on grounds of undue burden, instead offering mere "boilerplate" objections of

burden.  In order to sustain an objection based on undue burden, the objecting party must make a

specific, detailed showing of how the discovery request is burdensome.  *See Pleasants v. Allbaugh*, 208

F.R.D. 7, 12 (D.D.C. 2002) (rejecting "boilerplate" objections and compelling discovery because

---

[20] *See* **Exhibit D** (excerpts from Defendant UP's interrogatory answers).

[21] As Plaintiffs have represented to State on more than one occasion in attempting to obtain State's compliance with the subpoenas, Plaintiffs do not seek any privileged information that may bear upon State's internal discussions or deliberative processes, only Fr. Hartley's actual communications with State's employees.  Nonetheless, the mere existence of potentially privileged information is not a sufficient basis to deny deposition testimony in its entirety. Moreover, State's employees likely will be represented by counsel for State, and will have the opportunity to object to any testimony that may fall within the deliberative process, attorney-client or other potentially applicable privileges.

party opposing production failed to "make a specific showing, supported by declaration, as to why the production sought would be unreasonably burdensome.") (citations omitted); *Lohrenz v. Donnelly*, 187 F.R.D. 1, 4 (D.D.C. 1999) (compelling the objecting party to fully answer the interrogatory at issue because there was no showing that the research required was unduly burdensome); *Chubb Integrated Systems Ltd. v. Nat'l Bank of Washington*, 103 F.R.D. 52, 60-61 (D.D.C. 1984) ("An objection must show specifically how an interrogatory is overly broad, burdensome or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden."). This, State has failed to do, offering only its unsupported assertion that producing the four State employees for deposition would impose an undue burden or otherwise because compliance would contravene various factors set forth in State's inapplicable *Touhy* regulations.[22]

Nonetheless, the subpoenas seeking the deposition testimony of Messrs. Bryan, Searby, Garuckis and former Amb. Hertell impose no undue burden. Plaintiffs already have limited the number of the depositions from five to four, voluntarily dropping the deposition subpoena of Mr. Puccetti, and have offered to take the remaining four depositions at a time and place most convenient to State and its employees, including taking the depositions in the Dominican Republic (where the employees ostensibly work) at Plaintiffs' expense. Additionally, Plaintiffs anticipate that each deposition will last no more than a few hours, and will be limited to information concerning communications with Fr. Hartley and, Noemi Mendez (a/k/a Manuela Castro). The Court therefore should compel State to produce Messrs. Bryan, Searby, Garuckis, and former Amb. Hertell for deposition.

---

[22] State cited various reasons for its claim of undue burden based upon its *Touhy* regulations, including that compliance (1) would not allow State to "maintain impartiality between private litigants," (2) would exact costs by requiring officials to "divert their attention from the Department's mission" to "testify as third-parties" in private litigation, (3) may implicate material protected by the deliberative process privilege, and (4) would be burdensome to involve State "in controversial issues not related to its mission... ." **Exhibit Q** (May 16 letter at 2-3). As set forth above, none of these *Touhy*-based reasons can justify non-compliance with a subpoena.

### 4.    The Mere Assertion of Privilege Does Not Relieve State of Its Obligation to Respond to the Subpoenas

State flatly asserted in its May 16 letter that it is exempt from complying with the subpoenas by virtue of "the deliberative process privilege, the state secret privilege, the attorney-client privilege, the attorney work-product privilege and other privileges." **Exhibit Q** (May 16, 2008, Hudak Letter). However, merely citing a variety of privileges, some of which may be facially inapplicable, is not sufficient to shield State from its Rule 45 obligations.

Rule 45 expressly requires that a person withholding subpoenaed information on grounds of privilege must "expressly make the claim" and "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to asses the claim." Fed.R.Civ.P. 45(d)(2)(A). State is a "person" for all purposes of Rule 45 and, "as such, is subject to the duties that devolve upon a person served with a subpoena under that Rule, including a duty to substantiate claims of privilege pursuant to Rule 45(d)(2)." *In re Apollo Group, Inc. Securities Litigation*, 2007 WL 778653, *8 (D.D.C. March 12, 2007). In *In re Apollo Group*, the District Court held that the Department of Energy's ("DOE") claims of deliberative process, attorney-client, and attorney work-product privileges was an insubstantial and insufficient response to plaintiff's subpoenas, ordering the DOE to respond to the subpoenas and produce a privilege log to permit the plaintiff and the Court to assess the validity of the claimed privileges. *Id.* Thus, it is not sufficient and does not satisfy its obligations under the Federal Rules of Civil Procedure for State to withhold deposition testimony in its entirety merely by citing a host of possibly applicable privileges.

