**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FELIPE VICINI LLUBERES and JUAN VICINI LLUBERES** | |
| **Plaintiffs/Movants,** | |
| **v.** | **Misc. Case No. 08-0384 (RJL)** |
| **UNITED STATES DEPARTMENT OF STATE,** | **ORAL HEARING REQUESTED** |
| **Respondent.** | |

**OPPOSITION TO STATE DEPARTMENT'S CROSS-MOTION TO QUASH /
PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION TO COMPEL**

Movants Juan Vicini Lluberes and Felipe Vicini Lluberes ("Plaintiffs" or the "Vicinis"),

plaintiffs in the underlying action *Felipe Vicini Lluberes and Juan Vicini Lluberes v. Uncommon Productions*

*LLC, et al.,* Civil Action No. 07-CA-11623 (DPW), pending before the United States District Court

of the District of Massachusetts (the "Underlying Action"), have moved this Honorable Court,

pursuant to Rules 26, 30, 37, and 45 of the Federal Rules of Civil Procedure, for an Order

compelling the United States Department of State ("State") to comply with four subpoenas seeking

deposition testimony of current and/or former State employees as narrowed by Plaintiffs in

discussions with State.   State has cross-moved to quash the subpoenas, and Plaintiffs hereby

respectfully submit this opposition to State's cross-motion and/or reply in support of Plaintiffs'

Motion to Compel.  Because State has failed to provide a legally-sufficient basis for refusing to

comply with the subpoenas, Plaintiffs respectfully request that the Court enter an Order compelling

State to produce its four employees for deposition, and deny State's Cross Motion to Quash.

## I.    PRELIMINARY STATEMENT

In *The Price of Sugar* ("*POS*"), the defendant filmmakers rely almost exclusively upon the testimony of Father Christopher Hartley ("Fr. Hartley"), a Roman Catholic priest, to republish false accusations that the Vicinis have, *inter alia*, committed heinous crimes against migrant Haitian workers in the Dominican Republic.  As the Court is by now well aware, Fr. Hartley, the original author of most of the defendant filmmakers' defamatory statements, has gone to extraordinary lengths to avoid being deposed in the Underlying Action, including moving to quash a subpoena personally served upon him on November 14, 2007, and then lying under oath to this Court— twice—in order to avoid complying with his subpoena.[1]

As a result of Fr. Hartley's flat refusal to stand by his allegations against the Vicinis and subject himself to examination under oath—either in deposition or at trial, and with a discovery cut- off date of August 11, 2008 fast approaching in the Underlying Case, Plaintiffs have had no option but to obtain relevant evidence of Fr. Hartley's communications concerning the Vicinis and *POS* from third parties with whom Fr. Hartley had extensive contacts, including the four State employees

---

[1] Fr. Hartley has lied twice to this Court in sworn declarations he submitted in support of his Motion to Quash the November 14, 2007 subpoena that Plaintiffs personally served upon him in the District of Columbia.  The first lie concerned the facts and circumstances surrounding personal service of the subpoena by Scott Kucik of Capitol Process Services.  Both Mr. Kucik and eye-witness Joe Johns of CNN squarely contradicted Fr. Hartley's sworn statement that no one approached him with the subpoena, when in fact Mr. Kucik not only had addressed Fr. Hartley by name and attempted to hand the subpoena to Fr. Hartley, but also laid the subpoena at Fr. Hartley's feet after Fr. Hartley refused to take the subpoena, turning his back on Mr. Kucik.  *See* Exhibits J, K, & L attached to Plaintiffs' Motion to Compel, June 17, 2008 (originally filed in *Hartley v. Lluberes*, Case No. 08-mc-00010 (RJL)(D.D.C., filed January 4, 2008).  In a second sworn declaration dated January 26, 2008, Fr. Hartley lied about being ex-cardinated from the Archdiocese of New York in 2006, when in fact he was ex-cardinated in April 2007 according to the Archdiocese, itself.  *See* **Exhibit 1** (declaration)(originally filed in *Hartley v. Lluberes*); Plaintiffs' Motion to Compel at 5 and Exhibit G filed thereto (Archdiocese notice).

By Order dated May 2, 2008, the Court granted Fr. Hartley's Motion to Quash the November 14, 2007 subpoena seeking his deposition testimony, but refused to quash the subpoena with respect to Fr. Hartley's production of documents.  Because Fr. Hartley had failed to timely lodge his written objections to the subpoena, the Court granted Plaintiffs' motion seeking clarification of the Court's May 2 Order, ruling by Order dated July 21, 2008 that Fr. Hartley had waived any objections he may have had to the subpoena and ordering him to produce all responsive documents, regardless of privilege, within 20 days of the Order.  The Court further found in its July 21 Order that Fr. Hartley failed to rebut Mr. Kucik's sworn testimony that he had personally served Fr. Hartley with the subpoena on November 14, 2008, thereby rejecting Fr. Hartley's mendacious declarations to the contrary.

at issue in Plaintiffs' motion—Bryan, Garuckis, Hertell and Searby. Absent deposition testimony from these four State employees about their contacts with Fr. Hartley, Plaintiffs will be at a serious disadvantage at trial as they will not be able to cross-examine Fr. Hartley, upon whom the defendant filmmakers have relied—and will rely at trial—for their defense.

To the extent the State employees' testimony contradicts, or even parallels, what Fr. Hartley told the defendant filmmakers, this goes to credibility which is always relevant. The State employees' testimony also will clarify whether Fr. Hartley is the primary or sole authority for State's Human Rights Report criticizing the Vicinis, which the defendant filmmakers also have expressly relied upon as "corroboration" for the false statements republished in *POS*. Thus, due to Fr. Hartley's persistence in evading testifying in the Underlying Action, the State employees' testimony concerning their interactions and communications with Fr. Hartley is crucial to testing the veracity of Fr. Hartley's statements to the defendant filmmakers and the reasonableness of the defendants' reliance upon Fr. Hartley as the primary—if not sole—source of the allegations against the Vicinis in *POS*.

## II.    ARGUMENT

### A.    The State Employees Should Be Compelled to Testify Because Their Testimony Concerns Highly-Relevant, Non-Privileged Matters and Producing Them for Deposition Imposes No Special Burden on State.

State asserts three arguments why subpoenas *ad testificandum* should be quashed as against its four employees, two located in Washington, D.C., and two at post in the Dominican Republic.[2] With regard to all four employees, State first argues that the substantive aspects of its *Touhy* housekeeping regulations should govern its assessment of undue burden. However, pursuant to *Watts v. S.E.C.*, 482 F.3d 501 (D.C. Cir. 2007), the D.C. Circuit clearly ruled that the Federal Rules of

---

[2] Although note, as described hereafter, that one of the State employees in Santo Domingo is returning to Washington, D.C. within mere weeks.

Civil Procedure, not a federal agency's *Touhy* regulations, govern the agency's compliance with a federal court subpoena. This holds true both as to requests for documents or live testimony, because agency *Touhy* regulations are for "housekeeping" purposes only.

Second, State argues that the four depositions sought here are unduly burdensome because the testimony has "no relevance" at all to the Underlying Action, and making these four employees available for deposition would require State to commit resources to a case to which it is not a party. Under the applicable, liberal standard for seeking discovery under the Federal Rules, however, this argument fails. The narrow, limited testimony Plaintiffs seek from the four employees goes directly to the credibility of the key witness whose statements the defendant filmmakers relied upon in producing, and republished, in *POS*. The State employees' testimony also bears directly upon one of the defendant filmmakers' defenses—that Fr. Hartley's false statements were corroborated by State's Human Rights Report, when Fr. Hartley likely was their primary, if not sole, source of information about the Vicinis.

State's assertion of hardship in producing these four employees for deposition also cannot pass the straight-face test. Two of these witnesses (Bryan and Hertell) admittedly reside and work in the District of Columbia, one (Garuckis) will commence work in the District of Columbia shortly (August 7, 2008),[3] and Plaintiffs already have offered to depose the final employee (Searby) where he works in the Dominican Republic and pay the reasonable costs of attending the depositions. Moreover, in correspondence with State following service of the subpoenas, Plaintiffs have significantly narrowed the scope of the depositions to only cover the employees' interactions and communications with Fr. Hartley, thereby avoiding inquiry about any internal communications that might invoke privilege issues, such as the deliberative process privilege.

---

[3] *See* Exhibit 2, at ¶ 5 (Garuckis Affidavit) attached to State's Motion to Quash, July 9, 2008.

### i.    *Touhy* Housekeeping Regulations Do Not Provide an Independent Legal Basis for State's Refusal to Produce Its Employees for Deposition.

State initially concedes that Rule 45 governs its obligations to respond to Plaintiffs' subpoenas, Cross Motion to Quash at 10, but then attempts an end-run around the Federal Rules by arguing that complying with the subpoenas would impose an undue burden upon the agency based upon the various factors set forth in its *Touhy* regulations.  *Id.* at 15-17.  The D.C. Circuit, however, has conclusively rejected agency *Touhy* regulations as controlling discovery.  *See Watts*, 482 F.3d at 508-09 (citing 5 U.S.C. § 301 as authorizing *Touhy* regulations, but providing: "This section does not authorize withholding information from the public or limiting the availability of records to the public.")  The Court, therefore, should reject State's attempt to construct additional impediments to discovery through its *Touhy* housekeeping regulations beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules.

Whether a subpoena subjects a witness to undue burden within the meaning of Rule 45(c)(3)(A)(iv) requires a court to balance the interests of the subpoenaed party against the bedrock principle that discovery should be liberally permitted.  Fed.R.Civ.P. 26(b)(1); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)( The rules were designed to provide a liberal opportunity for discovery.)  Under the Federal Rules, liberal discovery remains the norm, subject to slight, additional consideration, even when directed at third parties.  *See Watts*, 482 F.3d at 501, 509 (requiring courts only to be "generally sensitive to the costs imposed on third parties"); *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993)("Discovery of persons not party to the litigation is contemplated by the Rules.  Although Rule 26(b) applies equally to discovery of nonparties, the fact of nonparty status **may be considered** by the court in weighing the burdens imposed in the circumstances.")(emphasis added).[4]  In any event, the party from whom discovery is sought has the

---

[4] *See also Lipinski v. Skinner*, 781 F. Supp. 131, 135 (N.D.N.Y. 1991)("This court embraces the liberal discovery provisions available against nonparties and adheres to the sweeping language contained in Fed.R.Civ.P. 26(b) and in *Hickman v.*

burden of establishing why the discovery should not be permitted. *Linder v. Department of Defense,* 133 F.3d 17, 24 (D.C. Cir. 1998)("To the extent such information satisfies Rule 26's broad definition of relevance, the district court may decline to order the agencies to search for that information only if the agencies satisfy their heavy burden of proving oppressiveness or establish some other recognized ground for modifying or quashing subpoenas for relevant information."); *Rimstat, Ltd. v. Hilliard,* 207 B.R. 964, 970 (D.D.C. 1997) (Lamberth, J.)("the onus is on the moving party to prove an undue burden.… Mere assertions, without support or specificity, are not looked upon favorably by this court, and will, standing alone, always fail."); *Flatow v. Islamic Republic of Iran,* 196 F.R.D. 203, 207 (D.D.C. 2000)(in third-party document subpoena to the government, noting "in an era of mammoth federal agencies, where every requested search may take 'thousands of person hours,' a specificity requirement deters the government from thwarting any search it dislikes or disagrees with.")  As State is well aware, the D.C. Circuit has stated unequivocally that Rule 45 alone governs the analysis of a subpoena's reasonableness, and that agency *Touhy* regulations are limited to the agency's "internal housekeeping":

> **Rule 45 also supplies the standards under which district courts assess agency objections to a subpoena**.  The rule requires that district courts quash subpoenas that call for privileged matter or would cause an undue burden.  Courts have applied these Rule 45 standards to document subpoenas issued to civil suits.  [internal citations omitted]  Rule 45 does not set forth a different standard for testimonial subpoenas issued under Rule 45 to an agency or agency employee (nor would it be logical to apply a different standard); Rule 45's privilege and undue burden standard thus applies to both document and testimonial subpoenas.  [internal citations omitted]  Moreover, an agency's *Touhy* regulations do not relieve district courts of the responsibility to analyze privilege or undue burden assertions under Rule 45.  **An agency's *Touhy* regulations are relevant for**

---

*Taylor*"); *Byrnes v. Jetnet Corp.,* 111 F.R.D. 68, 74 (M.D.N.C. 1986)("Only in the face of a clear showing of hardship or burden should a court consider requiring discovery be first sought from a party as opposed to from a tangential or non-party."); *Schwartz v. New York City Off-Track Betting Corp.,* 1993 WL 42760, at *3 (S.D.N.Y., Feb. 11, 1993)("courts often state that the obligations of a nonparty under Rule 45 of the Federal Rules of Civil Procedure are equivalent to the duties of parties responding to discovery under other rules.")

> **internal housekeeping and determining who within the agency**
> **must decide how to respond to a federal court subpoena**.

*Watts*, 482 F.3d at 508-09 (basing its decision on three Court of Appeals decisions, the express

language of the *Touhy* regulations in that case, as well as MOORE'S FEDERAL PRACTICE) (emphasis

added). The Court's holding could scarcely be clearer.

State acknowledges the D.C. Circuit's threshold holding but then stunningly characterizes it

as mere "dicta" while suggesting that its *Touhy* factors should control the Court's analysis. Cross

Motion to Quash at 10, 15. No matter how intently State may wish to do so, it cannot rewrite the

controlling precedent of this Circuit. While *Watts* does indeed remind us that third-party status may

be considered in the burden analysis, 482 F.3d at 509, this does not permit State to import *via* the

back-door the very housekeeping regulations which the Circuit Court clearly said above do not

control.

When the fact that State is a non-party here is "considered," however, the assessment of

burden in this case scarcely changes. None of the concerns over "overly burdensome and

cumulative discovery requests" that could "commandeer" uninvolved government agencies apply

here. There is no danger of impinging agency function because the scope of the depositions was

narrowly tailored at the outset and has been further narrowed and limited by Plaintiffs. The type of

discovery sought here is further distinguishable as it does not involve an agency perpetually involved

in litigation—such as was the case with the SEC in *Watts*. Certainly until State comes forward with

non-conclusory statements about how this discovery impacts it in any way fundamentally different

from the slightest discovery request, its motion should be rejected. To do otherwise would turn the

clock back to a time when State could assert "sovereign immunity," or that it was not a "person"

subject to the Federal Rules. *See, e.g., Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 399 n. 2

(D.C.Cir. 1984)("Since at least 1965, however, this court has assumed the nonapplicability of

sovereign immunity to such a subpoena."); *Yousuf v. Samantar*, 451 F.3d 248, 257 (D.C. Cir. 2006)

("[W]e hold the Government is a 'person' subject to subpoena under Rule 45 regardless whether it is a party to the underlying litigation.").

> **ii.    State Has Not Asserted a Sufficient Basis for Refusing to Comply with the Deposition Subpoenas Under Rule 45.**

State's Cross Motion to Quash is inappropriate because, contrary to its conclusory assertions, the information sought is of particular relevance to the Underlying Action. Moreover, there is no undue burden in providing testimonial depositions here. At most, State's assertion of burden consists of little more than the commonplace hardship faced by any third party in producing witnesses for deposition. Merely because State is a government agency does not, however, give it special protections beyond those set forth in the Federal Rules. Moreover, the Vicinis have already voluntarily limited their subpoenas both in scope of content, to avoid infringing upon any applicable privileges (such as State's asserted deliberative process privilege), and in the number of witnesses to be deposed (withdrawing their subpoena to depose State employee Michael Puccetti). Plaintiffs also have aggressively sought, but failed to obtain, deposition testimony from Fr. Hartley, thereby increasing the importance of these depositions as the State employees are the only available witnesses from whom Plaintiffs can reasonably seek the information they need concerning Fr. Hartley. Consequently, State has not shown—and under these circumstances cannot show—how these four limited depositions pose an undue burden, particularly when weighed against the Plaintiffs' need for the State employees' testimony concerning Fr. Hartley in the Underlying Action.

> a.    *The Testimony Sought Is Relevant and Necessary to Plaintiffs' Case in the Underlying Action.*

State is willfully dismissive of the plain relevance of the deposition testimony sought from its four employees, going so far as to assert that "such miniscule relevance does not justify the significant burden of producing third-party government officials to provide testimony." Cross Motion to Quash at 5. This is nonsense. Even a cursory review of Plaintiffs' detailed, 11-page letter

to the Office of State's Legal Advisor dated May 9, 2008 (*See* Exhibit P, attached to Plaintiffs'

Motion to Compel, June 17, 2008 (originally filed in *Hartley v. Lluberes*) makes it clear that the

testimony of the four State employees concerning their interactions and communications with Fr.

Hartley is not only relevant, but also necessary to Plaintiffs' defamation case against the defendant

filmmakers, particularly in the absence of any live testimony from Fr. Hartley.[5]

 State intentionally understates the relevance—and value—of the limited testimony Plaintiffs

seek from the four State employees in three essential ways.

 First, State repeats its formalistic objection that because it is not identified as a party in the

Complaint—nor have a specific role in making *POS*—the testimony Plaintiffs seek about Fr. Hartley

therefore must be irrelevant to the Underlying Action. Motion to Quash at 1, 2, 3 and 12. State's

rationale is, of course, both overly simplistic and simply wrong. 6 MOORE'S FEDERAL PRACTICE

§ 26.41[2][a] at 26-156 (2007)("a fact [need not] be alleged in a pleading for a party to be entitled to

discovery of information concerning that fact.") *See also U. S. v. American Tel. & Tel. Co.*, 461

F.Supp. 1314, 1341 n.81 (D.D.C. 1978)("it is rare that a showing can be made that a particular item

of requested information is not "relevant")(citing Kaufman, *Judicial Control Over Discovery*, 28 F.R.D.

111, 119 (1961)). Rather than relying upon specified categories, relevance depends upon the

circumstances of a case. Fed.R.Civ.P. 26(b)(1) (permitting discovery of any information that

"appears reasonably calculated to lead to the discovery of admissible evidence"); *Peskoff v. Faber*,

2006 WL 1933483, at *2 (D.D.C., July 11, 2006) (finding that a party's discovery request was not

overly broad where it was reasonably calculated to lead to the discovery of evidence relating to

---

[5] State has raised all its present objections to relevance in its prior correspondence with the Vicinis. In their letter and telephone conferences with State, Plaintiffs have repeatedly explained why State either misses the point or needs to understand more factual basis about the Underlying Action in order to ascertain relevance. Plaintiffs' Motion to Compel at 10-12 and Exhibit O (May 2, 2008 State Letter [Ramish]), Exhibit P (May 9, 2008 Vicini Letter [Chew]), Exhibit Q (May 16, 2008 State Letter [Hudak], Exhibit R (May 28, 2008 State E-mail [Hudak]), Exhibit S (June 6, 2008 State Letter [Min]), filed thereto. Despite these prior explanations, State simple-mindedly repeats all their prior correspondence objections without considering or distinguishing the rationales Plaintiffs have already provided.

plaintiff's claim). Here, although State is not formally designated a party, it is undisputed that Fr. Hartley is a key witness both to Plaintiffs and the defendant filmmakers in the Underlying Action.[6] Also, because Fr. Hartley has refused to testify either at deposition or at trial, testing the truthfulness of his statements that defendants republished in *POS* further underscores the need to obtain Fr. Hartley's statements made to third parties about the same subject matter.