Moreover, Plaintiffs have made it clear that they seek to discover only the subpoenaed State employees' communications with Fr. Hartley, a foreign national, and not State's internal communications that possibly could be subject to the deliberative process or other privileges. Both during his assignment by the Archdiocese of New York to serve as a parish priest in the Dominican

19

Republic and after his dismissal by the Church for "serious offenses," Fr. Hartley went to great lengths to promote his participation in *POS* and bring international attention to his crusade against the Vicinis. Fr. Hartley sought interviews with the international press, including Spanish, Italian and American television (including Univision and CNN), and reporters from across the United States, in which he frequently accused the Vicinis falsely of committing crimes and other social and economic injustices against Haitian immigrants, repeating defamatory statements he made in *POS*. His contacts with the subpoenaed State employees were for no different a purpose, which Fr. Hartley did not keep a secret. For example, Fr. Hartley himself published part of his September 14, 2007, e-mail to Mr. Garuckis in his prepared remarks given before the CHRC on November 14, 2007, in which he reiterated his false accusations of child labor and human trafficking against the Vicinis, and stating further that such offenses would *increase* due to recent developments in ethanol production. *See* **Exhibit F**. Thus, even assuming State may withhold some testimony and materials on grounds of privilege, it is highly unlikely that all of Fr. Hartley's oral and written communications with the subpoenaed State employees are privileged.

State, therefore, should be compelled to produce the subpoenaed employees (except for Mr. Puccetti, as agreed by Plaintiffs) for deposition. Plaintiffs already have agreed to accommodate State and its employees as to time, place, and cost.

### IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an Order compelling State to fully comply with the subpoenas (as limited by Plaintiffs) and immediately make the four subpoenaed employees (Bryan, Searby, Garuckis and Hertell) available for deposition. Plaintiffs have submitted a proposed Order with the Motion to Compel for the Court's consideration.

Respectfully submitted,

Read K. McCaffrey
Stephen Diaz Gavin
Benjamin G. Chew (D.C. Bar # 418577)
Nigel L. Wilkinson (D.C. Bar # 466221)
PATTON BOGGS LLP
2550 M St, N.W.
Washington, DC 20037
Telephone: (202) 457-6015
Facsimile: (202) 457-6315
e-mail: bchew@pattonboggs.com


*Counsel for Plaintiffs/Movants*
*Felipe Vicini Lluberes*
*and Juan Vicini Lluberes*


Dated: June 17, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELIPE VICINI LLUBERES and
JUAN VICINI LLUBERES

              Plaintiffs/Movants,

    v.                                       CASE NO.

UNITED STATES DEPARTMENT OF
STATE,

              Respondent.

## ORDER

UPON CONSIDERATION of Plaintiffs/Movants Felipe Vicini Lluberes' and Juan Vicini Lluberes' ("Plaintiffs" or the "Vicinis") Motion to Compel Deposition Testimony Pursuant to Subpoenas, memorandum in support thereof, any opposition and reply briefs submitted thereto, the argument of counsel and the record, it is hereby ORDERED that:

    1.      Plaintiffs'/Movants' Motion to Compel is GRANTED;

    2.      The United States Department of State shall make the following current and/or former employees available for deposition by Plaintiffs at a location and on a date to be determined by the parties on or before July 18, 2008:

          a.      Alexander T. Bryan

          b.      Michael J. Garuckis

          c.      Former Ambassador Hans H. Hertell

          d.      David Searby

    3.      All parties are to bear their own costs associated with the ordered depositions.

Dated: June ___, 2008

                                              _____

                                            UNITED STATES DISTRICT JUDGE

Copies to:

Brian P. Hudak, Esq.
Assistant United States Attorney
U.S. Department of Justice
Judiciary Center
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone:    (202) 514-7143
E-mail:        brian.hudak@usdoj.gov
and

Royce Min, Esq.
Office of the Legal Adviser
United States Department of State
2201 C Street, N.W.
Washington, D.C. 20520
Telephone:    (202) 647-6823
E-mail:        minrb@state.gov

*Counsel for Respondent the United States Department of
State*

Read K. McCaffrey, Esq.
Stephen Díaz Gavin, Esq.
Benjamin G. Chew, Esq. (D.C. Bar # 418577)
Nigel L. Wilkinson, Esq. (D.C. Bar # 466221)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
Telephone:  (202) 457-6000
Facsimile:    (202) 457-6315
E-mail:        bchew@pattonboggs.com

*Counsel for Plaintiffs/Movants Felipe Vicini Lluberes
and Juan Vicini Lluberes*

Elizabeth C. Koch, Esq.
LEVINE SULLIVAN KOCH & SHULTZ,
LLP
1050 17th Street, NW
Suite 800
Washington, DC 20036
Telephone:  (202) 508-1100
Facsimile:    (202) 861-9888
E-mail:        ekoch@lskslaw.com

*Counsel for Defendants in the Underlying Action,
William Haney and Uncommon Productions LLC*

4964713                                    2