Second, State either misunderstands or misstates the factual posture of the defamation claim in the Underlying Action by suggesting that statements by non-parties cannot be relevant: "The credibility of Father Hartley judged in light of statements he made to State officials is simply irrelevant to … Plaintiffs' defamation claims against Defendants."  Cross Motion to Quash at 14. The Vicinis are suing the defendant filmmakers for statements they made, and for Fr. Hartley's statements they republished.  Without access to Fr. Hartley either in deposition or at trial, assessing the truth of Fr. Hartley's statements (and his credibility and thus defendants' reasonableness in relying on his statements) can only be accomplished through the testimony of those people with whom Fr. Hartley communicated.[7]  In this case, those persons include the State employees identified in these subpoenas.

Moreover, it is the defendant filmmakers who have drawn State into the Underlying Action by asserting the substantial truth of Fr. Hartley's false statements based, at least in part, upon State's Human Rights Report.  Discovery which pertains to the validity *vel non* of affirmative defenses is

---

[6] Indeed, in their Initial Disclosures, both Plaintiffs and the Defendants have each designated Fr. Hartley as a key witness.  *See* **Exhibit 2** (Plaintiffs' Initial Disclosures, #14) and **Exhibit 3** (Defendants' Initial Disclosures #9)(originally filed in *Felipe Vicini Lluberes and Juan Vicini Lluberes v. Uncommon Productions LLC, et al.,* Civil Action No. 07-CA-11623 (DPW) (D. Mass.).

[7] Consequently, the statement that "the testimony sought by Plaintiffs—i.e., communications with Father Hartley—does not tend to show that statements in *The Price of Sugar* are false or true" similarly misses the mark.  Motion to Quash at 13. The case is about the reasonableness in relying on Fr. Hartley, so it is vital, and authorized by the Federal Rules, to permit discovery as to credibility.  Advisory Committee Notes to Rule 26 (specifically stating that discoverable information may include "information that could be used to impeach a likely witness"); *Hickman v. Taylor,* 329 U.S. 495, 511 (1947)(information that might be used for impeachment or corroboration discoverable).

always relevant.  Fed.R.Civ.P. 26(b)(1)("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense").  *See also Chubb Integrated Systems Ltd. v. National Bank of Washington,* 103 F.R.D. 52, 59 (D.D.C. 1984)(finding discovery pertaining to affirmative defense relevant).  The defendant filmmakers have affirmatively relied upon the State's Human Rights Report as an affirmative defense ("truth") as to the matters asserted in *POS.*  They claim that it corroborates their account of events.  *See* **Exhibit 4,** at 14, 16, 27, 41-43, 59, 78 (Uncommon Productions' Response to Interrogatories, November 26, 2007) (originally filed in *Lluberes v. Uncommon Productions).*  Indeed, State appears to have relied on Fr. Hartley as an authority when constructing the 2006 Report.  *See* **Exhibit 5,** UP 26169, 26190-91 (Note and attachment 2006 State Department Human Rights Report, from Fr. Hartley to Uncommon Productions highlighting parts of Report that he attributes to interviews he conducted).  If it turns out that anything Fr. Hartley told State was not true, or State had no other corroborating source,[8] then the defendant filmmakers' affirmative defense of "substantial truth" will fail.  Consequently, State's assertion that "Plaintiffs have failed to show how statements made to Department officials would be relevant or could lead to the discovery of relevant, admissible evidence" simply looks more like a case of  the Government playing "ostrich" than a genuine assessment of relevance under the Rules.  Cross Motion to Quash at 12.

Finally, State asserts that because allegedly very little non-privileged testimony exists, the Vicinis' voluntary concession not to delve into areas protected by the deliberative process privilege renders what testimony is available irrelevant.  Motion to Quash at 14.  This is absurd, because information is only considered "deliberative," when "it reflects the give-and-take of the consultative process."  *Heartwood, Inc. v. U.S. Forest Service,* 431 F.Supp.2d 28, 37 (D.D.C. 2006)(*citing Coastal States*

---

[8] *See* **Exhibit 6**, UP20155 (January 28, 2007), Email from Fr. Hartley to Alexander T. Bryan (U.S. State Department) (requesting that the Vicini name be included in the 2006 Human Rights Report for the Dominican Republic).

*Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C.Cir. 1980). Such limitation is in place because the partial privilege merely shields the "process by which governmental decisions and policies are formulated," thereby ensuring "honest and frank communication within the agency." *Id.* Where information is merely factual, or not intra-agency, like the direct communications and interactions at issue here between Fr. Hartley and the State employees, there can be no question of deliberative privilege. *In re Subpoena Served upon the Comptroller of the Currency (Fleet)*, 967 F.2d 630, 634 (D.C. Cir. 1992)(factual matters not subject to deliberative process privilege).

The questions the Vicinis intend to put to the four deponents are wholly factual, and cannot even indirectly expose the deliberative process. *Heartwood*, 431 F.Supp.2d at 37; *General Elec. Co. v. Johnson*, 2006 WL 2616187 at *5 (D.D.C. Sept. 12, 2006). Without giving their assessment of what they thought of Fr. Hartley or his opinions, the State employees nonetheless can provide the factual substance of what he reported to them, and indeed, identify whether they talked to anyone else about the same issues.

With regard to the first line of questioning, to the extent that Fr. Hartley's statements to the State employees differ from his statements made elsewhere, such inconsistencies are directly relevant to his credibility. With regard to the second line of questioning, if the answer is they only talked to Fr. Hartley, then the issue concerning the affirmative defense of the corroborating source will be resolved.

Because Fr. Hartley has steadfastly refused to testify and stand behind his statements in *POS*, the Vicinis' only opportunity to effectively cross-examine Fr. Hartley will be through these statements on the same subject matter that Fr. Hartley made to third-parties. It therefore is clear that the testimony of the four State employees concerning their interactions and communications with Fr. Hartley is not only relevant, but also necessary to Plaintiffs' defamation case.

   b.  <u>*State Has Failed to Establish that Producing the Four Employees for Deposition Would*</u>
      <u>*Impose an Undue Burden.*</u>

   State's straight-faced claim that "the Subpoenas seek to impose an undue burden on the

Department" is simply absurd.  Cross Motion to Quash at 9.  In an era of litigation when production

is regularly measured in terabytes, all Plaintiffs seek in this case is to examine four employees for a

few hours each about discrete and limited communications they had with Fr. Hartley, at a time and

place convenient to State, and without intruding on any applicable privileges.  *See Northrop Corp. v.*

*McDonnell Douglas Corp.*, 751 F.2d 395 (D.C. Cir. 1984)(in case involving discovery sought of State by

two private corporations twenty-five years ago, already announcing, "Massive discovery requests are

unfortunately now part of the standard tactical maneuvering of parties immersed in the adversarial

process," before finding State had to properly assess 967 cubic feet of documents because of the

"'the paramount interest of the Government in having justice done between litigants in Federal

courts'")(citation omitted).  Moreover, as State's entire burdensomeness argument is based upon an

improper application of its internal *Touhy* housekeeping regulations as opposed to the more liberal

discovery standard permitted under the Federal Rules, State cannot meet its burden to quash an

otherwise valid and enforceable subpoena.  To conclude otherwise would permit government

agencies to disregard private litigant subpoenas based upon even the slightest disturbance to agency

business, which would contravene the express intent of the Rules and the law of this Circuit.

   *Watts*, as discussed by State, sets forth three considerations for assessing whether a subpoena

imposes an undue burden.  Cross Motion to Quash at 10 (*citing Watts*, 482 F.3d at 508); *see also*

Fed.R.Civ.P. 26(b)(1)-(2).  Properly analyzed, none of these factors, however, favors quashing the

deposition subpoenas in this matter.

   First, the testimony Plaintiffs seek is not unreasonably cumulative or duplicative of the

documents that State has voluntarily produced.  *See* WRIGHT & MILLER, 8 FEDERAL PRACTICE AND

PROCEDURE § 2037 (2007) ("Reasons that have been advanced for an order that a deposition not be

taken, and that have been disposed of by the court—and usually denied—on the facts of the

particular case, are: that the information sought has already been obtained by … other means of

discovery"). Indeed, live testimony would only be duplicative if the paper production encapsulated

its substance. Of the 790 pages of documents that State has produced, only a minute portion (no

more than 50 pages) constitutes any substantive discussions between the relevant State employees

and Fr. Hartley.[9] Such a limited source of documentary evidence cannot possibly summarize the

complete interactions between Fr. Hartley and the State employees (averaging no more than 12.5

pages of email correspondence each). State's characterization of its document production as

producing "a wealth of written communications" therefore is, at best, highly exaggerated. Cross

Motion to Quash at 17. Moreover, because these same State documents refer to physical meetings

and telephone calls, the substance of which themselves is not reflected in the documents, State's

document production clearly cannot capture the complete interaction between Fr. Hartley and the

State employees.[10] Furthermore, it is reasonable to presume that not all communications in the

Dominican Republic are conducted using electronic means. In any event, State has the burden on

this point, and because its assertions are devoid of any particularity that live testimony would be

unreasonably cumulative or duplicative of the document production, any motion to quash on this

---

[9] At least 671 pages are attachments of various reports, speeches, and pictures, and do not constitute distinct communication between the parties, such as correspondence e-mails. Of the 119 pages of e-mails which could be considered correspondence, at least half are brief statements naming the e-mail attachment, and a further half is duplicates.

[10] *See* **Exhibit 7**, STATE000014 (October 23, 2006), E-mail from Fr. Hartley to Michael Garuckis ("[unintelligible] contact person you can blindly trust, I recommend Mrs. Noemi Mendez, CEDAIL with whom I worked hand in hand over these past nine years. She knows all the Vicini and CEA bateyes we visited together and can be a very useful contact for you and your colleagues at the Embassy. Her cell phone is: 829 427-8196. Her e-mail address: naomicastro@yahoo.com"); **Exhibit 8**, STATE000703 (December 10, 2006), E-mail from Fr. Hartley to Alexander T. Bryan ("You will be surprised to know how happy Noemi is as a result of the visit. Give her a call and you will be pleasantly surprised at her reaction!!"); **Exhibit 9**, STATE000098 (April 3, 2007), E-mail from Alexander T. Bryan to Fr. Hartley ("It was great speaking to you the other day, thanks for your kind words"); **Exhibit 10**, STATE000756 (June 26, 2007), E-mail from Fr. Hartley to Alexander T. Bryan ("You will be interested to know I spent all of yesterday in DC. The morning at State (David Searby and many others).")

basis would be improper.  *See Linder,* 133 F.3d at 24; *Rimstat,* 207 B.R. at 969; *Flatow,* 196 F.R.D. at 206-07.

The second *Watts* factor is whether the discovery Plaintiffs seek is obtainable from some other source which is more convenient, less burdensome, or less expensive.  *Watts,* 482 F.3d at 508. State simply asserts here that it is unduly burdensome to seek discovery from the government non-party because the information Plaintiffs seek also is available from Fr. Hartley through the international discovery process in Ethiopia, where Fr. Hartley reportedly is assigned to mission work.  Cross Motion to Quash at 13.  This argument misapprehends a critical legal concept, however.  *See* 9 MOORE'S FEDERAL PRACTICE § 45.32 at 45-67 (2007)("The mere availability of the [information] from another source, however, does not preclude a subpoena directed to a nonparty if the party serving the subpoena can show ***it is more expeditious*** to obtain the documents from the witness.")(emphasis added).  State confuses the convenience analysis with a "last resort" test, such that discovery of the State employees may only be permitted once all other sources have been laid bare.[11]  However, contrary to State's suggestion, Plaintiffs in fact have pursued a deposition of Fr. Hartley aggressively, personally serving him with a subpoena on November 14, 2007. Unfortunately, Fr. Hartley successfully quashed the deposition portion of his subpoena, and to date shows no signs of volunteering his testimony either in deposition or at trial.

Indeed, State's suggestion that Plaintiffs exhaust even the remotest avenues of discovery by serving letters rogatory is not really feasible at all.  State concedes as much in its understated admission that the very discovery path they advocate ("letters rogatory") is in fact "lengthy," particularly in serving process upon a foreign national residing in a non-Hague Convention nation

---

[11] *See, e.g., In re Exxon Valdez,* 142 F.R.D. 380 (D.D.C.1992) (third-party energy industry group forced to produce documents, even though the documents were in the possession of actual parties to the litigation); *State Farm Mut. Auto. Ins. Co. v. Accurate Medical,* P.C., 2007 WL 2993840, *1 (E.D.N.Y. October 10, 2007)("nothing in the Federal Rules of Civil Procedure requires a litigant to rely solely on discovery obtained from an adversary instead of utilizing subpoenas")(citing  *Covey Oil Co. v. Continental Oil Co.,* 340 F.2d 993, 998 (10th Cir. 1965)("a person may not avoid a subpoena by saying that the evidence sought from him is obtainable from another").

like Ethiopia.[12]  Cross Motion to Quash at 8, n.5.  With a discovery cut-off deadline of August 11,

2008 fast approaching in the Underlying Action (which State fails to note), Plaintiffs have no

practicable option but to obtain the information they need concerning Fr. Hartley from third parties

with whom he has communicated.  *See Northrop*, 751 F.2d at 404 (in motion to quash document

production by non-party State Department, the Court considered relevant in burden analysis the fact

that court hearing main case would not alter discovery dates).

The third *Watts* burden factor is whether the burden or expense of the proposed discovery

outweighs its likely benefit.  *Watts*, 482 F.3d at 508.  Plaintiffs have satisfied this requirement here as

well, because, as set forth in more detail above, Fr. Hartley is the original source of the defamatory

statements republished by the defendant filmmakers in *POS*.  Because he is unavailable, information

that goes to Fr. Hartley's credibility or the defendant filmmakers' affirmative defense is undoubtedly

of high relevance.  Offsetting this relevance is scant hardship, as discussed above and as evidenced

by the Vicinis' many steps to further limit the scope and cost of its limited deposition requests.  *See*

WRIGHT & MILLER, 8 FEDERAL PRACTICE AND PROCEDURE § 2037 (2007) ("Rule 26(c)(1) permits a

court to order that the discovery requested not be had.  Such orders are not exceptional with regard

to interrogatories and requests to produce.…  It is even more difficult to show grounds for ordering

that discovery not be had when it is a deposition that is sought, and most requests of this kind are

denied."); 9 MOORE'S FEDERAL PRACTICE § 45.32 at 45-63 (2007)("As a practical matter, the issue

of whether a subpoena creates an 'undue burden or expense' is almost always encountered in the

context of a subpoena *duces tecum* requiring production of documents or other tangible things").[13]  In

---

[12] *See* List of Signatories to Hague Service Convention, at http://hcch.e-vision.nl/index_en.php?act=conventions.status&cid=17, last visited July 23, 2008 (Ethiopia not listed).

[13] The same conclusion follows even under State's internal *Touhy* guidance standard, which nonetheless does not govern State's compliance.  The key factors—the fourth through sixth (officials' time, expense, and impartiality when lacking direct interest)—do not favor State nearly as much as it suggests.  Cross Motion at 16.  These considerations are all relative, and so the fact that any time or resources are spent does not render discovery requests *per se* unduly burdensome.  Indeed, compared with typical discovery requests, what is sought here is quite modest.  A limited amount

short, pursuant to the controlling *Watts* Federal Rules test, the live testimony sought in this case is not impermissibly burdensome, and so should be permitted. Because State has failed to articulate beyond mere conclusory assertions why the limited deposition testimony sought is unduly burdensome, quashing the deposition subpoenas would be inappropriate. *See Jennings v. Family Management*, 201 F.R.D. 272, 275 (D.D.C. 2001)("in the case of a protective order related to deposition testimony, courts regard the complete prohibition of a deposition as an 'extraordinary measure[ ] which should be resorted to only in rare occasions.' … As defendants correctly point out, plaintiff relies on conclusory, speculative statements to support its motion rather than demonstrating evidence of specific harm that will result to Jennings if she is made to testify.")(citations omitted). Consequently, the Court should permit the four depositions (Bryan, Garuckis, Hertell and Searby) to proceed.

**B.      Plaintiffs Properly Served the Subpoenas on Messrs. Garuckis and Searby Pursuant to State's Internal *Touhy* Housekeeping Regulations.**

The final issue raised by State pertains only to two of the deponents, Messrs. Garuckis and Searby, who were not physically stationed at the State's Headquarters in Washington, D.C., when they were served via State's Legal Advisor as required by the agency's internal *Touhy* housekeeping regulations.[14] State now asserts that Rule 45(b)(3) requires that these individuals should have been served pursuant to 28 U.S.C. § 1783 (service upon U.S. nationals abroad), but that depositions are impossible nonetheless because, pursuant to Rule 45(c)(3)(A)(ii), they reside and/or work more than 100 miles from any U.S. District Court.

In making these arguments, however, State grossly misapprehends the nature and purpose of the subpoenas. Plaintiffs are not seeking the deposition testimony of Messrs. Garruckis and Searby

---

of the employees' time is required, and the Vicinis already have agreed to assume the major costs associated with the depositions of Messrs. Searby and Garuckis by taking them in the Dominican Republic.

[14] As noted previously, Mr. Garuckis will begin his new post in Washington, D.C. starting August 7, 2008.

in their private, individual capacities. Rather, Plaintiffs seek their testimony concerning their communications with Fr. Hartley in their capacity as State employees conducting official business.[15] In short, service under 28 U.S.C. § 1783 is inapplicable here because Plaintiffs properly served Messrs. Garuckis and Searby pursuant to Rule 45(b)(2) and the State's own internal *Touhy* housekeeping regulations.[16]

i.      **State's Office of Legal Adviser is the Designated Agent to Receive and Accept Service of Third-Party Subpoenas on Behalf of State Employees.**

State's *Touhy* housekeeping regulations unequivocally designate its Executive Office of the Office of the Legal Adviser ("L/EX") as the sole agent to receive and accept service of third-party subpoenas on behalf of State employees for information sought in their official capacities.[17] The regulations provide, in relevant part:

> (a)…*only* L/EX is authorized to receive and accept subpoenas or other demands or requests directed to the Department, or any component thereof, *or its employees, or former employees,* whether [of a] civil or criminal nature, for:…
> (2) Information, including testimony, affidavits, declarations, admissions, responses to interrogatories, or informal statements, relating to material contained in the files of the Department or which any Department employee *acquired in the course and scope of the performance of his official duties.*

22 C.F.R. § 172.3 (emphasis added). L/EX's designation as the "only" authority to receive and accept subpoenas applies to all State employees world-wide. 22 C.F.R. § 172.1.

---

[15] Indeed, Exhibit R to Plaintiffs' Motion to Compel, which is a communication from Assistant United States Attorney Mr. Brian Hudak to Mr. Benjamin Chew acknowledges that the subpoenas here were "issued to certain State Department employees in their official capacities."

[16] As noted above, while *Watts* invalidated State's *Touhy* regulations as a substantive basis on which to determine compliance with discovery requests, it implicitly left in place its procedural requirements designating an agent for service of process for State employees. *Watts,* 482 F.3d at 508 (citing MOORE'S FEDERAL PRACTICE for the proposition that "[T]hough an agency regulation may provide the method by which an agency head will comply with or oppose a subpoena, the legal basis for any opposition to the subpoena must derive from an independent source of law such as a governmental privilege or the rules of evidence or procedure.").

[17] The term "official information" as used in this brief shall refer to the scope of information, testimony, and other disclosures provided for in the State Department's applicable *Touhy* housekeeping regulation located at 22 C.F.R. § 172.3(a) and its subparts.

ii.    **The Garuckis and Searby Subpoenas Were Properly Served Under Rule 45(b)(2)(A).**

Service was proper under Rule 45(b)(2)(A) because, pursuant to its *Touhy* housekeeping regulations, State designated L/EX as its agent for service of process both upon State and its current and former employees.

Rule 45 provides that service of a subpoena "requires delivering a copy to the named person". Fed.R.Civ.P. 45(b)(1). This is precisely what Plaintiffs did in complying with State's internal *Touhy* housekeeping regulation, 22 C.F.R. § 172.1, which expressly designates L/EX as the sole agent for purposes of receiving service for its current and former employees. Thus, the Garuckis subpoena was delivered to "Michael J. Garuckis, c/o Office of the Legal Advisor," and the Searby subpoena was delivered to "David Searby, c/o Office of the Legal Advisor."[18] Had Plaintiffs attempted service other than by delivering the subpoenas to Garuckis and Searby in care of L/EX, State would have deemed service ineffective, just as it did when its counsel advised Plaintiffs that personal service upon former Ambassador Hans Hertell at his D.C. residence was not effective because it failed to comply with 22 C.F.R. § 172.3(b).[19] Thus, Plaintiffs properly issued the subpoenas in this District under Rule (b)(2)(A) because Messrs. Garuckis's and Searby's designated

---

[18] *See* Exhibit T to Plaintiffs' Motion to Compel.

[19] State's counsel unequivocally stated that service upon Amb. Hertell at his residence in the District was improper because the subpoena had not been served through L/EX pursuant to State's *Touhy* housekeeping regulations:

> I am in receipt of your email attaching the subpoena addressed to Ambassador Hertell. I believe that it is improper under State Department regulations, which have effect of law. Specifically, pursuant to 22 C.F.R. Sect. 172.3, any subpoena of Ambassador Hertell seeking information he acquired in the course and scope of the performance of his official duties with the Department of State is improperly served on Ambassador Hertell by the service indicated in your attachments.

*See* **Exhibit 11** (June 16, 2008), E-mail from Brian Hudak to Benjamin Chew. Plaintiffs previously had served the same subpoena upon Amb. Hertell via the State L/EX along with the subpoenas for the other three State employees, Messrs. Searby, Bryan and Garuckis.

agent – L/EX – is located here.  *See* Fed.R.Civ.P. 45(b)(2)(A) ("… a subpoena may be served at any place…within the district of the issuing court").

### iii.    State's Tortured Interpretation of Rule 45 is Incorrect Because it Ignores the Fact that the Federal Rules Permit Agents to Accept Service and also Ignores Its Own *Touhy* Housekeeping Regulations

In its Cross Motion to Quash, State incredulously ignores its own internal *Touhy* housekeeping regulations requiring service through L/EX and posits that the Garuckis and Searby subpoenas had to be served pursuant to 28 U.S.C. § 1783 for service to be proper under Rule 45. Not only is State's position fundamentally incompatible with its own *Touhy* housekeeping regulations, but it also contravenes Rule 1, which requires that the Rules "be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."  It would be neither just nor speedy to require Plaintiffs to serve the Garuckis and Searby subpoenas under 28 U.S.C. § 1783 when State's own *Touhy* housekeeping regulations expressly mandate service upon its employees through L/EX and when discovery in the Underlying Action is scheduled to close August 11, 2008.[20]  Even if service on Garuckis and Searby were effected pursuant to 28 U.S.C. § 1783, Plaintiffs would be caught in a catch-22, as State undoubtedly would decline to honor subpoenas personally served upon Searby and Garuckis in the Dominican Republic (just as State declined to honor the subpoena personally served upon former Amb. Hertell at his home in Washington, D.C.), and refer Plaintiffs to State's *Touhy* housekeeping regulations at 22 C.F.R. § 172.3.  State simply cannot have it both ways:  by virtue of its internal *Touhy* housekeeping regulations, State mandated that its current and former employees, wherever located, be served "only" through L/EX in Washington, D.C., 22 C.F.R. § 172.3, thereby waiving any requirement

---

[20] As State acknowledges, because the Dominican Republic is not a signatory to any service treaty, Plaintiffs would have to use the "lengthy" letters rogatory process to effectively subpoena Messrs. Garuckis and Searby.  *See* Motion to Quash at 8, footnote 5.  State also acknowledges that the letters rogatory process can take a year or longer.  *See* "Preparation of Letters Rogatory" at http://travel.state.gov/law/info/judicial/judicial_683.html, last visited July 19, 2008.

under Rule 45 that Plaintiffs directly serve its employees.  To then play "gotcha" with private litigants facing tight discovery deadlines smacks of precisely the sort of abuse that the D.C. Circuit has sought to avoid in even-handedly applying the Federal Rules.  *See Yousuf*, 451 F.3d at 250 (explaining that "[t]he drafters of the Federal Rules of Civil Procedure believed Rule 45 was 'so simple that it did not need any discussion'… The dispute before us today … suggests the framers underestimated the creativity of the United States [State Department] when faced with a subpoena *duces tecum* issued in a case to which it is not a party," and holding that federal government agencies are "persons" subject to Rule 45).

State further argues that the Garuckis and Searby subpoenas must be quashed under Rule 45(c)(3)(A)(ii) because they would require Garuckis and Searby to travel more than 100 miles of where they reside.  First, this argument does not even apply because the Vicinis have offered to take their depositions in the Dominican Republic where they work and reside.  Even accepting State's position would mean that any State employee stationed abroad more than 100 miles away from United States territory would be completely out of reach of third-party subpoenas issued in federal court – except for those few instances of diplomats serving in Northern Mexico or Southern Canada.[21]  This further defies the purpose and logic behind the Federal Rules and, as set forth in more detail above, State's own internal *Touhy* housekeeping regulations.  State's position also is inconsistent with a central tenet of the Housekeeping Act – the genesis of State's *Touhy* housekeeping regulations – which expressly provides that it does not authorize the withholding of information from the public or limiting the availability of records to the public.  5 U.S.C. § 301.

---

[21] Plaintiffs have repeatedly offered to schedule the depositions at a time and place most convenient to each deponent whether in the United States or in the Dominican Republic.  *See* Exhibit P to Plaintiffs' Motion to Compel at 9.

Moreover, the Federal Rules generally allow an agent to accept service on behalf of its principal, when the agent has been designated with such power.[22]

Clearly, State has the legal authority under the Housekeeping Act and *Touhy* to control the process by which it receives and accepts requests from private litigants seeking official departmental information. Plaintiffs have complied with those regulations and personally served each one of the four State employees (Searby, Garuckis, Bryan and Hertell) through L/EX pursuant to Rule 45(b)(2)(A). Accordingly, service of the subpoenas was proper and the witnesses should be made available for deposition without further delay.

## III.    CONCLUSION

For the foregoing reasons, and for the reasons originally set forth in Plaintiffs' Motion to Compel, Plaintiffs respectfully request that the Court enter an Order denying State's Cross Motion to Quash, granting Plaintiffs' Motion to Compel, and ordering State to fully comply with the subpoenas (as limited by Plaintiffs) and immediately make the four subpoenaed employees (Bryan, Searby, Garuckis, and Hertell) available for deposition.

---

[22] *See, e.g.,* Fed.R.Civ.P. 4(e)(2)(C) (permitting service of summons by delivering a copy to an agent authorized by appointment or by law to receive service of process for a party); *Silvious v. Pharaon*, 54 F.3d 697, 701 (11th Cir. 1995) (recognizing under current Fed.R.Civ.P. 4(e) the propriety of serving an absent foreign defendant's agent resident in the United States that has been authorized to accept service); *Mattel, Inc. v. Louis Marx & Co.*, 353 F.2d 421, 423 n.2 (2d Cir. 1965) (noting that service on a resident agent is deemed service on the principal).

Respectfully submitted,


/s/ Benjamin G. Chew
Read K. McCaffrey
Stephen Díaz Gavin
Benjamin G. Chew (D.C. Bar # 418577)
PATTON BOGGS LLP
2550 M St, N.W.
Washington, DC 20037
Telephone:  (202) 457-6015
Facsimile:  (202) 457-6315
e-mail:  bchew@pattonboggs.com


*Counsel for Plaintiffs/Movants*
*Felipe Vicini Lluberes*
*and Juan Vicini Lluberes*


Dated:  July 23, 2008

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of July 2008, I caused to be filed electronically

with the Court and served via first class mail, postage prepaid, the foregoing Opposition to State

Department's Cross Motion to Quash / Reply in Further Support of Plaintiffs' Motion to Compel,

with exhibits, and proposed order upon the following:

Brian P. Hudak, Esq.
Assistant United States Attorney
U.S. Department of Justice
Judiciary Center
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone:     (202) 514-7143
E-mail:     brian.hudak@usdoj.gov

and

Royce Min, Esq.
Office of the Legal Adviser
United States Department of State
2201 C Street, N.W.
Washington, D.C. 20520
Telephone:     (202) 647-6823
E-mail:     minrb@state.gov

*Counsel for Respondent the United States Department of State*

Elizabeth C. Koch, Esq.
LEVINE SULLIVAN KOCH & SHULTZ, LLP
1050 17th Street, NW
Suite 800
Washington, DC 20036
Telephone:  (202) 508-1100
Facsimile:   (202) 861-9888
E-mail:     ekoch@lskslaw.com

*Counsel for Defendants in the Underlying Action,*
*William Haney and Uncommon Productions LLC*

/s/ Benjamin G. Chew

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FATHER CHRISTOPHER HARTLEY

Movant,

v.

FELIPE VICINI LLUBERES, et al.,

Respondents.

Civil Action No. 1:08-mc-00010-
RJL

## DECLARATION OF FATHER CHRISTOPHER HARTLEY

I declare under penalty of perjury as follows:

1.    My name is Christopher Hartley. By vocation, I am a Catholic priest ordained on November 8, 1982.

2.    My religious superiors are located in Toledo, Spain. In 2006, I was excardinated from my former diocese in New York and incardinated into the Toledo, Spain diocese. My present assignment in Ethiopia is at the direction of the Toledo, Spain diocese.

3.    I have been in the District of Columbia, or within 100 miles of the District of Columbia, on only three (3) occasions in the last twenty years:

   a.    I was in the District of Columbia for three days, from November 13-15, 2007, for a screening of the documentary film that is the subject of the above-captioned dispute;

   b.    On or about June 26, 2007, I was in the District of Columbia for one day to attend a meeting at the United States Department of State; and

Exhibit A
Page 1

c.  In 1988 or 1989, I was in the District of Columbia for one day to teach at the

Formation House of the Missionaries of Charity.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on January 26, 2008.

Father Christopher Hartley

2

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

FELIPE VICINI LLUBERES
    and
JUAN VICINI LLUBERES

    Plaintiffs,

    v.

UNCOMMON PRODUCTIONS, LLC
    And
WILLIAM M. HANEY, III,

    Defendants.

Civil Action No. 07-11623 (DPW)

## PLAINTIFFS' INITIAL DISCLOSURE

Plaintiffs Felipe Vicini Lluberes and Juan Vicini Lluberes (the "Vicinis"), by and through

their undersigned counsel, pursuant to Fed. R. Civ. P. 26(a)(1) and Local Rules 26.1(A) and 26.1(B),

hereby disclose the following:[1]

**A.**    **Fed. R. Civ. P. 26(a)(1)(A):  Individuals Likely To Have Discoverable Information**

The following individuals are likely to have discoverable information that the Vicinis may

use to support their claims:

| | Name | Address and Telephone Number | Subjects of Information |
|---|---|---|---|
| 1. | Julio Altagracia | Dominican Republic, specific address to be provided | President of the Board of Directors of CEA, has knowledge of the ownership of the properties on which *The Price of Sugar* ("POS") was filmed |

---

[1] The Vicinis respectfully reserve the right to supplement these disclosures as discovery continues.

| Name | Address and Telephone Number | Subjects of Information |
|------|------------------------------|-------------------------|
| 2. Celine Anaya-Gautier | 24, rue du Vert Bois, 75009 Paris, France  06 66 80 00 29 | Photographer – "Slaves in Paradise"/Co-writer "Batey Zero", has knowledge of the allegations in the Complaint and certain scenes in POS |
| 3. Ramon Asencio | Dominican Republic, specific address to be provided | Reporter, has knowledge of Fr. Hartley's activities and why he left the Dominican Republic |
| 4. Manuel Bacz | Dominican Republic, specific address to be provided | Former Director of CEA; former President of International Sugar Organization, has knowledge of the ownership of properties on which POS was filmed |
| 5. Johnny Belizaire | Address is most likely known by Defendants | Featured in POS, "The Sugar Babies," and "Batey Zero", has knowledge of allegations in the Complaint |
| 6. Eric Cochran | U.S. Address and telephone number are known by Defendants | POS Cinematographer, has knowledge of allegations in the Complaint |
| 7. Campos de Moya | c/o Benjamin G. Chew, Esq. Patton Boggs, LLP 2550 M Street, N.W. Washington, DC  20037 (202) 457-6000 | Plaintiffs believe that Mr. de Moya may have information concerning many of the allegations in the Complaint, including the living conditions on bateyes on Vicini property, the means by which companies owned by the Vicinis employ workers in the Dominican Republic and the manner in which those employees are paid |
| 8. Rafael Derich | Dominican Republic, specific address to be provided | Reporter, has knowledge of Fr. Hartley's activities and why he left the Dominican Republic |
| 9. Abby Disney | U.S. Address and telephone number are known by Defendants | POS Co-Executive Producer, has knowledge of allegations in the Complaint |

| Name | Address and Telephone Number | Subjects of Information |
|------|------------------------------|------------------------|
| 10. Tim Disney | U.S. Address and telephone number are known by Defendants | POS Executive producer, has knowledge of the allegations in the Complaint |
| 11. Eric Grunebaum | U.S. Address and telephone number are known by Defendants | POS Co-Producer, has knowledge of allegations in the Complaint |
| 12. Milton Ray Guevarra | Dominican Republic, specific address to be provided | Labor Lawyer, former Secretary of Labor, Chief Negotiator of Labor, has knowledge of conditions on the bateyes |
| 13. William M. ("Bill") Haney, III | U.S. Address and telephone number are known by Defendants | Writer and Director of POS; Defendant, who has knowledge of the allegations in the Complaint and Defendants' alleged defenses |
| 14. Fr. Christopher Hartley | Address is most likely known by Defendants | Priest featured in POS, "The Sugar Babies," "Batey Zero" and "Big Sugar", has knowledge of the allegations in the Complaint |
| 15. Ricardo Hernandez | Living in Santo Domingo, Dominican Republic specific address to be produced. | Fr. Hartley states in the film that he is the one responsible for the entire sugar business, from the bateyes to the sugar mills, should have knowledge of the allegations in the Complaint |
| 16. Lori Joyal | U.S. Address and telephone number are known by Defendants | POS Finance Manager, has knowledge of the allegations in the Complaint |
| 17. Kees Kasander | U.S. Address and telephone number are known by Defendants | POS Co-Executive Producer, has knowledge of the allegations in the Complaint |
| 18. Marie Langlois | U.S. Address and telephone number are known by Defendants | POS Co-Executive Producer, has knowledge of the allegations in the Complaint |
| 19. Noemi Mendez | Address is most likely known by Defendants | Human Rights lawyer in the DR, featured in POS and "The Sugar Babies", has knowledge of the allegations in the Complaint |

| Name | Address and Telephone Number | Subjects of Information |
|---|---|---|
| 20. Paul Newman | U.S. Address and telephone number are known by Defendants | POS Narrator, should have knowledge of the allegations in the Complaint |
| 21. Monsigniour Francisco Osorio | Dominican Republic, specific address to be provided | Bishop of San Pedro de Macorís, has knowledge of Fr. Hartley's activities and why Fr. Hartley left the Dominican Republic |
| 22. Richard Perez | Dominican Republic, specific address to be provided | Head of Agriculture of CAEI, has knowledge of conditions and practices on bateyes associated with the Vicinis |
| 23. Peter Rhodes | U.S. Address and telephone number are known by Defendants | POS Writer, Editor, has knowledge of the allegations in the Complaint |
| 24. Jerry Risius | U.S. Address and telephone number are known by Defendants | POS Cinematographer, has knowledge of the allegations in the Complaint |
| 25. Louise Rosen | Address and telephone number are known by Defendants | PR person for Haney and Uncommon Productions, has knowledge of the allegations in the Complaint |
| 26. Amy Serrano | Siren Studios, P.O. Box 51355, New Orleans, LA 70113  (504) 483-7935 | Writer/Director "The Sugar Babies", has knowledge of the allegations in the Complaint |
| 27. Ing. Merejildo Sosa Bonilla | Sindico Municipal Ayuntamiento de San Jose de los Llanos Provincia de San Pedro de Macorís Dominica Republic | Mayor of llos Llanos, has knowledge of the ownership of properties shown in the film |
| 28. Felipe Vicini Lluberes | c/o Benjamin G. Chew, Esq. Patton Boggs, LLP 2550 M Street, N.W. Washington, DC  20037 (202) 457-6000 | Mr. Vicini is a Plaintiff in this action and has information concerning all of the allegations in the Complaint |

| Name | Address and Telephone Number | Subjects of Information |
|------|------------------------------|------------------------|
| 29.  Juan Vicini Lluberes | c/o Benjamin G. Chew, Esq. Patton Boggs, LLP 2550 M Street, N.W. Washington, DC  20037 (202) 457-6000 | Mr. Vicini is a Plaintiff in this action and has information concerning all the allegations in the Complaint |

**B.    Fed. R. Civ. P. 26(a)(1)(B):  Documents Which May Support Claims**

The Vicinis also identify the following documents or tangible things that they may use to

support their claims in this action:

|     | Date: | Description |
|-----|-------|-------------|
| 1.  | 11/-/06 | Film entitled *The Price of Sugar* ("POS") |
| 2.  | 11/-/06 | Contents of the website located at www.thepriceofsugar.com. |
| 3.  | 11/-/06 | Contents of the website located at www.myspace.com. |
| 4.  |       | USCCB review of the POS. |
| 5.  | 12/21/06 | Circular #012-06 from the Office of the Bishop of San Pedro de Macorís (Original Spanish and English translation) |
| 6.  | 10/-/07 | Frederic and Mary Ann Brussat review of the POS. |
| 7.  | 10/-/07 | Chad Greene review of the POS. |
| 8.  | 10/4/07 | Maria Garcia review of the POS. |
| 9.  | 10/4/07 | Transcript of NPR article entitled "Family Accuses 'Sugar' Filmmakers of Defamation." |
| 10. | 2/21/07 | Seton Hall Law announcement of screening for the POS. |
| 11. | 5/07/07 | Cease and Desist letter sent to Bill Haney and Uncommon Productions. |
| 12. | 5/17/07 | Letter from Gang, Tyre, Ramer & Brown, Inc. responding to Cease and Desist Letter |
| 13. | 6/12/07 | Letter from Levine, Sullivan, Koch & Schulz, L.L.P., responding to Cease and Desist Letter |
| 14. | 6/18/07 | Michael Deibert review of the POS |
| 15. | 6/18/07 | Don Aucoin interview with Bill Haney |

|     | Date: | Description |
|-----|-------|-------------|
| 16. | 6/18/07 | *Boston Globe* Interview with Bill Haney |
| 17. | 7/19/07 | Article from *La República*, "Cardinal Rejects the Campaigns Being Launched to Discredit the Dominican Republic" |
| 18. | 8/-/07 | Flyer for showing of POS at the Four Corners Arts Center in Tiverton Four Corners, RI |
| 19. | 8/13/07 | Complaint, including Exhibit A (Factual Analysis of *The Price of Sugar*) |
| 20. | 8/23/07 | Stephen Farber review of the POS. |
| 21. | 8/24/07 | IDA interview with Bill Haney. |
| 22. | 8/9/07 | Peter Brunette review of the POS. |
| 23. | 9/11/07 | Nick Schager review of the POS. |
| 24. | 9/12/07 | Haitian Entertainment News article announcing opening of the POS in New York and Los Angeles. |
| 25. | 9/13/07 | Brandon Judell review of the POS. |
| 26. | 9/13/07 | General Consulate of the Dominican Republic press release. |
| 27. | 9/15/07 | Harvey Karten review of the POS. |
| 28. | 9/17/07 | Jay Seaver review of the POS. |
| 29. | 9/20/07 | Answer of Defendants Uncommon Productions, LLC and William Haney, III |
| 30. | 9/2007 | Jim Hemphill review of the POS. |
| 31. | 9/2007 | Darrel Manson review of the POS. |
| 32. | 9/25/07 | Prarie Miller review of the POS. |
| 33. | 9/26/07 | Mark Pattison review of the POS. |
| 34. | 9/26/07 | John Mulderig review of the POS. |
| 35. | 9/27/07 | Andrew O'Hehir review of the POS. |
| 36. | 9/28/07 | Stephen Holden review of the POS. |
| 37. | 9/28/07 | Meghan Keane review of the POS. |
| 38. | 9/30/07 | Bill Long review of the POS. |

|     | Date:      | Description                                                                                          |
| --- | ---------- | ---------------------------------------------------------------------------------------------------- |
| 39. | 10/4/2007  | Transcript of Barbara Bradley Haggerty article on the POS.                                            |
| 40. | 10/13/07   | Le Monde du Sud/Elsie News republication of the Barbara Bradley Haggerty article.                    |
| 41. | 10/18/07   | Article entitled "'Price of Sugar' documentary exposes dark side of globalization."                  |
| 42. | 10/18/07   | Review from the LA City Beat Review                                                                   |
| 43. | 10/18/07   | Interview of Bill Haney in *The Daily Trojan*                                                         |

**C.      Fed. R. Civ. P. 26(a)(1)(C):  Computation of Damages**

Not applicable to the Vicini Plaintiffs as the Complaint seeks injunctive and

declaratory relief and damages in excess of $75,000 to be proven at trial for damages only to their

personal reputations for claims of defamation *per se*.

**D.      Fed. R. Civ. P. 26(a)(1)(D):  Relevant Insurance Agreements**

Not applicable to the Vicinis (as Plaintiffs).

Respectfully Submitted,


/s/ Benjamin G. Chew
Read K. McCaffrey
Stephen Diaz Gavin
Benjamin G. Chew
PATTON BOGGS LLP
2550 M St, N.W.
Washington, DC 20037
Telephone:  (202) 457-6015
Facsimile:  (202) 457-6315
e-mail:  rmccaffrey@pattonboggs.com

Jessica Block
BLOCK & ROOS LLP
60 State Street
Suite 3800
Boston, MA 02109
617-223-1900
Fax: 617-227-1948
Email: block@blockroos.com

Counsel for Plaintiffs
Felipe Vicini Lluberes
and Juan Vicini Lluberes

Dated: October 19, 2007

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this document filed through the ECI system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated  as non-registered participants on October 19, 2007.


/s/ Benjamin G. Chew

4914852

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FELIPE VICINI LLUBERES and<br>JUAN VICINI LLUBERES,<br><br>        Plaintiffs,<br><br>vs.<br><br>UNCOMMON PRODUCTIONS, LLC,<br>and WILLIAM M. HANEY, III,<br><br>        Defendants. | Civil Action No. 07-11623 (DPW) |

## DEFENDANTS' INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Defendants Uncommon Productions, LLC and William M. Haney, III ("Defendants") provide to Plaintiffs Felipe Vicini Lluberes and Juan Vicini Lluberes ("Plaintiffs") their initial disclosures.

Defendants make these disclosures without waiving and expressly preserving (a) any objections as to competency, relevancy, materiality, privilege and admissibility of any of the information or documents provided; and (b) the right to object to discovery requests involving or relating to the subject matter of the disclosures made herein and the documents provided herein.

As used herein, the "Film" refers to the documentary produced by Uncommon Productions entitled *The Price of Sugar*.

I.     **Individuals Likely to Have Discoverable Information that Defendants May Use to Support Their Defenses**

Defendants' identification of individuals who are likely to have discoverable information is continuing, and Defendants reserve the right to supplement this disclosure. Notwithstanding the foregoing, the following individuals may have discoverable information regarding (a) the researching, filming, and production of the Film; (b) the public figure status of Plaintiffs; and/or (c) the substantial truth of the allegedly defamatory statements in the Film concerning Plaintiffs:

1.     William M. Haney, III, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050 Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to all topics).

2.     Eric Grunebaum, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050 Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to all topics).

3.     Eric Cochran, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050 Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to (a) and (c)).

4.     Jerry Risius, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050 Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to (a) and (c)).

5.     Debra Longo, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050 Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to all topics).

6.     Diana Trudell, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050 Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to all topics).

7.     Adam Moyer, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050 Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to (a) and (c)).

8.    Peter Rhodes, c/o Levine Sullivan Koch & Schulz, L.L.P., 1050 Seventeenth Street, N.W., Suite 800, Washington, D.C. 20036 (as to (a)).

9.    Father Christopher Hartley, Ethiopia (as to all topics).

10.    Yela Machasa, Dominican Republic (as to (a) and (c)).

11.    Jhonny Belizaire, Dominican Republic (as to (a) and (c)).

12.    Noemi Mendez, Dominican Republic (as to all topics).

13.    Flor Angel Polanco, Dominican Republic (as to all topics).

14.    Father Pedro Ruquoy, Zambia (as to all topics).

15.    Sergio Roitberg, Newlink, Miami, Florida (as to (b) and (c)).

16.    Campos de Moya, Grupo Vicini, Dominican Republic (as to (b) and (c)).

17.    Fernandez Mario Rivadulla, Grupo Vi cini, Dominican Republic (as to (b) and (c)).

18.    Ricardo Hernandez, Grupo Vicini, Dominican Republic (as to (b) and (c)).

19.    Carmen Ogando, Grupo Vicini, Dominican Republic (as to (b) and (c)).

20.    "Merité," Grupo Vicini, Dominican Republic (as to (c)).

21.    Amelia Vicini, c/o Town & Country Magazine, 300 West 57th Street, New York, New York 10019-3794 (as to (b) and (c)).

22.    Felipe Vicini Lluberes (as to all topics).

23.    Juan Vicini Lluberes (as to all topics).

## II.    **Documents**

Defendants' review of their files is continuing and they reserve the right to supplement the categories of documents identified herein. Notwithstanding the

foregoing, Defendants may use various documents, information and tangible things that fall within the following categories, that are in their possession, custody or control, to support their defenses: film footage and still photographs shot by Defendants and their agents, including the Film and excerpts of outtake footage; excerpts of film footage obtained by Defendants in connection with the production of the Film; original documents from the Dominican Republic related to the conditions of the Haitian cane cutters and related matters obtained by Defendants in connection with the production of the Film; news articles and transcripts, websites, academic papers, books, U.S. government, international, and non-governmental organization reports, correspondence, notes, and similar materials obtained and reviewed by Defendants in connection with the production of the Film; still photos obtained by Defendants in connection with the production of the Film; Newlink materials accessed on the internet; and similar materials obtained by Defendants since the production of the Film relating to Plaintiffs and to the substantial truth of the statements in the Film being challenged by Plaintiffs.

Defendants' documents, information and tangible things are located in their Massachusetts offices and the post-production facility in New York City.

## III.    **Damages**

Inapplicable.

## IV.    **Insurance Information**

A copy of Defendants' insurance policy is provided herewith.

Respectfully submitted,

*Of Counsel*

BINGHAM MCCUTCHEN LLP

Elizabeth C. Koch (*pro hac vice*)
Thomas Curley (*pro hac vice*)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1050 Seventeenth Street, N.W., Suite 800
Washington, DC 20036
Telephone:    (202) 508-1100
Facsimile:     (202) 861-9888

By:  _____/s/_____
     Jonathan M. Albano BBO #013850
     Lisa E. Kirby BBO #667802
150 Federal Street
Boston, MA 02110
Telephone:    (617) 951-8000
Facsimile:     (617) 951-8736

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Defendants'

Initial Disclosures were served via email to Jessica Block, block@blockroos.com and

Benjamin Chew, bchew@PattonBoggs.com, this 8th day of November, 2007.

_/s/_
Elizabeth C. Koch

# Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**FELIPE VICINI LLUBERES and**
**JUAN VICINI LLUBERES,**

**Plaintiffs,**

vs.

**CASE NO.  07 CA 11623 DPW**

**UNCOMMON PRODUCTIONS, LLC**
**and WILLIAM HANEY III,**

**Defendants.**

## DEFENDANT UNCOMMON PRODUCTIONS, LLC RESPONSES TO PLAINTIFF FELIPE VICINI LLUBERE'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Uncommon Productions, LLC ("defendant") hereby responds to Plaintiff Felipe Vicini Llubere's First Set of Interrogatories (the "Interrogatories").

## GENERAL OBJECTIONS

Defendant responds to the Interrogatories subject to the objections set forth herein, each of which is incorporated into each response, without waiving and expressly preserving (a) any objections as to competency, relevancy, materiality, privilege, and admissibility of any of the responses; and (b) the right to object to other discovery procedures involving and relating to the subject matter of interrogatories responded to herein.

1.      Defendant objects to the Interrogatories to the extent that they seek discovery of work product or information or communications protected from discovery

by privilege, including, but not limited to, (a) the attorney work product privilege; (b) the attorney-client privilege; (c) the newsperson's privilege, (d) the privilege under the First and Fourteenth Amendments to the Constitution of the United States; and/or (e) any other applicable privilege.

2.    In some instances, defendant may provide information that is not specifically called for by any of plaintiff's Interrogatories or that is subject to one or more of the objections stated herein.  By providing such information, defendant does not agree to provide any other information that is not called for by any Interrogatory or that is privileged or is subject to some other objection.

3.    Defendant objects to the Interrogatories to the extent they are overly broad, unduly burdensome, vague and/or ambiguous, or to the extent that they seek information which is unrelated to matters at issue in this action and is not reasonably calculated to lead to the discovery of admissible evidence.

4.    Defendant objects to the Interrogatories to the extent that they seek or purport to impose on it obligations other than those prescribed by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Massachusetts, and defendant responds to the Interrogatories in accordance with those Rules.

5.    Defendant reserves the right to amend and/or supplement these responses.

2

| Boalt Hall/Ctr for Latin Amer. Studies | Berkeley | 10/30 |
| Kendall Square | Cambridge, MA | 10/30 |
| Lumiere | San Francisco | 11/2 - 11/8 |
| Shattuck | Berkeley | 11/2 - 11/8 |
| Harvard Kennedy School of Government | Cambridge, MA | 11/8 |
| Kendall Square | Cambridge, MA | 11/9 – 11/15 |
| E Street | Washington, DC | 11/9 |
| Rayburn Bldg - Human Rights Caucus | Washington, DC | 11/14 |
| E Street | Washington, DC | 11/16 – 11/22 |
| United Nations - Aux Antilles Club | New York, NY | 11/20 |
| IDFA | Amsterdam | 11/22 - 12/2 |
| Gene Siskel Center | Chicago, IL | 1/4 – 1/12 (2008) |
| Starz | Denver | 1/11 – 1/17 (2008) |
| Salem Cinema | Salem, OR | 9/21 - 10/2 |
| Behind the Mall | Hot Springs, AK | 9/24 – 29 |
| Galaxy | Cary, NC | 9/28 - 11/4 |
| Regal Arbor | Austin, TX | 10/7 – 9 |
| Hollywood | Portland, OR | 10/8 – 18 |
| Bonita Springs Stadium | Bonita Springs, FL | 10/9 – 11 |
| Westwood 8 | Omaha, NB | 10/12 – 18 |
| Flagship Cinema | Auburn, ME | 10/12 - 11/1 |
| Reel Art Ways | Hartford, CT | 10/19 – 28 |
| Cedar Lee | Cleveland, OH | 10/26 - 11/1 |
| Celebration Cinema | Grand Rapids, MI | 10/26 - 11/1 |
| Putnam Scr. Rm. | Keene, NH | 11/2 – 11 |
| Sundance | Madison, WI | 11/2 – 8 |
| Tower | Salt Lake City, UT | 11/2 – 8 |

**Interrogatory No. 2:**        Please state all of the facts supporting the following statement, which begins approximately at 6:07 (Exhibit 1, p. 5:17-19) in *The Price of Sugar*:

> 17    NARRATOR:  The Haitian workers are
> 18    under armed guard.  They are not allowed to
> 19    leave the plantations.

**RESPONSE:**

**A) The film includes two photographs of Vicini employees with rifles wearing the ICC logo hat (Ingenio Cristóbal Colón) at 18:24 and 18:37. Two additional photographs not included in the film also picture Vicini employees (as identified by the ICC hat) carrying rifles.**

**B) Later in the film, it is reported that the guards are no longer carrying guns.  However, the guards continued to be armed with machetes.**

4

**C) Videotaped interviews describe guards carrying guns and bateyes guards using violence against the workers, and workers being stopped from leaving the bateyes.**

> Father Christopher Hartley (Tape U027):

"This is 26 miles from where I live, and it's still in my parish. So it gives you an idea. I have about 1,000 square kilometers to take care of, and this means about 60 bateyes, all scattered in the sugar cane fields of which over 50% are of Haitian origin. They live in a situation of slavery, really. They don't even realize that they're not allowed to leave the bateyes, they're guarded by armed men. They're brought from the border with the complicity of the army and the police.

"And the only valid reason they can find at this moment is that somebody, an institution which is powerful, such as the Church in this country, is beside them, is next to them. They don't expect me to liberate them from their misery in 24 hours. But at least they know that something is happening, that something is changing, that they're not on their own. And because the law doesn't operate, or the police has no access, so the only system is a system of repression, which the company itself exercises through armed men, who keep law and order within the batey."

> Father Christopher Hartley (Tape U136):

"So they have a very hostile relationship toward the batey. That's why they don't to ...(inaudible). No. No. Themselves. The Haitians dwelling in the bateyes, they have a very hostile relationship to the place, toward the place they dwell because they don't own it. It's where they have to be. It's really like a zoo. That's where the animal is. They feed it. But the animal doesn't own the cage. You are just there. They feed you. They take care of you but you don't own it and you can't leave from there. You are supposed to remain within the confines of the sugar cane fields. The minute they leave, they become illegal and the immigration department just sends you to the border."

> Father Christopher Hartley (Tape U140):

"But at the same time, they are not allowed, even by the government authorities to leave the enclosure of the sugar cane fields or the batey because they immediately become illegal and they are deported across the border, which means splitting, breaking up the families."

> Father Christopher (Tape U122):

"Merité has done exactly the same thing this year. He's becoming a very, very wealthy man. The Vicini family — Because he's the one responsible, for example, for the Haitians not leaving the bateyes. He beats the hell out of them. He locks them up in a shed and hits them with a flat machete. Or he conceals their little backpack, so their

5

meager possessions are taken away from them.  This was a very common practice. Basically, it's industrial kidnapping."

> Father Christopher (Tape U204):

"That's why you have Merité, who is the head of the buscones, who would lock them up in the barn where they keep the fertilizer, lock them up and beat the hell out of them with a machete, with a flat machete.  Slap them, or they would actually put them in prison because the sugar mill had its own prison.  I mean the prison is a room, have a room, lock somebody up for two or three days, exercising the same authority of the national police or of a prosecutor or of a judge."

> Jhonny Belizaire, resident of Vicini batey Santa Lucia (Tape U115):

"In the last few months some Haitians arrived... and they were asking me why life was so bad here and I was explaining the conditions here.  So, they told me that they wanted to leave.  And since I know that when they bring you from the border, they stop you from leaving, I told them that they couldn't go and I told them that it was better for them to try to escape at night so they wouldn't get in trouble.  I spoke to them and they agreed.  So that night, he came looking for me, at around 8' o'clock and he told me: "Jhonny, I am leaving" and I said: "Take care".
And so when I went outside to say goodbye, I saw two men with a pair of very well sharpened "machetes".  They were the same men that had recruited them at the border. And I told them:  "why are you going around with the "machetes?" and they told me that the man that was leaving, that they were looking for him, that they were looking for him so he wouldn't leave and that I was also part of the fact that the man was going to leave and that they were going to kill me... to assassinate me.  And I asked him: "Well, if you kill me, you know that you are going to get caught?" They said: No, that they were not afraid, they were not afraid because they are employees of the company and that the company was going to protect them and that if they were put in jail, the company was going to take them out.  And I got scared because they had the intentions of killing me."
*["Entonces en los meses pasados, hay unos cuantos Haitianos que vinieron para acá y que... y ellos me preguntaban a mí por qué aquí se vive tan mal y yo les estaba explicando las condiciones de vida que hay aquí. Entonces ellos me dijeron: "Bueno, no, no me voy a quedar". Y cómo yo se que aquí el que, cuando los traen de la frontera para acá les impiden salir, le dije que no podían irse, que él no podía irse y le dije que era preferible el irse de noche, para que en el día se evitara un problema. Entonces yo hablé con el y el me dijo que sí. Entonces a la noche, el se iba y me vino a llamar, como a las ocho de la noche y me dijo: "Jhonny, me voy a ir" y le dije yo, "bueno, cuídate". Y entonces cuando salí para afuera a despedirme, vi a dos hombres con unos machetes bien afilados. Eran los mismos capataces que lo habían reclutado de la frontera para acá. Y les dije, y les dije:"por qué andan con los machetes?" y ellos me dijeron a mi que al hombre que se iba, que ellos lo estaban acechando, acechándolo, que estaban acechándolo para que el no se fuera y que también yo formaba parte de que el hombre se iba a ir y que ellos me iban a matar... a asesinar. Y yo le pregunté: "Bueno, si ustedes*

6

*me matan, ustedes saben que ustedes van a caer presos?" Ellos me dijeron que no, que ellos no tenían miedo, no tenían miedo porque ellos son trabajadores de la compañía y que la compañía los iba a proteger y que si los metían presos, la compañía los iba a sacar. Y yo me, cogi miedo porque tenía miedo porque ellos tenían las intenciones de matarme."]*

> Jhonny Belizaire, resident of Vicini batey Santa Lucia (Tape U137):

"Well, one Sunday at noon, I was sitting in the batey after I had returned from work and immediately a truck appeared and Alex told me that the Father had asked him to tell me to wait for him at Batey Contador. So I got ready and left for Contador. So, when I arrived I found a "trip" of Haitians; that means that they had been brought through the frontier and in that trip there were two students that left Haiti, but that their parents lived here, resided here and they sent them the money so that they could come legally. So the "buscones" told them that they had the possibility of bringing them without spending that much money to get a visa in their passport and that with only paying a "buscon" five thousand pesos he would bring them over here without any kind of problem for them, so that later, they would take them to Casa de Campo, where their parents work. And well, they decided to come with him, but they explained to me... when I got there, in the dialogue that I was having with them, they told me that when they were in the frontier, where they had them, they, since apparently you could tell by their appearance that they were not cane cutters, they came from Port au Prince. So the "buscon" told them to dirty their clothes so that when the people came to bring them to the Dominican Republic they would think that they were cane cutters, because physically the cane cutters, you can see it in their outfits, physically you can tell that they work in the cane fields and that they are not people that are used to another kind of work."

*["Pues, un domingo al medio día estaba yo sentado en el batey que había yo regresado del trabajo entonces apareció inmediatamente una camioneta y me dijo Ale que el Padre, me mandó a decir que lo esperara en el batey Contador. Entonces me, me alisté y arranqué para Contador. Entonces cuando yo llegué encontré a un viaje de Haitianos, es decir que los habían traído por la frontera y en ese viaje andaban dos estudiantes que salieron de Haiti, pero que sus papas vivían aquí, residían aquí y les mandaron el dinero para que ellos vinieran legalmente. Entonces los buscones les dijeron a ellos que ellos tenían la facilidad de traerlos sin que ellos gastaran tanto dinero para visar un pasaporte y que ellos con tan sólo pagarle a un buscón, eh, cinco mil pesos el los traía para acá sin ningún tipo de problema para ellos, para luego, luego llevarlos a Casa de Campo donde trabajan sus padres. Y ellos bien, decidieron venir con el, pero ellos me expli... cuando yo llegué, en el diálogo que tenía con ellos, ellos me dijeron que cuando estaban, eh, en la frontera, donde los tenían, ellos, como aparentemente eran personas que se les veía en el físico que no eran gente que picaban cana, porque eran gente fina que sabía, que venían de Puerto Príncipe. Entonces el buscón les dijo que, que se ensuciaran la ropa para cuando la gente vinieran a... a reclutarlos para traerlos a República Dominicana vieran que son gente que pican caña, que son cortadores de caña porque físicamente a los cortadores de caña se les ve la facha; es decir se les ve en lo físico que son gente que, que trabaja en la caña y que no son gente que tenga acost... acostumbrados a otro tipo de trabajo."]*

7

"So they were not in agreement to stay, but they couldn't leave because at night, the guard went to the house where they were sleeping and he was putting pressure on them with a shotgun, that they could not leave because some had already escaped during the night. So, the next day when I arrived they had given them a mattress and a "machete" to go cut cane. And since they were, they didn't know how to do that kind of work they said: "No". So they said to them: "Okay, if you don't want to work, you are going to have to be forced to work because you are not leaving from here.""

*["Entonces ellos no estaban de acuerdo en quedarse, pero que ellos no podían irse porque en la noche, el Campestre fue a la casa a donde estaban durmiendo y los estaba presionando con una escopeta, que ellos no se podían ir porque habían unos cuantos que se habían escapado en la noche. Entonces al otro día cuando yo, eh, cuando yo llegué les dieron un colchón y un machete para que fueran a picar caña. Y ellos como no estaban, no sabían, eh hacer ese tipo de trabajo dijeron que no. Entonces ellos dijeron "bueno, si ustedes no quieren trabajar, van a tener que trabajar obligados porque de aquí no se van.""]*

> Yancro Belizaire, Jhonny Belizaire's Father, resident of Vicini batey Santa Lucia (Tape U115):

"Around here, we didn't know anything. The guard would hit us, but not anymore, now they can't, now they can only look at you like this, they are afraid of us. But before, uh! You would wake up and you couldn't cut cane. They would say: "Go!" But not now, thanks to Christopher, not now."

*["Nosotros estaba aquí, ahí... no sabía nada. Aquí Campestre golpeaba a uno, pero ahora no, ahora no se puede, ahora no más me tienen que mirar así, ellos tienen miedo a nosotros. Pero a de antes, uh! Cuando tu levantas, tu no podías picar caña, que váyase! Ahora no, gracias a Christopher, ahora no."]*

> Yela Machasa, resident of Vicini batey Canepa (Tape U179):

"Well, in the past, there used to be a lot of violence in the bateyes. The workers were treated badly. When the workers came from Haiti, they would take their clothes, they would beat them, they would treat them badly and so, you would feel very bad about that, you didn't know who to go to. And one day, there were three sick men that couldn't work. They were going to leave. Well, there is one from the Company, a guard of the Company called Merité. He found the two of them and asks them: "Where are you going?" And they said: "Well, we are sick and we don't have family here. We feel bad, we cannot work, we leave." And he takes them as prisoners in a truck and when he arrives to the office in the batey, to the office, he took out the machete, he beat him to the ground, he hit him twice the... the two of them."

*["Bueno, antes había mucha violencia en los bateyes. Los maltrata a los trabajadores mucho, se quita, cuando los trabajadores vino de Haiti, les quita la ropa, les dá golpes, los maltrata y bueno, uno se sentía mala con eso, no sabían de quién que uno va ahí y bueno. Y un día había tres que estaban enfermos y que no podían trabajar. Se iban. Bueno, hay uno de la Compañía, un, un Campestre de la Compañía que se llama Merite.*

8

*Le encuentra con los dos y les pregunta: "Pa' donde van" y ellos dijo: "Bueno, nosotros está enfermo y no tenía familia aquí. Nosotros se sentía mala, nosotros no puede trabajar, me voy" y lo agarra preso en una camioneta y cuando el llega allá en el batey, el mismo oficina, el jalo machete, el lo cae a planazos, le dan dos planazos a... a los dos."]*

> Guillermo, cane cutter (Tape U128):

Interviewer: Guillermo tell me, the people that work with you, the other cutters that come to cut cane for this company, they also have a bit of fear towards the bosses, the administrator, the field chief?
*[Guillermo dime, los compañeros tuyos, los otros picadores que vienen a picar caña a esta compañía, ellos también le tienen un chin de miedo a los jefes, al administrador, al jefe de campo?]*

Guillermo: There are many there that are scared because when they came here... What happens is that the immigrants, they take their bags away from them.
*[Si es que es muchos allá que tienen miedo, porque tienen miedo, porque, porque ellos antes cuando vinieron... Es que los migrantes. Es que se la cogen, es que el bulto, es que, es que se lo han guardado a ellos.]*

Interviewer: They would take their bag and they would keep it.
*[Les quitaban el bulto y se los guardaban.]*

Guillermo: They would keep it.
[Se los guardaban ellos.]

Interviewer: Yes, and why did they do that? What for?
*[Sí, y por qué hacían eso, para qué?]*

Guillermo: So they don't leave.
*[Es que, es que para que no se vayan.]*

Interviewer: They would take their things?
*[Les quitaban sus cosas?]*

Guillermo: Yes.
*[Sí.]*

Interviewer: Do you know if they've ever hit a person?
*[Está bien. Tú sabes si alguna vez le han dado golpes a alguna persona?]*

Guillermo: Yes. They would hit them.
*[Sí. Es que le dan tres planazos por reparo.]*

Interviewer: They would hit them?

9

Guillermo: Yes.
[*Sí*]

Interviewer: And why is that, is that because they wanted to leave?

Guillermo: Yes, because they wanted to leave, yes.
*[Sí, porque se querían ir, sí.]*

Interviewer: Did you see that?
*[Eso lo viste tú?]*

Guillermo: I saw it myself. In front there.
*[Lo he visto yo mismo. En frente ahí.]*

Interviewer: When people come here, with the company to work in the cane, they are scared to leave, to leave the sugar mill?
*[Cuando la gente viene aquí, con la compañía a trabajar en la caña, tiene miedo de irse, de dejar el ingenio?]*

Guillermo: Yes they are scared because sometimes what happens is that the Vicinis go look for them, what happens is that the bosses... attack them, what happens is that to leave, sometimes they put guards at night so that you can't leave. They have to go there, even against their will. They are forced to go cut cane.
*[Sí, de antes tiene miedo porque a veces que, es que los Vicini mismos que los van mandar, es que los jefes, es que... es que de atacar, de ellos, es que pa' irse, a veces ellos ponen sirenos de noche que pa' que no se iba ir. Tiene que irse ahi, es que ellos obligatoriamente tienen que picar cana obligados.]*

> Bridget Wooding (Tape U207-208):

[Bio: Development consultant working in the Immigration and Human Rights arena. Currently a researcher based in the Dominican Republic at FLACSO, a Latin American think tank (Facultad Latinoamericana de Ciencias Sociales, www.flacso.org.do/). Formerly Advocacy Officer, Jesuit Refugee Service, Dominican Republic. Co-writer of "Needed but Unwanted: Haitian immigrants and their descendants in the Dominican Republic" for the Catholic Institute for International Relations, www.ciir.org.]

**Bridget: "So it gives kids a bad start in life, which may never be rectified. So that's one of the key differences that we find in the bateyes and also in terms of freedom of movement. It may often be difficult for people to move away, either through questions of indebtedness or through questions of not having really too much freedom of movement."**

> Sonia Pierre (Tapes U094 and U095):

10

[Bio: Dominican Born-Haitian Rights Activist awarded the 2006 Robert F. Kennedy Human Rights Award. Founder and Director of the Movement for Dominican Women of Haitian Descent (MUDHA), an organization that has worked with the Haitian communities in the bateyes for the last 20 years. Sonia was raised in a batey and has fought discrimination her entire life.]

Sonia: "He (Haitian worker) arrives in the community and he is prevented from leaving and exercising his right – the intrinsic right to free transit, to circulate and walk around. The owner of the plantation feels he is his owner. He can't negotiate a salary because it is already pre-established and anyway he doesn't have a way to complain or anyone to complain to."
["... Luego llega a la comunidad y es impedido de salir y ejercer un derecho tan intrínseco como es el derecho a circular a caminar. El dueño del ingenio se siente su dueño. No puede negociar un salario porque el salario está preestablecido y además no tiene forma ni donde quejarse."]


**D) Dominican and international media**

> Financial Times, "Haitians: Cane Cutters Seek Sweet Life," by Andy Webb-Vidal, March 9, 2006:
[Full text: http://www.ft.com/cms/s/1/57ea324c-aeb9-11da-b04a-
0000779e2340,dwp_uuid=b6627dbe-b023-11da-a142-0000779e2340.html]
"Haitian workers complain that the scales used to weigh the several tones of cane they cut every day are manipulated. 'I really don't think the scales work properly,' says Jeremi Dimach, 28 a cane cutter, as a menacing foreman, on horseback and with a pistol in his waistband, approaches from the corner of the plantation. The Vicini Group declined to comment on the labour conditions on its plantations."

> U.S. CNN. Special Edition of Anderson Cooper 360. "Invisible Chains: Sex, Works and Slavery". Reporter in the Dominican Republic: Joe Johns. Aired: January 24, 2007:
[Transcript: http://transcripts.cnn.com/TRANSCRIPTS/0702/16/acd.02.html]
[Reporting from the Vicini plantations in the Dominican Republic regarding the sugar industry.]

NARRATOR:
"It looks like a scene from slavery in the United States more than 140 years ago. The overseers on horseback, some are armed."

> "Caña y Sudor" ("Cane and Sweat"), a four-hour series on the Dominican's sugar industry produced and directed by Dominican journalist Huchi Lora for television, 2006:

Sandra Boné, identified as a teacher in Vicini owned batey Contador:
"When a person wants to leave, they take away their belongings, their clothes, everything, and put him in a house they have over there (she says as she points) in an office and they hit him. Last year there was a struggle with some people. They arrested a

man who was working here because he wanted to leave because he had been brought here without knowing what he was going to do for work. They took away his belongings and hit him because of that."

*["Cuando una persona se quiere marchar ellos le quitan los bultos, le quitan su ropa, todo, lo guardan en una casita que hay ahí, en la oficina y le dan golpes. El ultimo año que bregamos con unas personas se llevaron a un señor preso que estaba trabajando aquí porque el se quería marchar porque lo trajeron de allá sin el saber para que el venía a trabajar aquí. Y por eso a el le quitaron sus bultos y lo golpearon. Y lo llevaron preso para el ingenio."]*

Sandra: "The guard of this batey. His name is Merité."

Interviewer: "Merité? Is he Haitian as well?"

Sandra: "Yes, he is Haitian."

> Dominican television show "Nuria, Investigación Periodística" (Ch. 9, Color Visión). Reported by journalist Nuria Piera, July 16, 2005:

Nuria: "The life and the work conditions of the sugar cane workers are really pathetic in the sugar mills of the Vicini Group where they are subjected to a regime of terror, surrounded by armed men in the sugar fields."

*["Las condiciones de vida y trabajo de estos braceros es realmente patética en los ingenios de la Casa Vicini donde son sometidos a un régimen de terror rodeados en los campos de caña de hombres armados."]*

> El Nuevo Herald "Esclavos en el Paraíso" (Slaves in Paradise") [The Miami Herald's Spanish language newspaper]; Reported by Gerardo Reyes, January 9, 2005:

"During four days a journalist and a photographer of El Nuevo Herald went around the bitter corners of this area and interviewed dozens of workers of 10 bateyes of the Vicini company and two of Central Romana of the Fanjul family. The most common complaints are hunger, the bad treatment they receive from the company employees in the Vicini fields -- such as insults, beatings and clandestine imprisonments, the deficient and in most cases non-existant medical services, and the daily work exploitation in exchange for a sum of money that is rarely enough to eat once a day."

*["Durante cuatro días, un reportero y un fotógrafo de El Nuevo Herald recorrieron los rincones amargos de esta zona y entrevistaron a decenas de trabajadores en unos 10 bateyes del Consorcio Vicini y en dos del Central Romana, de la familia Fanjul. La denuncia común es el hambre, los malos tratos que reciben por parte de los capataces en los terrenos de los Vicini, desde insultos hasta golpizas y encarcelaciones clandestinas, los deficientes y en muchos casos inexistentes servicios médicos y la explotación inhumana de su trabajo a cambio de un estipendio que escasamente alcanza para comer una vez al día."]*

> Miami Herald, English-language follow-up to El Nuevo Herald's "Esclavos en el Paraíso" ("Slaves in Paradise"), reported by Gerardo Reyes, March 6, 2005:

12

[Full Text: http://www.moun.com/articles.asp?art=2085]
"Three workers disappeared after they were caught and beaten by Vicini complex employees when they were trying to escape in November of 2003, according to a complaint by the nonprofit Dominican Center for Advisory and Legal Investigations."

> Univision [U.S.-based Spanish language national TV broadcaster] "Azucar Amarga" ("Bitter Sugar") on February 21-23, 2005. Reported by Ricardo Arambari):

Ricardo speaking to a cane cutter:
So you feel the pressure, that you have to stay here to work?
*[O sea que sientes la presión de que te tienes que quedar aquí a trabajar?]*

Man: Yes.
*[Sí]*

Ricardo: You cannot escape?
*[No te puedes escapar?]*

Man: No.

Ricardo: If you want to go, for example, this night, go out to the road, you can't?
*[Si te quieres ir, por ejemplo, esta noche, salir por la carretera, no puedes?]*

Man: No.

Ricardo: No?
Man: No.

Ricardo: What do they do to you?
*[Qué te hacen?]*

Man: If they find you, they put you there, in a room there.
*[Es que lo meten a uno allí, en un cuarto allí.]*

Ricardo: They arrest you?
*[Te tienen preso?]*

Man: Yes.
*[Sí.]*

Ricardo: The people that employ them in these very bad conditions, in this case the Consortium Vicini, have a very simple answer."
*["Quines los emploeau en estas pesimas condiciones, en este caso el Corsorcio Vicini tien en una sencilla respuesta."*

> Spanish Newspaper El Mundo, "Un Cura en el Infierno" ("A Priest In Hell"), reported by

Ildefonso Olmedo. January 5, 2003.
"There are so many questions to ask, but no one dares to answer and interrupt the law of silence. Nobody has seen, nobody has heard anything. "Yes, Father, it was the Guarda-Campestre (guard) of Batey Contador. He chased them when they were trying to escape. He beat them up with the machete, in that barrack... It was probably five in the morning, it wasn't dawn yet. He says he cannot let them escape, that the bosses pay too much per head" finally someone gets over the fear and tells him what happened.
*["Después ya sólo caben las preguntas, pero nadie se atreve a romper la ley del silencio. Nadie ha visto, nadie ha oído. «Sí, padre, fue el guarda campestre del batey de Contador. Los cazó cuando intentaban huir. Les golpeó con el machete ahí, en ese barracón... Serían las cinco de la madrugada, aún no había amanecido. Dice que no les puede dejar escapar, que los jefes pagan demasiado por cada cabeza», confiesa finalmente un paisano que vence el miedo.]*

The Spanish Priest has been in his mission in the sugar cane fields of the Dominican Republic for five years and personally suffers the abuse over the Haitians, the slavery of the sugar cane. – Never serve someone who has served- says the Priest after learning that in that same morning the guarda campestre (the police in the villages where the workers are confined) had imprisoned and beat a group of cane cutters who, like himself, are Haitian. Hours later, the Priest repeated agrily to the administrator of the factory that owns all these fields: "Merite, the Campestre of Contador". He was asking for justice and the end of the bad treatments. In a corner of 'Don' Ricardo's office, the almighty boss that the Vicini Consortium has put in front of the sugar factory Cristóbal Colón..."
*[El sacerdote español lleva cinco años de misión entre los campos de caña de la República Dominicana y padece en carne propia los abusos sobre los haitianos, la esclavitud de la caña. «Nunca sirvas a quien sirvió», masculla el clérigo al saber que el guarda campestre (policía de las aldeas donde son recluidos los braceros) que esa mañana había apresado y apaleado a un grupo de cortadores era, como ellos, haitiano. «Meritè, el Campestre de Contador», repetía enrabietado horas después el padre ante el administrador del ingenio al que pertenecen todos aquellos campos. Exigía justicia y el fin del maltrato. A sus espaldas, en una esquina del despacho de don Ricardo, el todopoderoso jefe que el Consorcio Vicini ha puesto al frente de la factoría azucarera Cristóbal Colón y que ahora oía las quejas del padre...]*

## E) Reports from the U.S. Department of State and from NGOs

> U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 8, 2006.
[http://www.state.gov/g/drl/rls/hrrpt/2006/78889.htm]
"Although the law provides for these rights, and the government generally respected these provisions in practice, there were some exceptions. For example human rights groups alleged that many Haitians were not allowed to leave the sugarcane plantations where they worked. Local and international human rights groups charged that there was discrimination against Haitian migrants and that they were subject to arbitrary and unjustified action by the authorities."

14

> Report "Dominican Bateyes: A New Reality". February 28th, 2001. By Batey Relief Alliance. Victor Manuel Baez (Executive Director of the Dominican's State Sugar Council (CEA). In the 1st Conference of the BRA. United Nations, NY.
[BRA is a US based organization that works to help batey dwellers]

"These are some of the reasons why Haitian workers (contrary to the Dominican workers) are easy targets for those looking for cheap labor:
a) Haitians can be paid less than the Dominicans.
b) the procedures for over exploitation as well as the fraud with the weight of the sugar cane is better used with Haitians than with Dominicans;
c) have less pressure to offer a proper housing;
d) Haitians can only move around the area of the plantation that hired them.
e) The Companies don't have to reimburse the Haitians for the amounts they take for their social security, pension and others.
f) Haitians cannot organize themselves in Unions or use other mechanisms of representation.
g) Although Haitians were hired for many years through an arrangement between the two governments, they were treated as illegals, denying them the rights that an immigrant worker can claim in any other part of the world."

**F) Letter from the lawyers of CEDAIL (Centro Dominicano de Asesoría e Investigaciones Legales, an Organization of the Catholic Church that gives legal support and advice to the parishioners) to the Department of Immigration reporting the disappearance of three men on November 20, 2004 from a Vicini batey**

"Mister Garcia:
We would like to report the following information:
THAT it is of your knowledge that at the end of November the harvest starts in the sugar plantations of the country and with the beginning of that period comes the hiring of Haitian immigrant workers. This takes place under rough situations, without proper supervision by the authorities. This situation allows all kinds of bad treatments from the so-called "'buscones'".
*["Que como es de su conocimiento a finales de noviembre se inicia la temporada de cosecha o zafra en los centrales azucareros del país, con el inicio de esta temporada también se incia la contratación de trabajadores migrantes haitianos en condiciones duras, desprovistas de vigilancia y supervisión de las autoridades competentes, situación esta que permite todo tipo de maltratos y vejaciones por parte de los denominados "buscones".]*

"THAT starting November 20th the workers of the Cristobal Colon sugar mill, property of the Vicini family, started to arrive in San Pedro de Macoris. On the date 21st of November between 1 and 5 in the early morning they arrived at Batey Contador of the mentioned factory. According to the testimonies of some people in the area, a green vehicle (jeep) appeared intercepting 5 men who apparently, were trying to leave the batey. There were two people in the vehicle, one of them, identified as Captain Amarante, the man in charge

15

of security for the sugar mill; as well as the caretaker and the guard of the batey. They took with them 3 of the 5 men."

*["Que a partir del 20 de noviembre aproximadamente comenzaron a llegar los trabajadores al Ingenio Cristóbal Colón, propiedad de la familia Vicini en San Pedro de Macorís, en fecha 21 de noviembre entre las 4 y 5 de la madrugada, en el Batey Contador del referido ingenio. De acudo a declaraciones de los lugareños se presentó un vehículo de colo verde (jeep- jeepeta) interceptando a 5 hombres que aparentemente pretendían marcharse del Batey, en el vehículo referido habían 2 personas, uno de ellos identificado como el Encargado de Seguridad del ingenio Cap. Amarante, además del mayordomo y el guarda campestre del lugar, llevándose 3 de los 5 hombres."]*

"The witnesses of this incident also say, and we do not mention them in order to avoid retaliations from the Company, that these people were severly beaten.

These people were later taken to Batey Copellito and given to the Administrator Mr. Ricardo Hernández and from there, they were allegedly taken to the Ingenio Cristóbal Colón..."

*["Que de igual manera cuentan los testigos del hecho, los cuales no mencionamos para evitar represalias en su contra de parte del ingenio estas personas fueron duramente golpeadas. Que posteriormente estas personas fueron llevadas al Batey Copellito y entregadas al administrador Sr. Ricardo Hernández y de ahí supuestamente trasladadas al Ingenio Cristóbal Colón..."]*

"That thanks to the testimonies of their friends we know that the names of the missing men are Tusaint, Editon and Gebon, and their whereabouts are unknown."

*["Que por referencia de sus compañeros nos enteramos que los nombres de los desaparecidos son Tusaint, Editon y Gebon, y su destino o paradero es desconocido."]*

**Interrogatory No. 3:**        Please state all of the facts supporting the following statement, which begins approximately at 12:10 (Exhibit 1, pp. 10:10-14) in *The Price of Sugar*:

>     10     FATHER HARTLEY: Haitians are
>     11     recruited by what are called buscones, who
>     12     work for the companies, go across the border
>     13     into Haiti, and recruit approximately 30,000
>     14     men every harvest season.

**RESPONSE:**

**A) U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 6, 2007:**

[Full text: http://www.state.gov/g/drl/rls/hrrpt/2006/78889.htm]

"At year's end there were allegations that some employers, specifically the Vicini Corporation, had resumed the practice of importing undocumented workers for the sugar fields." (Section 5, Page 13)

### B) Interviews

> Group of young men, residents of San Jose de los Llanos, interviewed during a protest against Father Christopher (Tape U210):

Cameraman: Who brings the Haitians here?
*[Quién trae los Haitianos aquí?]*

Man #2: The Vicini.

Cameraman: But why do they do that?
*[Pero por qué hacen eso?]*

Man #2: They bring them to cut cane.
*[Para picar caña es que los traen.]*

Cameraman: Why, why do they bring the Haitians?
*[Por qué, por qué traen a los Haitianos?]*

Man #2:  Oh, listen, if they don't have Haitians here, then who is going to cut the cane?
*[Oh, oiga, si no tienen a los Haitianos aquí entonces quién va a picar la caña?]*

Bridget Wooding (bio above) describes how "buscones" recruit Haitians across the border for the sugar companies. (Tape U207-208):

Interviewer: "How does the Vicini company gets its workers in years past?  How do they get workers from Haiti, which is a ways away?  How do they get them to their plantation?  Can you tell me about how their operation seems to work?"

Bridget: "Up until the time of the fall of Baby Doc, say two decades ago in Haiti, there had been agreements between the two countries.  With the fall of Baby Doc, the dictator in Haiti, that fell into abeyance.  And so what's been happening now is that plantations like the Vicini or construction companies or agro-industrial employers have been often working out together with people on both sides of the border, together with scouts effectively, how to get the labor force for the harvesters as necessary.  And the problem is that this may often involve extortion, it may involve corruption, it may involve traveling by illegal means, all of which is detrimental to the people who are going to come and work.  They may never arrive at their destination, they may never be returned properly to Haiti, there may be shortfall in their wages because of the informality, the lack of regulation that has been particularly acute over the last two decades."

17

countries. Nowadays a significant number of Haitians cross the border with the Dominican Republic every day looking for better work and life conditions. This immigration pattern appears to have increased with the collapse of Haiti and the relative stability of the Dominican economy. According to a quote from the FIU research, estimates that haven't been confirmed say that approximately 15,000-20,000 temporary workers arrive and leave each harvest."
*["En el pasado se dieron contratos entre los países para contar con una mano de obra más controlada proveniente de Haití. Esta situación terminó por completo y hoy día el proceso de reclutamiento es más informal y no hay un acuerdo estatal de por medio. Actualmente un número muy grande de inmigrantes haitianos cruza la frontera de la República Dominicana cada día, en busca de oportunidades de trabajo y de vida. Este patrón de la migración parece haberse acelerado en los últimos tiempos con el derrumbamiento de Haití y la relativa estabilidad de la economía dominicana. Según una cita del estudio de FIU, existen cálculos no confirmados del gobierno dominicano que aproximadamente 15.000 a 20.000 zafreros temporales llegan y se van en cada zafra."]*

"The Vicini Group used around 12,000 Haitian temporary workers in the last harvest. The workers, although they are recruited and transported to the sugar mills by the owners, are rarely returned to the frontier at the end of the harvest and as we witnessed, they rarely leave the batey at the end of the season. They end up staying because they didn't save enough money to leave. This is the culture of the bateyes that exists today. The common threat to all of them is their illegal status in the country, which forces them to take any job offered. Many of them have done it for more than 20 or 30 years."
*["Los ingenios del Grupo utilizaron alrededor de 12,000 zafreros haitianos en la última zafra. Los braceros, pese a que son reclutados y transportados a los ingenios a costo del dueño rara vez son llevados a las fronteras y, como evidenciamos, casi nunca salen de las bateyes cuando termina la zafra algunos simplemente se quedan por que no pudieron ahorrar lo suficiente como para continuar. Ahí radica la raíz de la cultura bateyes existente hoy en día. El rasgo común a todos, sin embargo, es su estado indocumentado en el país, lo que los lleva a aceptar cualquier trabajo en las condiciones disponibles. Muchos de ellos lo han hecho por más de 20 o 30 años."]*

"According to Amy Wilentz (quote from the FIU Study) the harvest needs at least 20,000 immigrant workers each year. Other sources estimate that it needs close to 40,000 temporary workers. The industry creates around 40,000 direct jobs."
*["Según Amy Wilentz (cita estudio FIU) cada año la zafra requiere de por lo menos veinte mil trabajadores inmigrantes, otras fuentes calculan que se requieren cerca de cuarenta mil zafreros. La industria crea alrededor de 40 mil empleos directos."]*

**Interrogatory No. 4:**    Please state all the facts supporting the following statement, which begins approximately at 13:43 (Exhibit 1, pp. 11:16-20) in *The Price of Sugar*:

```
16          UNIDENTIFIED WOMAN (subtitled): And who pays
17   The Dominican soldiers at the border?
18          UNIDENTIFIED MAN [Dario] (subtitled): The
19   employees of the Company. The Vicini are the ones
20   who pay.
```

**RESPONSE:** *See* Responses to Interrogatory Nos. 3 and 5.


**A) Reports about the Dominican government's complicity in human trafficking**

> U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 6, 2007 http://www.state.gov/g/drl/rls/hrrpt/2006/78889.htm
"Nongovernmental organizations (NGOs) alleged corruption among the military and migration officials stationed at border posts and noted that these officials sometimes facilitated the illegal transit of Haitian workers into the country. In January authorities indicted seven military officials accused of accepting bribes to permit the entry of Haitians, 25 of whom died from asphyxiation while being smuggled in the back of a truck."


> "Historic Perspectives of the Dominican-Haitian relations. Experiences that can be applied to the present realities". Conference given by Bernardo Vega in New York. November 18th, 2005:
[Note: Bernardo Vega is a Dominican historian, economist and writer. He served as director of the newspaper El Caribe, Ambassador in Washington and Governor of the Central Bank of the Dominican Republic.]


"The American Marines left the Dominican Republic in 1924 and Haiti in 1934 and from that point on the hiring of Haitian labour was done by the new armies of the two countries with the same formula as the one the American Marines established: in direct colaboration with the owners of the sugar cane factories. This didn't change, not even after the killing of thousands of Haitians by the Dominican soldiers ordered by Trujillo in 1937.The dictator excluded the Haitians that lived in the bateyes from the genocide and only two months after it took place, the sugar mills started bringing Haitian workers through the frontier."
*["Los infantes de marina abandonaron a Santo Domingo en 1924 y a Haití en 1934 y desde esas fechas las contrataciones de mano de obra haitiana las efectuaban los representantes de los nuevos ejércitos de ambos países, junto con los dueños extranjeros de los ingenios y eso siguió aun después de la matanza de varios miles de haitianos por parte de soldados dominicanos ordenada por Trujillo a finales de 1937 y en la cual los civiles no participaron, ni la apoyaron. El dictador excluyó de ese genocidio a los haitianos ubicados en los bateyes de los ingenios y el reclutamiento desde Haití de braceros se reinició apenas dos meses después de la tragedia."]*


"In 1986, the first time in 80 years, both countries had democratic regimes. Shortly after that, the Haitian army disappeared eliminating one of the negotiators in the hiring of Haitian workers."
*["A partir de 1986, por primera vez en ochenta años, coexistieron regímenes democráticos en ambos lados de la isla. Poco después desapareció el ejército haitiano, lo que eliminó a uno de los interlocutores en la trata de la mano de obra."]*


"The dealing of Haitian workers 'braceros' became a private and informal business without any military control, which previously assured the return to Haiti of the inhabitants of the bateyes. The "buscones" on both sides are the ones who now promote the traffic and the Dominican army pretends like they don't see anything. It has become harder for the sugar industry to get the Haitians to cut cane when they can choose to go work in another place now that the pseudo-military 'guardacampestres' have lost their power to keep the workers in the bateyes."

27

*también los que vienen a pie cruzando montañas, pero que se sabe a donde van pues se trata de un negocio muy bien organizado."]*

**G) Additional reports from NGOs reference the fact that traditionally, the workers pay to be brought across the border:**

> Report "Strengthening Hope: Addressing Barriers to Basic Health and Education in Dominican Bateyes". By: Mara-Cecilia Ostfeld.
"Every year, operators of the sugar plantations cross the Haitian border, 'buy' low-wage workers, and put them to work harvesting sugar cane in the Dominican Republic."

> Report "Migration in the Caribbean: Haiti, the Dominican Republic and Beyond" 2003. By James Ferguson, Minority Rights Group International (MRG) [http://www.minorityrights.org/recent_pub_Detail.asp?ID=33]
"At the border point of Escondido he (Father Pedro Ruquoy) claimed to have seen temporary lodging facilities for Haitians, and said that 30,000 braceros had been smuggled into the Dominican Republic, earning the buscones RD $150 (US $10) per head. These claims were supported by the director of the Dominican Department of Migration, Danilo Díaz, who said in March 2000 that the border security forces had 'turned the trafficking of illegal Haitians into a lucrative business'. (www.dr1.com 03/31/00)."

**Interrogatory No. 7:**    Please state all of the facts supporting the following statement, which begins at 17:43 (Exhibit 1, pp. 15:19 – 16:10) in *The Price of Sugar*:

| | |
|---|---|
| 19 | FATHER HARTLEY:  This is where they're |
| 20 | going to put the workers when they arrive. |
| 21 | Anywhere from 60 to 100 people are going will |
| 22 | be crammed into this one barrack.  You can see |
| 0016 | |
| 1 | all this wiring up on the top which is to |
| 2 | prevent them from escaping at night and they |
| 3 | will have armed men at the door of the |
| 4 | barracks in the night so they don't attempt to |
| 5 | flee the barrack in the night. |
| 6 | The bateyes are like a state within a |
| 7 | state because the company there is the police, |
| 8 | is the government.  They exercise absolute |
| 9 | authority over the lives of those who dwell |
| 10 | there, which is quasi-slavery. |

**RESPONSE:**    *See* Response to Interrogatory No. 2.

**A) The poor housing conditions of the bateyes is reported in various government reports and the media:**

> U.S. Dept. of State Country Reports on Human Rights Practices; Dominican Republic. March 8, 2006.
[http://www.state.gov/g/drl/rls/hrrpt/2006/78889.htm]
"Housing in the *bateyes* was poor; many individuals slept in barracks on iron beds without mattresses or on dirt floors. Many families of 5 or more shared living quarters that measured as little as 10 by 9 feet. Bathroom facilities, where available, were generally unhygienic, and cooking facilities were usually improvised."

> "Needed But Unwanted: Haitian Immigrants and Their Descendants in the Dominican Republic". By: Bridget Wooding and Richard Moseley-Williams. 2004.
[http://www.ciir.org/shared_asp_files/uploadedfiles/%7B3106D504-A9F9-457C-AF18-A6FCD9A9AE62%7D_Needed_but_unwanted.pdf]
"The ingenios were required to provide health services and accommodations. In reality health care was rudimentary where it existed, and the barracks in the bateyes, often a long walk to the cane fields, were overcrowded and filthy, lacking water, sanitation, electric light, and cooking facilities. "

> Report written by Father Christopher and other local representatives of the Catholic Church for the visit of the Dominican President Hipólito Mejía to Spain in 2003.
"The conditions of life and work of the cane workers and specifically of the bateyes are extremely difficult. Many of the workers and their children sleep on the ground or on box springs. The housing in the bateyes is reduced to small barracks of 3x3 meters where 6 people sleep on bunkbeds, with no toilets, no ventilation, or a place to cook."
*["Las condiciones de vida y de trabajo de los trabajadores de la caña y de manera específica en los bateyes son extremadamente difíciles. La vivienda en los bateyes se reduce a pequeños barrancones formados por cubículos de 3x3 m, en los que se hacinan hasta 6 personas en "camarotes" (literas), sin letrinas, sin ventilación apropiada, ni un lugar para cocinar. "]*

> Report "Migration In The Caribbean:  Haiti, The Dominican Republic And Beyond" 2003. By James Ferguson, Minority Rights Group International (MRG)
[http://www.minorityrights.org/recent_pub_Detail.asp?ID=33]
"Few of the foreign tourists enjoying the US $250-a-day luxury of the Casa de Campo resort on the Dominican Republic's south coast will be aware of a different minority in the vicinity of their hotel complex. A few miles from the hotel stand some of the Dominican Republic's hundreds of bateyes, clusters of concrete barracks or wooden shacks, home to the country's poorest people: those who cut cane on its sugar plantations."

> Spanish Newspaper El Mundo, "Un Cura en el Infierno" ("A Priest In Hell"), by Ildefonso Olmedo. January 5, 2003.
"Just a few kilometers from the resorts of La Romana and Punta Cana, from the golf course "Diente de Perro" and from the mansions of Julio Iglesias and Óscar de la Renta, thousands of people live every harvest in disgusting barracks and tin houses without electricity, drinking water or toilet facilities; and many times, without a voice."

*["A pocos kilómetros de los centros hoteleros de La Romana y Punta Cana, del campo de golf Diente de Perro y de las mansiones de Julio Iglesias y Oscar de la Renta, miles de personas viven cada zafra en infectos barracones y cajas de hojalata sin luz, sin agua potable, sin letrinas las más de las veces, sin voz."]*

**B) U.S. Univision "Azucar Amarga" ("Bitter Sugar") on February 21-23, 2005. U.S. nationwide Latino TV network, reported by Ricardo Arambari.**

Ricardo: "This is where they sleep. Trapped in a barrack with barbed wires above their head."
*["Aquí es donde duermen. Atrapados en un barracón con alambre de púas sobre la cabeza."]*

**C) Power Point presentation entitled "Investigacion Vicini" located on the internet:**
[Note: This document is attributed to the Newlink PR company which was retained by the Vicinis.]

"ICC (Ingenio Cristobal Colon), 23 bateyes, CAEI 8 bateyes, Angelina 13 bateyes.
In each batey there are 6 kinds of housing: individual, duplex or collective. In some cases they are overcrowded."
*["ICC 23 bateyes, el CAEI 8 bateyes, Angelina 13 bateyes. En cada batey existen 6 tipos de vivienda que van individuales, dúplex, colectivas. En algunos casos hay hacinamiento."]*

**D) Reports, media and interview (from the year 1970 on) describe the conditions in the bateyes as being very much as they continue to be today.**

> U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 8, 2006.
[http://www.state.gov/g/drl/rls/hrrpt/2006/78889.htm]
"Although the law provides for these rights, and the government generally respected these provisions in practice, there were some exceptions. For example human rights groups alleged that many Haitians were not allowed to leave the sugarcane plantations where they worked. Local and international human rights groups charged that there was discrimination against Haitian migrants and that they were subject to arbitrary and unjustified action by the authorities.

Human rights NGOs, the Catholic Church, and activists described Haitian living conditions in *bateyes* as modern-day slavery. In most *bateyes*, medical assistance either was rudimentary or not readily available. Housing in the *bateyes* was poor; many individuals slept in barracks on iron beds without mattresses or on dirt floors. Many families of 5 or more shared living quarters that measured as little as 10 by 9 feet. Bathroom facilities, where available, were generally unhygienic, and cooking facilities were usually improvised. The availability of fresh food, including fruits and vegetables, was severely limited. Clean water was often unavailable."

> "The Cane of Uncle Tom" Magazine: Match Du Monde, France. March 10, 2006.

42

INTRODUCTION: "Near the Dominican Republic beaches that tourists of the whole world visit, Haitian workers survive living in horrifying ghettos, reduced to slavery by the big Dominican sugar companies. The hope for a better life has put them in the route to exile. The cruelty of their guards and the misery that reigns there makes these cane cutters prisoners for eternity."

*["A proximite des plages immacullees de la Republique dominicaine, si prisees par les tourists du monde entire, des travailleurs haitiens survivent dans des ghettos effroyablles, reduits en esclavage par les grandes companies sucrieres domincaines. L'espoir d'une vie meilleure les a mis sur les routes de l'exil. La cruaute des gardiens et la misere qui regne chez eux, en Haiti, font des ces coupeurs de canne des prisonniers a perpetuite."]*

> U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. February 28, 2005.
[http://www.state.gov/g/drl/rls/hrrpt/2005/61725.htm]
"In various sugarcane industry shantytowns, field guards reportedly kept workers' clothes and documents to prevent them from leaving until the end of the harvest. Employers also withheld wages to keep workers in the fields. Sugarcane workers were paid less, worked longer hours, and had fewer benefits than workers in other industries. One monitor in a batey reported that laborers worked 14-16 hours per day – a violation of the Labor Code. Many older sugarcane workers, who had lived in sugarcane shantytowns for 50 years and longer, had not received pensions for which deductions had been taken from their pay. Several NGOs asserted that the privatization of the sugarcane industry was the reason the government did not enforce protection laws for cane cutters' rights. The IOM estimated that approximately 650,000 Haitian immigrants--or 7.5 percent of the country's population--lived in shantytowns or sugarcane work camps known as "bateyes," which were harsh environments with limited or no electricity, usually no running water, and no adequate schooling."

> Testimony Videotaped by Univision for the TV Program "Azucar Amarga" ("Bitter Sugar") on February 21-23, 2005. Reported by Ricardo Arambari.
[Note: Interview with Franklin Almeyda, Secretary of Interior and Police of the Dominican Republic.]

Ricardo: "But when you talk about historical processes, there used to be contracts between the two countries, contracts..."
*["Pero cuando me habla de un proceso histórico, antes había acuerdos bilaterales, ha habido tratados..."]*

Franklin Almeyda: "What those contracts did was to legalize a behavior that is not human because that was a way to legalize a kind of slavery for the modern times. That is slavery."
*["Esos acuerdos bilaterales lo que hicieron fue este, legalizar un comportamiento inhumano porque era legalizar una forma de esclavitud en tiempos modernos, eso es esclavitud."]*

Interviewer: "That is slavery."
*[Eso es esclavitud.]*

Franklin Almeyda: "That is slavery, that's true."

43

Sonia: "In working in a batey? I would say that it is a kind of modern-day slavery... Later he (Haitian) arrives in the community and he is prevented from leaving and exercising his right – the intrinsic right to free transit, to circulate and walk around. The owner of the plantation feels he is his owner. He can't negotiate a salary because it is already pre-established and anyway he doesn't have a way to complain or anyone to complain to. Eh – the houses they live in are really not adequate to be inhabited by human beings. Just as the health conditions aren't – because there are no health conditions. So it is a life that – it is very close to what you could call slavery – very, very close."

> Gustavo Olivo Peña (Tape U187):
[Gustavo Olivo Peña is a Dominican political analyst and respected journalist. Editor and co-founder of the Dominican online leading newspaper "Clave Digital". He previously wrote for the magazines "Ahora" and "Rumbo" among others. He also co-hosts "Uno mas Uno" a morning TV show on TeleAntillas.]

Gustavo: "[The Vicini employees in their bateyes are] living in conditions that remind you of the barracks of the Medieval times, of slavery-like conditions. It's something unbelievable."
["Eh...viviendo en condiciones realmente que recuerdan las barracas de la edad media, de esclavistas, es una cosa increible."]

Fausto Rosario (Tape U187):
[Fausto Rosario is a recognized journalist, manager of the Dominican company Media Team and co-founder and director of the online Dominican newspaper "Clave Digital."]

Fausto: "A batey is a subgroup within the Dominican society. Its poor living conditions are marked by the neglect of the government. In the bateyes there aren't any health services, education services, nutrition services. There is no drinking water or electricity in these bateyes. These people do not have the backing, nor the interest or help from the society."
["El batey es una demarcación, un sub-grupo dentro de la sociedad Dominicana muy marginado aceptado por la desatención pública. No tienen servicios de salud, de educación, de alimentación, agua, electricidad. Igualmente tampoco tienen la inversión publica en ayuda o en interés."]

> Ana Mitila Lora (Tape U090):

Ana Mitila: "To tell you the truth – it is nothing new in the Dominican Republic. It's something that has a century, maybe a century since the sugar industry started. That's the way that it has worked. It's in slave conditions that people live there and they are like a big hand one century ago. It's incredible."

**Interrogatory No. 8:**    Please state all of the facts supporting the following statement, which begins approximately at 23:38 (Exhibit 1, pp. 18:21 – 19:5) in *The Price of Sugar*:

DARIO: "Merité counts the people and when there is a bad situation, like there is not water or anything. Merité himself stands outside and guards with a, club in his hands. If you don't walk fast enough he beats you."
*["Es Merite que cuenta a todas las personas y cuando ellas salen en una situación malo, malo.... pero no hay agua, no hay nada. Es la misma Merite se para afuera como un guardia. Ella como un, con un palo en la mano. Si una no anda rápido, el les da palo."]*

### E) Government Reports

> U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 6, 2007.
[www.state.gov/g/drl/rls/hrrpt/2006/78889.htm]

1) "At year's end there were allegations that some employers, specifically the Vicini Corporation, had resumed the practice of importing undocumented workers for the sugar fields." (Section 5, Page 13)

2) "Conditions for the agricultural workers were poor, particularly in the sugar industry. Most bateyes lacked schools, medical facilities, running water, and sewage systems and had high rates of disease. Company-provided housing was sub-standard. Most sugarcane workers were Haitian or of Haitian descent. In some *bateyes*, employers withheld a portion of wages to ensure that workers returned to the fields for the next season's harvest. Sugarcane workers often did not receive medical services or pensions due them even though deductions were taken from their pay." (Section 6E, Page 18)

Power Point presentation entitled "Investigacion Vicini" located on the internet:
[Note: This document is attributed to the Newlink PR company which was retained by the Vicinis. The document is dated March 30, 2007.]

"Data of the Group
Health: When the workers are refered to [medical] specialists, they have no way to get there because they lack transportation and economical resources."
*["Datos del Grupo. Salud: Cuando los trabajadores son remitidos a los especialistas no tienen manera de llegar a ellos porque carecen de transporte y de medios económicos."]*

"Less than a third of the batey households have direct access to water in their patio (24.9%). In the interior of the houses (8.0%). The lack of drinking water forces people to use and drink contaminated water, which produces diseases."
*["Menos de la tercera parte de los hogares de los bateyes tienen acceso directo a agua en el patio (24.9%). En el interior de su vivienda (8.0%). La carencia de agua potable obliga a la gente a utilizar y beber agua contaminada lo que les produce enfermedades."]*

"The social situation of the bateyes is perceived as critical and this suggests a great political threat since DR-CAFTA opened the competition."

**Interrogatory No. 11:**     Please state all of the facts supporting the following statement, which begins approximately at 54:32 and ends with a photograph of a newspaper headline (with English subtitle) (Exhibit 1, pp. 40:20 – 41:5) in *The Price of Sugar*:

|    |    | 40 |
|----|----|----|
| 20 | FATHER HARTLEY: As events have |
| 21 | unfolded in the past months, the sugarcane |
| 22 | industry has been trying to pressure me and |
|    |    | 41 |
| 1  | the people who work with me to basically back |
| 2  | off and to leave things the way they are. |
| 3  | ******** |
| 4  | (SUBTITLED): The Vicini want to kill |
| 5  | Los Llanos Priest. |

**RESPONSE:**

**A) Local Newspaper Published Statement that the Vicini want to kill Father Christopher Hartley.**

> Higuamo Newspaper, San Pedro de Macorís, Dominican Republic, November 16, 2003. Headline: "The Vicini want to kill the Priest of los Llanos.
... the work of Hartley and his demands for better life and work conditions for these people do not please the Company. The message he has received is clear: "Tell the Reverend, that one of these days they are going to find him on the mud with his mouth full of flies."
*["Los Vicini quieren matar sacerdote de los Llanos. Pero la labor de Hartley y sus exigencias de mejores condiciones de vida y trabajo para estas personas no agradan a los responsables del ingenio. El mensaje que le ha llegado es claro: "Dile al reverendo que cualquier día lo encontrarán en un carril de lodo con la boca llena de moscas".]*

**B) In 2005, several protests took place in the area of San Jose de los Llanos to create pressure to force Father Christopher out of the town.**

**July 17th**          **Protest organized by the "Movement for the Re-independence of San Jose de los Llanos"**

**October 12th**       **Protest over the distribution of 26 houses in batey Gautier**

**October 24th**       **24-hour strike in San Jose de los Llanos**

**November 7th**       **2 day protest**

> Newspaper Diario Libre. "Haitianos y Dominicanos se enfrentan por viviendas SPM" ("Haitians and Dominicans Fight Over Houses"). October 11, 2005.
[http://www.diariolibre.com/app/article.aspx?id=46172]

*[Quién?]*

Man #2: It was the Vicini who were paying for the people in the streets.
*[Los Vicini era que pagaban eso para la gente de la calle.]*

Cameraman: And who are the Vicini?
*[Y quiénes son los Vicini?]*

Man #2: A Company.
*[Una Compañía.]*

Cameraman: And why did they do that?
*[Y por qué hicieron eso?]*

Man #2: I don't know, because of the thing with the Haitians that the Father is cleaning up and taking the Haitians and that and it's because the Father doesn't want the Vicini to trick the Haitians and that... For the cane.
*[Yo no sé, dizque por la vaina de los Haitianos que el Padre esta aseando y llevándose a los Haitianos y eso y es porque el Padre no quiere que los están engañando a los Haitianos los Vicini y eso dizque... Por la caña.]*

Man #3: They went, on Saturday they went to San Pedro and on Friday they told me "Look, get up early because we are going to give you two hundred pesos to go with us to San Pedro". And I told them "But I am working, I cannot just go there". But they told me "Look, we are going to give you two hundred, it's two hundred pesos." "For two hundred pesos I cannot do it because I cannot leave my job for two hundred pesos". And I didn't go and now they keep calling me again and again, that they are going to give me two hundred pesos.
*[Ellos fueron, como el sábado fue que fueron a San Pedro y me y el viernes me dijeron "Mira, levántate temprano que te vamos a dar doscientos pesos para que vayas con nosotros a San Pedro". Y yo les dije "Pero yo estoy trabajando, yo no puedo coger e irme pa' ahí". Pero me dijeron "Oye, te vamos a dar doscientos, son doscientos". "Por doscientos pesos yo no puedo porque yo no puedo dejar mi trabajo por doscientos pesos". Y no fui y a cada rato me viven llamando, que me van a dar docientos pesos.]*

Man #4: They offer to put gas on my motorcycle so that I join the strike, but I am not doing that.
*[A mi mismo me echan gasolina al motor para que yo haga huelga y no he ido.]*

Cameraman: But who, where does the money come from? Who is offering it?
*[Pero quién, de dónde viene el dinero? Y quién está ofreciendo?]*

Men: The leaders, the leaders who are with the Vicini.
*[Los cabecillas, los cabecillas que estan con los Vicini.]*


**C) For several months, unfounded and false accusations were made blaming Father Christopher for the fires in several sugar cane mills:**

> Interview of Father Christopher (Tape U143):

Father Christopher: "One of the major accusations is that they accuse me of inciting people to burn the sugar cane fields, but to the tune of, of fifty thousand hectares. And they went to him to the Secretary of State for the Enforces to accuse me and he basically told them to get out of his office. He didn't believe them and he said, I know the Priest personally because he's been here in my office and I know that what you are saying is not true, but that gives you an idea of how far they are ready to go."

> U.S. Dept. of State Country Reports on Human Rights Practices: Dominican Republic. March 8, 2006
[http://www.state.gov/g/drl/rls/hrrpt/2006/78889.htm]
"Officials of the association of sugar industries regularly criticized the priest heading this effort, and newspapers carried unfounded allegations that he had encouraged workers to destroy property."

> Dominican Newspaper Diario Libre
[http://www.diariolibre.com/app/article.aspx?id=44705]
HEADLINE: "The burning of cane causes RD$350M in losses.
Faustino Jimenez, The Director of Inazucar, says that the traditional defenders of the Haitians in the country could be behind these actions. He revealed that as a result of the fires in the sugar cane plantations of the country, the sugar industry has lost over RD$350M. He didn't rule out the possibility that sectors of the country who defend the Haitians and dedicate themselves to discredit the country could be behind these fires. The Priests Ruquoy and Hartley are among those defenders."

*["Quema de caña causa pérdidas RD$350 MM. Faustino Jiménez dice que detrás de esas acciones podrían estar los tradicionales defensores de los haitianos en el país. El director del Instituto Azucarero Dominicano (Inazucar), Faustino Jiménez, reveló que como consecuencia de las quemas de plantaciones cañeras perpetradas por manos criminales en los ingenios del país, la industria azucarera ha tenido pérdidas por encima de los RD$350 millones en lo que va de año. El funcionario no descartó que detrás de esos incendios estén sectores que se dedican a desacreditar al país para justificar su defensa a los haitianos. Dijo que entre esos defensores de los haitianos están los sacerdotes Pedro Riquoy y Christopher Hartley."]*

> INAZUCAR, Instituto Azucarero Dominicano (Dominican Sugar Institute) Report, April 15, 2005 Writen by: Faustino Jimenez, executive director.
[http://www.inazucar.gov.do/]
"The Sugar Industry has been the victim, once more, of significant and criminal fires that have devastated an important part of the cane plantations, especially in the East Region of the country.... The most affected companies were Central Azucarera Consuelo ... and in second place, the Ingenio Cristobal Colon of the Vicini Company.... The less affected ones were Central Romana and Barahona."
*["La industria azucarera ha sido víctima una vez más de grandes y criminales incendios que han devastado una parte importante de las plantaciones de caña con énfasis en la Región Este*

78

# Exhibit 5

From FC: I have highlighted all references to the sugar industry, the paragraph before last refers to me.



## Dominican Republic

Country Reports on Human Rights Practices - 2006
Released by the Bureau of Democracy, Human Rights, and Labor
March 6, 2007

The Dominican Republic is a representative constitutional democracy with a population of approximately 9.2 million, including an estimated 650,000 to one million undocumented Haitians. In August 2004 President Leonel Fernandez of the Dominican Liberation Party (PLD) was elected for a second (nonconsecutive) term, and in May the PLD won majorities in both chambers of Congress during congressional and municipal elections. Impartial outside observers assessed both elections as generally free and fair. While civilian authorities generally maintained effective control of the security forces, there were some instances in which elements of the security forces acted independently of government authority.

Although the government's human rights record improved somewhat, serious problems remained: unlawful killings; beatings and other abuse of suspects, detainees, and prisoners; poor to harsh prison conditions; arbitrary arrest and detention of suspects; severe discrimination against Haitian migrants and their descendants; widespread perceptions of corruption; violence and discrimination against women; child prostitution and other abuse of children; trafficking in persons; and disregard of fundamental labor rights.

The government's new police chief implemented changes that diminished the level of killings and other abuse carried out by security forces and in some cases prosecuted those suspected of misconduct. Continued implementation of the new Criminal Procedures Code provided detainees additional protections, enhanced due process, and improved respect for detainee rights.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

Although the government or its agents did not commit any politically motivated killings, security forces were involved in many killings that were unlawful, unwarranted, or involved excessive use of force.

UP26169

Many participants reported that mediation facilitated by the Secretariat of Labor was the most effective method for resolving worker-company disputes.

The law provides for the right of most workers to strike (and for private sector employers to lock out workers), but formal strikes were not common. Formal requirements for a strike include the support of an absolute majority of all company workers whether unionized or not, a prior attempt to resolve the conflict through mediation, written notification to the Ministry of Labor, and a 10-day waiting period following notification before proceeding with the strike.

Government workers and essential public service personnel are not allowed to strike. Government-employed physicians of the Dominican Medical Association threatened to strike in midyear but cancelled their plan following last-minute negotiations with the president's office.

A few labor unions represented a small number of Haitian workers, who are covered by the Labor Code regardless of legal status. Various NGOs reported that **the majority of Haitian laborers in the sugar** and construction industries did not exercise their rights, fearing firing or deportation.

The Labor Code applies in the 57 established FTZs, which employed approximately 155,000 workers. According to the National Council of Labor Unions, unions were active in only four companies in the FTZs. Workplace regulations and their enforcement in the FTZs did not differ from those in the country at large, although working conditions were sometimes better and the pay was occasionally higher. Mandatory overtime was a common practice, and it was sometimes enforced through locked doors or loss of pay or employment for those who refused.

There were reports of widespread covert intimidation by employers in the FTZs in an effort to prevent union activity (see section 6.a.). Unions in the FTZs reported that their members hesitated to discuss union activity at work, even during break time, for fear of losing their jobs. Some FTZ companies were accused of discharging workers who attempted to organize unions. The majority of the unions in the FTZs were affiliated with the National Federation of Free Trade Zone Workers (FENATRAZONAS) or FEDOTRAZONAS. FEDOTRAZONAS estimated that fewer than 10 percent of the workers in the FTZs were unionized. Many of the major manufacturers in the FTZs had voluntary codes of conduct that included worker rights protection clauses generally consistent with the ILO Declaration on Fundamental Principles and Rights at Work. However, workers were not always aware of such codes or of the principles they contained.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced or compulsory labor, and there no longer were reports that it occurred. In previous years managers regularly prohibited workers on sugarcane plantations from leaving during the harvest, but it appeared that this was no longer the case (see section 5).

d. Prohibition of Child Labor and Minimum Age for Employment

While the law prohibits employment of children younger than 14 years of age and places restrictions on the employment of children under the age of 16, child labor was a serious problem. The Central Bank's Statistics Department estimated that throughout the first half of the year more than 157,000 children, including 15.7 percent of children between the ages of 14 and 17, engaged in some sort of work, although bank officials conceded that the actual proportion of child laborers was much higher than these statistics indicated. Regulations limited working hours of those between the ages of 14 and 16 to six hours per day, prohibited employment of those under the age of 18 in hazardous occupations or in establishments serving alcohol, and limited nighttime work. Fines and legal sanctions may be applied to firms employing underage children. While the government effectively enforced these regulations in the formal sector, child labor was largely a problem in the informal sector beyond regulatory reach.

The high level of overall unemployment, an insufficient social safety net, and the lack of educational or recreational alternatives created pressures on families to allow or encourage children to earn supplemental income. According to the ILO, 90 percent of child laborers began working before the age of 14. Child labor

UP26189

UP26189

took place primarily in the informal economy, small businesses, private households, and agriculture. Children often accompanied their parents to work in agricultural fields, in part because parents had nowhere else to leave their children, since schools in the countryside were usually in session only for a few hours a day. The commercial sexual exploitation of children remained a problem, especially in popular tourist destinations (see section 5, Trafficking).

There was some inconclusive evidence that poor Haitian families arranged for Dominican families to "adopt" and employ their children, in hopes of assuring a more promising future for them. The adoptive parents were alleged to register the child as their own. In exchange the birth parents received monetary payment or a supply of clothes and food. In many cases adoptive parents were said not to treat the adopted children as full family members, expecting them to work in the households or family businesses rather than to attend school. This was alleged to result in a kind of indentured servitude for children and adolescents.

The Ministry of Labor and other government institutions, as well as organizations from civil society, collaborated with the ILO's Program for the Elimination of Child Labor and other international labor rights organizations to continue programs combating child labor. These included programs to eliminate the employment of children in hazardous agriculture in the rice-growing region around San Francisco de Macoris and the agricultural provinces of Constanza, San Juan de la Maguana, and Barahona. The effort also included a program to combat the commercial sexual exploitation of minors in popular tourist destinations such as Boca Chica, Sosua, and Las Terrenas. These programs provided psychological support and medical assistance, returned children to classrooms, and reunited children with their families and communities whenever possible. The programs also provided legal assistance to child victims in order to arrest and convict exploiters.

According to the Secretariat of Labor, approximately 28,000 children either actively working or at risk of exploitation benefited from child labor prevention and withdrawal programs. The National Steering Committee against Child Labor adopted a National Strategic Plan to Eliminate the Worst Forms of Child Labor. This plan set objectives, identified priorities, and assigned responsibilities so that exploitive labor could be efficiently tackled and the number of child laborers significantly reduced by 2016.

The Ministries of Labor and Education continued to support the Combating Child Labor through Education program, which established several camps that hosted large numbers of children and adolescents.

There were no confirmed reports of forced child labor in the formal sector.

e. Acceptable Conditions of Work

The executive branch sets minimum wage levels for public workers, and the National Salary Committee sets levels for the private sector, with the exception of workers in the FTZs and the sugar, construction, hotel, and shoe manufacturing industries. The minimum monthly salary was approximately $139 (4,450 pesos) in the FTZs and $200 (6,400 pesos) outside the FTZs. The minimum wage for the public sector was approximately $81 (2,600 pesos) per month. The daily minimum wage for farm workers covered by minimum wage regulations was approximately $4.00 (130 pesos), based on a 10-hour day. The national minimum wage did not provide a decent standard of living for a worker and family.

The law establishes a standard work period of 44 hours per week and stipulates that all workers are entitled to 36 hours of uninterrupted rest each week. The law provides for premium pay for overtime, which was mandatory at some firms in the FTZs.

On sugar plantations, cane cutters usually were paid by the weight of cane cut rather than the hours worked. Observers suspected fraud at some weighing stations and noted that employers sometimes did not provide trucks or carts to transport the newly cut cane at the end of the workday, causing workers to receive lower compensation because the cane dried out overnight and weighed less. The amount of cane a worker could cut varied, but many cane cutters earned less than $2.50 (75 pesos) per day.

Conditions for agricultural workers were poor, particularly in the sugar industry. Most bateyes

lacked schools, medical facilities, running water, and sewage systems and had high rates of disease. Company-provided housing was sub-standard (see section 5). Most sugarcane workers were Haitian or of Haitian descent. In some bateyes, employers withheld a portion of wages to ensure that workers returned to the fields for the next season's harvest. Sugarcane workers often did not receive medical services or pensions due them even though deductions were taken from their pay.

The Diocese of San Pedro de Macoris continued to promote worker rights in the bateyes and to seek a work contract for cane workers. Officials of the association of sugar industries criticized the priest heading this effort, who was abruptly recalled and departed the country in October. Media reports indicated that the diocese abandoned the many projects the priest had managed on behalf of batey residents.

The Dominican Social Security Institute (IDSS) sets workplace safety and health conditions. Both the IDSS and the Ministry of Labor had a small corps of inspectors charged with enforcing standards. The Secretariat of Labor had 185 active inspectors. Inspector positions customarily were filled through political patronage, and inspectors typically took bribes from businesses. Workers complained that inspectors were not trained and did not respond to health and safety complaints. While the law requires that employers provide a safe working environment, in practice workers could not remove themselves from hazardous working situations without losing their jobs.

UP26191

UP26191

# Exhibit 6

| | |
|---|---|
| **From:** | "Chrstopher Hartley" <hartley.christopher@gmail.com> |
| **To:** | "Ted Bryan (Embajada USA)" <BryanAT@state.gov> |
| **Sent:** | Sunday, January 28, 2007 11:39 AM |
| **Attach:** | Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 021.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 022.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 023.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 024.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 025.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 026.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 027.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 028.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 029.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 030.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 031.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 032.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 033.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 034.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 035.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 036.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 037.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 038.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 039.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 040.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 041.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 042.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 043.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 044.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 045.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 046.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 047.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 048.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 049.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 050.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 051.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 052.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 053.jpg; Ninos sembrando. Santa Lucia (Vicini) 26 Junio 2006 054.jpg |
| **Subject:** | 2006 Human Rights Report |

Dear Ted.

I hope all is well with you.

I imagine you must be coming to the final stages of the 2006 HHRR Report.

I would like to insist very strongly that you please don't forget to continue to mention the Vicini corporation by name.

If you recall, some months ago I forwarded photographs and videos take by me, in the month of June, of children sowing the sugar cane fields of the Vicini family (batey Santa Lucia to be precise). As in reports of years past, I hope this be denounced in the strongest terms by the Department of State's Human Rights Report. If these reports traditionally do not hesitate to mention other institutions (government or private) as well as private citizens by name; I think there is no reason to make exceptions with the rich and the powerful.

To drop their name at this point would be very misleading of what is really going o in the sugar cane fields. The fact that the sugar industry is a little less of a hell, does not imply, by any stretch of the imagination, that it is still not a living hell of a place to live and work in.

We will never be able to thank Shelby Smith-Wilson and Neda Brown for their courage and commitment in this regard.

Wish you all the best and a big thanks for your very hard work over this past year.

In Christ.

Fr. Christopher

UP20156

# Exhibit 7

**Barnert, Christopher**

| | |
|---|---|
| **From:** | Chrstopher Hartley [hartley.christopher@gmail.com] |
| **Sent:** | Monday, October 23, 2006 3:59 AM |
| **To:** | Garuckis, Michael J |
| **Subject:** | RE: nuevo e-mail/new e-mail |

Dear Michael.

I am at home with my parents. My father is in very poor health, so I will be spending some time with them. Nevertheless, it is also true I have been told to leave by the Church authorities under pressure of the Dominican Government and most specially de Vicini and Fanjul families. So I will not be returning to the DR; I am no longer Parish Priest of San José de Los Llanos.

She is a contact person you can blindly trust, I recommend Mrs. Noemí Mendez. CEDAIL with whom I worked hand in hand over these past nine years. She knows all the Vicini and CEA bateyes we visited together and can be a very useful contact for you and your colleges al the Embassy. Her cell phone is: 829 427-8196. Her e-mail address: naomicastro2003@yahoo.com

If you need any further info re what happened, do not hesitate to ask.

These are very sad days for me. If I can be of any service, just let me know.

God bless.

Father

---

**De:** Garuckis, Michael J [mailto:GaruckisMJ@state.gov]
**Enviado el:** lunes, 02 de octubre de 2006 14:23
**Para:** Christopher Hartley
**CC:** Bryan, Alexander T
**Asunto:** RE: nuevo e-mail/new e-mail

Good morning Father,

Hoping that you're still here -- Diario Libre this morning is writing that you've returned to NY...
If that's true and it was a problem here on the Dominican end (e.g., with the government) we'd sure love to know about it.

If not, it would be great if you could drop Ted and me a quick note in any case.

Take care,
Michael

6/11/2008

STATE000014

STATE000014

# Exhibit 8

**Min, Royce B**

| | |
|---|---|
| **From:** | Chrstopher Hartley [hartley.christopher@gmail.com] |
| **Sent:** | Sunday, December 10, 2006 12:55 PM |
| **To:** | Bryan, Alexander T |
| **Subject:** | RE: a big thanks |

**You will be surprised to know how very happy Noemí is as a result of the visit. Give her a call and you will be pleasantly surprised at her reaction!!**

---

**De:** Bryan, Alexander T [mailto:BryanAT@state.gov]
**Enviado el:** lunes, 11 de diciembre de 2006 18:48
**Para:** Chrstopher Hartley
**Asunto:** RE: a big thanks

Hi Father Hartley,

I thought that the visit went very well. Of course, the press reports what they want to report. The CODEL arrived much later than anticipated; they were supposed to arrive on Friday but didn't get here until Saturday around 1:30pm. So we really had to condense the trip a lot. But I kept the visit to the bateyes, and when were running very late I fought hard to keep the portion with CEDAIL. Unfortunately we had to shorten it a lot, and for that I think the folks at CEDAIL, Noemi included, aren't very happy with me right now. But the most important thing is that they got to do it all. They were an hour and a half late to their meeting with Morales Troncoso, and two hours late to their own reception (!), but I nonetheless believe the trip was a successful one both for us and for them.

The outcome of this visit? Unknown. You know very well how paranoid Dominicans tend to react to perceived outside "interference" on the Haitian issue.

I couldn't help but laugh at yesterday's headline in Diario Libre that you had come out of hiding to meet with us. Where on earth do people come up with this garbage? It really makes you wonder.

Thanks again for all of your help, and for putting me in touch with CEDAIL. They did a great job.

-Ted

---

**From:** Chrstopher Hartley [mailto:hartley.christopher@gmail.com]
**Sent:** Sunday, December 10, 2006 8:05 AM
**To:** Bryan, Alexander T
**Subject:** a big thanks

**Dear Ted.**

**I just wanted to drop a note of gratitude for the very hard work you put in**

6/25/2008

STATE000703

to the planning of the Congressional visit to the bateyes. I am very interested to know your opinion if you think you can share it. I am also interested to have any feedback from the Embassy staff that participated. Any idea what you anticipate might be the outcome of this visit?

By the way:

Did you know the Vicini tore down the kitchens of the Haitian families in Batey Cayacoa (their constructions have no kitchen inside the house) just because "they didn't look nice" for the visit. Today all those women are cooking in the open on the bare soil as a result.

Did you know that 24 hours before you arrived to Cayacoa, 20 Haitians were smuggled into Batey Cayacoa, the night before and brought there in private pickups.

The harvesting machines were placed there strategically, as living proof that all the harvesting was mechanized and not done through manual labour.

Wish you all the best and hope to hear from you soon.

God bless.


Father


6/25/2008

STATE000704

# Exhibit 9

**Barnert, Christopher**

| | |
|---|---|
| **From:** | Christopher Hartley [hartley.christopher@gmail.com] |
| **Sent:** | Tuesday, April 03, 2007 1:43 AM |
| **To:** | Christopher Hartley |
| **Subject:** | RV: Listín Diario Digital - El periódico de los dominicanos |

**Attachments:** DR-CAFTA Labor Rights Issues (CRS Rpt).pdf; Procedural Guidelines - DR-CAFTA Labor Submissions.doc

 

DR-CAFTA Labor    Procedural
Rights Issues (...   uidelines - DR-CAF.

```
-----Mensaje original-----
De: Bryan, Alexander T [mailto:BryanAT@state.gov] Enviado cl: luncs, 02 dc abril dc 2007
22:30
Para: Christopher Hartley
Asunto: RE: Listín Diario Digital - El periódico de los dominicanos
```

Father Hartley,

It was great speaking with you the other day, thanks for your kind words.

As you know, the Embassy has taken a more active role on a range of human rights concerns
in recent months. One area that I wanted to bring to your attention is the existence of a
mechanism in DR-CAFTA to file "submissions"
(complaints) alleging the violation of a country's labor laws. Those submissions can
result in fines of up to USD $15 million per year.

Please see the attached documents for more information on this. I will also be meeting
with Noemi next week to discuss this very issue.

I hope all is well for you. We are working hard in your absence, don't you worry. Take
care and stay in touch.

Regards,
Ted

1

STATE000098

# Exhibit 10

## Min, Royce B

**From:**    Christopher Hartley [hartley.christopher@gmail.com]
**Sent:**    Tuesday, June 26, 2007 11:51 AM
**To:**      Bryan, Alexander T
**Subject:** RE: (no subject)

Dear Ted

Sorry to hear, you will be missed by all of us, you have done an outstanding job. You will never know how much good has come - and will come in the future - to the many thousands you helped get a better life.

You will be interested to know I spent all of yesterday in DC. The morning at State (David Searby and many others) and the afternoon on the Hill, coordinated by Clare Ribando. I had a very long, very interesting conversation with Jason Steinbaum, who as you know is the Staff Director of the Subcommittee on the Western Hemisphere. Will continue to work together.

We will be delighted to continue working with José Silva, please give him Noemí´s e-mail and phone.

Wish you all the best and hope to keep in touch.

God be with you always

Father

PS I fly back to Madrid tomorrow from JFK

---

**De:** Bryan, Alexander T [mailto:BryanAT@state.gov]
**Enviado el:** martes, 26 de junio de 2007 7:35
**Para:** Christopher Hartley
**CC:** Silva, Jose D
**Asunto:** RE: (no subject)

Hello Father Hartley,

I am leaving the Dominican Republic in two weeks, and will be replaced as human rights and labor officer in August by Jose Silva, who is currently working in the Embassy's consular section. Would you mind adding him to your e-mail distribution list? He is copied on this e-mail.

Thanks,
Ted

---

**From:** Christopher Hartley [mailto:hartley.christopher@gmail.com]
**Sent:** Tuesday, June 26, 2007 11:29 AM
**To:** Christopher Hartley
**Subject:** RV: (no subject)
**Importance:** High

Please pay attention to this.

6/25/2008                                                              STATE000756

# Exhibit 11

**Wilkinson, Nigel**

| | |
|---|---|
| **From:** | Zimmitti, Andrew |
| **Sent:** | Friday, July 18, 2008 1:54 PM |
| **To:** | Wilkinson, Nigel |
| **Subject:** | FW: Lluberes v. Uncommon Prods., LLC -- Re: Hertell Subpoena |

```
-----Original Message-----
From: Hudak, Brian (USADC) [mailto:Brian.Hudak@usdoj.gov]
Sent: Monday, June 16, 2008 6:59 PM
To: Chew, Benjamin
Cc: Zimmitti, Andrew; Min, Royce B
Subject: RE: Lluberes v. Uncommon Prods., LLC -- Re: Hertell Subpoena

Ben -- I hope you are doing well.  As I told Andrew on the phone earlier
today, I am in receipt of your email attaching the subpoena addressed to
Ambassador Hertell.  I believe that it is improper under State
Department regulations, which have effect of law.   Specifically,
pursuant to 22 C.F.R. Sect. 172.3, any subpoena of Ambassador Hertell
seeking information he acquired in the course and scope of the
performance of his official duties with the Department of State is
improperly served on Ambassador Hertell by the service indicated in your
attachments.

A formal objection to this subpoena is forthcoming.

Best regards,
Brian

Brian Hudak
Assistant United States Attorney
555 4th Street NW
Washington, DC 20530
(202) 514-7143


-----Original Message-----
From: Chew, Benjamin [mailto:bchew@PattonBoggs.com]
Sent: Sunday, June 15, 2008 3:12 PM
To: Hudak, Brian (USADC)
Cc: Betsy Koch; Elizabeth Koch
Subject: Courtesy Copy of Hertell Subpoena & Affidavit of Service


Dear Brian,

Hope you are enjoying the weekend.

Attached FYI is a courtesy copy of the deposition subpoena and Affidavit
of Service for the new subpoena on former Ambassador Hertell, whose
deposition will take place in our Washington, D.C. offices on Monday,
July 21 at 9:00 a.m.

Very truly yours,

Ben


> _____
>
>
> <<2008-06-13 Hertell Affidavit of Service.pdf>>  <<Hertell Subpoena &
```

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FELIPE VICINI LLUBERES and JUAN VICINI LLUBERES**<br><br>           **Plaintiffs/Movants,**<br><br>    **v.**<br><br>**UNITED STATES DEPARTMENT OF STATE,**<br><br>          **Respondent.** | **CASE NO.  08-0384 (RJL)** |

## <u>ORDER</u>

UPON CONSIDERATION of Plaintiffs/Movants Felipe Vicini Lluberes' and Juan Vicini Lluberes' ("Plaintiffs" or the "Vicinis") Motion to Compel Deposition Testimony Pursuant to Subpoenas, memorandum in support thereof, Respondent United States Department of State's ("State") Opposition thereto and Cross Motion to Quash, the reply briefs of the parties, the argument of counsel and the record, it is hereby ORDERED that:

1.      Plaintiffs'/Movants' Motion to Compel is GRANTED;

2.      Respondent State's Cross Motion to Quash is DENIED;

3.      Respondent State shall make the following current and/or former employees available for deposition by Plaintiffs at a location and on a date to be determined by the parties on or before August 11, 2008:

        a.      Alexander T. Bryan

        b.      Michael J. Garuckis

        c.      Former Ambassador Hans H. Hertell

        d.      David Searby

4.      All parties are to bear their own costs associated with the ordered depositions.


Dated:  July ____, 2008                    _____
                                           UNITED STATES DISTRICT JUDGE

Copies to:

Brian P. Hudak, Esq.
Assistant United States Attorney
U.S. Department of Justice
Judiciary Center
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone:     (202) 514-7143
E-mail:          brian.hudak@usdoj.gov
and

Royce Min, Esq.
Office of the Legal Adviser
United States Department of State
2201 C Street, N.W.
Washington, D.C.  20520
Telephone:     (202) 647-6823
E-mail:          minrb@state.gov

*Counsel for Respondent the United States Department of
State*

Read K. McCaffrey, Esq.
Stephen Díaz Gavin, Esq.
Benjamin G. Chew, Esq. (D.C. Bar #418577)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
Telephone:  (202) 457-6000
Facsimile:   (202) 457-6315
E-mail:       bchew@pattonboggs.com

*Counsel for Plaintiffs/Movants Felipe Vicini Lluberes
and Juan Vicini Lluberes*

Elizabeth C. Koch, Esq.
LEVINE SULLIVAN KOCH & SHULTZ,
LLP
1050 17th Street, NW
Suite 800
Washington, DC  20036
Telephone:  (202) 508-1100
Facsimile:   (202) 861-9888
E-mail:       ekoch@lskslaw.com

*Counsel for Defendants in the Underlying Action,
William Haney and Uncommon Productions LLC*